UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 4:17-CR-866-RBH |
| BRANDON COUNCIL, | ) ) | |
| Defendant-Appellant. | ) ) | |

**DEFENDANT'S MOTION TO VACATE
SENTENCES OF DEATH BY ELECTROCUTION**

Defendant Brandon Council moves the Court, under Federal Rule of Criminal Procedure 33, to vacate his death sentences. According to the federal execution statute and this Court's judgment, he is sentenced to be executed by the method prescribed by South Carolina law because that is the state where this Court is located. Two months ago, South Carolina enacted a new statute substituting electrocution for lethal injection as the default method of execution and, at present, the only legally available one. Thus, Council now stands sentenced to death by electrocution. This is a barbaric form of capital punishment that has been widely abandoned because of "its specter of excruciating pain and its certainty of cooked

brains and blistered bodies." *Dawson v State*, 554 S.E.2d 137, 143-44 (Ga. 2001) (electrocution "inflicts purposeless physical violence and needless mutilation that makes no measurable contribution to accepted goals of punishment"); *State v. Mata*, 745 N.W.2d 229, 278-79 (Neb. 2008) ("electrocution inflicts intense pain and agonizing suffering" — "a human being is electrically on fire" — and its "proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man"). South Carolina is the only jurisdiction in not just the country but the world that makes electrocution the presumptive method for carrying out death sentences.

Council challenges, on its face and as applied to his case, the constitutionality of the federal statute, 18 U.S.C. § 3596, that incorporates South Carolina's manner of execution. By carrying over to his sentence the state's switch to the electric chair, a significantly more inhumane method, § 3596 violates his rights against *ex post facto* punishments and cruel and unusual ones, against delegations of federal legislative and judicial power to state officials, and to equal protection and due process, under Article I, Section 1 and Article III, Section 3 of the Constitution, and the Fifth and Eighth Amendments.

Council's attorneys have contacted counsel for the government at the

2

Department of Justice, Joshua Handell, who states that the government opposes this motion and will be filing response.

In support of the motion, counsel state as follows:

## A.     Procedural Background

1.     Council was convicted of bank robbery and murder with a firearm at a jury trial, and, following the jury's recommendation, sentenced to death by this Court in October 2019.

2.     When the Court entered judgment, it directed that Council be put to death "in the manner prescribed by the law of the State in which the sentence is imposed," *i.e.*, South Carolina.  (DE #860, at 3).  This tracked the federal execution statute, which requires "implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed."  § 3596(a); *see In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020); *id.* at 135 (Rao, J., concurring) ("Congress enacted a federalist scheme, incorporating state law as to the 'manner' of death penalty implementation"); Dep't of Justice, Office of the Attorney General, *Manner of Federal Executions*, 85 FR 47324, 47325 (Aug. 5, 2020) (should a State "provide that a manner other than lethal injection is the only authorized means of execution, Section 3596(a) would then require execution in that manner for a Federal

offender sentenced in the State").  At the time of Council's sentencing, the

default manner of execution in South Carolina was lethal injection.  S.C.

Stat. § 24-3-530(A) (1995) (absent election otherwise, "the penalty must be

administered by lethal injection"); Order, *Owens v. Stirling*, No.

2021CP4002306, Slip op. at 2 (Richland Cty., S.C. June 10, 2021) ("lethal

injection was the default method of execution").

3.    Shortly after judgment was entered, Council filed a timely

motion under Rule 33 challenging his death sentences.  (DE #866).  He

claimed that § 3596(b) is unconstitutional because it delegates the power to

set the manner of his execution to the evolving choices of state officials in

the state where he happened to be federally sentenced, South Carolina.  He

argued that "if on some future date . . . the state legislature amends its

capital statute to provide for a different form of capital punishment ... no

matter how novel or problematic, that presumably would, by operation of

the judgment, become the new punishment ordered by this Court for Mr.

Council." (*Id*. at 7-8).  The Court rejected that claim, finding no

unconstitutional delegation in Congress's and the Court's leaving the choice

of how Council is sentenced to die to "South Carolina law."[1]  (DE #869 at 7-

---

[1] The Court also rejected Council's claim that § 3596 constituted an
impermissible delegation of Congressional power to this Court.  (DE #869

8).

4. Council timely appealed his convictions and death sentences. (DE #872). That appeal remains pending in the United States Court of Appeals for the Fourth Circuit. Council's opening brief is currently due to be filed on October 14, 2021.

5. Two months ago, though, South Carolina's legislature took a step that effectively altered Council's punishment: It changed the default method of execution under state law to electrocution: "A person . . . having imposed upon him the sentence of death shall suffer the penalty by electrocution . . . . If the convicted person waives the right of election, then the penalty must be administered by electrocution." S.C. Stat. § 24-3-530 (May 14, 2021). This change applies in all cases, including to defendants previously sentenced to death. *Id.*

6. The new statute does purport to permit a condemned prisoner to opt to be executed instead "by firing squad or lethal injection," but *not* if the alternative method has been "certified . . . to be unavailable" by the state's Director of the Department of Corrections. *Id.* And last month, shortly after the statute was amended, that certification was formally filed with the

---

at 7-8; DE #866 at 7). Council maintains that claim, but the new state statute does not require him to address it further in this motion.

South Carolina Supreme Court.  Affidavit of Director of S.C. Dep't of Corrections, *State v. Sigmon*, No. 2002-024388 (S.C. June 3, 2021) (Exhibit A) ("I hereby certify that, as of this date, the only statutorily approved method of execution available to the South Carolina Department of Corrections is electrocution.").  The state corrections director informed the state supreme court that lethal-injection drugs are unavailable and expected to remain so indefinitely, and that there was also no timetable for creating protocols to carry out executions by firing squad.  Response, *State v. Sigmon*, No. 2002-024388 (S.C. June 8, 2021) (Exhibit B).[2]

7.    Accordingly, the federal execution statute and this Court's judgment now provide that Council be put to death by electrocution, since it currently constitutes the "manner" of execution prescribed by South Carolina law.  *See United States v. Higgs*, 141 S. Ct. 645 (2021).[3]  Indeed,

_____

[2] Thereafter, the South Carolina Supreme Court halted executions until it receives notice that the Department of Corrections has created and implemented such procedures for firing-squad executions.  Order, *State v. Sigmon*, No. 2002–024388 (S.C. June 16, 2021).

[3] In *Higgs*, a federal defendant had been death sentenced in Maryland when capital punishment was lawful in the state and lethal injection was the prescribed execution method.  The district court's judgment, like Council's, had sentenced Higgs to die in the manner provided for by the state in which he was sentenced, citing § 3596.  *See United States v. Higgs*, 2020 WL 7707165, at *3 (D. Md. Dec. 29, 2020), *rev'd*, 141 S. Ct. 645 (2021).  After Maryland subsequently abolished the death penalty, the Supreme Court ordered the district court to redesignate a new state in

the government has specifically represented that, if a state's law provides that condemned prisoners be executed by electrocution, it would have to follow § 3596 and thus use an electric chair to execute a federal prisoner from that state. *See* Government's Reply, *In the Matter of Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145, DE #191, at 19 (D.D.C. Aug. 13, 2020). The government also has indicated that it might use the state's correctional staff or its electric chair as "the most expedient means of carrying out" such an execution. Dep't of Justice, Office of the Attorney General, *Manner of Federal Executions*, 85 FR 75846, 75847 (Nov. 27, 2020).

## B.    Jurisdiction and Timeliness

8.    This post-trial Rule 33 motion is jurisdictionally proper though it

---

which it remained lawful (Indiana, where the federal death chamber is housed), whose manner of execution, lethal injection, would be used to execute Higgs. *See id.*; *see also* 18 U.S.C. § 3596(a) ("If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law."). *Higgs* confirms that the operative state law, under § 3596 and Council's judgment, is the new South Carolina execution statute, not the old one. In *Higgs*, the government acknowledged this, never suggesting it could execute him by lethal injection simply because that had been the approved method in Maryland when he was sentenced. *See* Petition for Writ of Certiorari, at 13-14, *United States v. Higgs*, No. 20-927 (Jan. 11, 2021).

challenges Council's death sentence rather than his convictions. *See United States v. Lawrence*, 555 F.3d 254, 261-263 (6th Cir. 2009); *United States v. Lee*, 274 F.3d 485, 493-494 (8th Cir. 2001); *United States v. Runyon*, 652 F. Supp. 2d 716, 718 (E.D. Va. 2009); *see also* DE #869 at 2 (this Court agrees it has authority to entertain such a post-trial challenge).

9.     This motion is also timely though it is filed beyond the ordinary 14-day time limit for a Rule 33 motion. Rule 45 authorizes this Court to extend that or any other deadline for "good cause" and based on "excusable neglect."[4] Fed. R. Crim. P. 45(b)(1)(B); *see* Fed. R. Crim. P. 33, Adv. Comm. Notes (2005 Amendments) ("if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider the untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect"). *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993) (determination of "excusable neglect" turns on "the danger of prejudice to the [nonmoving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether

---

[4] To the extent the Court would be reconsidering its denial of Council's original Rule 33 motion, the timing of this motion is still amply justified under Rule 45.

it was within the reasonable control of the movant, and whether the movant acted in good faith"); *United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010) (applying this standard to out-of-time Rule 33 motion).

10. Certainly the standard is satisfied here. The statutory change in South Carolina giving rise to this motion occurred well after the deadline passed. And following that change two months ago, and the state's certification last month that electrocution is the only available method, Council's attorneys have acted expeditiously in preparing and filing this motion, before briefing commences in his appeal. Moreover, the government is not prejudiced by having to respond to the motion now. *See, e.g., United States v. Kirsch*, 151 F. Supp.3d 311, 314-15 (W.D.N.Y. 2015) (allowing second motion for new trial, filed 15 months after deadline, because "a significant intervening change in law constitutes a valid basis to extend time under Rule 45(b)"); *see also, e.g., United States v. Robinson*, 2019 WL 7985173, at *2 (W.D. Tenn. Nov. 19, 2019); *United States v. Collins*, 2019 WL 3432591, at *2 n.1 (S.D. W.Va. July 30, 2019); *United States v. Sprouse*, 2011 WL 2414322, at **3-5 (W.D.N.C. June 10, 2011), *rev'd on other grounds*, 517 Fed. Appx. 199 (4th Cir. 2013); *United States v. Maricle*, 2010 WL 3927570, at **3-4 (E.D. Ky. Oct. 4, 2010).

11. Alternatively, to the extent the new South Carolina statute is

considered a new fact rather than new law (because it is a state statute rather than a federal one), the Court should consider this motion as one "grounded on newly discovered evidence," which, under the rule, is timely because it is being filed "within 3 years after the verdict or finding of guilty."[5]  Fed. R. Rule Crim. P. 33(b)(1).  Under this provision, though the appeal is pending, the Court would have jurisdiction over the motion, and could either deny it on the merits or certify an intention to grant it so that the Fourth Circuit could, if it wished, remand the case.  *Id.*; *see United States v. Christy*, 3 F.3d 765, 768 n.3 (4th Cir. 1993); *United States v. Russell*, 971 F.2d 1098, 1112 n.28 (4th Cir. 1992); *see also* Fed. R. Crim. P. 37; *United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984).

12.   Council's claims in this motion are also ripe and should be adjudicated now in his criminal case rather than deferred to a later collateral proceeding under 28 U.S.C. § 2241 or a civil suit against the Federal Bureau of Prisons.  As discussed below, this motion does not merely contest how a valid sentence Council received is to be implemented.  *See United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004); *In re Vial*, 115

---

[5] Newly discovered evidence "need not relate only to the question of guilt or innocence, but may be factual evidence that is probative of another controlling issue of law."  Wright & Miller, 3 *Fed. Prac. & Proc. Crim.* § 583 (4th ed. Apr. 2021 update).

F.3d 1192, 1194 n.5 (4th Cir. 1997); *Higgs v. United States*, 711 F. Supp. 2d 479, 556 (D. Md. 2010) (challenge to BOP protocol for administering lethal injection had to be brought in § 2241 action rather than criminal case). Rather, he argues that the unconstitutionality of § 3596 and his sentences of death by electrocution require that the sentences themselves be vacated. *See United States v. Bourgeois*, 423 F.3d 501, 509-10 (5th Cir. 2005) (addressing on direct appeal death-sentenced prisoner's challenge to constitutionality of § 3596); *United States v. Battle*, 173 F.3d 1343, 1350 & n.2 (11th Cir. 1999) (same); *United States v. Tipton*, 90 F.3d 861, 901-903 (4th Cir. 1996) (same, for predecessor statute); *see also Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1203 (11th Cir. 2020) (challenge to constitutionality of state's only lawfully available method of execution should be brought in the criminal proceeding).

13.   Furthermore, Council's *ex post facto* claim is specifically ripe, regardless of what may happen in the future, since, as the Supreme Court has explained, "[t]he inquiry" into whether a law "inflict[s]a greater punishment" "looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual." *Weaver v. Graham*, 450 U.S. 24, 33 (1981); *Lindsey v. Washington*, 301 U.S. 397, 400-01 (1937); *McCall v. Dretke*, 390 F.3d 358, 362 (5th Cir.

2004) (finding ripeness where "harm asserted by McCall is the allegedly *ex post facto* application" of new statute that made his eligibility for supervised release discretionary rather than mandatory, "not the actual denial"of supervised release ); *see also* Section D.2, *post.*

14.   Presumably the government will agree the serious issues raised in this motion should be adjudicated now, as early in the appellate process as possible.  For when various of the 13 federal prisoners the government put to death during the last administration interposed legal challenges to their executions, the government castigated them for not presenting those issues earlier, and successfully persuaded the courts that their claims should be defaulted or summarily denied as untimely.  *See, e.g.*, Government's Application to Vacate Stay, at 7, 32-35, *Barr v. Lee*, No. 20A8 (July 13, 2020) (accusing prisoners of "abusive delay" for not raising sooner their claim that lethal injection under BOP protocol is cruel and unusual punishment); *Barr v. Lee*, 140 S. Ct. 2590, 2590-91 (2020) (accepting government's argument and vacating stay of execution for prisoners convicted "decades ago"); *cf.* Attorney General Merrick Garland, *Memorandum: Moratorium on Federal Executions Pending Review of Policies and Procedures* (July 1, 2021) (though Supreme Court in *Barr v. Lee* denied late-stage challenge, "important questions" about whether lethal

injection may cause "unnecessary pain and suffering" justify suspending executions and reviewing those questions now).

## C.    Relevant Facts

15.    The last two appellate courts to consider the constitutionality of the electric chair on an evidentiary record found it to be inherently a barbaric form of capital punishment with "its specter of excruciating pain and its certainty of cooked brains and blistered bodies." *Dawson v State*, 554 S.E.2d 137, 143-44 (Ga. 2001). Electrocution, concluded the Georgia Supreme Court, "inflicts purposeless physical violence and needless mutilation." *Id.* Similarly, the Nebraska Supreme Court found that use of the electric chair — during which "a human being is electrically on fire" — "inflicts intense pain and agonizing suffering," and has a "proven history of burning and charring bodies." *State v. Mata*, 745 N.W.2d 229, 278-79 (Neb. 2008). Those findings were extensively supported by post-mortem reports and other scientific evidence, sworn expert opinions, and witness accounts of the kind that are attached to this motion.[6] *See* Exhibits C-H.

---

[6] These facts were not unknown to the South Carolina legislators who enacted the state's new electrocution statute. A House committee chairman acknowledged that the electric chair is less humane than lethal injection. And a state senator told the press he understood there had been problems with the electric chair where prisoners "catch on fire and don't die immediately." Both were former prosecutors, and thus prominently

16.   If executed by electrocution, as Council is now sentenced to be according to § 3596 and this Court's judgment, it is very likely that he will "'feel[] himself being burnt to death while he is conscious of his inability to breathe.'" *Amicus Curiae* Brief of Physicians and Public Health Groups, *Bryan v. Moore*, 1999 WL 1249424, at *8 (Dec. 20, 1999), *quoting* Hillman, *An Unnatural Way to Die*, 27 New Scientist 278, 278 (Oct. 1983) (Exhibit C); Affidavit of John P. Wikswo, Jr., Ph.D, at 4 (Exhibit D) (finding "substantial risk" that electrocuted prisoner "will experience for some period of time the excruciating pain and suffering associated with the phenomena that occur when a high voltage electrical current contacts a human being"); Affidavit of Jonathan L. Arden, M.D., at 7 (Exhibit E) (numerous autopsies demonstrate "all the executed people sustained significant burning and charring, as well as cooking of tissues, which would be excruciatingly painful");[7] *Mata*, 745 N.W.2d at 277 ("there is abundant evidence that prisoners sometimes will retain enough brain functioning to

---

involved in enacting the new law.  Fausset & Rojas, *After a Decade Without Executions, South Carolina's Solution: Bring Out the Firing Squad*, N.Y. Times, at A20 (May 7, 2021); Schecter, *Firing squad still on table as SC House panel advances electric chair execution bill*, The State (Apr. 21, 2021).

[7] The affidavits from Drs. Wikswo and Arden are copies of ones that were recently filed by South Carolina prisoners in litigation challenging the state's new electrocution statute.

consciously suffer the torture high voltage electric current inflicts on a human body").

17. Execution by electrocution would entail tying Council's extremities and head to a chair, so he could not move, with a mask covering his head. One electrode would be strapped to his head and another to his leg. Then thousands of volts of electricity would be administered to his body; the current would enter at his head, exit at his leg, then return through his body, completing the circuit, 60 times a second. Wikswo Aff. at 2 (Exhibit D); Affidavits of Nine Witnesses to Executions by Electrocution in Five Different States (Exhibit F); *Mata*, 745 N.W.2d at 269; Hillman, *The Possible Pain Experienced During Execution by Different Methods*, 22 Perception 745, 747 (1993) (Exhibit G).

18. It is almost certain that unconsciousness and death would not come quickly for Council. *See Mata*, 745 N.W.2d at 272 ("the proposition that judicial electrocutions always result in instantaneous and irreversible brain death . . . is a myth"). Because of the high resistance of the skull and conductivity of spinal fluid, only a small fraction of the electrical current would reach his brain initially; rather, the vast majority would travel through his scalp, neck, and face, and across his torso and legs. Nor is it likely that the electricity would immediately stop his heart from beating,

15

since it is farther from the electrodes, and even if an electrocuted prisoner's heart does stop, it often restarts.  All this is supported by studies of victims of lightning strikes and other high-voltage accidents; post-mortem findings from electrocuted prisoners; and witness accounts that many of them continued or resumed breathing well into the electrocution process, sometimes for a prolonged period and after multiple jolts of electricity. Wikswo Aff. at 6 (Exhibit D); Arden Aff. at 5-7 (Exhibit E); Affidavits of Witnesses (Exhibit F); *Mata*, 745 N.W.2d at 271-76; Physicians' *Amicus* Brief, 1999 WL 1249424, at *9; Hillman, *Possible Pain*, *supra*, at 747-48 (Exhibit G); *see also Dawson*, 554 S.E.2d at 141-42.

19.   Instead, ultimately the electric chair would likely cause Council's death by asphyxiation from damage to his respiratory muscles, with his experiencing the sensation of suffocating, and from the "cooking" of his body's vital organs.  This could well take several minutes, and almost certainly no less than 15-30 seconds.  Arden Aff. at 6-8 (Exhibit E); Wikswo Aff. at 7 (Exhibit D); Affidavits of Witnesses (Exhibit F); Post-Mortem Reports and Photos From Executions By Electrocution (Exhibit H); Physicians' *Amicus* Brief, 1999 WL 1249424, at **11-12; *Mata*, 745 N.W.2d at 277; Hillman, *Possible Pain*, *supra*, at 748 (Exhibit G); *see also Dawson*, 554 S.E.2d at 141.

20.  During that process, Council would likely experience agonizing pain and terror, and would certainly suffer extreme violence and mutilation to his body.  High-voltage electricity is excruciating, as shown by studies of survivors of electrical accidents.  The direct excitation of the various nerves along the path of the current would produce intense pain.  The thermal heat from the current would also "cook" Council's body and internal organs, causing second- and third-degree burns, painful swelling (and possibly bursting) of tissues and organs, and heating of bodily fluids close to the boiling point of water.  Witnesses to electrocutions often report hearing crackling sounds and smelling burning flesh.  And the burning of the prisoner's skin and heating of bodily fluids sometimes results in visible steam and smoke rising from the his body.  Post-mortem reports from executions using the electric chair frequently reveal that the bodies were severely burned and blistered, often with substantial skin slippage, especially around the head and legs where the electrodes were attached, as well as the thighs and scrotum.  There are even documented instances of flames erupting from prisoners' bodies.  The electricity would also stimulate enormously painful muscle contractions that would cause Council's body to jerk and lurch violently against the straps that bind him to the chair, which may result in blunt force injuries, abrasions, and possibly skeletal fractures

17

or dislocations.  The contractions may also cause him to involuntarily defecate and urinate on himself.  Arden Aff. at 7 (Exhibit E); Wikswo Aff. at 9-10 (Exhibit D); Affidavits of Witnesses (Exhibit F); Post-Mortem Reports and Photos (Exhibit H); *Mata*, 745 N.W.2d at 269-70, 277-78; Physicians' *Amicus* Brief, 1999 WL 1249424, at \*\*5-8; Hillman, *Possible Pain*, *supra*, at 747 (Exhibit G);  *Dawson*, 554 S.E.2d at 143; *Glass v. Louisiana*, 471 U.S. 1080, 1091 (1985) (Brennan & Marshall, JJ., dissenting from denial of certiorari); *Provenzano v. Moore*, 744 So.2d 413, 435-36, 450 (Fla. 1999) (Shaw, Pariente & Anstead, JJ., dissenting).

21.    Finally, as to the firing squad, another new method of execution under the recent South Carolina statute:  That option is conditional and, indeed, only theoretical, since the State Department of Corrections has certified, per the statute, that it is not available and that there is no timetable for making it available.  *See* Section B, *ante*.  And, in any event, the firing squad suffers from many of the problems associated with electrocution.  It has been rejected by almost all jurisdictions: Only three people, all in Utah, have been executed by that method in the modern era, and only two other states, Oklahoma and Mississippi, even theoretically allow it by statute.  (Internationally, the use of firing squads is also rare, limited mostly to North Korea.)  Fausset & Rojas, *supra*.

22.  And for good reason.  Even when it goes according to plan, the condemned person's heart — the shooters are told to aim there —is "ripped to pieces by bullets," and he is left to bleed to death; it may take several minutes or longer before the blood supplied to the brain drops enough to cause loss of consciousness and death.  And if the shooters miss the heart (which can easily happen if the prisoner moves even slightly), death can be even more prolonged and painful; indeed, the risk is so significant that Great Britain rejected it on this ground in a national study of capital punishment in 1953.  In addition, the executed person's body is ordinarily left with baseball-sized holes and internal tissues splattered on the outside of the corpse.  Post-Mortem Photographs From 2010 Firing-Squad Execution in Utah (Exhibit I); Hillman, *The Possible Pain Experienced During Executions by Different Methods*, 22 Perception 745 (1992); *Should Firing Squads Replace Lethal Injections?*, VICE News (Mar. 21, 2017), https://www.youtube.com/watch?v=BOKYCqee2YY; Pilkington, *Utah firing squad executes death row inmate*, The Guardian (June 18, 2010); Acker & Champagne, *The Execution of Wallace Wilkerson: Precedent and Portent*, 42 Crim. Justice Rev. 349, 354 (2017); Sarat, *Return of firing squads shows death penalty and its 'machinery' are grinding to a halt*, USA Today (May 18, 2021); Wikipedia, *Execution by Firing Squad*,

https://en.wikipedia.org/wiki/Execution_by_firing_squad.

## D.     Legal Argument

### 1.     The election provision of the South Carolina statute does not detract from Council's challenges to electrocution.

23.     As a threshold matter, it would be no defense to Council's claims that South Carolina's revised statute purports to allow a condemned prisoner to opt out of electrocution and elect instead to be executed by lethal injection or firing squad.  That provision is only conditional. Practically speaking, as discussed, the election option does not exist now under South Carolina law, since the statute hinges it on a certification by the Department of Corrections.  And it has certified, and the South Carolina Supreme Court has acknowledged, that electrocution is the only available method of execution under South Carolina law, and will remain so for the foreseeable future.[8]

24.     In addition, electrocution, which Council is challenging, is the

---

[8] It does not matter whether lethal injection is available to the Federal Bureau of Prisons, or if it offered to design and implement its own firing squad.  The "federalist scheme" for executions mandated by Congress in Section 3596, *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 135 (Rao, J., concurring), requires that federal prisoners be executed in the same manner as state prisoners in South Carolina — who, again, are not subject to execution in that manner under South Carolina law, nor will be for the foreseeable future.

presumptive method of execution under South Carolina law, which his judgment and the federal statute incorporate. That alone distinguishes this case from *Stewart v. LaGrand*, 526 U.S. 115 (1999), which involved an Arizona statute that made lethal injection the default method but let a prisoner opt instead for lethal gas. The prisoner there elected, indeed "insisted that he desired to be executed by lethal gas." The Court held that "[b]y declaring his method of execution, picking lethal gas over the State's default form of execution — lethal injection — Walter LaGrand has waived any objection he might have to it." *Id.* at 119, *citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("intelligent waiver" involves "an intentional relinquishment or abandonment of a known right or privilege"); *see also Bryan v. Moore*, 528 U.S. 1133 (2000) (dismissing writ of certiorari, which Court had granted to consider constitutionality of electrocution, based on new state statute providing that death sentence "will be carried out by lethal injection unless petitioner affirmatively elects death by electrocution").

25. Furthermore, review of electrocution also may not be avoided based on the state statute's election provision because, based on appellate counsel's interactions with Council since their appointment a year and a half ago, they doubt that he is mentally competent to make or waive any such election. During Council's trial, his former attorneys informed the

Court he had suffered a mental breakdown and that they did not believe then he was competent to proceed.  (DE #805).  *See In re Ohio Execution Protocol Litigation*, 2018 WL 3207419, at *2 (S.D. Ohio June 29, 2018) (likening standard for competency to elect method of execution to standard for competency to be tried).  The Court's subsequent handling of that issue, including its finding that Council was competent, will likely be presented in his appeal for the Fourth Circuit to adjudicate.

**2.     By incorporating the South Carolina electrocution statute, § 3596 violates Council's right against *ex post facto* punishments.**

26.  The Constitution prohibits both the federal and state governments from enacting any "*ex post facto* Law."  Art. I, § 9, cl.3; Art. I, § 10, cl.1.  It is one of the safeguards "against arbitrary and oppressive" government action,  *Collins v. Youngblood*, 497 U.S. 37, 46 (1990), that the framers considered most critical.  *See* The Federalist No. 44, p.282, 511 (Rossiter ed. 1961) (quoting Madison and Hamilton).

27.  The phrase "'*ex post facto* Law' was a term of art with an established meaning at the time of the framing."  *Peugh v. United States*, 569 U.S. 530, 538 (2013) (cleaned up).  Just a few years after the Constitution was ratified, the Supreme Court identified the categories of *ex post facto* laws, including the one relevant here: "'Every law that changes

the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *Carmell v. Texas*, 529 U.S. 513, 522 (2000), *quoting Calder v. Bull*, 3 U.S. 386, 390-91 (1798).

28.  Electrocution is a "greater punishment" than lethal injection, as it inherently is much more painful, as well as much more violent and mutilating.[9]  *See* Section C, *ante* (and exhibits thereto).  The law challenged here, 18 U.S.C. § 3596(a), the federal execution statute, incorporates the current state method of execution without regard for whether it has changed since the date of the offense, or, if it has, whether the new method is more or less humane.  *See Higgs*, 2020 WL 7707165, at *3, *rev'd*, 141 S. Ct. 645 (2021) (discussed further at footnote 3, *ante*).  By thus incorporating South Carolina's new default method of electrocution, when lethal injection was the default at the time of the offense, § 3596, as applied to Council, violates the prohibition against *ex post facto* laws.

29.  Death by electrocution and not just death in the abstract stands as Council's sentence under Section 3596.  The federal statute specifies that

---

[9] To establish that electrocution is a "greater" punishment than lethal injection, Council need only show that it is either more painful *or* more physically violent and mutilating — though the evidence conclusively shows (and other courts have found) it is both.  *See* Section C, *ante* (and exhibits thereto).

the method for causing the prisoner's death be the one used in the state, here South Carolina, as does this Court's final judgment. And, in any event, a law may be *ex post facto* even "if it alters punitive conditions outside the sentence." *Weaver*, 450 U.S. at 32, *citing In re Medley*, 134 U.S. 160 (1890). In *Medley*, a revised capital statute, which applied retrospectively, provided for execution of a death sentence to be preceded by a period of solitary confinement. The Supreme Court rejected the argument that the solitary confinement was not technically part of the defendant's sentence, but merely a prefatory means of safely carrying it out. It was enough, the Court explained, that the prisoner experienced the solitary confinement leading up to his execution as an additional punishment of an "important and painful character."[10]  *Id*. at 163-71; *see also Rooney v. North Dakota*, 196 U.S. 319, 325 (1905) (suggesting that a retrospective law "shortening the time of confinement . . . before execution" would also be *ex post facto*).

30.  That is why the Supreme Court has indicated that a retrospective

---

[10] By contrast, a statute that altered the location and hour of the day at which executions should occur and the number and nature of witnesses was not *ex post facto*, since such changes amounted to "nothing of substance" as to the prisoner's punishment. *Holden v. Minnesota*, 137 U.S. 483, 490-91 (1890); *see California Dep't of Corrections v. Morales*, 514 U.S. 499 (1995) (same for statute that altered frequency of successive parole hearings, but "left unchanged the substantive formula for securing" release).

change to a method of execution that, as here, is less humane than its predecessor would amount to "greater punishment" and be *ex post facto*. A century ago, in *Malloy v. South Carolina*, 237 U.S. 180 (1915), the Court rejected a challenge to a South Carolina law that substituted electrocution for hanging for all executions. The Court emphasized that this was an instance of a national change in favor of a "less barbarous" and "more humane" method of execution. *Id*. at 184-85. And it relied on what it perceived then as the "well grounded belief that electrocution is less painful and more human than hanging." *Id*. (noting further that "odious features incident to the old method were abated" by the change).

31.    Thus, as the Court has since recognized, *Malloy* "concluded that a change in the method of execution was not *ex post facto* because evidence showed the new method to be more humane." *Weaver*, 450 U.S. at 32 n.17; *Nelson v. Campbell*, 541 U.S. 637, 644 (2004) (citing principle that it is not an "*ex post facto* violation to change [the] method of execution to [a] more humane method"); *see also Baze v. Rees*, 553 U.S. 35, 42 (2008) (citing reliance in *Malloy* on the "well-grounded belief," as of 1915, "that electrocution is less painful and more humane than hanging") *Glossip v. Gross*, 576 U.S. 863, 868 (2015) (same).

32.    Lower courts have also understood the Supreme Court's

precedents this way.  Thus, for example, the Sixth Circuit, in rejecting an *ex post facto* challenge to a new lethal-injection protocol, cited *Weaver* and *Malloy* for the principle that "[a] change in a State's method of execution will not constitute an *ex post facto* violation if the evidence shows the new method to be more humane."  *Miller v. Parker*, 909 F.3d 827, 830 (6th Cir. 2018); *see also, e.g., Mata*, 745 N.W.2d at 259;  *In re Personal Restraint of Benn*, 952 P.2d 116, 149 n. 19 (Wash. 1998); *Glover v. State*, 474 So. 2d 886, 890-91 (Fla. 1985).

33.   Because electrocution (and, to the extent it matters, the firing squad too) is substantially more inhumane than lethal injection, the federal execution statute, by incorporating that new state method retroactively as the presumptive one for Council, violates the constitutional prohibition on *ex post facto* laws.

34.   This analysis is not altered by the state statute's provision for theoretically electing lethal injection as an alternative to the default method, electrocution.  "The inquiry" into whether a law "inflict[s] a greater punishment" "looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual."  *Weaver*, 450 U.S. at 33;  *Lindsey*, 301 U.S. at 400-01.  A law is *ex post facto* not only if it directly results in a greater sentence but also if it expands the

discretion of the court or prison officials to increase the defendant's sentence or ultimate punishment or, conversely, narrows the defendant's right to obtain a lesser sentence or ultimate punishment. *Peugh*, 569 U.S. at 540-41; *Miller v. Florida*, 482 U.S. 423, 432 (1987); *Weaver*, 450 U.S. at 35-36; *Lindsey*, 301 U.S. at 401. Before South Carolina changed its method of execution, Council's sentence, under § 3596 and his judgment, was death by lethal injection. Furthermore, there was nothing he needed to do to legally prevent — or that government officials could do to legally authorize — his ultimate punishment being altered to execution by electrocution. Whereas now under the federal statute and Council's judgment, with their incorporation of South Carolina's new law, he stands sentenced to electrocution, as the presumptive method. *Cf. Dobbert v. Florida*, 432 U.S. 282, 300 (1977) (rejecting *ex post facto* challenge by defendant to "an added burden newly attached to a sentence which was never imposed on him"). Moreover, lethal injection would have to be certified as legally available before Council would be allowed to elect it and opt out of electrocution. The law does not constrain corrections officials from declining to so certify it, based on purported difficulties obtaining lethal

27

drugs or for other possible reasons.[11]  And even if such a certification

occurred, Council still would need to be competent, and follow the required

procedures to elect lethal injection, or else he would, by law, be relegated to

the default method, electrocution.  Thus, at minimum, the change here is *ex

post facto* because it not only alters Council's existing, default sentence to

death by electrocution, but also expands the government's legal authority to

put him to death in that manner and narrows his legal rights to avoid it.[12]

*See Peugh*, 569 U.S. at 540-41.

### 3. By incorporating the South Carolina electrocution statute, § 3596 violates Council's right against cruel and unusual punishments.

35.  As discussed, Council's new, retroactively applied punishment,

death by electrocution, need not also rise to the level of cruel and unusual

under the Eighth Amendment in order to be "greater" than the previously

provided punishment, death by lethal injection, and thus *ex post facto*

under Article I, Section 9 of the Constitution.  But it does, in fact, rise to

---

[11] *See* Order, *State v. Sigmon*, No. 2002–024388 (S.C. June 16, 2021) (accepting Department of Corrections' certification that lethal-injection drugs are unavailable, without any hearing or factfinding even though state prisoner had factually disputed claim of unavailability).

[12] Even if Council ultimately had the same constrained option to elect the firing squad as an alternative to electrocution, that method too is significantly more inhumane than lethal injection, *see* Section C, *ante*, so the *ex post facto* violation would remain.

that level.  This provides an additional, independent reason to invalidate § 3596, as applied, and vacate his death sentences.

36.  Electrocution is cruel and unusual punishment for two related but independent reasons.  First, it inflicts excruciating pain, causing a lingering, torturous death.  And second, it does great physical violence to the prisoner and his body that results in serious mutilation and offends human dignity.

37.  The Eighth Amendment assures that the government's power to punish will be "'exercised within the limits of civilized standards,'" and it draws its meaning from "'the evolving standards of decency that mark the progress of a maturing society.'" *Kennedy v. Louisiana*, 554 U.S. 407, 435, 446 (2008), *quoting Trop v. Dulles*, 356 U.S. 86, 100-101 (1958).  "Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule." *Kennedy*, 554 U.S. at 420.

38.  There can be no doubt that electrocution is "unusual" under the Eighth Amendment.  The electric chair is a punishment not known at common law and not invented until more than a century after the Constitution was ratified.  And every jurisdiction that ever used it since has now abandoned it as the exclusive or primary mode of execution, because of

concerns about its brutality.[13]  By its new, retrograde statute, South

Carolina stands alone in the country, indeed the world, in making

electrocution the presumptive mode of execution (and, indeed, the only one

legally available).  *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019)

(when Constitution was ratified, "unusual" referred to methods of

punishment that had "fallen out of use").  The Supreme Court has

consistently deemed the death penalty for certain offenders or crimes to be

constitutionally "unusual" when only a handful of state statutes provide for

it.  *See Kennedy*, 554 U.S. at 425-26.

39.  As for the cruelty of electrocution, the Court has recognized that

methods of execution are cruel "'when they involve torture or a lingering

death . . . . something inhuman and barbarous, something more than the

mere extinguishment of life.'"  *Baze*, 553 U.S. at 49, *quoting In re Kemmler*,

136 U.S. 436, 447 (1890).  Thus, the Eighth Amendment comes into play

where an execution method carries a "substantial risk of severe pain" when

"compared to a known and available alternative.'"  *Bucklew*, 139 S. Ct. at

---

[13] *See* footnote 14, *post*; Wikipedia, *Electric Chair,* https://en.wikipedia.org/wiki/Electric_chair.  The handful of states whose execution statutes still include electrocution do so only as a secondary, alternative option.  *See* Dep't of Justice, Office of the Attorney General, *Manner of Federal Executions*, 85 FR 75846, 75847 (Nov. 27, 2020) (*citing* Alabama, Mississippi, Oklahoma, Arkansas, and Florida).

1125.  That is demonstrably true of electrocution, accepting the facts alleged and, indeed, extensively supported, by this motion.[14]  *See* Section C, *ante* (and exhibits thereto); *see also Mata*, 745 N.W.2d at 278 (finding electrocution to be cruel and unusual punishment prohibited by state constitution because of its "substantial risk of unnecessary pain"; even if prisoner remains conscious for only 15-30 seconds, that is intolerable "when a human being is electrically on fire").

40.  Regardless of how much pain a prisoner suffers or for how long, electrocution is also cruel for a second, independent reason: It seriously mutilates and desecrates his body; forces him to sit in his own excrement while observers watch, hear, and smell his body burn; and leaves his organs boiled, and his skin horribly charred and disfigured.  For that reason too, it is "inhuman and barbarous," *Baze*, 553 U.S. at 49 (cleaned up), and violates the basic "dignity of the person." *Kennedy*, 554 U.S. at 420; *see*

---

[14] Here, as discussed, electrocution is substantially more painful, and certainly more mutilating, than the alternative of lethal injection, which is why it was adopted to replace the electric chair by every other jurisdiction that formerly employed the latter.  *See Baze*, 553 U.S. at 62; *id.* at 64 (Alito, J., concurring); *Glass*, 471 U.S. at 1082 (Brennan and Marshall, JJ., dissenting from denial of certiorari).  *But see* Order, *Sigmon v. Stirling*, No. 3:21-cv-1651, DE #26 at 7-9 (D.S.C. June 11, 2021) ("when compared to electrocution, lethal injection . . . may present its own host of horrific results"), *citing Arthur v. Dunn*, 137 S. Ct. 725, 732-33 (2017) (Sotomayor, J., dissenting from denial of certiorari).

*also, e.g., Rupe v. Wood*, 863 F.Supp. 1307, 1315 (W.D. Wash. 1994) ("Because the Court concludes that there is a significant risk that Rupe's hanging would result in decapitation," even if "after death," it "would also violate basic human dignity, which is the basic concept underlying the Eighth Amendment") (cleaned up), *vacated on other grounds*, 93 F.3d 1434 (9th Cir. 1996).

41.    On this second, independent ground, two state high courts have found that electrocution contravened their state constitutional prohibitions against cruel and unusual punishments.  In *Mata*, the Nebraska Supreme Court held that "[b]esides" the likelihood of pain, "electrocution is unnecessarily cruel in its purposeless infliction of physical violence and mutilation on the prisoner's body.  Electrocution's proven history of burning and charring bodies is inconsistent with both the concepts of evolving standards of decency and the dignity of man."  745 N.W.2d at 278. Similarly, in *Dawson*, while the Georgia Supreme Court noted some uncertainty about the issue of pain, it nonetheless determined that electrocution violated the state constitution based on "the cruelty inherent in punishments that unnecessarily mutilate or disfigure the condemned prisoner's body" and "the unusualness that mutilation creates in light of

viable alternatives," such as lethal injection.  554 S.E.2d at 143.[15]

42.  Though the United States Supreme Court has never invalidated electrocution as cruel and unusual punishment under the Eighth Amendment, *Bucklew*, 139 S. Ct. at 1124, neither has the Court upheld it as such, let alone based on current evidence.[16]  In *Kemmler*, an 1890 decision, the Court rejected a challenge to electrocution because the Eighth Amendment was not then considered applicable to the states and thus, the Court held, the state court's decision upholding New York's electrocution statute "is not reexaminable here." 136 U.S. at 446-47; *see also Baze*, 553 U.S. at 48; *Poyner v. Murray*, 1993 WL 13119345, at *2 (4th Cir. Jan. 19, 1993).  Furthermore, the discussion of the Eighth Amendment in *dicta* in *Kemmler* rested on the since abandoned view that it prohibited only

---

[15] The Georgia Supreme Court also observed that a "limited focus" only on pain "would lead to the abhorrent situation where a condemned prisoner could be burned at the stake or crucified as long as he or she were rendered incapable by medication of consciously experiencing the pain." *Id.*

[16] Thus, this Court was mistaken when, in a civil suit brought by South Carolina prisoners challenging the new electrocution statute under the Eighth Amendment, it held that it lacked authority to consider this question because *Kemmler* was binding precedent that conclusively answered it. Order, *Sigmon v. Stirling*, No. 3:21-cv-1651, DE #26 at 6 (D.S.C. June 11, 2021).  Similarly mistaken were most of the circuit decisions this Court cited as having rejected such challenges; rather than addressing the merits, they simply deferred to *Kemmler* or to other lower court precedents that had done so.  *See id.* at 6.

punishments considered cruel and unusual at the time of the Founding, "burning at the stake, crucifixion, breaking on the wheel, or the like."[17]  136 U.S. at 446.  Most important, *Kemmler* also accepted on faith certain features of this then novel, never tested manner of execution that now, almost a century and a half later, experience and modern science have proven false.  *See id.* at 443 ("it is within easy reach of electrical science at this day to so generate and apply to the person of the convict a current of electricity of such known and sufficient force as certainly to produce instantaneous, and therefore painless, death"); *id.* at 444 ("the application of electricity to the vital parts of the human body, under such conditions and in the manner contemplated by the statute, must result in instantaneous, and consequently in painless, death").  Thus, as three justices observed in the early 1990's, the holding in *Kemmler* "does not constitute a dispositive response to litigation of the issue in light of modern knowledge about the method of execution in question."  *Poyner v. Murray*, 508 U.S. 931, 933 (1993) (Souter, Blackmun & Stevens, JJ., dissenting from

---

[17] Nor did the Supreme Court's glancing references to *Kemmler* in several later cases, having nothing to do with methods of execution let alone electrocution, transform that *dicta* into a holding that "electrocution is not cruel and unusual punishment under the Eighth Amendment," as this Court also mistakenly believed.  Order, *Sigmon v. Stirling*, DE #26 at 6.

denial of certiorari); *see also Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947) (plurality) (approving second attempt to carry out electrocution based on assumption that "[t]here is no . . . unnecessary pain involved in the proposed execution").

43.   In summary, electrocution is cruel and unusual punishment because, beyond merely extinguishing life, it likely also causes agonizing pain over several minutes, and certainly inflicts great violence and mutilation on the prisoner's body and creates a grisly experience for the senses of observers; has never been directly upheld by the Supreme Court based on evidence about how it functions; was found to be cruel and unusual by two state supreme courts; and has been abandoned or made a secondary in every jurisdiction that retains capital punishment.  For all of these reasons, § 3596's incorporation of execution by electrocution for Council violates the Eighth Amendment.

44.   Finally, as to the firing squad, a theoretical alternative under the new South Carolina statute:  Even were it the default (which it is not) and legally available (which it also is not, and will not be for the foreseeable future), because it too inherently inflicts agonizing, unnecessary pain, as well as significant physical violence and mutilation, *see* Section C, *ante*, it would also constitute cruel and unusual punishment and violate the Eighth

Amendment. As with electrocution, the wholesale rejection of this method by other jurisdictions and the modern scientific understanding of its effects undermine the Supreme Court's acceptance of it almost a century and a half ago, before the Court's acknowledgment that the Eighth Amendment must draw its meaning from evolving standards of decency. *See Wilkerson v. Utah*, 99 U.S. 130, 135-36 (1878) (accepting firing squads because they were routinely used in military executions and they did not compare to methods such as public dissection or embowelling).

### 4. By incorporating growingly disparate state execution statutes, § 3596 violates Council's rights to equal protection and due process.

45. Imagine a federal statute that mandated a one-year sentence of imprisonment for a certain crime, but singled out federal defendants sentenced in South Carolina, only, for whom the sentence would have to be served at hard labor in a super-maximum security prison, while others would be confined to a variety of other, less harsh facilities, depending on the state in which they happened to be sentenced. Certainly such an arbitrary, irrational law would violate the equal protection and due process guarantees of the Fifth Amendment. *See Chapman v. United States*, 500 U.S. 453, 465 (1991); *Jones v. United States*, 463 U.S. 354, 362 n. 10 (1983).

46.  Indeed, federal courts in noncapital cases are forbidden from adjusting a federal sentence based on how the law of the state punishes a crime, because that would introduce irrational disparities among similarly situated defendants nationally, based solely on geography.  *See United States v. Clark*, 434 F.3d 684, 686-88 (4th Cir. 2006); *United States v. Wiseman*, 749 F.3d 1191, 1194 (10th Cir. 2014); *United States v. Begin*, 696 F.3d 405, 412-13 (3d Cir. 2012); *United States v. Malone*, 503 F.3d 481, 485 (6th Cir. 2007); *United States v. Jeremiah*, 446 F.3d 805, 808 (8th Cir. 2006).

47.  Yet that is effectively the kind of irrational patchwork scheme the federal execution statute, § 3596, has created for death sentences.  And the disparities risk becoming pronounced as more capital-punishment states, beyond South Carolina, move away from lethal injection in favor of other execution methods.[18]  When it comes time to execute federally condemned prisoners, Council would be electrocuted, another lethally injected, and a

---

[18] See, e.g., Billeaud, *Arizona refurbishes gas chamber in push to resume executions*, Associated Press (June 10, 2021); Chandler, *Alabama: Nearly finished build for nitrogen gas executions*, Associated Press (June 9, 2021); Reuters, *Oklahoma to become first U.S. state to use nitrogen gas for executions* (Mar. 14, 2018); Gates, *Bill: Execution by gas, firing squad would be allowed*, Jackson (Mississippi) Clarion-Ledger (Feb. 1, 2017); National Public Radio, *Utah Brings Back Firing Squads As Lethal Injection Drugs Remain Scarce* (Mar. 23, 2015).

third fatally gassed — not because of any relevant factual or legal difference among the offenders, their crimes, or the proceedings in their cases, but solely based on the happenstance of where the federal court that sentenced them was located.

**5.   By delegating the choice of how Council is to be put to death to the unfettered discretion of South Carolina officials, § 3596 violates Article I, Section 1 and Article III, Section 3 of the Constitution.**

48.  The United States Constitution forbids Congress or this Court from delegating the determination of Council's sentence, which includes how he should be put to death, to the evolving, unfettered discretion of state officials in South Carolina, simply because that is where he happens to have been federally tried.  Yet that is exactly what § 3596 and the Court's judgment have done.

49.  Article I, Section 1 of the Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States." One of those "legislative Powers," is the power to define federal crimes (such as, in Council's case, bank robbery and murder during a bank robbery) and "fix[] the punishment" for their violation.  *Loving v. United States*, 517 U.S. 748, 768 (1996), *citing United States v. Grimaud*, 220 U.S. 506, 518 (1911) (no unconstitutional delegation where the "fine or

imprisonment [was] fixed by Congress"); *Touby v. United States*, 500 U.S. 160, 162 (1991) (same).

50.   A parallel provision of the Constitution, Article III, Section 1, provides: "The judicial Power of the United States shall be vested in" the Supreme Court and the lower federal courts.  This includes the power to set the terms of the defendant's sentence, whether it be a term of imprisonment, restitution, a fine, probation, supervised release — or death by a prescribed method.  *See United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995) (district court violated Article III by delegating to probation officer the authority to determine amount and timing of restitution payments); *United States v. Miller*, 77 F.3d 71, 78 (4th Cir. 1996) ("the imposition of a sentence, including the terms of probation or supervised release, is a core judicial function" that "a district court may not delegate"); *United States v. Van Donk*, 961 F.3d 314, 327 (4th Cir. 2020) (same for "authority to decide the amount of fine or restitution payment . . . or whether a defendant must attend a treatment program").

51.   The nondelegation principle represents an important constitutional constraint on the legislative and judicial power of the federal government.  *Pittston v. United States*, 368 F.3d 385, 394 (4th Cir. 2004); *see also Gundy v. United States*, 139 S. Ct. 2116, 2134-35 (2019) (Gorsuch &

Thomas, JJ., & Roberts, C.J., dissenting). The accountability that the principle ensures matters especially in an area like capital punishment, where some members of Congress and judges may be inclined toward legislating or imposing death sentences that are "tough" on criminals, without concerning themselves with the unpleasant details of how those sentences are carried out. *See* Klein, *Nondelegating Death*, 81 Ohio St. L.J. 923, 965-66 (2020).

52. Under this principle, the Constitution forbids a delegation not just to the executive branch or a private party, but also to state lawmakers, especially where, as here, it defers to those lawmakers' future unanticipated and unconstrained decisions.[19] *See Agency Holding Corp. v. Malley-Duff &*

---

[19] It is true, as this Court noted in its post-trial decision (DE #869 at 8), that the Eleventh Circuit found no unconstitutional delegation in the fact that a federal defendant would be put to death according to Georgia's mode of execution. *United States v. Battle*, 173 F.3d 1343, 1350 (11th Cir. 1999). But that decision did not consider the temporal open-endedness of the delegation, under which the state remains free to change its method of execution and thus the defendant's punishment, as South Carolina has done, or the effect this has on whether delegation to the state is based on an "intelligible principle," *id., quoting J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928) — even assuming that were the appropriate test, which Council disputes. (*See also* DE #866 at 6-7). Moreover, the other two decisions this Court relied on, *Wilkerson v. Utah*, 99 U.S. 130 (1878) and *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) (*see* DE #869 at 8) did not involve a delegation of federal sentencing authority to state officials.

*Associates, Inc.*, 483 U.S. 143, 163 (1987) (Scalia, J., concurring) ("because the Act required application of future state laws as well as those in effect at the time of its passage, it would have been considered open to serious constitutional challenge as an improper delegation of congressional legislative power to the States had it been anything other than declaratory"), *citing Wayman v. Southard*, 23 U.S. 1, 47-48 (1825) (Constitution forbade Congress from delegating to states the "power of altering modes of proceeding" of federal courts).

53.   It does not detract from Council's argument that federal executions in the pre-modern era (a half century or more ago) were carried out using state methods. *See In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 137 (Rao, J., concurring) ("nearly all executions conducted under the 1937 statute took place in state facilities. Presumably, those executions were carried out in accordance with state law and possibly with other state procedures"). The need to use state facilities and state personnel for executions required also using state methods. But since federal executions are now carried out by the Federal Bureau of Prisons in a centralized federal death chamber at USP Terre Haute, Indiana, there is no such justification for delegating the choice of method of execution to the state where the defendant happens to have been sentenced.

54.     Nor is the delegation of authority to set the terms of Council's punishment to South Carolina lawmakers and corrections officials justified by decisions approving Congressional incorporation of state statutes when the purpose was to help enforce state law. *See, e.g., United States v. Kebodeaux*, 570 U.S. 387 (2013) (SORNA); *United States v. Sharpnack*, 355 U.S. 286 (1958) (Assimilative Crimes Act); *Casino Ventures v. Stewart*, 183 F.3d 307 (4th Cir. 1999) (state gambling laws). Here, by contrast, the State of South Carolina has no interest in the method used by the Federal Bureau of Prisons to execute Council in Indiana for federal crimes adjudicated in federal court.

## E.     Conclusion

For these reasons, the Court should vacate Council's sentences of death by electrocution (or, alternatively, order an evidentiary hearing if the material facts alleged in this motion are controverted by the government). The Court lacks the authority to reinstate the repealed South Carolina execution statute and resentence Council to death by lethal injection on that basis. *See Higgs*, 2020 WL 7707165, at *3, *rev'd*, 141 S. Ct. 645 (2021) (discussed further at footnote 3, *ante*); *see also Weaver*, 450 U.S. at 36 n.22 (upon finding a state statute was *ex post facto*, it was up to state courts on remand, not federal ones, to determine whether predecessor state statute

42

could somehow be applied).  Nor does this Court have authority either to select an execution method entirely on its own and resentence Council to death by that method, or to simply resentence him to death in the abstract and leave it to the Attorney General or the Bureau of Prisons to choose an execution method.  Section 3596 does not allow either course, but rather provides only for a sentence of death "in the manner prescribed by the law of the State in which the sentence is imposed," here South Carolina.  *Cf. United States v. Tipton*, 90 F.3d 861, 902-903 (4th Cir. 1996) (because Congress had said nothing about execution method in earlier federal capital statute, it had not "preempted the power of the executive branch" to determine the method).  Since that provision is unconstitutional on multiple grounds, as this motion demonstrates, Council must be resentenced to a sentence other than death.

Respectfully submitted,

/s/ Barry J. Fisher
Barry J. Fisher
Office of the Federal Defender, NDNY
39 North Pearl Street, 5th Floor
Albany, NY 12207
(518) 650-9031 tel.
(518) 436-1780 fax
barry.fisher@fd.org

Lisa Lorish
Office of the Federal Defender, WDVA
401 E. Market Street, Suite 106
Charlottesville, VA 22902
(434) 220-3388 tel.
(434) 220-3390 fax
lisa.lorish@fd.org

*Counsel for Defendant Brandon Council*

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing was filed electronically through the ECF system and notice sent to counsel of record for all parties

s/ Barry J. Fisher