# Exhibit C

Harold Hillman, *An Unnatural Way to Die*, 27 New Scientist 278
(Oct. 1983)

4:17-cr-00866-JD     Date Filed 07/21/21     Entry Number 923-4     Page 2 of 4

# An unnatural way to die

**This week the World Medical Association discussed the attitudes of physicians to capital punishment. There are many ways of lawfully killing but, death apart, what is the biological effect of execution?**

**Harold Hillman**



LAST JULY, the British parliament voted decisively against the re-introduction of the death penalty, and everyone, it seemed, had an opinion on it. But what happens during an execution. Why does the person die? Is it painful? Is death instantaneous? Which is the most humane method? Here I shall deal with the techniques most commonly used in countries which practise capital punishment. I shall discuss only those methods in which execution is the primary intention, although torture, flogging or starvation of prisoners frequently result in death.

If the death penalty had been re-introduced in Britain, **hanging** would probably have been the method. The prisoner is blindfolded and stands on a trap door, with a rope around his neck. The trap door is opened suddenly. The weight of the prisoner's body below the neck causes traction and tearing of the cervical muscles, skin and blood vessels. The upper cervical vertebrae are dislocated, and the spinal cord is separated from the brain: this is the lesion which causes death. The volume of blood in the skull and face quickly increases, but soon the blood supply to the brain falls drastically (ischaemia). The respiratory and then the heart rate slow until they stop, and death supervenes.

Initially during hanging the prisoner attempts to move, presumably reacting mainly to the pain of neck traction and dislocation. Later on, there is a second series of more theatrical reflex movements, as a result of spinal reflexes originating at the site of severance of the brain from the spinal cord. Contrary to the beliefs of Victorian novelists, the later movements usually occur when the prisoner is unconscious, and are not evidence that he or she can still feel. It is often thought that hanging immediately arrests respiration and heartbeat; this is wrong. They both *start* to slow immediately, but whereas breathing stops in seconds, the heart may beat for minutes. Blood loss plays little part in death due to hanging.

It is impossible to know for how long the condemned person feels pain, and the standard practice of hooding prevents observation of the face. Animals in an analogous situation often squeak. Their facial muscles go into spasm in a "risus sardonicus", and they close their eyes.

The person being hanged, in addition to suffering cervical pain, probably has an acute headache from the occlusion of his veins and engorgement of cerebral blood vessels; this results from the rope closing off the veins of the neck before occluding the carotid and vertebral arteries. The vertebral and spinal arteries are deep and are protected normally by bone, although this protection may be diminished by the dislocation.

In experiments during the Second World War on human volunteers in the US, in which the pressure at the lower end of the neck was suddenly raised to 600 mm mercury, consciousness was lost in 6 to 7 seconds. During this time, there would have been sufficient blood in the brain to maintain consciousness and, therefore, feel pain.

Much of our knowledge of what happens during hanging is derived from observations on animals whose necks have been dislocated to excise organs for biochemical, pharmacological and physiological experiments *in vitro*. This is the commonest method used to "sacrifice" animals when a researcher does not want an experiment influenced by anaesthesia. Of

Photo: Madrid/Bridgeman Art Library

Copyrighted material

New Scientist 27 October 1983

course, the same events occur when a farmer or slaughterer wrings an animal's neck.

**Shooting** is probably the second most widely used technique of execution. Death is virtually instantaneous if the person is shot at close quarters through the skull; the bullet penetrates the medulla, which contains the vital respiratory and cardiac centres, among others.

But condemned prisoners are usually shot by firing squads aiming at the heart from some metres away. As was shown by the assassination attempts on both President Ronald Reagan and on Pope John Paul—but not, alas, on President John F. Kennedy—it is difficult to shoot a person dead with a single or few shots, except at very close range. The reason for this is that the cause of death in these cases is normally blood loss through rupture of the heart or a large blood vessel, or tearing of the lungs. Any lover of grand opera or classical Westerns knows that death in these circumstances takes several minutes, quite enough for the victim to sing a powerful aria or almost to describe the location of the buried treasure.

Persons suffering bullet wounds have reported that they felt as if they had been kicked hard by a horse; they do not always experience severe pain immediately, and they lose consciousness when the shock causes a fall in blood supply to the brain. Firing squads usually kill quickly because a substantial number of soldiers fire simultaneously.

Bullets cause a great deal of damage in tissues by releasing some of their enormous energy. The energy of a particle is a function of the square of its velocity. High-velocity missiles, such as rifle bullets, have a tremendous amount of energy, which is partly released as heat within the tissues. This causes evaporation of the tissues and water to form a carrot-shaped space several hundred times the volume of the original bullet; this phenomenon is called "cavitation" (see diagram). When the bullet has passed through, the cavity collapses, and sucks in dead tissue and contaminated air.

The **guillotine** was named after the French deputy who proposed the use of the device in 1789. It was tested on corpses at the Bicêtre Hospital in Paris, and employed by the French Revolution in 1792. It was introduced as a swift and painless device—as Joseph-Ignace Guillotin believed—to extend to all citizens the advantages of a technique used only on noblemen in France. Although most people believe that Guillotin invented the device, it had been previously used in Italy, Germany, France and Scotland in the 16th Century.

Guillotining was considered more humane because the blade was sharper and execution was more rapid than was normally accomplished with an axe. Death occurs due to separation of the brain and spinal cord, after transection of the surrounding tissues. This must cause acute and possibly severe pain. Consciousness is probably lost within 2-3 seconds, due to a rapid fall of intracranial perfusion of blood.

There are accounts in the literature of the eyes looking around from the severed head, and animals may do this when they are guillotined for experiments in which their organs are to be excised or their brain biochemistry is to be examined rapidly.

**Garrotting** was used in the Iberian Peninsula until about 10 years ago. It is a form of strangulation by a metal collar with a clamp. Those who use it believe that the resultant dislocation of the neck is rapid and death is instantaneous. Unfortunately, although the clamp is tightened very quickly, the degree of compression of the neck sufficient to dislocate it takes some seconds to achieve. The tissues of the neck are tough and the application of the contraption is highly disagreeable. In addition to compressing the soft tissues, the clamp occludes the trachea. Therefore it kills by asphyxia, cerebral ischaemia and neck dislocation. Dying is painful, deeply distressing and may take several minutes.

**Electrocution** was approved by the state of New York in 1888. Its use was immediately but unsuccessfully challenged in the federal courts as being a "cruel and unusual punishment". But it was used two years later, and several

## The stages of dying

ACUTE dying proceeds through a number of stages, irrespective of the agent which causes it. First, there is the "stress syndrome", so comprehensively documented by the Austrian-born physician Hans Selye. The person hyperventilates (breathes very rapidly), the heart beats faster, the muscles contract and the whole sympathetic nervous system is activated. Catecholamines (adrenaline and nor-adrenaline) and corticosteroids (hormones produced by the adrenal cortex) in the blood are elevated. The concentration of "high-energy phosphates" in brain and muscles falls. Glycogen in liver and muscles decrease.

In the second stage, the autonomic nervous system seems to become dominated by the parasympathetic nervous system, or the sympathetic response fails. The pupils dilate. The hairs of the skin erect. The person urinates and defecates.

In the third stage, dissolution supervenes. The temperature of the skin falls and then the cooling spreads centrally. The organs begin to lose their function—those like the brain with high oxygen consumption dying more quickly than the more slowly metabolising cornea. The body loses its resistance to infection, and anaerobic and aerobic organisms proliferate. The tissue autolyses (digests itself) and the proteins lose their structure.



*A Victorian view of hanging*

hundred people a year were executed in the US for rape and armed robbery, as well as murder, until the end of the 1960s.

The prisoner is securely fastened to a chair by his chest, groins, arms and legs to prevent violent movements and to keep the electrodes in place. These are moistened copper terminals attached to one calf and a band round the head. "Jolts" of 4-8 amperes at voltages between 500 and 2000 volts are applied for half a minute at a time, and a doctor inspects the condemned man to decide if he is dead, or if another jolt should be administered.

In April 1982, John Louis Evans was shocked for half a minute. This broke the leg electrode, which was re-attached. A second shock failed to kill him, and smoke was seen coming out of his mouth and his left leg; he was given a third dose. It took 10 minutes before the attending physician certified him as being dead. After an earlier electrocution, at post mortem the temperature of the leg electrode was found to be 54°C—about the temperature of a very hot bath.

Every first-aider is taught that the effects of accidental



Bullet enters          Bullet exit

*The gaseous cavitation produced by a bullet, whose diameter is slightly less than that of the exit tunnel on the right*

Copyrighted material



*Strapped in the chair, US, 1900*

electrocution are burns, respiratory paralysis and cardiac arrest. The widespread use of the electric chair for execution—like its use for the disposal of unwanted pets—was based on the belief that it caused instantaneous and painless death. In recent years, closer observation and attention have indicated clearly that this is not the case. In fact, there is no reason whatsoever to believe that the condemned person does not suffer severe and prolonged pain. He is so firmly fastened to the chair that he cannot move. The large amount of energy in the shock paralyses his muscles. Presumably it was the failure to move which led to the general belief that the prisoner was not suffering pain. However, it has been known for several decades that lack of movement does not mean absence of pain.

In the late 1930s, when Ugo Cerletti and Lucio Bini introduced electroconvulsive therapy for manic depression, it soon became apparent that patients had to be anaesthetised before the therapeutic shocks were applied; of course, this is standard practice nowadays. In Britain, it is illegal to operate experimentally on animals which have been paralysed only, by curare, and have not been anaesthetised, because it is known that they would feel pain. Indeed, a prisoner being electrocuted is paralysed and asphyxiated, but almost certainly is fully conscious and sentient. He feels himself being burnt to death while he is conscious of his inability to breath. It must feel very similar to the medieval trial by ordeal of being dropped into boiling oil.

In the US, capital punishment was reintroduced in some states in 1977. Fewer than 10 executions have been carried out since then, but 1200 condemned prisoners—mostly men—wait on "Death Row". Widespread unease has been felt about the use of the electric chair, and this has been re-inforced by opposition on moral, religious and aesthetic grounds. Furthermore, part of the suffering of the condemned persons has resulted from the long delays as their appeals grind through the complex legal machinery. Recently, the appeal procedure has been streamlined, so that many more executions may be expected unless the law is changed.

Two further techniques have been introduced in the US. In eight States of the Union, condemned persons may have the choice of being killed by **intravenous injection**, by hanging or shooting. On 2 December, 1982, Charlie Brooks of Texas had his vein cannulated by a physician. Then, from outside the execution chamber and unseen by the prisoner, a mixture was injected; this consisted of the rapidly acting anaesthetic pentothal, curare to paralyse the muscles, and potassium chloride to stop the heart. The condemned man would have gone off to sleep in 10-15 seconds, never to awaken again. If he did not resist, the prisoner would have suffered no more pain than a patient being given pentothal before an operation. However, the physician gave an overdose and the condemned man would have died under anaesthetic from central respiratory depression.

Another eight states have chosen **gassing** as a form of capital punishment. On 2 September, 1983, Jimmy Lee Gray was strapped to a chair in an airtight room. Sodium cyanide crystals were dropped into a bath of sulphuric acid below his chair, by depressing a lever from outside. Hydrogen cyanide gas evolved and the condemned man inhaled it. A sufficient concentration to constitute a lethal dose would take several seconds to minutes to accumulate, depending on how hard he tried to avoid inhaling. It would cause acute difficulty in breathing, asphyxia and, possibly, pain in the stomach. The prisoner would be severely distressed and in pain during the whole procedure. The resultant hypoxia would cause him to have spasms as in an epileptic fit, visible if he were not bound firmly; the strapping would prevent the appearance of spasms, but not their occurrence. The prisoner would have died of inhibition of respiratory enzymes.

Before executions, physicians are required to examine condemned persons to see if they are well enough to be executed. This puts the physician in an ambivalent professional and moral position. Medical doctors also have to certify that the person is not dead and implicitly sanction continuing the lethal measures. Or, they have to certify death, so that the burial may proceed. Yet in September 1981, members of the World Medical Association—including of course its most powerful member, the American Medical Association—resolved unanimously that, *inter alia*, "it is unethical for physicians to participate in capital punishment, although this does not preclude physicians certifying death". An attempt to sort out the several moral dilemmas for the medical profession was made when the World Medical Association met this week in Venice.



*In the condemned cell, through a Victorian artist's eyes*

In this article, I have deliberately not discussed the morality of capital punishment, since I believe that a physician or a physiologist has no more expertise in general moral and ethical questions than does anyone else. Each citizen should decide for himself whether society should subject a criminal to the short period of pain and distress, as justice for the prolonged and profound pain or distress that he may have caused others. Each citizen also has to consider whether he believes the lives of those who destroy others are as sacred as those who are pillars of society, or whether the destruction of anti-social individuals is a necessary price to pay to protect law-abiding citizens from them.

I have attempted to give what I believe to be the physiological facts of execution. They are inescapable even if gruesome, but, if considered, may well help us to make appropriate moral decisions. □

**Harold Hillman** is the reader in physiology at the University of Surrey, and the editor-in-chief of *Resuscitation*.

Copyrighted material