# Exhibit D

Affidavit, John P. Wikswo, Jr., Ph.D (April 27, 2021)

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

SWORN STATEMENT OF JOHN P. WIKSWO, JR., Ph.D

COUNTY OF DAVIDSON                    )
                                      )
STATE OF TENNESSEE                    )

Affiant John P. Wikswo, Jr., swears as follows:

1.     I hold a Bachelor's Degree in Physics from the University of Virginia, a Master's Degree in Physics from Stanford University, and a Ph.D. in Physics from Stanford University. I am the Founding Director of the Vanderbilt Institute for Integrative Biosystems Research and Education (VIIBRE), and at Vanderbilt University I am the Gordon A. Cain University Professor, A.B. Learned Professor of Living State Physics, and a Professor of Biomedical Engineering, Molecular Physiology & Biophysics, and Physics.

2.     I began investigating and considering judicial electrocution protocols and electrocution equipment in 1992. I have continued to do so for the past twenty-nine years.

3.     American jurisdictions first adopted electrocution as a means of execution in the late 1800s and early 1900s. At the time, the prevailing view was that a sufficiently strong current would, when applied would result in an instantaneous and painless death. That view has since been discredited.

4.     There are a small number of basic electrical principles that inform my understanding of how judicial electrocutions accomplish death.

   a.     Ohm's law describes the relationship between the three factors that govern electrical circuits: the current, in amperes (I), which is a measure of the flow of electrons per second; the voltage (E), which expresses the electrical pressure that drives the current; and resistance (R), which is a measure of impedance to current flow. According to Ohm's Law, the strength of a current flowing through a circuit is equal to the voltage applied divided by the total resistance in the circuit, or more simply, $I = \frac{E}{R}$.

   b.     The electric power delivered in a judicial electrocution is the product of the current and is measured in watts (W).

   c.     The electrical energy delivered in a judicial electrocution is the product of the power and the time, in seconds, over which the power is delivered. Energy is measured in joules (J).

   d.     There are two types of electrical circuits, both of which remain in wide use across the world. In a direct current (DC) circuit, current flows in the same direction at all times and with nearly continuous strength. In an alternating current (AC) circuit, the direction of the current flow constantly reverses, going from full strength to zero in one

1

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

direction, then from zero to full strength in the other direction. Current alternations in an AC circuit occur in a uniform manner, with a fixed frequency, measured in hertz (Hz).

  i.  DC is most commonly used to charge batteries for large power supplies (like electric cars) or to efficiently transfer large amounts of power from a generating source, like a solar panel, to a DC-to-AC converter so that it can be added to the electrical grid.

  ii.  Of all the electricity used in the United States today, an overwhelming majority is in the form of AC, as this is what is used to power most buildings. Although other countries use different frequencies, the most common frequency in the United States is 60 Hz, meaning that the current alternates sixty times per second. Some generators supply current at higher frequencies, for example aircraft power systems operate at 400 Hz, but it is unusual for a building in the United States to be supplied with power at any frequency other than 60 Hz. AC electric power can be converted to higher or lower voltages by means of transformers. A typical household electrical wall outlet delivers current at 120 volts, reduced by a transformer outside a dwelling or business from a much higher local transmission line voltage, such as 13,800 volts.

5. Based on my decades of research and the empirical evidence that accumulated in the century-plus that has passed since the first judicial electrocution, I am now confident that there is a substantial risk that in a significant number of cases death by electrocution is neither painless nor instantaneous for the reasons described in detail below.

6. The electrocution protocols and equipment that I have reviewed during the past twenty-nine years were designed to administer to a prisoner a 60 Hz alternating electrical voltage of between 1,500 and 3,000 volts and a current of 4 to 10 amps, or possibly more. These protocols were intended to render prisoners instantaneously unconscious, but they do not accomplish that goal.

7. The electrocution protocols and equipment I reviewed accomplished this result by attaching electrodes to seated prisoners' heads and to one or both of their lower legs.

8. The information I have received regarding South Carolina's plan to carry out an electrocution event is consistent with the information described in paragraphs 6 and 7.

9. In the course of reviewing the electrocution protocols and equipment described above, I also did the following:

  a.  Reviewed scientific literature concerning the application of electrical current to living organisms;

  b.  Reviewed scientific literature describing the physiological trauma associated with lightning strikes, electrocution in industrial accidents, and

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

electroconvulsive therapy;

c.     Reviewed non-scientific material relating to, among other things, anecdotal accounts from persons who have come into contact with a high-voltage electrical current;

d.     Reviewed autopsy reports of electrocuted prisoners from jurisdictions other than South Carolina;

e.     Read statements from persons who witnessed judicial electrocutions of prisoners; and

f.     Conducted my own research on cardiac, skeletal muscle, and neural responses to electrical stimulation. In this work, we have analyzed electrocardiogram data from patients having an acute myocardial infarction, studied factors that govern the process of cardiac fibrillation, and demonstrated the existence of the virtual cathodes and virtual anodes that serve as the fundamental tissue-level mechanisms for electrical defibrillation of the heart. We have recorded in detail the magnetic field produced by electrical activity in the heart, skeletal muscle, and nerves, and described these fields using detailed mathematical models of the electrical stimulation and response of electrically active tissues. We made detailed measurements on how the strength of electrical shocks determine the response of peripheral nerves to electrical stimulation.

10.     In addition to the information I reviewed about judicial electrocutions generally, attorneys from Justice 360 asked me to review the following information specific to South Carolina's electrocution process:

a.     A three-page fact sheet from the South Carolina Department of Corrections (SCDC) entitled "The Death Penalty in South Carolina";

b.     South Carolina Department of Corrections (SCDC) Execution Directives, Document SK-22.03, issued January 5, 1999;

c.     South Carolina Department of Corrections (SCDC) Execution Procedures as delineated in document number SK-22.02 issued on May 1, 2002;

d.     The February 4, 2009 affidavit of Robert E. Ward for Luke A. Williams, III, SCDC #SK-4874 v. Jon Ozmint, SCDC, and contained therein the South Carolina Department of Corrections (SCDC) Execution Procedures as delineated in document number SK-22.03 issued on May 1, 2008;

e.     Eleven letters dated 1912 and 1913 regarding the fabrication and use of apparatus (electric chairs) for judicial electrocution and the acquisition of sponges;

f.     Pages from the Report of State Electrician and Engineer to the General Assembly of the State of South Carolina at the Regular Session Beginning January, 1926;

3

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

g.      Pages from the Report of State Electrician and Engineer to the General Assembly of the State of South Carolina at the Regular Session Beginning January, 1927;

h.      Newspaper and other accounts of South Carolina judicial electrocutions and other events from 1893 through 1996; and

i.      A Microsoft Excel spreadsheet prepared by Justice 360 attorneys that lists 248 electrocutions carried out in South Carolina, with information about each electrocution, including the date of the electrocution, the height and weight of the electrocuted person, and the electrocuted person's gender, race, and age. The spreadsheet also lists the following information, where it is available: the maximum voltage used; the reported amperage applied; the number of shocks applied; the duration of the execution; whether witnesses saw smoke, fire, or sparks; whether witnesses reported any odors; and whether the person had a heartbeat after the execution.

11.      Based on the information I have reviewed, I conclude to a reasonable degree of scientific certainty that there is a substantial risk that a prisoner electrocuted using South Carolina's Electrocution Protocol and electrocution event will remain alive, conscious, and sensate for some period of time during the electrocution process and, as a result, will experience for some period of time the excruciating pain and suffering associated with the phenomena that occur when a high voltage electrical current contacts a human being.

12.      Specifically, after reviewing the electrocution protocols, equipment, and other materials described above, I arrived at the following conclusions and opinions about them:

a.      Prisoners can remain alive for some period of time during the electrocution event. I base this conclusion on the following:

   i.      There are numerous cases of judicial electrocutions, including in South Carolina, wherein the prisoner was still alive after one or more electrical shocks, as evidenced by breathing or a beating heart. Hence, they remained alive during the attempted execution.

   ii.      A prisoner's heart will not necessarily stop instantaneously when the high voltage electrical current contacts the prisoner's body.

   iii.      Even when contact with high voltage electrical current causes a prisoner's heart to stop beating at its normal rate, when the current ceases, there is a high probability that the prisoner's heart will spontaneously resume beating.

   iv.      In contrast to skeletal muscle, which tetanizes into a contracted state throughout the duration of an AC shock, cardiac muscle does not tetanize during continuous AC stimulation.

   v.      In order to prevent this resumption of the heartbeat, electrocution

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

aims to induce the heart to enter a mode of excitation known as fibrillation. However, electrical shocks whose voltage is above the upper limit of vulnerability (the shock strength above which an electrical shock cannot induce fibrillation) are unlikely to induce fibrillation. While the electrical energy in joules delivered to the prisoner can be computed from the current, voltage, and duration of the shocks, it is difficult to determine in energy actually delivered to the heart in a judicial or accidental electrocution. Anecdotally, electric shocks at 120 V are much more likely to cause cardiac fibrillation than are shocks over 1000 V.

vi.     If the electrical shock does not induce fibrillation but prevents the heart from beating at its normal rate, termination of the electrical shock could enable the heart to resume beating spontaneously.

vii.     During a strong alternating current electrical shock, contractions of the heart may become entrained to, or synchronized with, the alternating current, leading to defibrillation.

viii.     Even when a prisoner's heart fibrillates during an electrocution execution, death does not occur instantaneously. Rather, death results only after a period of time as the fibrillation of the prisoner's heart reduces cardiac output to the point that it is insufficient to maintain life.

ix.     When high voltage electrical current contacts a prisoner, the skeletal muscles he requires for breathing tetanize, meaning they enter a state of sustained contraction, and the prisoner cannot breathe to supply oxygen and eliminate carbon dioxide. Thus, a prisoner subjected to an electrocution execution described above dies from asphyxiation and/or organ damage due to thermal heating, i.e., cooking. These processes require a period of time to produce death.

x.     Should an electrocution shock fail to kill the prisoner, it would be possible for the prisoner to resume breathing again and prisoner's heart to resume beating. While the rhythms of breathing may be irregular, they could prolong the prisoner's pain and suffering.

xi.     No scientific evidence contradicts the above statements.

b.     Prisoners can remain conscious and sensate for some period of time during the electrocution event. There is evidence that this has happened in electrocutions in South Carolina. I base this conclusion on the following:

i.     A prisoner will lose consciousness during an electrocution event through loss of brain function. Loss of brain function occurs through (1) a direct electrical stimulation of the neurons in the brain; or (2) insufficient blood circulation to the brain due to cardiac asystole, shock entrainment, fibrillation, or asphyxia due to either cardiac or respiratory arrest.

5

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

ii.    Upon contacting the prisoner's body at the top of his or her head, the electrical current follows to the leg electrode(s) along paths of least resistance. The prisoner's skull presents significantly greater resistance for the current than does the prisoner's skin. As a result, the vast majority of the electrical current travels around the perimeter of the prisoner's head and down the prisoner's torso and legs until it leaves his or her body through an electrode applied to the calf of one leg, or an electrode on each leg. As the current alternates, it follows paths of least resistance in the opposite direction.

iii.    Because the skull effectively insulates the brain from the electrical current flowing from and to the head electrode/sponge, the electrical current may not immediately incapacitate the prisoner's brain. Rather, the ability of the prisoner's brain to function becomes compromised over time by a combination of factors: (1) electrical stimulation of neurons; (2) the reduced portion of the current that reaches the prisoner's brain and stimulates unspecified neural circuits by the electric current; (3) indirect thermal transfer through the skull, thereby heating the nerves; (4) indirect thermal transport through the blood vessels of the prisoner's neck; and (5) loss of oxygen.

iv.    The reduced portion of electrical current that reaches the prisoner's brain may, on occasion, depolarize a prisoner's brain, disrupting the brain's ability to transmit electrical current and inactivating (depolarizing or hyperpolarizing) the neurons. However, there is no scientific evidence that the prisoner's depolarized or hyperpolarized brain neurons will thereafter be incapable of repolarizing during the alternating current stimulation.

v.    Should depolarization or hyperpolarization of a prisoner's brain occur, a 60 Hz alternating current provides for repolarization of the prisoner's brain on the subsequent half-cycle.

vi.    Upon termination of the shock, the neurons in the brain may resume functioning unless they have been heated to a temperature at which neuron function is not possible or otherwise damaged, for example by electroporation of the nerve membranes in response to the transient voltage applied to them.

vii.    No scientific evidence contradicts the above statements.

c.    Because prisoners can remain alive, conscious, and sensate during at least a portion of the duration of a judicial electrocution event, for the following reasons they can experience excruciating pain and suffering during the event:

i.    When the high voltage electrical current contacts a prisoner and travels through his or her body, it burns the prisoner, causing extreme pain.

ii.    When the high voltage electrical current contacts a prisoner and

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

travels through his or her body, it thermally heats, i.e., cooks, his or her body and internal organs, causing extreme pain.

iii.     When the high voltage electrical current contacts a prisoner and travels through his or her body it directly excites most if not all sensory, motor, secretory, and autonomic nerves along the paths the current follows, causing extreme pain.

iv.     When the high voltage electrical current contacts the prisoner and travels through his or her body it can excite some brain neurons, causing extreme pain as well as sensations of sound, light, dread, and fear.

v.     When the high voltage electrical current contacts the prisoner and travels through his or her body, his or her skeletal flexor and extensor muscles that control straightening or bending of the arms and legs simultaneously tetanize, causing extreme pain. The muscles will remain tetanized until the current ceases.

vi.     When the high voltage electrical current contacts the prisoner and travels through his or her body, the skeletal muscles he or she requires for breathing tetanize, and the prisoner can neither inhale nor exhale. As a result, the prisoner experiences the sensation of suffocating. The intense metabolic demands of muscle tetany aggravate the prisoner's sense that he is suffocating.

vii.     The prisoner's perception of time during the electrocution process can become distorted so that he or she may perceive (1) each of the sixty-per-second alternating cycles of electrical current; and (2) the electrical trauma as lasting dramatically longer than it would appear to a bystander. As an example, there is a report in the literature that an electrical lineman, during an accidental high-voltage electrical shock, watched the individual spokes of a bicycle wheel turn slowly as a rider was passing by during the shock.

viii.     Because contact with high voltage electrical current causes muscle tetany, and because the electrocution protocols I reviewed command that the prisoner be harnessed tightly onto the electrocution equipment, a prisoner is unable to signal that he is experiencing pain and suffering during an electrocution.

d.     Because of the unpredictability and variability of each prisoner's electrical resistance due to differences in height, weight, bone density and body fat and that of the connections to his or her body during an electrocution execution, the current delivered to each prisoner will vary significantly from the currents delivered to other prisoners. As a result, the duration of time that individual prisoners remain alive, conscious, and sensate is unknown and will vary substantially from prisoner to prisoner.

e.     Because prisoners can remain alive at the conclusion of an electrocution execution, some of the electrocution protocols I reviewed provided that after the

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

executioner shuts off power to the electrocution equipment, a medical professional must wait for a period of time, usually four to five minutes, before examining a prisoner's body for signs of life. Although South Carolina's most recently available protocol does not specifically call for a waiting period, the historical accounts I reviewed indicate that in some electrocutions in South Carolina, the EMT waited for the body to cool before examining it. During this period, prisoners who survive the electrocution process die from thermal heating, i.e., cooking, of their vital organs, and asphyxiation.

13.     Since 1912, South Carolina has carried out judicial electrocutions using protocols that called for application of a wide range of maximum voltages, with a minimum of 1,350 volts in 1930 to a maximum of 7,000 volts in 1962. The majority of electrocutions for which there is reliable evidence were carried out using a maximum application of 2000 to 3000 volts. There is evidence consistent with painful or torturous deaths in electrocutions carried out according to protocols across the range of voltage requirements.

      a.     There is evidence consistent with torturous executions in thirty percent of all electrocutions in South Carolina's history for which there is any reliable information.

         i.     Witnesses to seven executions reported seeing smoke or fire; witnesses at three reported sparks; nine electrocuted people had a heartbeat after the first electrocution attempt; and fourteen people were reported to have involuntarily clenched their fists or demonstrated other evidence of involuntary muscle contractions.

         ii.     The witness reports from historical executions in South Carolina are consistent with witness reports from more recent executions in other jurisdictions.

      b.     The most recently available information indicates that South Carolina's electrocution protocol consists of a cycle of "2,000 volts at five amps for five seconds followed by 1,000 volts at two amps for eight seconds followed by approximately 250 volts for two minutes." Electric Chair Facts at page 3. This protocol is inconsistent with basic principles of electricity.

         i.     Given that the electrical resistance of the prisoner is unknown prior to the electrocution procedure and may vary during that procedure it is impossible by the laws of physics in general and Ohm's law in particular, to guarantee that BOTH criteria in South Carolina's most recent protocol—2,000 or 1,000 volts AND 5 or 2 amps—are met. There is no way, as a matter of basic electrical science, to ensure that both of these criteria (voltage and amperage) can be met simultaneously, and hence I find the most recent South Carolina Electrocution Protocol to be inaccurate from both the scientific and engineering perspective.

14.     Based on my review of the material described in Paragraph 13(b), above, and my consideration of that material in conjunction with the material described in Paragraph 13(b)(i),

8

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

above, I conclude and opine as follows:

a.     The most recently available South Carolina Electrocution Protocol calls for (1) an initial five-second application of 2,000 volts at five amperes, 60 Hz alternating electrical current; (2) a second eight-second application of 1,000 volts at two amperes, 60 Hz alternating electrical current; and (3) a final application of 250 volts for two minutes. This protocol is substantially the same as the protocol South Carolina first used when it carried out its first judicial electrocution in 1912.

b.     South Carolina's electrocution equipment requires the prisoner to sit in a chair. Electrodes are attached to the seated prisoner's head and one leg, and cables connected to a high-voltage transformer deliver the stated voltage to the prisoner.

c.     The initial five-second application of electrical current will not provide a time long enough for a prisoner to die because (1) electrical current applied during an electrocution execution will not necessarily stop the prisoner's heart; and (2) the skeletal muscles the prisoner requires for respiration will relax when the current stops, and air will flow into the prisoner's lungs.

d.     Based on South Carolina's most recently available Electrocution Protocol, my conclusions and opinions expressed in Paragraphs 12(b), 12(c), and 14(c), above, apply to the South Carolina protocol and equipment. Specifically, prisoners executed using South Carolina's Electrocution Protocol and electrocution equipment can, for some period of time, remain alive, conscious, and sensate during the electrocution event and can experience the excruciating pain and suffering associated with the phenomena that occur when a high voltage electrical current contacts a human being.

e.     Autopsy reports from judicial executions in other states, which use protocols substantially similar to South Carolina's, describe burns to the head, legs, and body that are fully consistent with the thermal heating that occurs as the electrical current passes between the electrodes and the prisoner, or between different parts of a prisoner's body.

i.     The autopsy reports describe thermal burns on the anterior and posterior portions of the neck that are consistent with substantial electric current flow through the skin and soft tissues of the neck, which in turn would have been a result of the electrical insulating properties of the bones of the skull that would have prevented substantial current from passing through the brain and the spinal cord.

ii.     Some autopsy reports describe thermal burns to the hands, lower back, thighs, and other regions of the body, including between tissue folds. These burns suggest that in those electrocutions, the electric current found an alternative path between the head and calf electrodes.

iii.     Some autopsy reports describe superficial blunt force injuries and

9

ELECTRONICALLY FILED - 2021 May 17 2:49 PM - RICHLAND - COMMON PLEAS - CASE#2021CP4002306

abrasions to the scalp, forehead, chin, foot, upper arms, and calf. These injuries are consistent with witness reports of the prisoner jerking against the straps and electrodes after application of the electric current and the resulting violent muscle contraction and tetany.

15.    A review of the information described above—both from other jurisdictions and specifically from South Carolina—makes clear to a reasonable degree of scientific certainty that South Carolina cannot carry out an execution by electrocution without running a significant risk of subjecting prisoners to excruciating pain.

FURTHER AFFIANT SAITH NAUGHT



John P. Wikswo, Jr., Ph.D.
Founding Director, Vanderbilt Institute for Integrated Biosystems Research and Education
Gordon A. Cain University Professor, A.B. Learned Professor of Living State Physics,
     Vanderbilt University
Professor of Biomedical Engineering, Molecular Physiology & Biophysics, and Physics,
     Vanderbilt University

STATE OF TENNESSEE

COUNTY OF DAVIDSON

Sworn and subscribed before me on this the __27__ day of ~~March~~ April, 2021.

_Pem_____
NOTARY PUBLIC

PAUL M. SKEENS
STATE OF TENNESSEE NOTARY PUBLIC
WILLIAMSON COUNTY

My commission expires:

My Commission Expires
~~May 23, 2022~~
Date

10