# Exhibit F

Affidavits of Witnesses to Executions by Electrocution

Affidavit of Dale Baich, Nebraska (May 14, 2014)
Affidavit of Robert Hammerle, Indiana (June 30, 2014)
Affidavit of Paula Hutchinson, Nebraska (Dec. 5, 1996)
Affidavit of Michael J. Minerva, Florida (July 9, 2014)
Affidavit of John W. Moser, Florida (July 8, 1999)
Affidavit of Rabbani Muhammad, Florida (Sept. 23, 1998)
Affidavit of Kim Curley Reynolds, Georgia (Oct. 16, 2014)
Affidavit of Gregory C. Smith, Florida (June 24, 2014)
Affidavit of Tom Weise, Alabama (July 16, 2014)

SWORN STATEMENT OF
DALE A. BAICH

FILED
2014 NOV 17 PM 3: 13
DAVIDSON CO. CLERK &
...CHANCERY CT
D.C & M

STATE OF ARIZONA            )
                           )            ss:
COUNTY OF MARICOPA         )

Affiant Dale A. Baich affirms as follows:

1.     I am an adult resident citizen of Phoenix, Maricopa County, Arizona. I am an attorney in good standing before the Ohio Supreme Court, and I am licensed to practice law in the State of Ohio.

2.     On July 16, 1996, pursuant to Section 29-2534 of the Nebraska Statutes, Harold W. Clarke, the Director of the Nebraska Department of Corrections and Frank X. Hopkins, the Warden of the Nebraska State Penitentiary, appointed me as a witness to the execution of John J. Joubert. The execution was scheduled to take place on July 17, 1996.

3.     At or about 11:50 p.m. on July 16, 1996, I was escorted into the Death Chamber Viewing Room in the Nebraska State Penitentiary. I was seated in the first of three rows of chairs facing a window that separated the viewing room from the execution chamber. A curtain, on the execution chamber side, covered the window.

4.     At or about 11:51 p.m. on July 16, 1996, an individual who appeared to be a prison official entered the room and offered witnesses paper bags. He set the bags on a chair in the viewing room.

5.     At or about 11:59 p.m. on July 16, 1996, I heard muffled "clanking" sounds coming from the execution chamber. At or about 12:00 a.m. on July 17, 1996, I heard a faint high pitched "squeak" from the execution chamber.

6.     At or about 12:06 a.m. on July 17, 1996, the curtains covering the window to the execution chamber were opened. I observed the following:

1

1889

a.    The electric chair, which appeared to be oversized and constructed of a dark-colored wood, was approximately ten feet from the window that separated the viewing room from the execution chamber. The electric chair was in the center of the execution chamber and it rested on a slightly-raised platform.    The lighting in the execution chamber was bright.

b.    Mr. Joubert was already strapped into the electric chair. He was secured in the chair by two tan leather restraints with buckles across his chest and two tan leather restraints across his torso.    Tan leather restraints with buckles also secured Mr. Joubert's arms to the arms of the electric chair, and his legs to the legs of the electric chair.

c.    Mr. Joubert's head was completely shaved and his beard and mustache were shaved as well.    He was wearing an oversized khaki jumpsuit.    Long sleeves covered Mr. Joubert's arms and the outseam of the left pant leg was slit.    Mr. Joubert's feet were covered by white socks.    His feet did not touch the floor of the platform on which the chair rested.

d.    Mr. Joubert's skin color was pale white.

7.    At or about 12:07 a.m. on July 17, 1996, the curtains covering the window to the execution chamber were closed.

8.    At or about 12:13 a.m. on July 17, 1996, the curtains covering the window to the execution chamber were opened.    I observed the following:

a.    Mr. Joubert's face was covered with a tan leather mask.    The mask covered Mr. Joubert's face from just above his eyebrows to the bottom of his chin.    A triangle cut in the mask exposed Mr. Joubert's nose.

b.    A dark leather strap secured an electrode to the top of Mr. Joubert's head.    The electrode was to the right side of his head and a sponge-type material, which appeared to be moistened, rested between the electrode and Mr. Joubert's scalp.    The strap securing the electrode circled Mr. Joubert's head from the top to under his chin.    There also appeared to be some type of fastening device on the strap in the area of Mr. Joubert's left ear.

c.    A dark leather strap secured an electrode to Mr. Joubert's left calf.    The electrode was located about halfway between Mr. Joubert's knee and ankle on the outside of his calf.    A sponge type material, which appeared to be moistened, rested between the electrode and Mr. Joubert's calf.

d.    The front of Mr. Joubert's jumpsuit appeared to be wet.    As time passed, more moisture appeared.

2

1883

9.    As Mr. Joubert sat in the electric chair, he repeatedly tapped his right index finger on the arm of the electric chair.

10.    At or about 12:14 a.m. on July 17, 1996, I heard a "clunk" sound and at the same time saw Mr. Joubert immediately puff up. It appeared as if he was being ejected from the electric chair. It appeared as if the jumpsuit Mr. Joubert was wearing suddenly filled with a blast of air. The rhythmic movement of Mr. Joubert's right index finger stopped and his hands curled into tight fists. Mr. Joubert's nose and the top of his head appeared to swell up. Mr. Joubert's head snapped to the back of the electric chair and his feet curved inward, making him look grossly pigeon-toed. Mr. Joubert's skin color changed from pale white to blue. This lasted for approximately ten to fifteen seconds.

11.    Next, I observed Mr. Joubert's jumpsuit deflate as his body pulled back to the seat, back, arms and legs of the electric chair. Mr. Joubert's fisted hands appeared to loosen. This lasted for approximately ten seconds.

12.    At or about 12:15 a.m. on July 17, 1996, I heard a second "clunk" sound and again, at the same time, saw Mr. Joubert immediately puff up. Again, it appeared as if Mr. Joubert was being ejected from the electric chair, and the jumpsuit filled with a blast of air. Mr. Joubert's fingers curled into tighter fists and his nose and the top of his head remained swollen. Again, Mr. Joubert's head snapped to the back of the electric chair and his feet curved inward, making him look pigeon-toed. Mr. Joubert's skin color changed from blue to red. This lasted for approximately thirty seconds.

13.    I then observed Mr. Joubert's jumpsuit deflate as his body pulled back to the seat, back arms and legs of the electric chair. This lasted for approximately ten seconds. The color of Mr. Joubert's skin became more red and his fingers remained curled in tight fists.

14.    At or about 12:15 or 12:16 a.m. on July 17, 1996, once again I heard a "clunk" sound and at the same time saw Mr. Joubert immediately puff up. Again, it appeared as if Mr. Joubert was being ejected from the electric chair and the jumpsuit suddenly filled with a blast of air. I heard a "hissing" sound and observed a puff of white smoke rise from the electrode attached to Mr. Joubert's left calf. The

3

1884

knee area of the left leg was blanched and the area below the left knee above the electrode was red and the color rapidly became more conspicuous. Fluid began to drip from the area surrounding the electrode on Mr. Joubert's calf. Mr. Joubert's fingers were still curled into tight fists and his nose and the top of his head were still swollen. Again, Mr. Joubert's head snapped to the back of the electric chair and his feet curved inward making him look pigeon-toed. I detected a fait scent of burnt flesh. Mr. Joubet's skin color changed from red to purple. This lasted for approximately thirty seconds.

15. I then observed Mr. Joubert's jumpsuit deflate and his body pulled back to the seat, back, arms and legs of the electric chair. This lasted for approximately ten seconds. The color of Mr. Joubert's skin remained purple and his fingers stayed curled in tight fists.

16. At or about 12:16 a.m. on July 17, 1996, and for the fourth time, I heard a "clunk" sound and again at the same time saw Mr. Joubert immediately puff up. The knee area of the left leg remained white and the area below the left knee and above the electrode remained red. Fluid continued to drip from the area surrounding the electrode on Mr. Joubert's calf. Again, Mr. Joubert's head snapped to the back of the electric chair and his feet curved inward. Mr. Joubert's fingers were still curled into tight fists and his nose and the top of his head were still swollen. Mr. Joubert's skin color began to change from purple to charcoal. The charcoal color of the hands was darker than the color of Mr. Joubert's head. This lasted for approximately twenty to thirty seconds.

17. At or about 12:16 or 12:17 a.m. on July 17, 1996, I observed Mr. Joubert's jumpsuit deflate as his body pulled back to the seat, back, arms and legs of the electric chair. Mr. Joubert's head was bent forward, slightly to the right. The color of Mr. Joubert's skin began to change from a light charcoal color to a darker charcoal. Mr. Joubert's feet were still curved inward, making him look pigeon-toed and his hands stayed curled in tight fists. Mr. Joubert's nose and the top of his head were still swollen.

18. At or about 12:21 a.m. on July 17, 1996, an individual who appeared to be an officer with the Lancaster County Sherriff's Department entered the execution chamber from the left side of the electric chair. He went behind the electric chair and to the right side of the electric chair. The officer

4

1885

unbuttoned the top button of the jumpsuit and placed his fingers on the right side of Mr. Joubert's neck. At about 12:22 a.m. on July 17, 1996, the officer looked at the assembled witnesses and shook his head. Approximately thirty seconds later the curtains were closed and the witnesses were asked to exit the viewing room.

FURTHER AFFIANT SAITH NAUGHT.

_____ *May 14, 2014* _____     _____ *Dale A. Baich* _____
Date                                Dale A. Baich

Sworn and subscribed before me on this the __14__ day of May, 2014.

_____ *Brenda J Deckard* _____
NOTARY PUBLIC
My commission expires:

**BRENDA J DECKARD**
Notary Public, State of Arizona
Maricopa County
My Commission Expires
**June 05, 2016**

_____ *June 05, 2016* _____
Date

5

1886

## SWORN STATEMENT OF ROBERT W. HAMMERLE

STATE OF INDIANA    )
                    ) SS:
COUNTY OF MARION   )

Affiant Robert W. Hammerle swears as follows:

1. I am an adult resident citizen of Indianapolis, Marion County, Indiana.

2. I am an attorney in good standing before the Indiana Supreme Court.

3. I make the following affirmations based on personal knowledge.

4. I was a member of a group of lawyers who represented Gregory Resnover during Clemency Proceedings before the Indiana Parole Board and Governor. After the Governor denied Gregory relief from his death sentenced, I volunteered to witness his execution.

5. During the evening of December 7, 1994, I was driven to Michigan City, Indiana, for one last visit with Gregory. The visit took place in a room next to the execution chamber that housed the electric chair. When I entered the room I saw that Gregory had been shaved bald, and that the legs of the pants he wore had been slit on the side from approximately the knee down.

6. Prison officials prevented me from getting any closer than five feet from Gregory. He was calm and reflective, and my recollection is that he told me that he refused to eat a last meal as a sign of his silent protest. I simply promised him that he would not be forgotten. When it was time for me to leave, I was not allowed to touch Gregory. I placed my hand over my heart, he placed

**1544**

his hand over his, and I walked out of the room.

7.    During my last visit with Gregory, I heard humming coming from an adjoining room, which I understood was the execution chamber.

8.    I was taken to a waiting room in the same building. A prison guard came and searched me, and he then escorted me to the witness room where there were rows of plastic chairs placed in front of a large window. Drawn shades on the other side of the window prevented me from seeing into the adjoining room. Other persons were already in the witness room, including Gregory's son.

9.    I sat down on a plastic chair in the front row.

10.    Without warning the blinds were drawn. I saw Gregory strapped to the electric chair. He had what appeared to be a bag over his head that was tied closely to his neck. Guards surrounded him. No one said anything.

11.    Seeing his father strapped and hooded in the electric chair, Gregory's son collapsed into the arms of the man sitting next to him.

12.    Without warning, the electric chair was activated. Gregory jerked up from the chair. He kept jerking up. I saw smoke, sparks and flame coming out of the bag that covered Gregory's head.

13.    When the electric chair's power was turned off, Gregory's body slumped down. A doctor entered the execution chamber and inspected Gregory's body. The doctor stated that Gregory was still alive.

2

1545

14.    The doctor left the execution chamber. Again, without warning, the electric chair was activated.

15.    Gregory's body again jerked up, and smoke poured out from the bag covering his head. The smell of burnt flesh filled the witness room.

16.    When the electric chair's power was turned off, Gregory's body again slumped down. The doctor entered the execution chamber and again inspected Gregory's body. This time the doctor said that Gregory was dead.

17.    The blinds on the window of the execution chamber were lowered, and the witnesses were escorted out of the witness room.

FURTHER AFFIANT SAITH NAUGHT.

Robert W. Hammerle

STATE OF INDIANA     )
                     ) SS:
COUNTY OF MARION     )

Sworn and subscribed before me, on this 30th day of June, 2014.

Nanci A. Miller
Notary Public

Marion County Resident
My Commission Expires: 6-29-16

3

1546

| AOC- 060<br>Rev. 12-10<br>Page 1 of 1<br><br>Commonwealth of Kentucky<br>Court of Justice   www.courts.ky.gov | CERTIFICATION OF<br>COURT RECORDS | Case No. 2011-CI-01094<br>Court Franklin Circuit<br>County Franklin |

RALPH _____ BAZE _____          PLAINTIFF/PETITIONER

VS.

ERNIE _____ FLETCHER          DEFENDANT/RESPONDENT

I, Sally Jump _____,

Clerk of the Franklin Circuit _____ Court, do certify that the following are true and correct copy(s) of the:

Exhibit No. 16:  Affidavit of Paula Hutchison

IN TESTIMONY WHEREOF, witness my hand as Clerk aforesaid, June 9 _____, 2014 .

Sally Jump _____ Clerk

By: _____ D.C.

1894

## AFFIDAVIT OF PAULA B. HUTCHINSON

Paula B. Hutchinson, being first duly sworn, states as follows:

1.      My name is Paula B. Hutchinson. This affidavit is made upon my personal knowledge and information. I am over the age of twenty-one (21) and I am competent to make this affidavit and to testify in court to the truth of these matters.

2.      I am an attorney licensed to practice law in the State of Nebraska.

3.      I served as part of the team of attorneys who represented Harold Lamont Otey, who was put to death by the State of Nebraska on September 2, 1994.

4.      I was one of three persons chosen by Mr. Otey to witness his death by electrocution.

5.      The following is an accounting of certain events which occurred prior to and during Mr. Otey's death.

6.      Mr. Otey had come within several hours of being electrocuted by the state on two prior occasions. He told me that, based on his prior experiences, he expected to be removed from his cell on death row to a cell in the prison hospital unit several days prior to his being killed. He told me that he would not be given advance notice of the move, and that he would be allowed few, if any, personal possessions after the move. He expressed anxiety on several occasions about his anticipating being moved and not knowing when it would occur.

7.      On the evening of August 25, 1994, Mr. Otey phoned me at approximately 10:30 PM to say that he had been moved to the hospital cell. His voice trembled and he was breathing rapidly and talked very rapidly. He expressed concern about not having his legal materials and other possessions.

8.      I spoke with Mr. Otey about his case on several occasions by telephone over the

266
447

next three days, and he seemed agitated during each of these conversations. He discussed the legal arguments to be made in great detail but never discussed the likelihood that he was about to be killed.

9.     I visited Mr. Otey in the hospital unit on two occasions prior to the day of his death. Three hospital cells were set aside for his detention there. One was where he was housed; one was for body searches of his visitors, and one was used as a visiting room. He was placed in handcuffs during these visits, and at least two guards remained outside his door, with several more guards in the immediate area. Again, he discussed his case but avoided any mention of his impending death.

10.     On the day Mr. Otey was to be killed shortly after midnight, his case remained pending before the United States Supreme Court. At about 10 AM, he phoned and asked me to visit and review with him the court documents that had been filed the night before. When I arrived at the penitentiary about noon, Mr. Otey said that another of the attorneys just had visited but there were "too many tears" on both their parts and they were unable to discuss the case. I explained the legal issues that had been raised. A deputy warden entered and offered Mr. Otey a meal, which he declined. Mr. Otey told me he had not eaten in a while, but he had no appetite. He spoke slowly and quietly, and seemed very sad. The deputy warden re-entered the room and reminded Mr. Otey he need to make a decision about witnesses to his death. I asked the deputy warden to delay this discussion until Mr. Otey and I had completed our attorney visit. When the deputy warden left, Mr. Otey somewhat indirectly asked whether I would be a witness. He expressed a great deal of anxiety about having personal witnesses because he did not want to subject anyone who was close to him to the ordeal of watching such a horrible spectacle as a death by electrocution

*267*

*148*

1896

11.    I knew that Mr. Otey was acutely aware of the details of death by electrocution. Several weeks prior to his death, he told me that he did not wish to participate in a lawsuit based on the cruelty of electrocution as a method of execution because he preferred not to dwell on the details of the process. He previously had read a law review article by Deborah Denno discussing whether electrocution is cruel and unusual punishment under the Eighth Amendment. The article described in graphic detail the process of death by electrocution. Also, the CBS news program "48 Hours" had aired a one-hour segment about his case which included a display of the electric chair and the equipment used to restrain and conduct electricity through the person being killed. The program showed a rehearsal of the process by prison guards with one guard pretending to be Mr. Otey so as to allow the other guards practice at strapping Mr. Otey into the chair and applying the mask and various electrodes. The program also showed staff testing the electrical equipment by running a current through a bucket of water placed near the chair. The penitentiary officials did not allow the bucket of water to be shown on the program, but the commentator explained the water began to boil very quickly. I knew Mr. Otey had viewed this program because we discussed the program after it aired in December of 1992, and again in the summer of 1993. So, as we discussed the subject of witnesses, it required a great deal of effort for me to convince Mr. Otey that he ought not to be left with strangers as he died.

12.    At about 8:30 on the evening he was killed, I received word by telephone from another of Mr. Otey's attorneys that the United States Supreme Court had refused to grant him a stay of execution. This meant he would be killed a few minutes after midnight. I went with two of his other attorneys to the penitentiary, where Mr. Otey and I spoke briefly.

13.    I met Mr. Otey's two friends who were to be his other personal witnesses in the lobby of the penitentiary, where we were told to wait until we were summoned. Upstairs, Mr.

268

1897

Otey stood in front of the official state witnesses (who were journalists and penitentiary staff) while his death warrant was read to him. One of these witnesses told me later that as the warrant was read, Mr. Otey remained silent, but looked each of them steadily in the eye. When asked to make a final statement, he shook his head and turned away. The remaining preparations were conducted outside the presence of the official state witnesses.

14.    All the witnesses then were directed to the viewing room of the execution chamber. Mr. Otey's personal witnesses, including myself, were accorded front-row seats. In front of us was a large plate-glass window with a pair of curtains drawn closed. A penitentiary official brandished a stack of brown lunch sacks, offering to distribute one to anyone who thought they might be sick. There were no takers.

15.    When everyone was settled in, the curtain was drawn open and Mr. Otey was alone in the execution chamber, strapped into the electric chair. We had been told earlier this initial viewing of him was for the official state witnesses to verify that it was Mr. Otey being killed. His arms, legs and chest were bound very tightly to the chair with broad leather straps. He made eye contact with me, nodded and silently mouthed a personal message. He repeated this process with each of the other two personal witnesses. He never once looked at anyone in the room except for the three of us. He continued to nod his encouragement to the three of us as long as the curtains remained open, which was for about a minute or so. As the curtains were drawn closed, he appeared to try to take a deep breath, but the tight straps around his chest appeared to restrict this effort. The curtains remained closed for about ten minutes, during which the roomful of witnesses waited in silence and heard nothing behind the glass. When the curtains opened again, Mr. Otey's face was covered by a stiff leather mask which covered all his face except for his nose, which appeared to be compressed to one side by the mask, which was not

269
150

1898

placed properly. I wondered how it was possible for him to breathe. On his head was a metal plate like a cap with what appeared to be a sponge bulging out from the rim. He shifted in the chair as best he could and seemed to try to take deep breaths. Drops of perspiration formed on his face. He remained that way for at least two minutes before anything occurred.

16. There was a noise from what I assumed to be an exhaust fan, which sounded like a loud furnace. I next heard a sound like a thunk, followed by a whining or humming sound, which was the first jolt of electricity. Mr. Otey's body seemed to slam against the straps, but did not move much, and I recall the fingers of one of his hands curved upward. His shirt grew wet immediately and sweat seemed to pour from his head. For a moment, I looked away. Near the end of the second jolt, I heard a low growling or guttural sound from Mr. Otey's direction, which lasted several seconds. I recall that he was still breathing after the first jolt, and after the second as well, but I could not determine whether he was breathing after the third. I saw a curl of smoke near the electrode on his leg, but the loud exhaust fan, which could be heard during the entire process, prevented the odor of smoke from reaching the viewing chamber.

17. Each jolt of electricity lasted about thirty seconds, with about a one minute interval between jolts. I had been told in advance that the procedure called for three jolts of electricity. However, a fourth jolt began. I was startled because I did not expect this, and I heard several people in the room gasp, so I assume the others did not expect a fourth jolt either.

18. A minute or so after the fourth jolt, a uniformed sheriff's deputy appeared in the execution chamber and began to take flash photographs of Mr Otey's body, which was still strapped in the chair. I do not recall how many photographs he took, but it was between ten and twenty. Soon after, the curtain closed and an assistant warden announced to the witnesses that Mr. Otey had been pronounced dead.

270
154

1899

19.     Another pe.    .1, John Joubert, was killed in Nebraska's electric chair on or about July 17, 1996. Although I did not personally witness Mr. Joubert's death, I viewed his body approximately one hour after his death. Since Mr. Joubert was caucasian, the anomalies of his skin color and tone were readily observable. His shaven head was colored a light green, red and purple color around the top, back and sides. There were, around the temples and the right shin, huge areas of sagging thin tissue, as though the skin had been stretched from being inflated and then deflated. The palms of his hands were black -- not charred, but rather as though they contained black fluid.

FURTHER AFFIANT SAYETH NAUGHT.

Executed this ⸺day of ⸺, 199⸺

⸺⸺⸺⸺⸺
Paula B. Hutchinson

Sworn to and subscribed before me this 3th day of DECEMBER, 1996

⸺⸺⸺⸺⸺
NOTARY PUBLIC

My commission expires: July 1, 1998

GENERAL NOTARY-State of Nebraska
J DOUGLAS CAMPBELL
My Comm Exp July 1, 1998

271

152

1900

## SWORN STATEMENT OF MICHAEL J. MINERVA

STATE OF FLORIDA

COUNTY OF BAKER

Affiant Michael J. Minerva swears as follows:

1. I am an adult resident citizen of Macclenny, Baker County, Florida.

2. I am an attorney in good standing before the Florida Supreme Court.

3. I make the following affirmations based on personal knowledge.

4. In 1993, Florida Governor Lawton Chiles appointed me Director of Florida's Office of Capital Collateral Representative (CCR). The CCR represented indigent Florida death row inmates who had completed the direct appeal process.

5. In my capacity as CCR Director, I witnessed the March 25, 1997, electrocution of Pedro Medina. I watched the following events sitting in a chair that faced a glass partition that separated me and the other witnesses from Florida's electric chair. The chair I sat in was ten to twelve feet away from the electric chair.

6. Correction Officers escorted Mr. Medina as he entered the execution chamber. Mr. Medina's head was shaved and the leg of his prison garb had been slit. Mr. Medina's hands were manacled, as were his legs. Mr. Medina offered no resistence as he shuffled to the electric chair and sat down on it.

7. Correction Officers took the chains off of Mr. Medina and strapped him into the electric chair.

8. Correction Officers attached the electric chair's leg electrode to Mr. Medina's leg where his prison garb had been slit.

9. Correction Officers placed what looked like an upside down soup bowl on Mr.

Medina's head. They screwed a cable into the center of the headpiece they had put on Mr. Medina's head.

10. After the Warden offered Mr. Medina an opportunity to say his last words, Correction Officers pulled a hood over Mr. Medina's face.

11. When the switch was thrown, Mr. Medina stiffened. Wisps of smoke started coming from the headpiece. The wisps of smoke stopped, and then little flames started appearing at the perimeter of the headpiece. With a sudden whoosh, flames approximately one foot high erupted around the headpiece. The execution chamber filled with smoke, and I perceived the smell of burning flesh. It was my impression that Mr. Medina was being burned alive.

12. When the flames flickered out, a man examined Mr. Medina's body. He concluded that Mr. Medina was dead.

FURTHER AFFIANT SAITH NAUGHT.

_____
MICHAEL J. MINERVA

STATE OF FLORIDA

COUNTY OF BAKER

Sworn and subscribed before me on this the ___9___ day of __July__, __2014__.

_____
NOTARY PUBLIC

My commission expires:

__7/9/14__
Date

HALEY THORN
Notary Public - State of Florida
My Comm. Expires Feb 13, 2017
Commission # EE 874855

2

1542

AOC- 060
Rev. 12-10
Page 1 of 1

Commonwealth of Kentucky
Court of Justice    www.courts.ky.gov

**CERTIFICATION OF COURT RECORDS**

Case No. 04-CI-01094

Court Franklin Circuit

County Franklin

RALPH                                      BAZE                    PLAINTIFF/PETITIONER

VS.

ERNIE                                      FLETCHER                DEFENDANT/RESPONDENT

I, Sally Jump

Clerk of the Franklin Circuit                    Court, do certify that the following are true and correct copy(s) of the:

Exhibit No. 30:  Affidavit of John W. Moser

IN TESTIMONY WHEREOF, witness my hand as Clerk aforesaid, June 9                                , 2014 .

Sally Jump    _Sally Jump_    Clerk

By: _____ D.C.

1889

# AFFIDAVIT

State of Florida}
County of Bradford}

Before me the undersigned authority, personally appeared John W. Moser, who after first being duly sworn, deposes and says that:

1. I am the person who is named in this affidavit and have personal knowledge of the facts and matters set forth herein.

2. I am the Capital Collateral Regional Counsel for the Middle Region of Florida. As part of my duties as the head of the agency that represents Mr. Allen Lee Davis, I served as a witness for the execution of Mr. Davis and made the following observations.

3. Mr. Davis was wheeled into the execution chamber (hereinafter referred to as chamber) in a wheel chair at 7:03 a.m. this date. He was strapped into the wooden chair by DOC officials. (All times in this statement are from the chamber clock)

4. Mr. Davis had a significant amount of gel covering his shaved head. The various straps were substantially tightened.

5. The head piece with the sponge and face veil was secured to Mr. Davis' head.

6. Mr. Davis was asked by Superintendent Crosby if Mr. Davis wanted to make a statement. Mr. Davis declined by shaking his head from side to side and uttering a barely audible grunt.

7. Although I am not certain about the precise time, some time between 7:05 and 7:10 there were two (2) distinct screams which came from Mr. Davis.

8. At 7:10 a.m. Mr. Davis' body arched backward and tensed up. At this same time blood began dripping from behind the right side of the veil onto the lapel/collar area of Mr. Davis' white dress shirt.

9. Very shortly after 7:10 a.m. blood appeared in the center chest area of the white shirt. The size of the blood stain grew to a diamond-like figure of approximately ten (10) inches vertically and 8-10 inches horizontally.

10. At 7:13 a.m. Mr. Davis exterior chest area moved back and forth several times. Again at 7:16 I observed the same chest movement.

404

1890

11. Although I do not know the exact length of time or the specific times, an individual in a white coat, which at the time I assumed to be a member of the medical staff, positioned himself in front of Mr. Davis' body. This occurred after 7:16 a.m. but before the formal announcement that the execution had been carried out. While facing Mr. Davis, this individual appeared to be examining Mr. Davis' vitals. However, I could not see clearly what was being done because this individual's body was blocking my view of his actions. This individual was engaged in this activity for at least several minutes.

12. This statement was prepared in an ongoing basis from approximately 8:45 a.m. until 11:00 a.m. this date. Due to my attention being devoted to other official duties associated with this case and the related case of Mr. Provenzano, I was unable to devote exclusive attention to this statement. I have also not had the luxury of collecting my thoughts in an uninterrupted fashion due to the necessity to coordinate and orchestrate the operations for the two cases.

Affiant
John W. Moser

Sworn to and Subscribed before me this 8th day of July, 1999.
PRESENTED FL D/L



Victoria Mosher Cooper
MY COMMISSION / CC841281 EXPIRES
June 29, 2001
BONDED THRU TROY FAIN INSURANCE, INC.

Notary Public
State of Florida at Large
My Commission expires: _____

405

1891

STATE OF FLORIDA    )
                    )    ss:
COUNTY OF LEON )

### AFFIDAVIT OF RABBANI MUHAMMAD

I, RABBANI MUHAMMAD, having been duly sworn or affirmed, do hereby depose and say:

1.    My name is Rabbani Muhammad. I am a professor and architect. I am also a Muslim Clergy (Iman), and in that capacity I serve as spritual advisor to Muslims who are on death row in the State of Florida. I served as spiritual advisor to Leo Alexander Jones prior to his execution. I also assisted in preparing Mr. Jones's body for burial in the manner prescribed in the Koran.

2.    I knew Leo for nearly seven years. In that time, I discussed with Leo aspects of his pending execution, including the procedures utilized by the department of corrections in carrying out the execution. We also discussed matters pertaining to his burial and the welfare of his family should the state succeed in executing him.

3.    I had witnessed three (3) executions before Leo's. During the executions, I observed the manner in which the Department of Corrections personnel strapped the inmates to the electric chair. Specifically, I observed that the inmates are constrained from the moment they enter the death chamber. Once they are sat in the chair, the inmates are quickly strapped in starting with the wrists, legs and torso, and ultimately the head and chin.

399

236

1923

4.    During the execution of John Mills (for whom I also served as spiritual advisor), I became concerned that the tightness of the straps used to hold the inmate in the chair severely restricted the inmates ability to breath during the moments which lead up to the execution. I noticed the extreme pressure used by the Department of Corrections personnel when tightening the straps, specifically the straps around the head, neck and chest areas.

5.    The straps around the neck and head area are not completely tightened until after the inmates are allowed their last words. Finally, a mask is lowered over the inmates face. Because the mask is lowered over the inmates head directly after the final straps are tightened, and because the inmates are strapped in so tightly, I noticed that the inmate would be unable to communicate to anyone if he was experiencing breathing difficulties leading up to the execution. This concerned me even more once I realized that the inmate had to wait in that position for several seconds (even minutes) before the chair was activated.

6.    The night before Leo's execution, I discussed with him the possibility that he may encounter breathing difficulties in the moments leading up to the execution due to the tightness of the straps. I also discussed with him the possibility of creating a way that he could signal me if he was experiencing breathing difficulties. A verbal signal would be impossible due to the wall\glass seperating the witnesses from the execution chamber and facial expressions were impossible due to the mask.

*400*

Furthermore, we both knew that it would be nearly impossible for him to communicate through body language due to the manner in which he was strapped into the chair.

7.   My experience with other executions had taught me that it was possible for Leo to move his fingers while he was strapped in the electric chair.  Thus, we decided that if Leo experienced breathing difficulties, he would move his pinky finger up and down communicating that fact to me.

8.   The morning of the execution, once Leo gave his last statement and was completely strapped to the chair, he immediately began to move his finger.  This became more and more rapid as time went on.  This movement lasted for several seconds, possibly minutes.

9.   When the electrical current was stopped, I observed Leo's left thigh jittering almost as if in spasm.  I also observed Leo's chest heave three seperate times after the electricity was disengaged.  Having observed these things, I was deeply concerned that the process of determining that Leo was in fact dead took 5 to 7 minutes.

10.   As his spiritual advisor, Leo entrusted me to arrange for his funeral.  As an adherent of Islam, Leo planned on receiving a Moslem burial.  As part of his funeral, his body had to be cleansed before burial.  It was my reponsibility to see this done, as well as to participate in the cleansing.

11.  While washing Leo's body, I witnessed the intense burns caused by the execution, particularly around the areas where the electrodes were attached.  I noticed that Leo's head was

401

disfigured and swollen. The skin around his right eye was blistered. There were also two deep black burns on Mr. Jones' right leg. The skin in between the legs was blistered and pink flesh was visible on the upper leg burn. Most shockingly, I noticed a hole in his chest directly above the breast bone which had blood flowing from it. This concerned me most due to the fact that it was in the same place where the torso straps were pulled so tightly around his chest prior to execution.

Further affiant sayeth naught.

Rabbani Muhammad

Sworn to or affirmed and subscribed before me this 23 day of September, 1998, by RABBANI MUHAMMAD:

NOTARY PUBLIC, STATE OF FLORIDA

My commission expires:



402

1920

SWORN STATEMENT OF
KIM CURLEY REYNOLDS

STATE OF OREGON            )

COUNTY OF DESCHUTES        )

Affiant Kim Curley Reynolds affirms as follows:

1.      I am an adult resident citizen of Bend, Deschutes County, Oregon. I am the Community Outreach Director for Commute Options, a non-profit corporation that promotes carpooling, vanpooling, walking, bicycling, teleworking, and using public transportation.

2.      In the fall of 1996, I was the host of an Atlanta, Georgia, radio talk show. I was one of five media witnesses to Georgia's November 14, 1996, execution of Larry Lonchar.

3.      On November 13, 1996, at approximately 5:00 p.m., I arrived at the Georgia Diagnostic and Classification Center, Jackson, Georgia. A dirt parking lot had been separated into three sections: one for media representatives, one for protestors in favor of Mr. Lonchar's execution, and one for protesters who opposed it. The dirt parking lot was approximately 1.5 miles from the prison walls.

4.      After an hour or so, prison officials told me and the other media witnesses to get into a van. We rode a few minutes in the fading light to a sloping grassy embankment. I squinted to see a high chain link fence atop the hill. It was garnished with coils of razor wire, three levels thick. As I got out of the van I realized that the hill was actually the outside wall of the prison.

5.      Not saying a word, we filed through a large barred door in the earth and walked a long hall lined with gleaming white lockers. At the end of the hall we ascended a staircase and went through two metal detectors. After a pat down, we were taken to what appeared to be an

1911

employee break room.

6. A prison official gave us "witness directions." The official told us, among other things, that we would be taken to a witness room that looked into the execution chamber. Mr. Lonchar's execution would take approximately seven minutes. First, the executioner would administer electricity to Mr. Lonchar for two minutes. Then there would be a five minute "cool down" period. After that a doctor would pronounce Mr. Lonchar dead. We were instructed to leave the witness room through a back door if we felt sick or faint at any time.

7. After signing a document acknowledging that I had received the witness directions, a prison official told us that the Supreme Court had stayed Mr. Lonchar's execution. He instructed us to "Get back in the van. You're going outside." We returned to the van, and the van returned us to the dirt parking lot.

8. As the media representatives waited to find out what would happen next, prison officials provided a kerosene heater to help us keep warm. Over the hours that followed, camera crews and reporters huddled around it like a campfire.

9. At approximately 9:00 p.m. a prison official brought the media representatives a tray of sandwiches, chips, and a cooler filled with soda. I had been warned not to eat, but I figured there would be no execution that night, so I ate a sandwich.

10. As I threw out the crusts from my sandwich a prison official informed us that the stay of Mr. Lonchar's execution had been lifted. The van returned and we were again taken to the door in the earth. We again walked down the long white hallway, up the staircase, through the metal detectors, and into the employee break room.

11. After a while, we were taken back down the staircase, back through the long white hallway, and outside where the van was waiting. We got into the van, but it did not move.

2

1912

Shortly thereafter, a prison official came and took us back to the break room. We were told that another stay had been granted.

12. At approximately 11:40 p.m., prison officials took us back to the van that remained waiting outside. We got into the van, and this time the driver put it in drive. Instead of turning right to take us back to the dirt parking lot, however, the van turned left and headed around the back of the prison. It took us to a small out building sitting alone inside the prison walls.

13. We filed into a cream colored room that had wood benches that resembled church pews. At the front of the room were full-length windows. Behind the windows was the electric chair, sitting atop a raised platform. Though there were many persons in the witness room, the room was silent. Everyone stared at the electric chair beyond the windows.

14. At approximately 12:17 a.m. guards ushered Mr. Lonchar into the room behind the glass. Mr. Lonchar stared at all of us on the other side of the glass. Guards strapped Mr. Lonchar's legs and arms to the electric chair. A guard tightened a head restraint, pulling Mr. Lonchar's whole frame upwards. Mr. Lonchar's eyes darted from face to face, as if trying to experience fully these last minutes of his life. My heart was pounding so loudly that it was all I heard until Mr. Lonchar's final words. "Father forgive them, for they know not what they do." A minister prayed that heaven would open for this brother in Christ. He prayed for us too, the witnesses.

15. A prison official read the execution order. Mr. Lonchar tapped his index fingers.

16. Mr. Lonchar waved to us with his left index finger. He closed his eyes as guards attached clamps to his head and shaved leg. A guard secured an apron over Mr. Lonchar's face. After guards tightened one last time the straps securing Mr. Lonchar to the electric chair,

3

1913

everyone left the room. Mr. Lonchar was alone. Approximately thirty seconds later I hear a ZAP, CLICK.

17.     At approximately 12:21 a.m. Mr. Lonchar's hands clenched. Approximately one minute later they turned purple. There was no other movement from the man or any of the witnesses.

18.     At approximately 12:29 a.m., toward the conclusion of the five minute "cool down" period, Mr. Lonchar took a huge gasping breath. Twenty seconds later he breathed again, and again. Mr. Lonchar lived through Georgia's electrocution procedure.

19.     At approximately 12:31a.m. I heard again ZAP, CLICK. Mr. Lonchar's hands, which had relaxed a bit during the "cool down" period, again clenched and his whole body jolted.

20.     At approximately 12:33 a.m. Mr. Lonchar's legs loosed and there was no more breathing. Two minutes later there was nothing, not a sound or movement of any kind. I noticed that the three white buttons on the blue stripe down the middle of his white shirt were not moving anymore. I was relieved that Mr. Lonchar would not have to be electrocuted a third time.

21.     At approximately 12:38 a.m., two doctors checked for signs of life. They put stethoscopes on the blue stripe. A prison official announced that Mr. Lonchar was dead. The curtains closed and we rose to leave the room.

22.     I declare under penalty of perjury that the foregoing is true and correct.

FURTHER THE AFFIANT SAITH NAUGHT

_Kim Curley Reynolds_
Kim Curley Reynolds

Executed on: 10/16/14

4

1914

1915

STATE OF OREGON

COUNTY OF DESCHUTES

Sworn and subscribed before me on this the _____ day of October, 2014.

_____
NOTARY PUBLIC

My commission expires:

_____
Date

5

**1915**

STATE OF FLORIDA ) 
COUNTY OF LEON )

## SWORN STATEMENT OF GREGORY C. SMITH

Affiant Gregory C. Smith swears as follows:

1. I am an adult resident citizen of Tallahassee, Leon County, Florida. I am a member in good standing of the Florida State Bar. My Florida Bar Number is 279080.

2. From June 1997 to May 2001 I was the Capital Collateral Counsel for the Northern Region of Florida. Pursuant to my duties as counsel to Judia Buenoano, I witnessed her March 30, 1998, judicial execution.

3. I was seated in the front row of the witness viewing area. When prison guards put Ms. Buenoano into the electric chair, she had to slide toward the back of the chair because it was too large for her body. However, to get Ms. Buenoano's legs into the restraints at the base of the chair, guards required her to slide forward slightly while slouching so that the top of her back touched the back of the electric chair. In this position, Ms. Buenoano was awkwardly slumped. As a guard tightened the chest strap, it appeared that the strap's metal buckle pinched Ms. Buenoano's breast. Ms. Buenoano indicated pain and discomfort as the chest strap was tightened and the leg electrode was attached to her.

4. When the State applied electricity to Ms. Buenoano, her body tensed and she balled up her hands. About half way through the application of current, white smoke or steam rose from the area of the leg electrode. The smoke or steam rose about eight to ten inches, and it lasted until the current was stopped.

FURTHER THE AFFIANT SAITH NAUGHT

Gregory C. Smith

STATE OF FLORIDA

COUNTY OF LEON

Sworn and subscribed before me on this the 24th day of JUNE ,
2014 .

NOTARY PUBLIC
My commission expires:

JUNE 24, 2014
Date

FILED

2014 NOV 17 PM 3: 13

CLERK & MAS...
DAVIDSON CO. CHANCERY CT

_____ D.C & M

STATE OF ALABAMA )
COUNTY OF RUSSELL )

## SWORN STATEMENT OF FATHER TOM WEISE

Affiant Tom Weise swears as follows:

1. I am an adult resident citizen of Phenix City, Russell County, Alabama. I am an ordained Catholic Priest.

2. I make the following affirmations based on personal knowledge.

3. On November 20, 1992, the State of Alabama executed Cornelius Singleton. Mr. Singleton asked me to be a witness at his execution, and I agreed to watch the State of Alabama execute him.

4. Alabama executed Mr. Singleton in its electric chair. During Mr. Singleton's execution, I saw smoke come out from under the cap that was on Mr. Singleton's head.

5. After Alabama electrocuted Mr. Singleton, I saw pictures of a man who I recognized to be Mr. Singleton. The pictures showed severe burns around the top of Mr. Singleton's shaved head, in the area where the electric chair's cap had been attached to Mr. Singleton's head.

FURTHER THE AFFIANT SAITH NAUGHT

_Father Tom Weise_

Father Tom Weise

STATE OF ALABAMA
COUNTY OF RUSSELL

Sworn and subscribed before me on this the _16th_ day of _July_, _2014_.

NOTARY PUBLIC
My commission expires:

_7/16/14_
Date

Johnnie Ingle Bennie
MY COMMISSION EXPIRES
APRIL 27, 2016

1879