**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 20-1**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRANDON MICHAEL COUNCIL,

Defendant - Appellant.

----------------------------------------------------

MENTAL HEALTH PROFESSIONALS,

Amicus Supporting Appellant,

GOVERNOR HENRY MCMASTER,

Amicus Supporting Appellee.

———————

**No. 21-8**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRANDON MICHAEL COUNCIL,

Defendant - Appellant.

---------------------------------------------------

MENTAL HEALTH PROFESSIONALS,

      Amicus Supporting Appellant,


GOVERNOR HENRY MCMASTER,

      Amicus Supporting Appellee.

---

Appeal from the United States District Court for the District of South Carolina, at Florence. R. Bryan Harwell, Chief District Judge. (4:17-cr-00866-RBH-1)

---

Argued: May 3, 2023                  Decided: August 9, 2023

---

Before WILKINSON, AGEE, and HEYTENS, Circuit Judges.

---

Affirmed by published opinion. Judge Heytens wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

---

**ARGUED:** Barry Joseph Fisher, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Albany, New York, for Appellant. Ann Adams, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jaclyn L. Tarlton, Raleigh, North Carolina; Jerome C. Del Pino, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Albany, New York, for Appellant. Kenneth A. Polite, Jr., Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Joshua K. Handell, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Adair Ford Boroughs, United States Attorney, Kathleen Stoughton, Appellate Chief, Columbia, South Carolina, Everett E. McMillian, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Florence, South Carolina, for Appellee. Maya M. Eckstein, Trevor S. Cox, William P. Sowers, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Amicus Mental Health Professionals. Thomas A. Limehouse, Jr., Chief Legal Counsel, Wm. Grayson Lambert, Senior Legal Counsel, Erica W. Shedd, Deputy Legal Counsel, OFFICE OF THE GOVERNOR OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus Governor Henry McMaster.

---

2

TOBY HEYTENS, Circuit Judge:

The Federal Death Penalty Act requires us to "address all substantive and procedural issues raised on the appeal of a sentence of death" and "state in writing the reasons for [our] disposition." 18 U.S.C. § 3595(c)(1) & (3). Fulfilling that responsibility, we explain why we affirm Brandon Council's convictions and sentences.

I.

On August 21, 2017, Council robbed the CresCom Bank in Conway, South Carolina. During the robbery, Council fatally shot bank teller Donna Major and bank manager Kathryn Skeen. Council was arrested three days later.

The next month, a federal grand jury returned a three-count indictment. One count—which accused Council of possessing a firearm after being convicted of a felony—was dismissed on the government's motion. The other counts, of which Council was ultimately convicted, charged: (1) bank robbery resulting in death, in violation of 18 U.S.C. § 2113(a) & (e) (Count One); and (2) using and carrying a firearm during and in relation to a crime of violence in a manner causing death, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) & (j)(1) (Count Two). Both counts carried a possible death sentence. See §§ 2113(e) (Count One), 924(j)(1) (Count Two). Council pleaded not guilty.

In March 2018, the government filed a notice of intent to seek the death penalty. See 18 U.S.C. § 3593(a) (requiring the government to file such notice within "a reasonable time before the trial or before acceptance by the court of a plea of guilty"). As required by federal law, the notice identified various "aggravating . . . factors that the government . . . propose[d] to prove as justifying a sentence of death." § 3593(a)(2).

3

The guilt-phase portion of Council's trial was held over four days in September 2019. Council presented no evidence or witnesses during that phase. The jury found Council guilty on both charges. After a six-day penalty-phase trial, the jury unanimously recommended a sentence of death on each count, and the district court entered judgment consistent with the jury's verdict. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3595.

## II.

Council raises four challenges to the district court's handling of the guilt phase. We conclude none warrants upsetting the court's judgment.

## A.

"A criminal prosecution may not proceed unless the defendant is competent." *United States v. Tucker*, 60 F.4th 879, 883 (4th Cir. 2023). Indeed, "[i]t would be a violation of due process to convict a defendant when he is legally incompetent." *United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007). "For constitutional purposes, the test [for competency] is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Tucker*, 60 F.4th at 883 (quotation marks omitted).

Council disputes the adequacy of the procedures the district court used in assessing his competency. Specifically, Council asserts the court improperly delegated its duty to determine his competency by allowing defense-selected experts to examine him, declining to secure a report assessing Council's competency, and failing to conduct an appropriate

competency hearing. We review such a "procedural competency claim" for abuse of discretion, *Banks*, 482 F.3d at 742 (quotation marks omitted), while reviewing any embedded questions of statutory interpretation de novo, see *United States v. Jones*, 60 F.4th 230, 232 (4th Cir. 2023).[1]

The Insanity Defense Reform Act establishes a process for determining whether a federal criminal defendant is competent to stand trial. The Act says a district court "shall order" a competency hearing whenever "there is reasonable cause to believe that [a] defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The Act also says that "[p]rior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c)." § 4241(b). Finally, the Act instructs that a competency "hearing shall be conducted pursuant to the provisions of section 4247(d)," § 4241(c), which, in turn, establishes various procedural protections.[2]

---

[1] Council makes no substantive argument against the district court's bottom-line finding that he was "competent to proceed." JA 4782. As a result, any such claim is forfeited. See, *e.g.*, *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

[2] Council notes the Due Process Clause independently "require[s] procedural protections to ensure that questions of a defendant's competency are adequately investigated and reliably adjudicated by the district court." Council Br. 44. Because Council "develops no separate argument on that point," *Tucker*, 60 F.4th at 889 n.2, however, we do not consider whether the Constitution sometimes requires more than the statute. See *Grayson O*, 856 F.3d at 316.

The district court fulfilled its obligations under Sections 4241 and 4247. The court raised the issue of competency on its own initiative several times, including before and during a pretrial conference held roughly a year and a half before trial. At that time, defense counsel vigorously opposed any court-ordered examination of Council's competency as "unwarranted and potentially prejudicial" because it could place information in the government's hands that could increase the risk of a death sentence. JA 196. Seeking to avoid such an examination, one of Council's attorneys declared under penalty of perjury that Council "ha[d] been appropriately cooperative with counsel" and "has present ability to consult with counsel to a reasonable degree of rational understanding, and has a rational and factual understanding of the proceedings against him." JA 215. "To make doubly sure" Council was "competent," the declaration further advised that defense counsel "had a board certified forensic psychologist . . . conduct a competency evaluation." *Id.* Crediting that declaration, and given the government's lack of any contrary argument, the district court found it did "not have reasonable cause under 18 U.S.C. § 4241(a) to doubt [Council]'s mental competency." JA 219.

Fast forward a year and some months. After the government rested its guilt-phase case and the district court advised Council of his right to testify, Council's attorneys requested a recess because Council had unexpectedly told them he wanted to take the stand. The court adjourned proceedings for the day, and, that evening, defense counsel moved for a competency evaluation and a continuance. The motion asserted Council was "presently suffering from a mental disease or defect rendering him unable to assist properly and rationally in his defense," JA 2176, and noted that under Section 4241(a), a competency

6

"hearing is mandatory" whenever there is reasonable cause to doubt a defendant's competency. JA 2177. The motion did not ask the district court to exercise its power under Section 4241(b) to order a psychiatric or psychological evaluation, much less argue the court had to do so. Instead, the motion stated Council's attorneys had already "contacted an expert" who had agreed "to conduct" a competency examination the next day and asked for a continuance "so that the expert would be able to conduct the evaluation and provide vital information regarding Mr. Council's ability to proceed." JA 2181–82.

The next day was a Friday, and the jury did not hear any testimony that day. Instead, the district court held three relevant hearings: one with all parties present; a second ex parte hearing attended only by Council and his attorneys; and a third again attended by all parties. During the initial hearing, defense counsel reiterated their request for time to have Council evaluated by the doctor referenced in their motion and suggested that, apart from that evaluation, no "further testing [was] needed" at that point. JA 4748.

After government counsel was excused, Council's attorneys recounted statements and interactions with their client they believed suggested a "possibl[e] . . . break with reality." JA 4771. Defense counsel also reiterated their request for time to permit Council to be evaluated by their chosen expert, once again making no suggestion the district court should or must exercise its power to order its own evaluation. The district court sought to directly engage Council, who was seated, unresponsive to the court's questions, and crying.

After permitting the government's attorneys to return, the district court made a "find[ing] that there's reasonable cause to order an examination" of Council's competency. JA 4754. The parties and the court discussed various medical professionals who might

7

conduct the competency evaluation, without clear resolution. Without objection from either party, the court dismissed the jury until the following Monday afternoon and instructed both sides to "let me know when you talk to whoever you talk to" about performing an evaluation. JA 4765.

That same day, Council's attorneys sent two emails to the court and government counsel. The first identified two medical professionals who would be seeing Council, one that same day (Friday) and the other on Sunday. The second email objected to having Council examined by a doctor suggested by the government and the court during that day's hearing.

As required by 18 U.S.C. § 4241(a), the district court "convene[d] a competency hearing" the following Monday. JA 4781. During the hearing, defense counsel advised that Council had been "seen by a forensic psychologist and forensic psychiatrist," both of whom "opined to a reasonable degree of medical certainty that Mr. Council is competent to proceed." JA 4781. Defense counsel also provided "statements by those two individuals along with their CVs," and said: "We now no longer believe that Mr. Council is incompetent, to the contrary, we believe that he is competent to proceed in this case." *Id.* The district court asked to hear from the government, which advised it did not have any additional information to offer. "Based on what's been presented," the district court found Council "competent to proceed." JA 4782.

Nothing about the district court's handling of this delicate matter reflects a legal error or an abuse of discretion. At times, Council's argument appears to be that once a district court finds reasonable cause to doubt a defendant's competency, the court must

always order an examination by a court-appointed expert and insist the expert file a report satisfying the standards of 18 U.S.C. § 4247(c). That argument cannot be squared with the text of Section 4241(b), which—in distinct contrast to other provisions of the Insanity Defense Reform Act—conspicuously uses "may" rather than "shall." Compare 18 U.S.C. § 4241(b) with § 4241(a), (c), (d), (e), (f), and § 4247(b), (c), (d), (e). Because "the word 'may' *clearly* connotes discretion," *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (quotation marks omitted), we see no warrant for imposing any sort of categorical requirement.[3]

To be sure, Section 4241(b) would have authorized the district court to designate other experts to examine Council or order the filing of a formal report had it decided to do so. But the court was tasked with the difficult job of balancing multiple aspects of the Constitution's fair trial guarantee, which includes not only the right to be tried only if competent but also the rights to have the effective assistance of counsel and to refuse to provide information that could compromise one's own defense. See, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 684–85 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause."). Even if we accept Council's current premise—that obtaining an independent examination that results in the filing of a detailed report is generally preferable to relying on a private

---

[3] When asked at oral argument, Council was also unable to cite a decision imposing such a requirement. See Oral Arg. 5:17–6:34.

9

evaluation by defense-chosen experts—we cannot say the district court exceeded its discretion in proceeding as it did here. See *Banks*, 482 F.3d at 742–43 (emphasizing district courts are "in a superior position" to evaluate "procedural competency claim[s]" (quotation marks omitted)).

We likewise hold the district court did not exceed its discretion while conducting the competency hearing. At that hearing, Council was "represented by counsel," as required by 18 U.S.C. § 4247(d). Council was also afforded the other procedural rights guaranteed by Section 4247(d), including "an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *Id.* Indeed, Council does not contest that fact.

Instead, Council insists the district court erred in not requiring additional information so it could make its own "independent [and] informed determination" of Council's competency. Council Br. 85–86. But Council identifies no statutory text supporting that argument, and the primary authority Council cites—*Pate v. Robinson*, 383 U.S. 375 (1966)—imposes no such requirement. The Supreme Court's holding in *Pate* was about whether a defendant is entitled to a competency hearing, not the nature and characteristics of such a hearing. See *id.* at 377 ("We have concluded that Robinson was constitutionally entitled to a hearing on the issue of his competence to stand trial."). In addition, the circumstances of *Pate* differ from those here in several respects. In *Pate*, defense counsel insisted "throughout the proceedings" that the defendant's "present sanity was very much in issue" and offered four witnesses who "expressed the opinion that [the defendant] was insane." *Id.* at 383–384. That is a far cry from the situation the district court

10

confronted here—one where there was a competency hearing at which defense counsel insisted their client was "competent to proceed." JA 4781.

B.

Council's second argument is the district court should have granted his July 2019 motion for a 90-day continuance so his defense team could further investigate mitigation evidence. To prevail on that challenge, Council must "show, first, that the district court abused its discretion in denying the continuance motion, and second, that the ruling specifically prejudiced" his defense. *United States v. Hedgepeth*, 418 F.3d 411, 423 (4th Cir. 2005) (quotation marks omitted). Here, we need not reach the prejudice issue because we hold the district court did not abuse its "broad discretion." *Morris v. Slappy*, 461 U.S. 1, 11 (1983).

In reviewing the record, we remain mindful of the mammoth task facing capital defense attorneys. Because "execution is the most irremediable and unfathomable of penalties," the Supreme Court "has demanded that factfinding procedures aspire to a heightened standard of reliability" in capital cases. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). In particular, the Court has stressed that penalty-phase investigations "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quotation marks omitted). As relevant here, these investigative efforts extend to evidence about a defendant's time at a juvenile detention facility. See *Andrus v. Texas*, 140 S. Ct. 1875, 1877–78 (2020) (per curiam).

11

But the question before us is not what we might have done had we been sitting as the court of first instance. As the Supreme Court has long recognized, "[t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Morris*, 461 U.S. at 11. For that reason, "[t]he denial of a continuance" violates a defendant's rights "only when there has been an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Hedgepeth*, 418 F.3d at 423 (quotation marks omitted). Applying that deferential standard here, we cannot say the district court abused its discretion in denying Council's July 2019 motion.

Before the challenged denial, Council sought, and received, four continuances of the trial date. The first three requests came via joint motions while the government decided whether to pursue the death penalty. Council made his fourth request for a continuance in October 2018—more than six months after the government noticed its intent to seek the death penalty and just over three months before the then-scheduled trial date. In that motion, Council sought a nine-month delay, while the government opposed any delay longer than three months. The district court granted an eight-month continuance "out of an abundance of caution," JA 1051, and continued the trial until September 2019.

On July 11, 2019— about two months before trial was scheduled to start—Council sought another three-month continuance, which is the request at issue here. In that motion, Council acknowledged "that 2000 summonses" had already "been sent to potential jurors, most of whom ha[d] completed and returned standard juror questionnaires." JA 1432. The

motion argued, however, that defense counsel had "encountered unusual obstacles in completing" their mitigation investigation, including an inability to locate and question several potential penalty-phase witnesses despite having issued more than 100 subpoenas. JA 1431.

After a hearing, the district court denied the motion for a fifth continuance. The court began by stating Council had "not shown that a further delay is necessary for a just determination of the case" and that "the defense has had . . . sufficient time to . . . prepare a defense and still has time over a couple of months certainly." JA 1913. The court noted it had granted "what I believe to be a generous continuance previously," emphasizing "the jury summons have already gone out" and "[s]everal hundred people will be coming in in a little over a month to complete the supplemental case questionnaires." JA 1914. The court also observed that "[m]any people, witnesses, jurors, . . . victims' families, [and] this Court ha[ve] made plans regarding the schedule of this case" and it "note[d] the government's arguments that the victims have rights as well." *Id.* Finally, the court emphasized it was "very satisfied that these defense lawyers have been fulfilling their duties of preparation and investigation" and that it had "appointed Mr. Council four lawyers, not two" and ensured "they have adequate resources, substantial resources available to them." JA 1914–15; see 18 U.S.C. § 3005 (requiring a district court to appoint two lawyers to represent a capital defendant).

Council's lead argument on this point is that the district court inappropriately "prioritiz[ed]" the victims' families' "desire for the swiftest trial" over his own "right to prepare a defense." Council Br. 90. We respectfully disagree. Although the district court

13

referenced the victims and their families at two points during its explanation, the court began its remarks by emphasizing its conclusion that Council had failed to show "that a further delay is necessary for a just determination of the case." JA 1913; see JA 1914–15. Viewing the district court's remarks as a whole, we see no indication it shortchanged Council's legitimate interests or placed undue emphasis on any one factor.

Nor do any of Council's other arguments establish the district court abused its discretion. That this case went to trial faster than most other federal death penalty cases does not show the district court exceeded its "broad discretion" in denying this particular motion. *Morris*, 461 U.S. at 11. And Council's arguments about his need for more time, and the preferability of alternatives to denying his motion outright, ask us to second-guess the district court's case-specific judgments in "areas where the district court's comparative expertise is at its zenith and ours its nadir." *Tucker*, 60 F.4th at 888. We thus hold the district court made no reversible error in denying Council's fifth continuance motion.

## C.

Council's third guilt-phase challenge involves the district court's procedures for questioning potential jurors about racial bias. Council asserts the court should have asked—or allowed him to ask—more precise questions about prospective jurors' racial attitudes instead of "generic" questions about whether they could "self-identify as racially unfair." Council Br. 118 (quotation marks omitted). Here too, we perceive no reversible error.

The Sixth Amendment guarantees the right to trial "by an impartial jury." U.S. Const. amend. VI. "Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain

14

undetected." *Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion). For that reason, "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.* at 36–37.

At the same time, "the trial judge retains discretion as to the form and number of questions on the subject" of racial bias. *Turner*, 476 U.S at 37. In addition, "the adequacy of *voir dire* is not easily subject to appellate review" because we cannot "easily second-guess the conclusions of the decision-maker who heard and observed the witnesses." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). For that reason—as Council acknowledges—we review the district court's handling of this issue for abuse of discretion. See *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022) ("A court of appeals reviews the district court's questioning of prospective jurors only for abuse of discretion.").

The district court followed a three-part process for gathering information about prospective jurors. All prospective jurors filled out the court's standard questionnaire, which was mailed with the summons. Prospective jurors then completed "a supplemental in-court questionnaire specific to this case." Council Br. 116. Finally, the court conducted multiple days of individualized voir dire, during which both the court and the parties asked questions.

Although the district court's standard questionnaire did not ask about racial attitudes, the issue was addressed in the supplemental questionnaire and with some

15

individual jurors during voir dire. The supplemental questionnaire contained six questions under the heading "Racial Attitudes." JA 2100 (formatting omitted). The questions were:

- Have you, or any member of your immediate family ever been a member of a private club, professional, fraternal or social organization that limits or restricts membership on the basis of race, ethnic origin or religion? If you answered "Yes," please explain.

- Do you ever socialize with people of different races, or belong or participate in any clubs, groups or organizations with members from diverse racial backgrounds? If you answered "Yes," please explain.

- Is there any racial group you feel uncomfortable being around? If you answered "Yes," please explain.

- Have you, or a member of your family or household, or close friend ever had a conflict, physical confrontation or any type of very bad experience involving a person of a different race? If you answered "Yes," please explain.

- Can you be fair and impartial in a case involving an African-American defendant and a Caucasian victim(s)? If you answered "No," please explain.

- The Defendant, Brandon Council, is African-American. The victims, Donna Major and Kathryn "Katie" Skeen, are white/Caucasian. Will these facts prejudice you against the Defendant, Brandon Council, or affect your ability to render a fair and impartial verdict?

JA 2100–01. Each of these questions was the same as, or similar to, one proposed by Council or the government. The supplemental questionnaire concluded by asking whether "there [are] any particular questions contained in this questionnaire, or any other issues that you want to bring to the attention and discuss privately with the Court or attorneys[.]" JA 2111.

Council's primary argument is that the district court should also have asked some variation of six other questions he proposed including in the supplemental questionnaire.

16

As Council puts it, those questions "would have inquired, in complementary ways, whether jurors believed that Black people . . . are more prone to violence" than non-Black people. Council Reply Br. 39; see *id.* at 39 n.27. The rejected questions on which Council now focuses are:

- Do you believe certain racial groups are more predisposed to commit crimes of violence than others? Please explain your answer.

- Do you believe Blacks are more predisposed to commit violence than Whites are? If you answered "Yes," please explain.

- Do you think that people who record, produce, write or are otherwise involved in "rap" or "hip hop" music are prone to violence or criminal activities?

- Do you believe that regularly listening to "rap" and "hip hop" music or watching videos and movies about the music industry or the drug culture can lead people to commit crimes of violence?

- Do you believe certain types of male dress and hair style, such as wearing low hung pants or "dreadlocks," are indicators of a criminal lifestyle?

- In this case, the defendant is an African American man and the victims were both White women. Do you feel that this fact would in any way, even slightly, affect how you would view this case or the actions of the defendant?

Council Br. 116–17 (citing JA 1352, 1360–61, 1371).

There is force to Council's argument that—in a case involving "a dark-skinned dreadlocked Black man with an affinity for flashy cars and movies about rap-music gangsters, who had killed two church-going White women"—it would have been wise to ask prospective jurors if they believe Black people are prone to violence. Council Reply Br. 45. After all, "a juror who believes" Black people "are violence prone . . . might well be influenced by that belief in deciding whether [the defendant's] crime involved the

17

aggravating factors specified" by the government. *Turner*, 476 U.S. at 35 (plurality opinion).

But the question before us is not whether we would have asked one or more of Council's proposed questions had we been sitting as the trial judge. Rather, it is whether the district court abused its discretion in concluding the steps it took were appropriate to guard Council's Sixth Amendment right to an impartial jury.

We hold the district court did not abuse its discretion. The court's supplemental questionnaire posed six questions that were directly about race, and the Supreme Court has emphasized that even when a defendant is constitutionally entitled to have prospective jurors "questioned on the issue of racial bias," "the trial judge retains discretion as to the form and number of questions on the subject." *Turner*, 476 U.S. at 37. Indeed, as Council acknowledges, one of the questions the district court asked here is almost identical to the one the defendant requested in *Turner*. Compare *Turner*, 476 U.S. at 30–31, with JA 2101.

True, some of Council's proposed questions were more tailored to this case than the ones posed by the district court. Although these questions might have better homed in on a potential juror's biases, it is also possible these "more pointed questions could well [have] exacerbate[d] whatever prejudice might exist without substantially aiding in exposing it." *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224–25 (2017). Given that balancing these concerns is a fundamentally fact and context-specific task, trial courts possess "broad discretion" and "great latitude in deciding what questions should be asked on *voir dire*." *Tsarnaev*, 142 S. Ct. at 1034 (first quote); *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) (second quote).

18

We also must consider the district court's jury selection process in its entirety rather than artificially limiting ourselves to the supplemental questionnaire. See *Tsarnaev*, 142 S. Ct. at 1035. Although it did not have to do so, see Fed. R. Crim. P. 24(a), the district court allowed defense counsel to question prospective jurors, thus giving Council a chance to explore matters he believed were not adequately captured by the supplemental questionnaire or the court's questions. See *Tsarnaev*, 142 S. Ct. at 1035 ("[B]oth parties had the opportunity to ask additional questions and probe for bias."). Despite this opportunity, Council's attorneys asked only one prospective juror about racial attitudes during their allotted time. By contrast, after reviewing the answers on their supplemental questionnaires, the court subjected nine prospective jurors to follow-up questions about their attitudes towards persons of other races.

Council offers several explanations for his attorneys' failure to ask potential jurors more questions about race, but none carries the day. For example, Council asserts the district court "announc[ed] that voir dire would be confined to death-penalty inquiries and follow-ups to questionnaire answers" rather than matters the court had refused to include in the supplemental questionnaire. Council Br. 120 (citing JA 2680–81). The cited transcript pages do not support that assertion. Instead, the court said its own oral questioning would be confined to such matters, while clarifying that "[t]he lawyers certainly are free to spend their limited time asking some of their [proposed] questions if they're appropriate." JA 2681.

Council insists the district court would not have permitted him to ask the questions he now asserts should have been included in the supplemental questionnaire, noting the

court previewed that "some of" the parties' proposed questions had been "not appropriate." JA 2681; see Council Reply Br. 50. But Council had proposed 25 questions about racial attitudes for inclusion in the supplemental questionnaire and a set of 27 questions (some involving race, some not) for the district court to ask during the court-conducted voir dire. We thus have no way of knowing which questions the district court would have considered inappropriate for Council's attorneys to ask during voir dire. And we will not reverse a district court's judgment based on assumptions about how the court would have ruled had a party attempted to ask a question it never tried to ask.

Finally, Council asserts that asking more probing questions about racial attitudes during his own voir dire time "would not have been a realistic alternative" both because of the time limits and because "[t]he sensitive nature of the questions about racial attitudes required that they be posed by the court, not by the defense." Council Reply Br. 50. That does not adequately explain, however, why Council's attorneys used almost none of their own time to pose questions about race.

The process of selecting an impartial jury is delicate and involves complex tradeoffs. Council forcefully argues the district court should have proceeded differently here. But the record shows the district court was not blind to the risk of the "familiar and recurring evil" of racial bias, *Peña-Rodriguez*, 580 U.S. at 224, and we cannot say the means it chose to address that risk exceeded the bounds of its discretion.

## D.

Council's final guilt-phase argument is that the government violated the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), by using peremptory strikes to remove Black

20

potential jurors. We cannot assess whether Council could have mounted a winning *Batson* challenge—a finding that would have brought an "automatic reversal" of his convictions and sentences, *Weaver v. Massachusetts*, 582 U.S. 286, 301 (2017)—because we conclude his trial counsel affirmatively waived any such claim.

After completing the voir dire process, the district court held a hearing during which each side was allotted 22 peremptory strikes (20 for the main jury and two for the alternates). When each side finished using its strikes, the court asked: "Any objection regarding the method of the selection of the jury?" JA 4076–77. Both sides said no. The court called forward 16 people, told them they had "been selected as jurors," gave a set of preliminary instructions, and said a member of the court's staff would assist the jurors "with regard to hotel accommodations and arrangements like that." JA 4077, 4079.

The court then asked if there was "[a]nything from the lawyers before I allow them to be taken back in there." JA 4079. At that point, defense counsel asked for "a couple of minutes," which the court granted. *Id.* After a pause, defense counsel said, "I need to approach, Your Honor," and the court responded: "Okay. Any objection to me taking these people in there?" *Id.* Both sides said no, and the jurors who had just been selected left the room, leaving the potential jurors who had not been selected in the courtroom.

The court directed the lawyers to approach the bench. Because the following exchange is critical to our holding, we quote it in full:

THE COURT: What's the problem?

[DEFENSE] ATTORNEY NETTLES: I would ask the rest of the panel not be—

THE COURT: I'm just going to let them go.

ATTORNEY NETTLES: Well, we would like to analyze the strikes for any issues in regard to the exercise of peremptory strikes if the Court would give us a little bit of time to do that, I would ask that you not release the jury at this time.

THE COURT: Well, I asked if there were any objections.

ATTORNEY NETTLES: I was talking about the procedure—I thought you were talking about the method, 1 through 20 and the alternate. I didn't think you were talking about *Batson* issues or anything like that.

THE COURT: Yes, yes. Well, I need to bring them back out then, you're telling me—

ATTORNEY NETTLES: I'm just telling you we need to go look at it. I thought you were going to bring them out and do that, but not swear them. I didn't know it had anything to do—I just thought it had to do with the exercise of peremptories in that fashion, that was all I thought it was.

THE COURT: Okay. Well, that's not the way I've always done it.

ATTORNEY NETTLES: I haven't even had a chance to look at it yet.

THE COURT: Okay. Well, we need to bring them back out then. Bring them back out.

    (Brief pause.)

THE COURT: Let me ask you something. Lawyers, come here just a second. So what you're telling me is that you want time to review any potential *Batson* issues.

ATTORNEY NETTLES: That's all. That's all we're doing.

THE COURT: I understand that, but you should have told me before I—because this is the procedure I've always followed. And when I ask the question, you know, any objection regarding the method of selection of a jury, that's when the lawyers alert me to any *Batson* issues they want to raise.

ATTORNEY NETTLES: I'm sorry, I did not—

THE COURT: That's the way I've always done it. Now, you all want me to ask these people to take a seat back out there.

22

ATTORNEY NETTLES: I don't think you need to do that.

[DEFENSE] ATTORNEY BRYANT: I don't think you need to do that, Judge. All we need is just a couple of minutes just to review and then we can report right back to you, Your Honor.

THE COURT: Okay. All right.

ATTORNEY BRYANT: That's all we're asking for.

THE COURT: Okay.

ATTORNEY NETTLES: Thank you.

(Sidebar discussion ended.)

(Brief pause.)

ATTORNEY BRYANT: May we approach, Your Honor?

THE COURT: Yes.

(Sidebar as follows:)

ATTORNEY NETTLES: We are fine. We have no objection to the selection process.

THE COURT: Okay. Very good. Thank you. Yes, sir.

ATTORNEY BRYANT: Thank you.

(Sidebar discussion ended.)

THE COURT: All right. Let me ask the lawyers to come here just a second.

(Sidebar as follows:)

THE COURT: Any objection to me going ahead and thanking these people for being a part of the process and letting them go?

[GOVERNMENT] ATTORNEY SHOEMAKE: None from the government.

ATTORNEY NETTLES: No, sir.

JA 4080–83. The court then dismissed the potential jurors who had not been selected, and counsel and the court began discussing various matters of trial logistics.

23

As this exchange shows, Council's trial attorneys did not merely forfeit a *Batson* claim—they waived it. See *United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining the difference between forfeiture and waiver). "A party who identifies an issue, and then explicitly withdraws it, has waived the issue." *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) (quotation marks omitted). That is exactly what happened here. Defense counsel specifically identified "potential *Batson* issues," JA 4081, before withdrawing the issue by telling the court: "We are fine. We have no objection to the selection process." JA 4081–82. Having scrutinized the transcript, we can "say with confidence" that defense counsel "meant to relinquish" any *Batson* challenge. *United States v. Boyd*, 5 F.4th 550, 555 (4th Cir. 2021).[4]

Council argues we should overlook the waiver and "treat [the issue] as preserved" because the district court "deprived [him] of a fair and meaningful opportunity to harness and present the evidence needed to litigate the *Batson* claim." Council Br. 149. In particular, Council asserts the district court "indicated the defense would have [had] to litigate any *Batson* claim on the spot, and in front of the entire venire." *Id.* at 134.

To be sure, the record shows the district court was caught off guard when defense counsel raised "potential *Batson* issues," JA 4081, after previously advising they had no

---

[4] The waiver here was made by Council's attorneys rather than Council himself. But Council does not argue *Batson* issues fall within the rare category of rights that only defendants themselves can waive, and this Court has enforced other waivers of trial rights made by defense attorneys. See, *e.g.*, *United States v. Ivey*, 60 F.4th 99, 115–16 (4th Cir. 2023). We thus do not consider the merits of Council's *Batson* claim at this point. See note 5, *infra*.

24

"objection[s] regarding the method of the selection of the jury," JA 4076–77. But even at that point, defense counsel requested "just a couple of minutes just to review" the matter and never requested a formal recess. JA 4082. After the district court granted that request—which, defense counsel advised, was "all we're asking for"—it was defense counsel who cut short the break after what the trial transcript describes as a "[b]rief pause." *Id.* Far from lacking "an opportunity to object," Fed. R. Crim. P. 51(b), the record shows Council's trial attorneys made a decision—albeit a quick one—to forgo a *Batson* challenge.

The consequences of this waiver are serious. "[W]hen a claim is waived, it is not reviewable on appeal, even for plain error." *Robinson*, 744 F.3d at 298; accord *Allen v. Lee*, 366 F.3d 319, 328 (4th Cir. 2004) (en banc) (stating a defendant who "expressly relinquished his right to a remedy at trial by, in effect, consenting to be tried by the jury as constituted" cannot later "rescind that consent"). For that reason, we cannot consider—and express no opinion about—Council's current arguments that "the government used its peremptory strikes quite disproportionately against Black veniremembers" or that "[t]he record reveals no plausible race-neutral reason for most of those strikes that did not apply equally to White venirepersons the government left on the jury." Council Br. 133–34; see *id.* at 140–48. Nor has Council identified any authority for remanding to the district court for additional proceedings while the case is still on direct appeal. We have no warrant to disturb a district court's judgment based on a claim abandoned at trial.[5]

---

[5] Council does not ask us to reverse the district court's judgment on a theory that his trial attorneys' waiver of a *Batson* claim was ineffective assistance of counsel. At any rate, "a defendant may raise an ineffective assistance claim for the first time on direct appeal (Continued)

25

III.

Council also makes various challenges related to the penalty phase of his trial. He argues the death penalty is unconstitutional. But the Supreme Court has said "[t]he Constitution allows capital punishment," *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019), and we have no authority to say otherwise. Nor does Council identify any other basis for disturbing his sentence.

A.

The Federal Death Penalty Act prescribes a three-step process for deciding whether to recommend a sentence of death. First, a capital jury must find one of what the special verdict form here described as "threshold intent factors" listed in 18 U.S.C. § 3591(a)(2). JA 2306. Second, the jury must find at least one of what the special verdict form called "statutory" or "non-statutory" aggravating factors. JA 2307–08; see 18 U.S.C. § 3593(e)(2). Third and finally, the jury must "consider whether all the [statutory or non-statutory] aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." § 3593(e).

Council makes no arguments challenging the process at step one. At step two, the jury unanimously found six aggravating factors: two statutory and four non-statutory. Council offers two sets of arguments for why these findings were erroneous. For one thing, Council contends two of the factors were inherently contradictory, and unsupported by the

---

only where the ineffectiveness conclusively appears from the record," *United States v. Ojedokun*, 16 F.4th 1091, 1115 (4th Cir. 2021) (quotation marks omitted), and Council does not contend that standard is satisfied here.

26

evidence. For another, Council asserts the jury was allowed "to triple-count the supposedly 'unnecessary' nature of the murders" and that this multiple counting violated his rights under the Fifth and Eighth Amendments. Council Br. 161. These errors, Council concludes, erroneously inflated the number of aggravating factors at issue, and thus prejudiced him at step three.

We review challenges to the validity of an aggravating factor de novo. *United States v. Higgs*, 353 F.3d 281, 315, 320 (4th Cir. 2003). As always, we review a jury verdict for sufficiency of the evidence by asking "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942); see 18 U.S.C. § 3595(c)(2)(B) (instructing us to decide whether "the admissible evidence and information adduced" "support[s] the special finding of the existence of [an] . . . aggravating factor").[6]

1.

Council's "inherent conflict" and insufficiency of the evidence arguments focus on one statutory factor and one non-statutory factor. The statutory factor—captioned "Pecuniary Gain" on the special verdict form, JA 2307, 2321—asked whether:

> The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

---

[6] The government contends some of Council's arguments are properly reviewed only for plain error because they were never presented to the district court. See U.S. Br. 104–05. Because we conclude these arguments fail either way, we do not resolve the preservation issue.

27

18 U.S.C. § 3592(c)(8). The non-statutory aggravating factor was captioned "Targeting Innocent Victims." JA 2308, 2322. It asked whether:

> [T]he defendant displayed particular cruelty and callous disregard for human life by shooting both victims, who were unknown to him, multiple times at close range without warning and without provocation or resistance from the victims, in spite of the fact that such violence was not necessary to successfully complete the robbery of the CresCom bank[.]

JA 2308, 2322. (Because the latter factor focuses on Council's conduct rather than the character of his victims, it seems "gratuitous killing" may have been a more accurate shorthand. Council and the government both use "innocent victims," however, so we do the same.)

We conclude there is no inherent conflict between these factors and the evidence was sufficient to support the jury's finding on each of them. For the sake of argument, we assume Council is right that the jury could only find the pecuniary gain factor satisfied "if Council's 'motivation for the murders'—not just for the robbery—was to enable him to steal money from the bank." Council Br. 162; accord *United States v. Barnette*, 390 F.3d 775, 805–07 (4th Cir. 2004) (doing the same), *cert. granted and judgment vacated on other grounds*, 546 U.S. 803 (2005). But there is no inconsistency between saying Council killed his victims "in the *expectation*" it would help him complete the robbery, 18 U.S.C. § 3592(c)(8) (emphasis added), while also saying "such violence" was "not *necessary*" to complete the robbery and that it "displayed particular cruelty and callous disregard for human life." JA 2308, 2322 (emphasis added).

The evidence here adequately supported both findings. During a recorded interview with FBI agents, Council said he killed his victims to prevent them from "pushing that

28

button or whatever they do to alert the authorities" "[b]ecause that's the only way I knew that I could get away" from the bank without being apprehended or killed. JA 374, 377. A jury could reasonably conclude that, in so stating, Council admitted killing his victims to facilitate a robbery committed for pecuniary gain. See JA 6004 (government lawyer noting Council "said that he was worried they might hit the alarm so he killed them"). At the same time, the jury could also have reasonably found that—under all the circumstances—it was unnecessary for Council to kill his victims to facilitate an escape and that the way he did so showed a callous disregard for human life.

The decisions Council relies on do not compel a different result. In *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), this Court rejected a sufficiency challenge to the pecuniary gain factor in a carjacking prosecution where the defendant stated that—even though he had other options for escape—he killed the victim because "I just thought he [was] going to stop me." *Id.* at 808. That statement is not meaningfully different from what Council said here.

The Fifth Circuit's decision in *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), provides some support for Council's position, but we conclude it is ultimately distinguishable. To begin, despite determining it had been error to submit the pecuniary gain factor to the jury, the *Bernard* court ultimately affirmed the defendant's death sentence after concluding the error was harmless. See *id.* at 483–84. But see Council Br. 171 (asserting that "inflat[ing] the number of aggravating factors weigh[ing] in favor of death" is necessarily prejudicial). True, the *Bernard* court stated "[t]he motivation for the murders" in that case "was unrelated to pecuniary gain" because the defendant "sought to

29

prevent the [victims] from reporting their crimes to the police" rather than expecting a "pecuniary gain . . . to flow directly from the homicide." 299 F.3d at 483–84. But the Fifth Circuit also emphasized its insufficiency holding was based on "the facts presented by th[at] case," *id.* at 484, which included neither the sort of admission in the defendant's "own words" present here, nor the tight temporal proximity between the taking of property and the victim's murder. Finally, to the extent there is any tension between the Fifth Circuit's broad language in *Bernard* and this Court's holding in *Barnette*, we are required to follow the latter.

2.

We also are unpersuaded by Council's "triple counting" claim. Council's argument on this point focuses on three factors. The first is the innocent victims factor discussed earlier. The second is a statutory aggravating factor the parties and special verdict form call "multiple killings." It asked whether "the defendant intentionally killed . . . more than one person in a single criminal episode." 18 U.S.C. § 3592(c)(16). The third is a non-statutory aggravating factor the parties describe as "escalating violence." As put to the jury, that factor asked whether Council "engaged in a continuing and escalating pattern of criminal activity . . . culminating with the armed robbery of the CresCom bank." JA 2308, 2322. Council asserts these three factors "invited jurors to redundantly count [his] purported awareness that the murders were 'unnecessary,'" which violated his rights under the Fifth and Eighth Amendments. Council Br. 161.

That argument has several problems. For one thing, neither the Supreme Court nor this one has ever "held that aggravating factors could be duplicative so as to render them

30

constitutionally invalid" or "passed on the 'double counting' theory" Council advances. *Jones v. United States*, 527 U.S. 373, 398 (1999). And we need not address the theory's validity today because we conclude the aggravating factors Council identifies focused on discrete aspects of his wrongful conduct. The innocent victims factor addressed how Council killed his victims, and that it was unnecessary to do so to complete the robbery. The multiple killings factor recognized two people lost their lives. And the escalating violence factor involved Council's conduct over a longer time, requiring jurors to consider events leading up to the CresCom robbery (including previous robberies he committed in which no one had been killed). We thus conclude there was no triple counting—impermissible or otherwise.

## B.

Council's next challenge to his sentence involves victim impact testimony. Council asserts it was error for the district court to allow the presentation of evidence to become "lifetime retrospective[s] about each victim," which included "detailing their value to their professional, church, and local communities." Council Br. 173. Here too, we see no reversible error.

Before trial, Council filed a motion asserting the government's non-statutory victim impact aggravating factor was "unconstitutionally vague and overbroad." JA 494.[7] "Alternatively," Council asked the district court to require "the government [to] provide a more definite statement as to the specific victim impact evidence the government intends

---

[7] Council does not renew that claim on appeal.

31

to offer in the event a penalty phase is necessary." JA 497. The court denied Council's motion to strike the victim impact aggravating factor, noting "the Supreme Court has rejected similar vagueness and overbreadth challenges." JA 1061. The court also denied Council's request for a more definite statement, citing this Court's observation that the Federal Death Penalty Act and the Constitution "require that the defendant receive adequate notice of the aggravating factor, . . . not notice of the specific evidence that will be used to support it." JA 1062 (quoting *Higgs*, 353 F.3d at 325).

A month before trial, Council renewed his request for "an informative outline of testimony and exhibits in support of the 'victim impact' non-statutory aggravating factor." JA 1835. At a hearing held a week later, the government provided "a bit of an overview of what [it thought] our victim impact case looks like as it stands," including the number of witnesses and the nature of their relationship with the victims and the number and types of exhibits. JA 2048. When defense counsel requested additional information, the court responded the government had "done a very good job giving you an outline, probably much more than what you're entitled to." JA 2054. In its written order, the district court said it found the government's "proposed presentation reasonable" and granted "the Government's request to the extent that the Government abides by the description given at the" hearing. JA 1982. The court also stated that "the Government's proposed witnesses (family members and friends/coworkers) are proper" sources for victim impact testimony and emphasized that the government had acknowledged "the limitations on victim impact testimony." JA 1982 n.9.

32

Although Council continued to raise concerns about the nature and scope of the anticipated victim impact testimony before the sentencing phase began, the defense raised only one objection during the first day of penalty-phase testimony. That objection was prompted by government counsel's statement "I know this is very difficult for you" at the end of the first witness's testimony. JA 4924. After the witness was excused, defense counsel asked to approach and raised concerns about the statement. JA 4925. Government counsel responded, "That's fine," and the district court stated its view that the remark had been an "honest" mistake. *Id.* Defense counsel concurred with the court's observation, and the court directed counsel on each side to be mindful going forward. See *id.* The government called its second and final witness of the day, during which the defense raised no objections.

That same day, Council filed a motion asking the district court to take three actions. The first was "order the government to submit an informative outline of victim impact evidence." JA 2214. The second was "order that the government may not introduce evidence about the impact of the victims' deaths on the workplace or the community." *Id.* And the third asked the court to "conduct a review of victim impact evidence proposed in the government's informative outline and appropriately limit the evidence." *Id.*

The district court addressed the matter before resuming testimony the next day. After defense counsel expressed concern about "jumping up in front of the jury sounding insensitive and wanting to make objections," the court remarked, "you all have had no hesitation signaling that you all need to come up here at sidebar and speak to me." JA 4941. The court reminded defense counsel that the government had previously revealed "the

witnesses [they were] going to call," and stated that "[b]efore we get any further victim impact testimony I'll ask [the government] to meet with the defense[ and] say these are the exhibits." JA 4942.

Defense counsel also took issue with "the testimony" and "the things that [the witnesses are] saying," prompting the court to say it would give a limiting instruction. JA 4943. And when defense counsel lamented the risk of "appear[ing] insensitive" by objecting to, and thereby interrupting, forthcoming witnesses' testimony, the district court responded that "there was no contemporaneous objection" during the earlier testimony and "you all can signal and come here to sidebar at any time." JA 4944. Once the jurors reentered the courtroom, the court cautioned:

> To the extent there was any testimony yesterday regarding the effect on the community as a whole or the banking community as a whole or CresCom Bank as a whole as a result of these victims' deaths, you should disregard it. You can only consider the impacts of the victims' deaths on family, friends and coworkers.

JA 4949. After that instruction, defense counsel made no further objections to the victim impact testimony.

There is a significant mismatch between the arguments Council made before the district court and the ones he advances now. As laid out above, Council's overriding argument before the district court was that the government should have been required to provide a more detailed outline of the victim impact testimony before the testimony was offered. But Council all but abandons that argument before this Court—perhaps recognizing it is not supported by either the text of the Federal Death Penalty Act or this Court's precedent. See *Higgs*, 353 F.3d at 325. Instead, Council focuses on the substance

of the victim impact evidence, asserting it "transgressed almost every boundary . . . set by the Supreme Court." Council Br. 178.

Because Council did not lodge a contemporaneous objection to most of the testimony with which he now takes issue, there is an argument this claim should be reviewed only for plain error. See Fed. R. Crim. P. 52(b). The government does not ask us to apply that standard, however, so we will assume for the sake of argument Council's claim is preserved. At the same time, we reject Council's position that de novo review is appropriate simply because some of the government's evidence—or the presentation as a whole—"implicates constitutional rights." Council Br. 174. Instead, as this Court has held, a district court's decision "to admit certain evidence" involving victim impact is reviewed only "for abuse of discretion." *United States v. Runyon*, 707 F.3d 475, 499 (4th Cir. 2013).

We hold the district court committed no abuse of discretion. "The Eighth Amendment . . . permits capital sentencing juries to consider evidence relating to [a] victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." *Jones*, 527 U.S. at 395. The government may admit "victim impact evidence and prosecutorial argument on that subject" because it "may legitimately conclude that evidence . . . is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

Council highlights witness testimony made after the curative instruction that one of the victims "did a lot of charities to raise moneys for people in the community." JA 4961. Because "juries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S.

35

200, 211 (1987), however, we must assume the jury understood it could "only consider the impacts of the victims' deaths on family, friends and coworkers" rather than the broader community. JA 4949.

Council also cites the number of victim impact witnesses and the percentage of the government's sentencing case taken up by such witnesses; Council contrasts these figures to those of other capital cases to conclude the government's presentation was excessive. But Council cites no authority suggesting the number or percentages here present an independent constitutional problem. Indeed, this Court recently affirmed a death sentence in a case involving "victim-impact testimony from twenty-three witnesses"—far more than the number presented here. *United States v. Roof*, 10 F.4th 314, 366 (4th Cir. 2021).

Council asserts some of the "emotional stories and exhibits of distant memories did not reflect the specific, current loss" the Supreme Court "contemplated" when it held the Constitution permitted victim impact testimony in *Payne v. Tennessee*, 501 U.S. 808 (1991). Council Br. 182. But *Payne* did not freeze this area of law in amber, and this Court has since issued multiple decisions about the permissible scope of victim impact testimony, including *United States v. Barnette*, 390 F.3d 775, 797–801 (4th Cir. 2004); *United States v. Fulks*, 454 F.3d 410, 436 (4th Cir. 2006); *United States v. Runyon*, 707 F.3d 475, 499–502 (4th Cir. 2013) and *United States v. Roof*, 10 F.4th 314, 376–78 (4th Cir. 2021). Having examined the testimony here against the standards applied in those decisions, we see no abuse of discretion in the district court's handling of this sensitive issue, particularly given the lack of objections by the defense.

36

C.

Council next argues the district court failed to instruct the jury as required by

18 U.S.C. § 3593(f). As relevant here, that provision states:

> [T]he court, prior to the return of a finding under subsection (e), shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be.

*Id.*

We review a "challenged instruction holistically to determine whether it adequately

informed the jury of the law, without misleading or confusing the jury." *United States v.*

*Simmons*, 11 F.4th 239, 264 (4th Cir. 2021) (quotation marks omitted). "[W]e do not view

a single instruction in isolation; rather we consider whether taken as a whole and in the

context of the entire charge, the instructions accurately and fairly state the controlling law."

*United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009) (quotation marks omitted).

The district court instructed the jury as required by Section 3593(f).[8] The court

mentioned the jury's obligations under that provision in: (1) its oral instructions on the

opening day of the penalty phase; (2) its final oral instructions, when discussing the process

of weighing any aggravating and mitigating factors; (3) its final oral instructions, when

discussing a certification the jury would have to make on the special verdict form; (4) its

---

[8] The government asserts Council did not preserve an objection to the district court's instructions (rather than an argument the court erred by not also giving his proposed instruction). Because we conclude the district court committed no reversible error in any event, we need not resolve that question.

final written instructions, when discussing the certification; and (5) on the special verdict form itself.

Council asserts Section 3593(f) imposes two requirements: telling the jury it may "not consider" race or any other prohibited characteristic *and* saying it may not recommend a death sentence unless the jurors conclude they would do so "no matter what" the specific characteristics "of the defendant or any victim may be." 18 U.S.C. § 3593(f). Even assuming these requirements are as distinct as Council contends—but see *United States v. Lawrence*, 735 F.3d 385, 403 (6th Cir. 2013)—the district court touched on both in its initial oral instructions, its final written instructions, and on the special verdict form itself. For that reason, the district court committed no abuse of discretion in concluding its instructions "taken as a whole and in the context of the entire charge . . . accurately and fairly state[d] the controlling law." *Passaro*, 577 F.3d at 221.

Still, Council argues the district court erred in failing to give one of his proposed instructions. That lengthy instruction would have quoted the statutory language, characterized Congress's reasons for enacting Section 3593(f), and described and quoted the certification the jurors would have to make on the special verdict form. It also would have instructed the jurors to engage in a "race-switching" exercise, Council Br. 206, directing the jurors—when considering "the evidence and testimony of various witnesses and parties"—to "imagin[e] . . . that everyone's backgrounds were reversed from what they actually are." JA 1672.

"We review the district court's decision to . . . refuse to give a jury instruction for abuse of discretion." *Passaro*, 577 F.3d at 221. Such a refusal is "reversible error . . . only"

38

if the proffered instruction: "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.*

We see no abuse of discretion here. Whether or not portions of Council's proposed instruction would be wise as a matter of policy, they are not rooted in the text of the statute. As written, Section 3593(f) does not require the jury to mentally reverse the racial or other characteristics of anyone, much less witnesses who are neither the victim nor the defendant. Instead, the statute requires jurors to conclude (and certify) that they would have recommended a death sentence "no matter what" the characteristics of the victim or the defendant were. 18 U.S.C. § 3593(f). As we have already explained, that principle was "substantially covered by the court's charge to the jury." *Passaro*, 577 F.3d at 221.

### D.

We also conclude the district court did not abuse its discretion in rejecting Council's efforts to challenge the validity of his death sentence via a second—and untimely—motion under Federal Rule of Criminal Procedure 33.

Council filed his first Rule 33 motion shortly after he was sentenced. The district court denied that motion, and Council appealed to this Court.

More than a year and a half later—and while his appeal was still pending—Council filed a second Rule 33 motion. The district court denied that motion on three grounds, including that it was untimely. Reviewing that decision for abuse of discretion, see *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006), we affirm.

39

Rule 33(b)(2) provides any motion "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Council did not file his motion "within 14 days" after the jury recommended a death sentence or the court imposed it. Nor was Council's motion based on "newly discovered *evidence*." To the contrary, as the motion explained, it was based on "a new statute" enacted by the South Carolina legislature. JA 6170.[9]

Seeking to avoid this problem, Council asserts the district court abused its discretion in rejecting his claim that he could show "excusable neglect" for the late filing. See Fed. R. Crim. P. 45(b)(1)(B) (providing that, subject to one exception, a district court may extend an already expired deadline at the request of a party who shows "good cause" and that "the party failed to act because of excusable neglect"). But at least one of Council's current arguments—that the Federal Death Penalty Act makes an unconstitutional delegation of legislative authority by incorporating state law execution practices—was plainly available when Council filed his first Rule 33 motion. Nor did the district court abuse its discretion in concluding Council had not established excusable neglect for failing to bring his remaining claims sooner.

---

[9] Even if Council's motion had been based on "newly discovered evidence" under Rule 33, the district court would have lacked the authority to grant the motion. True, the outer time limit for filing that sort of motion is "3 years after the verdict or finding of guilty" and Council satisfied that requirement. Fed. R. Crim. P. 33(b)(1). The problem is that same provision declares that "[i]f an appeal is pending"—which one was by the time Council filed the relevant Rule 33 motion—a district court "may not grant" such a motion "until the appellate court remands the case." *Id.*

Our holding does not leave Council without a mechanism for raising constitutional challenges to his method of execution, should it proceed. As the government notes, this Court has stated that "challenges to the execution of a federal sentence"—including those "based on a perceived constitutional violation"—"are properly brought under 28 U.S.C.A. § 2241." *United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004); accord *In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997) (en banc) ("[A]ttacks on the execution of a sentence are properly raised in a § 2241 petition.").[10]

\*    \*    \*

Having scrutinized the record and considered Council's challenges under the applicable standards of review, we conclude the district court committed no reversible error. The judgment of the district court is

*AFFIRMED*.

---

[10] Council also contends he will be placed in solitary confinement for an indefinite period while awaiting execution and that this violates the Eighth Amendment's prohibition on "cruel and unusual punishments." But nothing in the district court's judgment establishes the conditions of Council's confinement, and a challenge to the conditions of a prisoner's confinement "does not go to the validity of a conviction or sentence." *Nance v. Ward*, 142 S. Ct. 2214, 2222 (2022).

41