

THE UNITED STATES TORTURES BEFORE IT KILLS:

AN EXAMINATION OF THE DEATH ROW EXPERIENCE FROM A
HUMAN RIGHTS PERSPECTIVE

A Position Paper by the Center for Constitutional Rights

Prepared for the 9th Annual World Day Against the Death Penalty

October 10, 2011

pg 36

# THE UNITED STATES TORTURES BEFORE IT KILLS:

## AN EXAMINATION OF THE DEATH ROW EXPERIENCE FROM A HUMAN RIGHTS PERSPECTIVE

### I.    Factual Overview[1]

According to recent figures, there are approximately 3,250 prisoners on death row in the United States.[2] The vast majority of these men and women will serve years in solitary and crippling conditions, awaiting execution. Conditions on death row are bleak, characterized by "rigid security, isolation, limited movement, and austere conditions."[3] Of the 34 states which impose the death penalty, at least 25 hold death row inmates in solitary confinement 23 hours or more a day.[4] All but two states (Missouri and Oklahoma) hold prisoners on death row in solitary cells for at least 16 hours a day.[5]

Contact with family members is minimal. Seventeen out of 34 states do not allow prisoners any physical contact with family or friends for the duration of their time on death row, other than on the weeks leading up to execution.[6] Most death row prisoners have extremely restricted access to non-contact visits, books, telephones, and programming, limited showers and exercise, and are not removed from their cells without

---

[1] The Center for Constitutional Rights is dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. Founded in 1966 by attorneys who represented civil rights movements in the South, CCR is a non-profit legal and educational organization committed to the creative use of law as a positive force for social change. If you have any questions regarding this paper, please feel free to contact Rachel Meeropol, Staff Attorney at the Center for Constitutional Rights, at rachelm@ccrjustice.org.

[2] Death Penalty Information Center, *Death Row Inmates by State*, available at: http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year.

[3] Lombardi G, Sluder RD, Wallace D. 1997, *Mainstreaming death-sentenced inmates: the Missouri experience and its legal significance,* Federal Probation 61: 3.

[4] NAACP Legal Defense and Educational Fund, Inc. *Death Row USA,* April 1, 2010 available at http://www.deathpenaltyinfo.org/documents/DeathRowConditions.xls.

[5] *Id.*

[6] *Id.*

shackles and a waist chain.[7] Only two states allow for *any* access to educational programming, and three more allow only limited occupational training or opportunity.[8]

Sensory deprivation is prevalent. One scholar described a relatively new Texas death row facility, where hundreds of condemned men are isolated in 60 square foot, single-person, solid-front cells for 23 hours a day. These men exercise alone for one hour each day. Meals are served through a locking metal flap in the cell door. There are no work or group recreation programs. Nor can the prisoners speak to each other through the solid cell walls and door. All visits are non-contact.[9]

*Time on Death Row*

Death row prisoners in the United States spend decades in these dehumanizing conditions. Of the 52 people executed in the United States in 2009, the average length of time on death row was 169 months – over fourteen years.[10] Many spend even longer. In *Thompson v. McNeil,* for example, the United States Supreme Court declined to review the case of William Thompson, who had been on death row in Florida. Thompson spent 23 hours a day locked in a solitary 6-by-9-foot cell for 32 years.[11] He had twice come within hours of execution, only to receive last minute stays.

The details of these prisoners' experiences are instructive. In their evenhanded analysis of death row syndrome, explained below, Dr. Karen Harrison and Anouska

---

[7] Andrea D. Lyon & Mark D. Cunningham, *"Reason Not the Need:" Does the Lack of Compelling State Interest in Maintaining a Separate Death Row Make it Unlawful?*, 33 Am. J. Crim. L. 1, 2 (2005).

[8] NAACP Legal Defense and Educational Fund, Inc. *Death Row USA,* April 1, 2010 available at http://www.deathpenaltyinfo.org/documents/DeathRowConditions.xls.

[9] *Id.* at 15.

[10] Bureau of Justice Statistics, *Capital Punishment 2009, Statistical Tables,* at Table 12, available at http://bjs.ojp.usdoj.gov/content/pub/pdf/cp09st.pdf

[11] *Thompson v. McNeil*, 129 S. Ct. 1299, 1299-3000 (2009), quoting *People v. Anderson*, 6 Cal. 3d 628, 649 (1972) for the proposition that "the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."

pg 38

Tamony describe the experience of a Virginia death row prisoner in his tenth year of

solitary confinement:

> The inmate spends approximately 23 hours a day in his 7 x 9 feet cell, with one hour of solitary exercise, followed by the opportunity to shower. The only human contact experienced, apart from being taken to and from the exercise yard, is when his meals are delivered on a plastic food tray, which is pushed through a small portal in the cell door. Visitation rights include one hour of family non-contact, to be taken at weekends and one face-to-face meeting every three months; although for this particular prisoner his only visits are from his legal representatives. When a visit is arranged, he is led out of his cell by a leash, hands shackled behind his back and ankles bound together.
>
> Everything, apart from a metal sanitation unit, is grey concrete; including the bed, stool and walls. There is one slim window but this provides so little natural light that the cell is illuminated by strip lighting. Although the prisoner spoke about conditions being sometimes eerily silent, he also described how it could also be unbearably noisy; the sound of keys rattling, toilets flushing, pipes gargling and prisoner's voices echoing through the labyrinth of cells...
>
> Since living on death row, the prisoner has shown increasingly severe mental health problems, including symptoms of chronic depression and active psychosis. Whilst, it cannot be categorically proven that he would not have suffered such deterioration in any event, his mental health team think this is unlikely; with them stating that his condition has been exacerbated by the psychological effects of the sensory and social deprivation which solitary confinement causes. Psychological and psychiatric professionals have noted how his behavior has become increasingly bizarre, including paranoid delusions and hallucinatory thoughts. A clinical psychologist describes his speech as tangential and rambling, his manner, at times, as intensely subdued, and at others as, manic and disorganized....[12]

While relatively few women are held on death row, their experiences mirror those

of men sentenced to die. The attorney for one such woman described her conditions:

> My client is held in a small area isolated from the rest of the prison. She is only allowed to see one prisoner .... She is allowed out of her cell for a 15 minute shower each day and one hour outside (alone) five days per week, weather permitting. ... [T]wo guards sit in front of her cell 24 hours each day, seven days a week. There is also a video camera on her at all times. [13]

---

[12] Dr. Karen Harrison and Anouska Tamony, *Death Row Phenomenon, Death Row Syndrome and their Affect on Capitol Cases in the US,* 2010 Internet J. Cri m., available at www.internetjournalofcriminology.com

[13] The ACLU & American Friends Service Committee, *The Forgotten Population: A Look at Death Row in the United States Through the Experiences of Women,* Dec 2004, at 12-13.

pg 39

*Coming Close to Death, Again and Again*

The intensity of the death row experience is not solely the result of abnormally prolonged solitary confinement. It is also based on the knowledge of one's impending, but uncertain, execution and the intense strain of repeatedly coming within hours or days of execution.[14] As anecdotes from just the last year show, it is not uncommon for a death row prisoner to come within hours of being killed, only to receive a temporary stay or reprieve, soon followed by a new execution date.[15] Cleve Foster, currently on death row in Texas, has already faced death three times. On September 20, 2011, he was granted a temporary reprieve two hours before he was scheduled to be executed. Months earlier, in January of 2011, he came within six hours of his scheduled execution. Hank Skinner, also on death row in Texas, was scheduled to be executed on February 24, 2010. That date was changed to March 24, due to a clerical error. He was finishing his last meal, thirty-five minutes before his scheduled execution on March 24th, when he again received a stay. He now anticipates execution on November 9, 2011. Jeffrey Matthews was sentenced to die in Oklahoma. He was given an execution date of June 17, which was stayed until July 17, 2010. Less than a week before his date of execution, he received another stay, until August 17, 2010. He received yet another stay, until October 16, 2010, so the State could seek permission to use a new drug to carry out the lethal injection. The date was continued once again, until November 20. He was finally executed on January 11, 2011.

---

[14] Though important, an exploration of the means of execution, and its concomitant physical pain and suffering, is beyond the scope of this paper. However, a death row prisoner's anticipation of this pain, along with his/her fear of death, must be considered in analyzing the experiential component of life on death row.

[15] The following information is compiled from reports of execution stays in 2010 and 2011 available at http://www.deathpenaltyinfo.org/upcoming-executions.

pg 40

Recently, in late September, Troy Davis was executed by the state of Georgia despite global protest on his behalf and significant evidence of his innocence. While the details of Troy Davis' underlying prosecution became common knowledge to his legions of supporters, few knew that he had already come within minutes of execution before his final eleventh-hour ordeal. In 2008, Davis came within 90 minutes of execution – he was already strapped down on the gurney when the Supreme Court granted his stay. Later that year, he again came within three days of an execution date. In 2007, he came within a day of execution.

Perhaps most disturbingly, on July 25, 2010, the Florida Supreme Court stayed the execution of Manuel Valle, scheduled for August 2, less than two weeks later. The execution date was rest for September 6. He received another stay, only to be killed on September 28, 2011. Valle had spent 33 years on death row in Florida, and had watched 69 other prisoners walk by his cell to the execution chamber to die.[16]

*Death Row Phenomenon & the Psychological Impact*
*of Prolonged Solitary Confinement*

Decades in isolation without access to programming, family, other prisoners, or any other form of intellectual or social stimulation, along with the constant knowledge of one's impending, but uncertain, death, combine to create "death row phenomenon." The phenomenon can be broken down into three elements: (1) a temporal component based on the length of time between sentencing and execution; (2) a physical component based on the punishing conditions in which the condemned prisoner is held; and (3) an

---

[16] Clive Stafford Smith, *Manuel Valle's Excruciating 33-year Execution*, Guardian.co.uk, Sep. 29, 2011. Available at http://www.guardian.co.uk/commentisfree/cifamerica/2011/sep/29/manuel-valle-execution-breyer?newsfeed=true.

experiential component, based on the meaning of living under sentence of death.[17] "Death row syndrome," in turn, refers to the significant negative psychological impacts of prolonged detention on death row. In a definitive and much-cited literature review, clinical psychologists Mark Cunningham and Mark Vigen summarized relevant research regarding conditions on death row and the impact of these conditions on prisoners facing execution.[18] In-depth interviews of 35 out of 37 prisoners on Alabama's death row in 1979, for example, uncovered "four adverse psychological processes… pervading the experience of death row inmates: (1) a sense of helplessness and defeat; (2) a sense of widespread and diffuse danger with an accompanying perception of helpless vulnerability; (3) emotional emptiness characterized by loneliness and a deadening of feelings for self and others; and (4) a decline in mental and physical acuity."[19] The prisoners experienced "chronically unstable, fluctuating moods and recurrent depression" along with severe deterioration in mental capability including slowness, confusion, forgetfulness, and lethargy.[20] The Alabama researchers "compared this deterioration to senility, describing the death row inmates as writing rambling correspondence, misplacing objects within a small cell, and expressing disconnected thoughts."[21]

While not yet recognized by the American Psychological Association, there has long been international recognition of death row syndrome   Indeed, the serious mental health impact of prolonged solitary confinement, in itself, is extraordinarily well documented.

---

[17] Amy Smith, *Not "Waiving" but Drowning: the Anatomy of Death Row Syndrome and Volunteering for Execution,* 17 B.U. Pub. Int. L.J. 237, 240 (2008); *see also* Death Penalty Information Center, *Time on Death Row,* available at http://www.deathpenaltyinfo.org/time-death-row.
[18] Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment and Confinement: a Critical Review of the Literature,* 20 BEHAV. SCI. & L. 191 (2002).
[19] *Id.* at 204.
[20] *Id.*
[21] *Id.*

pg 42

One of the most common psychological effects of prolonged solitary confinement is a persistent and heightened state of anxiety. For example, a 2003 study of prisoners in California's Pelican Bay Supermax facility by Dr. Craig Haney found that 91% of inmates suffered from abnormal levels of what Haney termed anxiety or "nervousness."[22] Similarly, a 1983 study by Dr. Stuart Grassian in the American Journal of Psychiatry found that 71% of inmates in his sample complained of "massive free-floating anxiety."[23] This anxiety and nervousness is reported by all accounts of those familiar with prolonged solitary confinement; frequently, it inspires a severe paranoia in inmates. In a 2006 paper summing up his findings from two different extensive studies, Grassian found that nearly half of the prisoners suffered from "paranoid and persecutory fears."[24] It is not uncommon for this paranoid mindset to persist long after prisoners are released from solitary confinement or incarceration.[25]

Another extremely common result of prolonged solitary confinement is the emergence of severe headaches. In the aforementioned Haney study, 88% of prisoners complained of recurring headaches, while a study by Danish psychiatrists found that 53% of prisoners held in solitary confinement for only two months suffered similarly.[26] A 2003 Norwegian study reported 40% of prisoners with the same complaint.[27]

---

[22] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement,* 49 Crime & Delinquency 124, 2003.

[23] Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. Psychiatric Ass. 1450, (1983).

[24] Stuart Grassian, *Prison Reform: Commission on Safety and Abuse in America's Prisons: Psychiatric Effects of Solitary Confinement,* 22 J.L. & Politics 325 (2006)

[25] Vince Beiser, *A Necessary Evil,* L.A.Times, Oct. 19, 2003

[26] Andersen, Henrik Steen, Tommy Lillebæk, and Dorte Sestoft. 1997. *Efterundersøgelsen - en opfølgningsundersøgelse af danske varetoegtsarrestanter.* Copenhagen: Schultz.

[27] Stang, Jan, Jens Moe, Inge Arne Teigset, Bjørn Østberg, and Tron Anders Moger, *Fanger i sikkerhetscelle - en utfordring,* 123 Tidsskrift for Den norske Lægeforening, 1844–46 (2003).

pg 43

Haney's 2003 study also found 88% of prisoners in his sample suffered from ruminations, irrational anger, and "intrusive thoughts."[28]  Grassian, too, reported finding prisoners suffering in this manner at a rate of nearly 1-out-of-2.[29]  Grassian describes prisoners experiencing "the emergence of primitive aggressive fantasies of revenge, torture, and mutilation of the prison guards," and in every instance, prisoners described such thoughts as "unwelcome, frightening and uncontrollable."[30]  While often difficult to measure scientifically, such disturbing, unsettling thoughts are reported throughout the literature on prolonged solitary confinement.  Sixty-one percent of Haney's 2003 study participants reported "violent fantasies."[31]

Both Grassian and Haney found that an extremely high percentage of prisoners in their sample suffered from oversensitivity to stimuli.  Eighty-six percent of Haney's study were thusly impaired, while Grassian reported nearly half of his sample similarly affected.[32]

It is extremely common for prisoners in prolonged isolation to find their ability to concentrate significantly impaired. Haney's 2003 study reported 84% of participants experiencing an "extreme state of confusion," and Grassian has repeatedly found this to also be the case in his studies.  In his 2006 paper, Grassian quotes a prisoner stating, "Your mind is narcotized," and Grassian reports that one prisoner "slashed his wrists during such a state."  Often, prisoners descend into this state to the point that they are no longer able to read.[33]

---

[28] *See supra*, note 22, at p. 134.
[29] *See supra,* note 24.
[30] *Id.* at 7.
[31] *See supra,* note 22.
[32] *Id; supra* note 24.
[33] Smith, Peter S, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime and Justice 441-528 (2006).

pg 44

Grassian concludes that nearly one-third of prisoners he worked with "described hearing voices," while others reported "noises taking on an increasing meaning and frightening significance." Haney's 2003 study found that 41% of his sample experienced hallucinations, 44% experienced perceptual distortions, and 56% suffered from frequent bouts of dizziness. Sixty-three percent reported frequently talking to themselves. Grassian also links "overt psychosis" to especially bad cases of paranoia.[34] In this state, prisoners lose touch with reality, frequently falling into paranoid fantasies that lead them to self-mutilation. It should be noted that in much of the non-clinical literature on solitary confinement, prisoners report losing themselves for days in hallucinatory fantasies. Sometimes this is described as a good thing (the fantasies are positive, pleasant, frequently sexual); other times, the experience is far more harrowing.

While it is clear that prisoners in prolonged solitary confinement suffer from a decreased ability to control their impulses, this is one of the hardest areas to measure scientifically, as the line between different, co-mingling pathologies becomes rather blurred. Without a doubt, there is a shockingly high frequency of prisoners responding to prolonged isolation by becoming violent against others and themselves. But it is hard to determine whether a prisoner's behavior is due to diminished impulse control, hallucinations, confusion, irrational anger, or, most likely, a combination of these factors. Generally, researchers tend to classify instances of self-mutilation as examples of weak impulse control. Grassian, for example, reports a prisoner, upon cutting himself, saying, "[E]very time I did it, I wasn't thinking – lost control – cut myself without knowing what

---

[34] *See supra,* note 25 at p 7.

pg 45

I was doing." Smith links a lack of impulse control to prevalence of suicidal thoughts, of which 27% of Haney's Pelican Bay Prison sample experienced.[35]

Grassian states that "well over half" of the inmates he interviewed described "severe" panic attacks while in solitary confinement. Haney doesn't use the term panic attack but, in his 2003 study, 70% of participants report a sense of an "impending nervous breakdown," while 67% suffer from "overall deterioration."

As destructive as each of these individual harms are, on their own, to inmates in solitary confinement, the true malignant nature of the practice cannot be understood by looking at its consequences piecemeal. It is not just because prolonged isolation causes prisoners to feel paranoid or confused that it is so horrible. It is because prolonged isolation causes prisoners paranoia and confusion, while annihilating their ability to concentrate – thus denying them the escape of reading or watching television – and *simultaneously* denying them the ability to sleep, digest, communicate, or even dream.

Indeed, the effects of solitary confinement do not harm prisoners like individual blows – this is not the psychological equivalent of a beating. Rather, prolonged isolation debilitates prisoners as if it were a far-ranging disease of the mind. In this vein, both Drs. Grassian and Haney have presented a more holistic view of prolonged solitary confinement's detrimental nature. Grassian considers the confluence of symptoms that those held in prolonged isolation experience to be so unique and rare that it is best understood as what he calls an "acute organic brain syndrome," or "a delirium."

This medical research backs up what should be obvious to us all: a human being cannot live without human interaction, intellectual and sensory stimulation, and hope. To deny all three denies the basic humanity of the individual.

---

[35] *See supra*, note 22; note 16.

pg 46

## II.    Legal Discussion

It is widely accepted that the death penalty constitutes cruel, inhuman or degrading treatment or punishment.[36]  Through this analysis, we seek to determine whether the conduct that forms an integral part a death sentence in the United States, which constitute the "death row phenomenon" discussed above – prolonged solitary confinement, sensory deprivation, dehumanizing conditions for extended periods of time and a form of mock execution[37] – also constitutes torture, thus rending the death penalty in the United States a form of torture.  Particularly in light of the UN Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment's recent statement that he would be examining the death penalty and prolonged solitary confinement[38] and the theme of this year's World Day Against the Death Penalty, we consider such an inquiry necessary and instructive.

We conclude that the course of conduct employed by the United States, from sentence, to just before execution, constitutes torture.

---

[36] *See, e.g., Soering v. United Kingdom*, 11 Eur. Hum. Rts. Rep. 439 (1989), para. 104 (finding that the facts used to determine whether the death penalty violates the prohibition on torture or inhuman or degrading treatment or punishment including "[t]he manner in which it is imposed or executed, the personal circumstances of the condemned person and a disproportionality to the gravity of the crime committed, as well as the conditions of detention awaiting execution" are present due to *inter alia* "death row phenomenon" existing in Virginia); *Pratt and Morgan v. The Attorney General of Jamaica*, 3 SLR 995, 2 AC 1, 4 All ER 769 (Privy Council 1993) (en banc).

[37] As noted above, the means and methods of execution are beyond the scope of this policy paper.  It is worth noting, however, that the UN Committee Against Torture expressed concern "at the fact that substantiated information indicates that executions in the State party can be accompanied by severe pain and suffering," in its 2006 report on the United States compliance with CAT. *See* Consideration of Reports Submitted by States Parties under Article 19 of the Convention, Conclusions and recommendations of the Committee against Torture, United States of America, CAT/C/USA/CO/2, July 25, 2006, para. 31.

[38] Report submitted by the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, Juan E. Méndez, A/HRC/16/52, Feb 3, 2011, para. 70: "The Special Rapporteur recognizes that the question as to whether the death penalty, as well as some health and drug policies, prolonged solitary confinement, some treatments for mental disability, and domestic violence constitute *per se* cruel, inhuman or degrading treatment or punishment has given rise to much debate and discussion in the Human Rights Council. ... The Special Rapporteur will look more deeply into these issues and also suggests that they be the subject of further research by the Human Rights Council and its mechanism." Available at http://www2.ohchr.org/english/bodies/hrcouncil/docs/16session/A.HRC.16.52.pdf

pg 47

*Torture Defined under International Law*

The United States ratified the Convention Against Torture (CAT) on October 21, 1994. Article 1, para. 1, of CAT, provides a definition of torture:

> For the purposes of this Convention, torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[39]

Numerous other international treaties also prohibit torture.[40]

Torture constitutes a crime against humanity, war crime, and violation of the Geneva Conventions, as reflected in the statutes of the International Criminal Court, the International Tribunal for the former Yugoslavia, and the International

---

[39] Article 1 further provides that torture "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions." This provision does not allow for a party to CAT to establish sanctions, or a regime for implementing sanctions "that defeat the object and purpose of the Convention Against Torture to prohibit torture." The former Special Rapporteur on Torture, Manfred Nowak, and another international law expert, recently clarified that this provision was related to "certain disciplinary measures below the threshold of corporal punishment" including solitary confinement. *See* Manfred Nowak and Elizabeth McArthur, *The United Nations Convention Against Torture - A Commentary,* (Oxford University Press 2008) ("Nowak and McArthur Commentary"), pp. 79-80. *C.f.,* 8 C.F.R. 1208.18 (Implementation of the Convention Against Torture) provides "Torture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture."

[40] *See, e.g.,* International Covenant on Civil and Political Rights, Art. 7; European Convention on Human Rights, Art. 3; Inter-American Convention to Prevent and Punish Torture, Art. 5; African Charter on Human and Peoples Rights, Art. 5. *See also* U.S. definition of torture, 18 U.S.C. § 2340:

> Definitions: As used in this chapter—(1) "torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control;(2) "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from—(A) the intentional infliction or threatened infliction of severe physical pain or suffering; (B) the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (C) the threat of imminent death; or (D) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality.

13

pg 48

Tribunal for Rwanda, among other sources. Over the last fifteen years, a substantive body of jurisprudence has developed setting forth the elements of torture under customary international law, which largely reflects the definition of torture under CAT.[41] Torture has been found to be "a violation of personal dignity and is used for such purposes as intimidation, degradation, humiliation and discrimination, punishment, control or destruction of a person."[42]

Of particular relevance here, torture is not limited to physical acts; the infliction of severe *mental* pain or suffering with the requisite intention and purpose is sufficient to constitute torture. There is not a particular threshold that must be crossed for pain or suffering to constitute "severe" mental harm; it is assessed in the circumstances of each case, taking into account the "nature, purpose and consistency of the acts committed."[43] Factors related to the alleged victim, including their "age, sex, state of health and position of inferiority" are relevant for assessing harm.[44]

### The Course of Conduct for Administration of the Death Penalty in the United States Constitutes Torture

As discussed above, prolonged solitary confinement, sensory deprivation, and dehumanizing conditions for extended periods of time are all aspects of the death penalty. Furthermore, the preparation for death followed by a temporary reprieve only to be followed by a later execution date can be said to constitute a mock execution. Each of these acts has been examined, either in isolation or

---

[41] *See, e.g., Prosecutor v. Mucic, et al. (Čelebići Case)*, Case No. IT-96-21-T, Judgement, para. 494 (Nov. 16, 1998); *Prosecutor v. Furundžija*, Case No. IT-95-17/1-A, Judgement, para. 111(July 21, 2000).
[42] *Prosecutor v. Bradjanin*, Case No. IT-99-36-T, Judgement, para. 485 (Sept. 1, 2004).
[43] *Id.* at para. 484.
[44] *Id.*

pg 49

together, by United Nations bodies, international tribunals, legal experts, and non-governmental organizations, and found to constitute torture.

Most notably, the Special Rapporteur on Torture, Juan Méndez, recently issued a report on solitary confinement, in which he concluded that "where the physical conditions and the prison regime of solitary confinement cause severe mental and physical pain or suffering, when used as a punishment, during pre-trial detention, indefinitely, prolonged, on juveniles or persons with mental disabilities, *it can amount to cruel, inhuman or degrading treatment or punishment and even torture.*"[45]

The Special Rapporteur examined the conditions of solitary confinement, prolonged or indefinite solitary confinement, as well as the psychological, physiological, and latent effects of solitary confinement. In relation to the conditions, the Special Rapporteur highlighted the physical conditions, including the small cell size, the presence or absence of windows, and the stark appearance and dull colors; the prison regime, including access to outdoor exercise, meaningful human contact, and contact with the outside world; and social isolation. As for what constitutes "prolonged" solitary confinement, after observing that the European Court of Human Rights (ECHR) found that detention for three years in solitary confinement constituted a violation of the prohibition against torture and inhuman or degrading treatment or punishment,[46] and that

---

[45] Report to the General Assembly, A/66/268, August 5, 2011 ("Special Rapporteur Report on Solitary Confinement"), Summary (emphasis added). *See also id.* at para. 80 (Conclusions): "Depending on the specific reason for its application, conditions, length, effects and other circumstances, solitary confinement can amount to a breach of article 7 of the International Covenant on Civil and Political Rights, and to an act defined in article 1 or article 16 of the Convention against Torture"

[46] *A.B. v. Russia*, Application No. 1439/06, European Court of Human Rights, para. 135 (2010).

pg 50

prisoners in the United States have been kept in solitary confinement for up to 40 years, the Special Rapporteur concluded that confinement exceeding 15 days is prolonged.

In his report, the Special Rapporteur provides an overview of international practice. This survey leads to the conclusion that prolonged solitary confinement, under the conditions applied to many persons on death row in the United States, constitute torture. For example, the Inter-American Court of Human Rights found that "prolonged isolation and deprivation of communication are in themselves cruel and inhuman treatment, harmful to the psychological and moral integrity of the person, and a violation of the right of any detainee to respect for his inherent dignity as a human being."[47] The Court went further in its 2000 decision in *Cantoral-Benavides v. Peru*, when it found that the conditions of solitary confinement, including being kept is a small cell with no ventilation or natural light, for up to 23 ½ hours a day, without being allowed physical contact with family members, constitutes torture.[48] The ECHR has found that "complete sensory isolation, coupled with total social isolation, can destroy the personality and constitutes a form of inhuman treatment which cannot be justified by the requirements of security or any other reason."[49] Two United Nations bodies have also issued authoritative findings on solitary confinement. In examining Article 7 of the ICCPR (the prohibition on torture and cruel treatment or punishment), the Human Rights Committee

---

[47] Special Rapporteur Report on Solitary Confinement, para. 37, citing *Velázquez-Rodríguez v. Honduras*, Inter-American Court of Human Rights, Series C, No. 4, para. 156.

[48] Special Rapporteur Report on Solitary Confinement, para. 38, citing *Cantoral-Benavides v. Peru*, Inter-American Court of Human Rights, Series C, No. 69, paras. 62 and 104 (2000).

[49] Special Rapporteur Report on Solitary Confinement, para. 55, citing *Ilaşcu and others v. Moldova and Russia*, Application No. 48787/99, European Court of Human Rights (2004), para. 432. *See also Krocher v. Switzerland*, 34 Eur. Comm'n H.R. Dec. & Rep. 24, 53, P 62 (1982) for the same proposition. As noted in a recent report by Committee on International Human Rights of the Association of the Bar of the City of New York, solitary confinement has rarely been used in Europe since the 1992 *Krocher* decision. New York City Bar, Committee on International Human Rights, "Supermax Confinement in U.S. Prisons," September 2011, p. 20, available at: http://www2.nycbar.org/pdf/report/uploads/20072165-TheBrutalityofSupermaxConfinement.pdf.

pg 51

found in 1992 that "prolonged solitary confinement of the detained or imprisoned person may amount to acts prohibited by article 7."[50] The Special Rapporteur also observed that the Committee against Torture "has recognized the harmful physical and mental effects of prolonged solitary confinement" and "has recommended that the use of solitary confinement be abolished … or at least that it should be strictly and specifically regulated by law (maximum duration, etc.) and exercised under judicial supervision, and used only in exceptional circumstances."[51]

The Special Rapporteur made numerous conclusions related to solitary confinement, which bear directly on the nature of the death penalty in the United States and its qualification as a form of torture:

- Given its severe adverse health effects, the use of solitary confinement itself can amount to acts prohibited by article 7 of the International Covenant on Civil and Political Rights, torture as defined in article 1 of the Convention against Torture or cruel, inhuman or degrading punishment as defined in article 16 of the Convention. (para. 70)

- Solitary confinement, when used for the purpose of punishment, cannot be justified for any reason, precisely because it imposes severe mental pain and suffering beyond any reasonable retribution for criminal behaviour and thus constitutes an act defined in article 1 or article 16 of the Convention against Torture, and a breach of article 7 of the International Covenant on Civil and Political Rights. (par. 72)

- Where the physical conditions of solitary confinement are so poor and the regime so strict that they lead to severe mental and physical pain or suffering of individuals who are subjected to the confinement, the conditions of solitary confinement amount to torture or to cruel and

---

[50] General Comment 20, 44th Session, 1992, para. 6, available at: http://www.unhchr.ch/tbs/doc.nsf/(Symbol)/6924291970754969c12563ed004c8ae5?Opendocument.
[51] Special Rapporteur Report on Solitary Confinement, para. 31. (citations omitted). *See also* Consideration of Reports Submitted by States Parties under Article 19 of the Convention, Conclusions and recommendations of the Committee against Torture, Mongolia, CAT/C/MNG/CO/1, Jan. 20, 2011, para. 16 ("The Committee is particularly concerned by reports that death row prisoners are detained in isolation, kept handcuffed and shackled throughout their detention and denied adequate food. Such conditions of detention were described by the Special Rapporteur as constituting additional punishments which can only be qualified as torture as defined in article 1 of the Convention").

pg 52

inhuman treatment as defined in articles 1 and 16 of the Convention, and constitute a breach of article 7 of the Covenant. (para. 74)

- The adverse acute and latent psychological and physiological effects of prolonged solitary confinement constitute severe mental pain or suffering. Thus the Special Rapporteur concurs with the position taken by the Committee against Torture in its General Comment No. 20 that prolonged solitary confinement amounts to acts prohibited by article 7 of the [ICCPR], and consequently to an act as defined in article 1 or article 16 of the Convention. For these reasons, the Special Rapporteur reiterates that, in his view, any imposition of solitary confinement beyond 15 days constitutes torture or cruel, inhuman or degrading treatment or punishment, depending on the circumstances. (para. 76)

- Considering the severe mental pain or suffering solitary confinement may cause when used as a punishment, during pretrial detention, indefinitely or for a prolonged period, for juveniles or persons with mental disabilities, it can amount to torture or cruel, inhuman or degrading treatment or punishment. The Special Rapporteur is of the view that where the physical conditions and the prison regime of solitary confinement fail to respect the inherent dignity of the human person and cause severe mental and physical pain or suffering, it amounts to cruel, inhuman or degrading treatment or punishment. (para. 81)

Solitary confinement is not the only condition of U.S. death row inmates that has been found to constitute torture. Severe isolation combined with sensory deprivation or overstimulation constitute torture under international legal standards. The Committee Against Torture expressly stated its concern about the publication of the revised United States Army Field Manual's authorization of questionable interrogation techniques, including sensory deprivation methods.[52] The Committee Against Torture has also concluded that holding prisoners in conditions of sensory deprivation and isolation consisting of an almost complete prohibition of communication caused "persistent and unjustified suffering which amounts to torture."[53] Similarly, the Special Rapporteur on

---

[52] *See* United Nations Committee Against Torture, 36th Session, Geneva, CAT/C/USA/Q/2, Feb. 8, 2006, para. 52.
[53] *See* UN Doc A/56/44, Report of the Committee Against Torture, para. 186, 2001: Peru.

pg 53

Torture has enumerated acts severe enough to constitute torture, including exposure to excessive light or noise, prolonged denial of rest or sleep, and *total isolation and sensory deprivation,* and simulated executions.[54]

Mock executions have also been found to violate international law. In a 1992 decision, the Human Rights Committee found that a mock execution set up by prison wardens constituted cruel and inhuman treatment.[55] The Appeals Chamber of the International Criminal Tribunal for the former Yugoslavia found that mental suffering associated with telling individuals that they would be put before a firing squad violated international law.[56] In addition, waterboarding – a form of mock execution employed recently by the United States – has long been found to amount to torture.[57]

## III.    Conclusion

As the above analysis makes clear, thousands of prisoners on death row in the United States face decades in isolation, haunted by the approach of their execution. This phenomenon gives rise to a pattern of significant psychological harm, amounting to severe mental pain and suffering. The international consensus is clear that such suffering amounts to cruel, inhuman, or degrading treatment; but a growing consensus also defines this phenomenon, appropriately, as torture.

---

[54] *See Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, Report of the Special Rapporteur, Mr. P. Kooijmans, appointed pursuant to Commission on Human Rights res. 1985/33 E/CN.4/1986/15, 19 Feb. 1986, para. 119 (emphasis added). In their report on

[55] *See Linton v. Jamaica*, Commc'n No. 255/1987(1992), para. 8.5

[56] *See Prosecutor v. Natelić and Martinović,* Judgement, Case No, IT-98-34-A, May 3, 2006, para. 292. *See also* para. 300 ("telling prisoners falsely that they will be executed, in a 'brutal context' that makes the statement believable, can amount to willfully causing great suffering").

[57] *See, e.g.,* G. SOLIS, THE LAW OF ARMED CONFLICT: INTERNATIONAL HUMANITARIAN LAW AT WAR 461-466 (Cambridge University Press 2010) (surveying jurisprudence and collecting statements by international bodies and experts that waterboarding constitutes torture); Transcript of Confirmation Hearing for Eric Holder as Attorney General of the United States, Jan. 16,2009, *available at* http://www.nytimes.com/2009/01/16/us/politics/16text-holder.html?_r¼1&pagewanted¼all; *See also* E. Wallach, *Drop by Drop: Forgetting the History of Water Torture in U.S. Courts*, 45 Colum. J. Transnat'l L. 468 (2007).

pg 54

Beyond the legal analysis, we must each undertake our own ethical and moral analysis. Did anyone who closely followed Troy Davis' execution, and his temporary reprieve from the Supreme Court, doubt that the hours leading up to his execution, the hope and then betrayal, amounted to torture? Is there any significant difference between mock executions, long recognized as torture by the international community, and Mr. Davis's last-minute brush with death in 2008? And can we conceive of thirty years in a small gray cube, without access to another human being beyond the hands of the guard who slides your food tray through the slot in your solid cell door, as anything but torture?

pg 55

AD

**MONEY INC**

≡

LIFESTYLE

# The 20 Worst Prisons in the World 2022

By Dana Hanson    July 31, 2022



One of the most common punishments for <u>committing a crime</u> is serving jail time, which applies to almost every country worldwide.

pg 56

Kamiti Maximum Security Prison in Nairobi, Kenya, is also known as Kamiti Downs. It is in Kenya's Kiambu agricultural district, and it is infamous for overcrowding, unsanitary conditions, and a lack of medical facilities. There are around 3,800 inmates at the prison who live miserable lives in cramped and dirty conditions. Diseases are rife in this prison, and violence between the inmates is also a major issue.



## 18. Guantanamo Bay, Cuba

Although Guantanamo Bay is in Cuba, the prison is a United States military prison. The prison first opened in 2002 and was specifically created to house Taliban and al-Queda prisoners who were captured in Afghanistan after the 9/11 attack. When President Obama was voted the President of the United States, he stated his intention to close the prison. However, it remains in operation today. It currently houses 150 inmates over Camp Iguana and Camp Delta. Many who have served time in this prison have experienced torture.



## 17. Terre Haute, United States

Nicknamed Guantanamo North, Terre Haute is an Indiana prison complex with separate maximum, medium, and low-security units.

pg 57 3/23

The main reason it is one of the world's worst prisons is that it houses the United States federal government's Special confinement Unit, which is where death row inmates are housed until their death. Those who are serving a death sentence live in solitary in small cages and are only allowed an exercise break three times a week.

## 16. United States Penitentiary Administrative Maximum Facility, United States

The United States Penitentiary Administrative Maximum Facility in Colorado is also known as Florence ADMAX and ADX Florence. According to How Stuff Works, it is nicknamed the Alcatraz of the Rockies. It currently houses some of the world's most dangerous criminals, including the 1993 World Trade Center bomber Ramzi Yousef and Zacarias Moussaoui, who was involved in the 9/11 attacks. Those serving their time at the facility spend 23 hours a day in their cells, with windows only three feet high and four -inches wide.

AD

## 15. Petak Island Prison, Russia

Petak Island Prison is also known as the Alcatraz of Russia, and it is used to detain Russia's most dangerous criminals. The authorities claim the prison is inescapable, as it is surrounded by the freezing waters of the White Lake. Life inside the prison is dire, as the inmates are only allowed out of their two-person cells for one and a half



**National Commission on
Correctional Health Care**

1145 W. Diversey Pkwy.   773-880-1460
Chicago, Illinois 60614   www.ncchc.org

## POSITION STATEMENT

### Solitary Confinement (Isolation)

---

**Definition**

Solitary confinement is the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals. Those in solitary confinement often experience sensory deprivation and are offered few or no educational, vocational, or rehabilitative programs. Different jurisdictions refer to solitary confinement by a variety of terms, such as isolation; administrative, protective, or disciplinary segregation; permanent lockdown; maximum security; supermax; security housing; special housing; intensive management; and restrictive housing units. Regardless of the term used, an individual who is deprived of meaningful contact with others is considered to be in solitary confinement.

---

### Introduction

In recent years, there has been increasing controversy over the use of solitary confinement in the nations' jails, prisons, and juvenile detention centers. Many national and international organizations have recognized prolonged solitary confinement as cruel, inhumane, and degrading treatment, and harmful to an individual's health. In its position statement on Correctional Health Professionals' Response to Inmate Abuse, NCCHC declares:

1. Correctional health professionals' duty is to the clinical care, physical safety, and psychological wellness of their patients.
2. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of inmates.

This position statement has been developed to assist health care professionals in addressing the use of solitary confinement in the facilities in which they work.

### Background

Over the last 25 to 30 years, there has been a marked increase in the use of solitary confinement in the United States. A report based on Bureau of Justice Statistics data estimated that approximately 80,000 inmates are held in some form of isolation in state and federal prisons on any given day.[1] Isolation can last for periods of time ranging from days to years, even decades. It can occur in "supermax" prisons and in special housing units within jails and prisons.

Adults and juveniles can be placed in solitary confinement for a variety of reasons, including (1) punishment for not following rules (sometimes as minor as failure to obey an order or talking back); (2) concerns related to the safety of staff or other inmates, such as the management of known or suspected gang members; (3) their own protection (such as for sex offenders or individuals who are transgender or sexually vulnerable); and (4) clinical or therapeutic reasons. In many cases, individuals with mental health problems who have difficulty conforming to facility rules, but are not violent or dangerous, end up being housed in these units. Continued misconduct related to their underlying mental health issues, which is often exacerbated by their isolation, can result in their being held in solitary confinement indefinitely.

It is well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement. As a result, federal courts have repeatedly found the solitary confinement of the mentally ill to be unconstitutional[2], and in 2012, the American Psychiatric Association adopted a policy opposing the "prolonged" segregation of prisoners with serious mental illness, which it defined as longer than 3 to 4 weeks.[3]

pg 59

S.D. - 23

The inherent restriction in meaningful social interaction and environmental stimulation and the lack of control adversely impact the health and welfare of all who are held in solitary confinement.[4,5,6,7,8] While there is a school of thought that suggests that solitary confinement in facilities that meet basic standards of humane care has relatively little adverse effect on most individuals' mental or physical health[9,10], this is not the view of most international organizations. The World Health Organization (WHO), United Nations, and other international bodies have recognized that solitary confinement is harmful to health. The WHO notes that effects can include gastrointestinal and genitourinary problems, diaphoresis, insomnia, deterioration of eyesight, profound fatigue, heart palpitations, migraines, back and joint pains, weight loss, diarrhea, and aggravation of preexisting medical problems.[11] Even those without a prior history of mental illness may experience a deterioration in mental health, experiencing anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumautic stress disorder, self-harm, suicide, and/or psychosis. Some of these effects may persist after release from solitary confinement. Moreover, the very nature of prolonged social isolation is antithetical to the goals of rehabilitation and social integration.

These consequences are especially harmful to juveniles whose brains are still developing and those with mental health problems. In 2012, a task force appointed by the U.S. attorney general concluded:

> Nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement.... Juveniles experience symptoms of paranoia, anxiety, and depression even after very short periods of isolation. Confined youth who spend extended periods isolated are among the most likely to attempt or actually commit suicide. One national study found that among the suicides in juvenile facilities, half of the victims were in isolation at the time they took their own lives, and 62 percent of victims had a history of solitary confinement.[12]

Psychologically, children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. They experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation.[13,14,15,16] The American Academy of Child and Adolescent Psychiatry has concluded that, due to their "developmental vulnerability," adolescents are in particular danger of adverse reactions to prolonged isolation and solitary confinement.[17]

In a report to the United Nations Human Rights Committee, Juan Méndez, U.N. special rapporteur on torture and cruel, inhuman, and degrading treatment, concludes that juveniles, given their physical and mental immaturity, should never be subjected to solitary confinement. He states that the imposition of solitary confinement of any duration on juveniles is cruel, inhuman, and degrading treatment and violates both the International Covenant on Civil and Political Rights and the Convention against Torture. He asserts, "given their diminished mental capacity and that solitary confinement often results in severe exacerbation of a previously existing mental condition," the imposition of solitary confinement, of any duration, on persons with mental disabilities is cruel, inhuman, or degrading treatment and also violates the Covenant and the Convention.[18]

The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Mandela Rules) state that solitary·confinement should be prohibited in cases involving children and in the case of adults with mental or physical disabilities when their conditions would be exacerbated by such measures.[19]

International standards established by the United Nations Rules for the Treatment of Women Prisoners and Non-Custodial Measures for Women Offenders state that pregnant women should never be placed in solitary confinement as they are especially susceptible to its harmful psychological effects.[20] In addition, placing these women in isolation impedes their access to necessary and timely prenatal care.[21]

The U.N. special rapporteur further asserts that solitary confinement is a harsh measure that may cause serious psychological and physiological adverse effects on individuals regardless of their specific conditions. He finds solitary confinement to be contrary to one of the essential aims of the penitentiary

NCCHC Position Statement: Solitary Confinement                                              Page 2     pg 60
Adopted April 2016

S.D. -23

system, which is to rehabilitate offenders and facilitate their reintegration into society. He recommends a complete ban on prolonged or indefinite solitary confinement, citing 15 days as the starting point of prolonged solitary confinement because, after that, "some of the harmful psychological effects of isolation can become irreversible."[22] The Mandela Rules affirm that solitary confinement "shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review...." They specifically prohibit indefinite and/or prolonged (defined as a time period in excess of 15 consecutive days) solitary confinement, or placement in a dark or constantly lit cell, noting that these conditions amount to "torture or other cruel, inhuman or degrading treatment or punishment."[23]

By virtue of working in facilities where security and control, rather than the health and well-being of their patients, are the priorities, health professionals working in correctional facilities are often faced with ethical dilemmas. The participation of health care staff in actions that may be injurious to an individual's health is in conflict with their role as caregivers. This is especially true when they are called on to determine whether a patient is physically and psychologically well enough to be placed in solitary confinement. By doing so, health care providers become participants in the process of solitary confinement. Both the United Nations and the WHO are opposed to such involvement on ethical grounds. The U.N. has stated that it is a contravention of medical ethics for health care staff, particularly physicians:

> To certify, or to participate in the certification of, the fitness of prisoners or detainees for any form of treatment or punishment that may adversely affect their physical or mental health and which is not in accordance with the relevant international instruments, or to participate in any way in the infliction of any such treatment or punishment which is not in accordance with the relevant international instruments.[24]

The WHO states health care staff should never participate in enforcing any sanctions or in the underlying decision-making process, as this is not a medical act, and:

> Doctors may frequently be approached when the sanction considered is solitary confinement. Solitary confinement has clearly been shown to be injurious to health. In cases where it is still enforced, its use should be limited to the shortest time possible. Thus, doctors should not collude in moves to segregate or restrict the movement of prisoners except on purely medical grounds, and they should not certify a prisoner as being fit for disciplinary isolation or any other form of punishment. Prisoners who are placed in isolation should be evaluated initially and periodically for acute mental illness, drug or alcohol withdrawal and injuries. If these are identified, prisoners should have access to prompt and effective treatment. Doctors should not certify fitness for isolation.[25]

At the same time, health care staff must ensure that those in solitary confinement have access to and receive needed clinical care. As stated in the European Prison Rules (2006):

> Medical practitioners or qualified nurses should not be obliged to pronounce prisoners fit for punishment but may advise prison authorities of the risks that certain measures may pose to the health of prisoners. They would have a particular duty to prisoners who are held in conditions of solitary confinement for whatever reason: for disciplinary purposes; as a result of their "dangerousness" or their "troublesome" behaviour; in the interests of a criminal investigation; at their own request. Following established practice, (see for example Rule 32.3 of the UN Standard Minimum Rules for the Treatment of Prisoners) such prisoners should be visited daily. Such visits can in no way be considered as condoning or legitimising a decision to put or to keep a prisoner in solitary confinement. Moreover, medical practitioners or qualified nurses should respond promptly to request for treatment by prisoners held in such conditions or by prison staff....[26]

The WHO also states:

> Once a sanction is enforced, doctors must follow the prisoner being punished with extreme vigilance. It is well-established that solitary confinement constitutes an important stressor and risk, notably of suicide. Doctors must pay particular attention to such prisoners and visit them

pg 61

S.D.-23

regularly of their own initiative, as soon as possible after an isolation order has taken effect and daily thereafter, to assess their physical and mental state and determine any deterioration in their well-being. Furthermore, doctors must immediately inform the prison management if a prisoner presents a health problem.[27]

While correctional health care providers often encounter obstacles in the performance of their duties, there are specific challenges to the provision of health care to individuals in solitary confinement. Solitary confinement often makes it more difficult for patients to access care. Many facilities require that individuals in solitary confinement be shackled and accompanied by two officers when they are out of their cells. Many times, they must be body searched upon leaving and returning to their cells. As a result, health care staff may decide to perform their evaluations at cell-front, through bars or slots in the doors, either for their own or the patient's ease. Alternatively, clinical encounters may occur with the patient in a metal cage or behind a glass partition. Even when patients are taken to the medical clinic for evaluation, they often remain in restraints with custody officers in close proximity. Such arrangements are not respectful of an individual's dignity, interfere with privacy and confidentiality, and hamper or prevent the clinician from performing an adequate evaluation.

### Position Statement

The following principles are to guide correctional health professionals in addressing issues about solitary confinement.

1. Prolonged (greater than 15 consecutive days) solitary confinement is cruel, inhumane, and degrading treatment, and harmful to an individual's health.

2. Juveniles[28], mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration.

3. Correctional health professionals should not condone or participate in cruel, inhumane, or degrading treatment of adults or juveniles in custody.

4. Prolonged solitary confinement should be eliminated as a means of punishment.

5. Solitary confinement as an administrative method of maintaining security should be used only as an exceptional measure when other, less restrictive options are not available, and then for the shortest time possible. Solitary confinement should never exceed 15 days. In those rare cases where longer isolation is required to protect the safety of staff and/or other inmates, more humane conditions of confinement need to be utilized.

6. Correctional health professionals' duty is the clinical care, physical safety, and psychological wellness of their patients.

7. Isolation for clinical or therapeutic purposes should be allowed only upon the order of a health care professional and for the shortest duration and under the least restrictive conditions possible, and should take place in a clinically designated and supervised area.

8. Individuals who are separated from the general population for their own protection should be housed in the least restrictive conditions possible.

9. Health staff must not be involved in determining whether adults or juveniles are physically or psychologically able to be placed in isolation.

10. Individuals in solitary confinement, like other inmates, are entitled to health care that is consistent with the community standard of care.

pg 62

S.D.-23.

11. Health care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required.

12. Health care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided.

13. Principles of respect and medical confidentiality must be observed for patients who are in solitary confinement. Medical examinations should occur in clinical areas where privacy can be ensured. Patients should be examined without restraints and without the presence of custody staff unless there is a high risk of violence. In situations where this cannot occur, the patient's privacy, dignity, and confidentiality should be maintained as much as possible. If custody staff must be present, they should maintain visual contact, but remain at a distance that provides auditory privacy.

14. Health care staff should ensure that the hygiene and cleanliness of individuals in solitary confinement and their housing areas are maintained; that they are receiving sufficient food, water, clothing, and exercise; and that the heating, lighting, and ventilation are adequate.

15. Adults and juveniles in solitary confinement should have as much human contact as possible with people from outside the facility and with custodial, educational, religious, and medical staff.

16. Appropriate programs need to be available to individuals in confinement to assist them with the transition to other housing units or the community, if released from isolation to the community.

17. In systems that do not conform to international standards, health care staff should advocate with correctional officials to establish policies prohibiting the use of solitary confinement for juveniles and mentally ill individuals, and limiting its use to less than 15 days for all others.

***Adopted by the National Commission on Correctional Health Care Board of Directors
April 10, 2016***

**Notes**

1. Shames, A., Wilcox, J., & Subramanian, R. (May 2015). Solitary confinement: Common misconceptions and emerging safe alternatives. Vera Institute of Justice.
2. See, e.g., Madrid, 889 F. Supp. at 1265-66; Ruiz v. Johnson, 37 F.Supp.2d 855, 915 (S.D. Tex. 1999), 243 F.3d 941 (5th Cir. 2001), adhered to on remand, 154 F.Supp.2d 975 (S.D. Tex. 2001).
3. American Psychiatric Association. (December 2012). Position statement on segregation of prisoners with mental illness.
4. Scharff Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. *Crime and Justice, 34*(1), 441-528.
5. Haney, C. (January 2003). Mental health issues in long-term solitary and "supermax" confinement, *Crime & Delinquency, (49)*1, 124-156.
6. Grassian, S. (1983). Psychopathological effects of solitary confinement. *American Journal of Psychiatry, 140,* 1450-1454.
7. Grassian, S. (2006). Psychiatric effects of solitary confinement. *Washington University Journal of Law & Policy, 22,* 325-383.
8. Kaba, F., et al. (2014). Solitary confinement and risk of self-harm among jail inmates. *American Journal of Public Health, 104*(3), 442-447.
9. Clements, C. B., et al. (2007). Systematic issues and correctional outcomes: Expanding the scope of correctional psychology. *Criminal Justice and Behavior, 34,* 919-932.
10. Gendreau, P., & Goggin, C. (2014). Practicing psychology in correctional settings. In I. B. Weiner & R. K. Otto (Eds.), *The handbook of forensic psychology* (4th ed.). Hoboken, NJ: Wiley.

S.D. -23

11. World Health Organization. (2014). Prisons and health (p. 28).
12. Department of Justice. (December 2012). Report of the Attorney General's National Task Force on Children Exposed to Violence.
13. Steinberg, L., et al. (2009). Age differences in future orientation and delay discounting. Child Development, 80, 28-44.
14. Woolard, J., Odgers, C., Lanza-Kaduce, L., & Daglis, H. (2005). Juveniles within adult correctional settings: Legal pathways and developmental considerations. International Journal of Forensic Mental Health, 4(1), 1-18.
15. Laible, D., Carlo, G., & Raffaelli, M. (2000). The differential relations of parent and peer attachment to adolescent adjustment, Journal of Youth and Adolescence, 29(1), 45-59.
16. Arredondo, D. E. (2004). Principles of child development and juvenile justice information for decision-makers. Journal of the Center for Families, Children & the Courts.
17. American Academy of Child & Adolescent Psychiatry. (April 2012). Solitary confinement of juvenile offenders (Policy Statement).
18. Méndez, J. (2011). Torture and other cruel, inhuman or degrading treatment or punishment. Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment (p. 21).
19. United Nations. (May 2015). United Nations standard minimum rules for the treatment of prisoners (the Mandela Rules) (Rule 45).
20. United Nations. (2010). United Nations rules for the treatment of women prisoners and non-custodial measures for women offenders (the Bangkok rules).
21. ACLU Foundation. (2014). Worse than second-class: Solitary confinement of women in the United States.
22. United Nations. (May 2015). United Nations standard minimum rules for the treatment of prisoners (the Mandela Rules) (p. 13).
23. Op. cit. (Rules 43 & 44).
24. United Nations Office of the High Commissioner for Human Rights. (1982). Principles of medical ethics relevant to the role of health personnel, particularly physicians, in the protection of prisoners and detainees against torture and other cruel, inhuman or degrading treatment or punishment.
25. World Health Organization. (2007). Health in prisons: A WHO guide to the essentials in prison health (p. 36).
26. Council of Europe. (2006). Commentary to recommendation rec(2006) 2 of the Committee of Ministers to Member States on the European Prison Rules.
27. Op. cit., p. 13.
28. Stop Solitary for Kids. (2016). Stop Solitary for Kids (Position Statement).

**Additional Resources**

1. National Commission on Correctional Heath Care. (2012). Correctional health professionals' response to inmate abuse (Position Statement).
2. American Public Health Association. (November 2013). Solitary confinement as a public health issue (Policy Statement).
3. Shalev, S. (2008). Sourcebook on solitary confinement. London: Mannheim Centre for Criminology, London School of Economics.
4. Metzner, J. (2015). Mental health considerations for segregated inmates.

pg 64

S.D.-23



## Office of the Inspector General
U.S. Department of Justice

# Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness

pg 65

# INTRODUCTION

## Background

The Federal Bureau of Prisons (BOP) is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. To ensure safe and orderly environments for inmates and staff, the BOP utilizes various forms of Restrictive Housing Unit (RHU) for the confinement of some inmates, including inmates with mental illness. The U.S. Department of Justice (Department, DOJ) defines restrictive housing as "any type of detention that includes removal from the general inmate population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another inmate; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more."[3] In recent years, studies have suggested that the frequency, duration, and conditions of confinement of restrictive housing, even for short periods of time, can cause psychological harm and significant adverse effects on these inmates' mental health. For example, research suggests that "isolation can be psychologically harmful to any prisoner — psychological effects can include anxiety, depression, anger, cognitive disturbances, perceptual disorders, obsessive thoughts, paranoia, and psychosis" — some of which may be long lasting.[4] According to some experts, inmates who have spent long periods in isolation are more likely to recidivate and have a more difficult time creating the lasting social bonds that are necessary for reintegration into society.[5] The BOP's own policy also recognizes that "an inmate's mental health may deteriorate during restrictive housing placement."[6]

As of June 2016, of the 148,227 sentenced inmates in the BOP's 122 institutions, 9,749 inmates (7 percent) were housed in its 3 largest forms of RHU:  Special Housing Units (SHU) in 111 institutions; 2 Special Management Units (SMU) at the U.S. Penitentiaries (USP) in Lewisburg and Allenwood, Pennsylvania; and the USP Administrative Maximum Security Facility (ADX) in Florence, Colorado.

---

[3] DOJ, *Report and Recommendations concerning the Use of Restrictive Housing* (January 2016), 3.  While the BOP has taken several corrective actions in response to the recommendations in this report, we found that several issues remain unresolved and require the BOP's immediate attention.

[4] Jeffrey L. Metzner, MD, and Jamie Fellner, Esq., "Solitary Confinement and Mental Illness in U.S. Prisons:  A Challenge for Medical Ethics," *Journal of the American Academy of Psychiatry and the Law,* 38 (March 2010):  104–08.

[5] Craig Haney, Professor of Psychology at the University of California, Santa Cruz, before the Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights, U.S. Senate, concerning "Reassessing Solitary Confinement:  The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012), 10–11.  The Office of the Inspector General (OIG) separately reviewed the BOP's Release Preparation Program.  See DOJ OIG, *Review of the Federal Bureau of Prisons' Release Preparation Program,* Evaluation and Inspections Report 16-07 (August 2016).

[6] BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness (May 1, 2014), 16.

pg 66

DEF-000560

Page: 238

S.D. - 22

AO 245B (SCDC Rev. 02/18) Judgment in a Criminal Case
      Sheet 2A - Imprisonment

Page 3

DEFENDANT: Brandon Michael Council
CASE NUMBER: 4:17-cr-00866-RBH

## ADDITIONAL IMPRISONMENT TERMS:

Defendant is committed to the custody of the Attorney General until the exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentences. See 18 U.S.C. Sec. 3596(a). When the sentence of death is to be implemented, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. See 18 U.S.C. Sec. 3596(a).

pg. 67

DEF-000405

 American Friends
Service Committee

# Solitary confinement facts





Related

Special confinement unit
Special housing unit

## Q: What is solitary confinement?

A: Solitary confinement of prisoners goes by a number of names—isolation, SHU (special housing units), administrative segregation, supermax prisons, the hole, MCU (management



yourname@email.co

pg 68

S.D. -27

talking to a suspected gang member.

## Q: How does long-term solitary confinement affect a person?

A: Numerous studies have documented the physical and psychological effects of long-term solitary confinement, which can produce debilitating symptoms, such as:

- Visual and auditory hallucinations
- Hypersensitivity to noise and touch
- Insomnia and paranoia
- Uncontrollable feelings of rage and fear
- Distortions of time and perception
- Increased risk of suicide
- Post-traumatic stress disorder (PTSD)

These effects are magnified for two particularly vulnerable populations: juveniles, whose brains are still developing, and people with mental health issues, who are estimated to make up one-third of all prisoners in isolation.

If a person isn't mentally ill when entering an isolation unit, by the time they are released, their mental health has been severely compromised. Many prisoners are released directly to the streets after spending years in isolation. Because of this, long-term solitary confinement goes beyond a problem of prison conditions, to pose a formidable public safety and community health problem.

## Q: Is solitary confinement considered "torture?"

A: Yes. Prison isolation fits the definition of torture as stated in several international human rights treaties, and thus constitutes a violation of human rights law. The U.N. Convention

8th Ammendment

yourname@email.com

pg. 69

S.D.-27

Find a Therapist (City or Zip)                                                    Psychology Today



**Elena Blanco-Suarez Ph.D.**
Brain Chemistry

# The Effects of Solitary Confinement on the Brain

Neurobiology shows the need to make solitary confinement more humane.

Posted Feb 27, 2019



There is a difference between *loneliness* (the imposition of social isolation) and *aloneness* (the choice of being alone), and thus the brain reacts in very different ways. Loneliness, or social isolation, affecting a large part of the population as it became an epidemic in the last few years, is known to cause changes in the brain, possibly leading to more serious consequences such as depression and other mood disorders. However, some of those changes can be reversed if the appropriate social interactions are re-established and the person reengages in social activities.

But what if the person doesn't have that option?

We are talking about solitary confinement, a form of imprisonment still practiced in many countries, including the U.S.

Robert King, an ex-inmate who was in solitary confinement for 29 years, shared his experience with a room full of curious neuroscientists during the world's biggest neuroscience conference by the Society for Neuroscience in November 2018. Being confined in a 6x9-foot cell for almost 30 years, with very limited contact with other humans or physical exercise, surely has consequences on one's overall health, including the brain. King knew that solitary confinement was changing the way his brain worked. When he finally left his cell, he realized he had trouble recognizing faces and had to retrain his eyes to learn what a face was like. His sense of direction was also messed up, and he was unable to follow a simple route in the city by himself. It is as if his brain had erased all those capabilities that were no longer necessary for survival in a cell no bigger than the back of a pick-up truck.

One of the most remarkable effects of chronic social isolation, as in the extreme case of solitary confinement, is the decrease in the size of the hippocampus, the brain region related to learning, memory, and spatial awareness. The sustained stress of extreme isolation leads to a loss of hippocampal plasticity, a decrease in the formation of new neurons, and the eventual failure in hippocampal function. On the other hand, the amygdala increases its activity in response to isolation. This area mediates fear and anxiety, symptoms enhanced in prisoners in solitary confinement.

Studies on mice have shown that one month of social isolation caused a decrease of around 20% of the total volume of neurons, though researchers saw that remaining neurons were branching out more than those mice that were not isolated. When the isolation went on longer — up to three months — researchers saw that the extra branching of the neurons was no longer happening, and that, in exchange, spines (structures that neurons develop to place the machinery that is required to communicate to each other) were greatly diminished. What does this mean? The branching that took place in the first month of isolation may represent some sort of compensatory mechanism that the brain puts in place in order to overcome and prevent the detrimental effects of isolation. However, when isolation went on for "too long," this mechanism seemed to come to an end, and trigger the loss of neuronal communication in the form of spine elimination.

pg. 70

S.D.-26

the busy schedule of the prison. King reported that sensory deprivation contributes to important health impairments, such as alterations of circadian rhythms, the internal biological clock that regulates overall the proper functioning of our bodies.

ARTICLE CONTINUES AFTER ADVERTISEMENT

Solitary confinement as a punishment is closer to a form of torture, with serious consequences for neurological health. Teams of researchers are investigating further the deep effects of this practice and studying the possibility of regulating it to maintain physical activity as well as sensory input and circadian rhythms, in order to prevent profound changes in the brain.

This calls attention to the necessity of integrating science in law, as legislators may not recognize possible emotional injuries in the same way they recognize the physical effects of imprisonment. Lawyers and neuroscientists need to work together to understand the full consequences of dangerous practices that still take place in the system, such as solitary confinement.

References

The growing problem of loneliness. Cacioppo JT, Cacioppo S. Lancet. 2018 Feb 3;391(10119):426. doi: 10.1016/S0140-6736(18)30142-9.

Law & Neuroscience: The Case of Solitary Confinement. Jules Lobel & Huda Akil. 2018 by the American Academy of Arts & Sciences doi:10.1162/DAED_a_00520



ADVERTISEMENT

## Read Next



Bringing Joy Back to Childbirth



The Myths about the Teenage Brain

pg. 71

S. D. - 26



The United States is a "party" to several treaties that explain how prisoners should be treated. There are two stages to becoming a "party" to a treaty: signing the treaty and ratifying the treaty. By signing a treaty, a country agrees to its general principles. But only by ratifying a treaty does a nation incorporate the treaty's provisions and standards into domestic law and become bound by them. The United States has ratified three human rights treaties that address the rights of prisoners: the *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*; the *International Covenant on Civil and Political Rights*; and the *International Convention on the Elimination of All Forms of Racial Discrimination.*

However, the United States has limited the ability of individuals to use the rights created by these treaties. First, when ratifying these treaties, Congress specifically stated that the United States government is not bound by certain provisions and that the United States government understands certain rights and protections to be severely restricted. Second, Congress has declared that many provisions of the treaties are not "self-executing," meaning that individuals cannot sue in U.S. courts to enforce those provisions unless Congress has also passed "implementing legislation." *Foster v. Neilson*, 27 U.S. 253 (1829).

While you will probably be unable to sue directly under these treaties, each treaty has a treaty body that monitors whether the United States is following the rules set out in the treaties. You can contact a human rights group, like Human Rights Watch, and ask for help sending a letter to one of those bodies.

Human Rights Watch is an organization that monitors the conditions in prisons and publishes reports on prisons. They answer mail from prisoners, and they also send free reports that you can use to support your legal claims.

U.S. Program Associate
Human Rights Watch
350 5th Avenue, 34th Floor
New York, New York 10118

Another important source of international law is the Universal Declaration of Human Rights, or UDHR. The UDHR was adopted by the UN General Assembly on December 10, 1948. It was the first time the fundamental freedoms and rights of all persons were set forth in detail by the international community. The UDHR is reprinted in Appendix G. It embodies the right to life, liberty and security of person, the right to

be free from torture, arbitrary arrest and detention and the right to a fair and public hearing. It also enshrines the right to an adequate standard of living for health and well-being, the right to work, education, medical care and other essential social services, as well as the right to freedom of opinion, expression and peaceful assembly and association, among others. These are inherent rights belonging to all persons that cannot be granted or withdrawn by anyone or any government.

Finally, the United States is a member of the Organization of American States (OAS), and is bound to the provisions of the *American Declaration on the Rights and Duties of Man*. The Inter-American Commission on Human Rights is an independent part of the OAS that looks at possible human rights violations in the Americas. Individuals can present petitions to the Commission once available remedies have been pursued and exhausted in domestic courts..

## SECTION F
### Brief Summary of the Prison Litigation Reform Act (PLRA)

The PLRA, an anti-prisoner statute which became law in 1996, has made it much harder for prisoners to gain relief in the federal courts. While you will learn more about the PLRA in the following chapters, we have included a brief outline of its major parts, or "provisions," here so that you keep them in mind as you start to plan your lawsuit. The full text of several important sections of the PLRA are included in Appendix F. One important thing to keep in mind is that most of these provisions only apply to suits filed while you are in prison. If you want to sue for damages after you are released, you will not need to worry about these rules.

### 1. Injunctive Relief
18 U.S.C. § 3626 limits the "injunctive relief" (also called "prospective relief") that is available in prison cases. Injunctive relief is when you ask the court to make the prison do something differently, or stop doing something altogether. For example, if you file a suit asking that the prison change their policy to let you pray in a group, that is a case for injunctive relief. Injunctive relief and the changes in its availability under the PLRA are discussed in Chapter Four.

pg 72

WIKIPEDIA

# United Nations Convention against Torture

The **Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment** (commonly known as the **United Nations Convention against Torture (UNCAT)**) is an international human rights treaty, under the review of the United Nations, that aims to prevent torture and other acts of cruel, inhuman, or degrading treatment or punishment around the world.

The Convention requires states to take effective measures to prevent torture in any territory under their jurisdiction, and forbids states to transport people to any country where there is reason to believe they will be tortured.

The text of the Convention was adopted by the United Nations General Assembly on 10 December 1984[1] and, following ratification by the 20th state party,[3] it came into force on 26 June 1987.[1] 26 June is now recognized as the International Day in Support of Victims of Torture, in honor of the Convention. Since the convention's entry into force, the absolute prohibition against torture and other acts of cruel, inhuman, or degrading treatment or punishment has become accepted as a principle of customary international law.[6] As of June 2020, the Convention has 170 state parties.[1]

## Contents

**Summary**

**Main provisions**
    Definition of torture
    Ban on torture
    Ban on *refoulement*
    Ban on cruel, inhuman, or degrading treatment or punishment

**Signatories and ratifications**

**Optional Protocol**

**Committee against Torture**

**Convention against Torture Initiative CTI2024**

**See also**

**References**

**External links**
    Decisions of the Committee Against Torture

### United Nations Convention against Torture

| | |
|---|---|
| **Long name:** | Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |



☐ states parties
☐ states that have signed, but not ratified
☐ states that have not signed

| | |
|---|---|
| **Type** | Human rights convention |
| **Drafted** | 10 December 1984[1] |
| **Signed** | 4 February 1985[2] |
| **Location** | New York |
| **Effective** | 26 June 1987[1] |
| **Condition** | 20 ratifications[3] |
| **Signatories** | 83[1] |
| **Parties** | 170[1] |
| **Depositary** | UN Secretary-General[4] |
| **Languages** | Arabic, Chinese, English, French, Russian and Spanish[5] |

🌐 Convention against Torture at Wikisource

*pg 73*

*S.D. - 20*

# Summary

The Convention follows the structure of the Universal Declaration of Human Rights (UDHR), International Covenant on Civil and Political Rights (ICCPR) and the International Covenant on Economic, Social and Cultural Rights (ICESCR), with a preamble and 33 articles, divided into three parts:

**Part I** (Articles 1–16) contains a definition of torture (Article 1), and commits parties to taking effective measures to prevent any act of torture in any territory under their jurisdiction (Article 2). These include ensuring that torture is a criminal offense under a party's municipal law (Article 4), establishing jurisdiction over acts of torture committed by or against a party's nationals (Article 5), ensuring that torture is an extraditable offense (Article 8), and establishing universal jurisdiction to try cases of torture where an alleged torturer cannot be extradited (Article 5). Parties must promptly investigate any allegation of torture (Articles 12 and 13), and victims of torture, or their dependents in case victims died as a result of torture, must have an enforceable right to compensation (Article 14). Parties must also ban the use of evidence produced by torture in their courts (Article 15), and are barred from deporting, extraditing, or refouling people where there are substantial grounds for believing they will be tortured (Article 3).

Parties are required to train and educate their law enforcement personnel, civilian or military personnel, medical personnel, public officials, and other persons involved in the custody, interrogation, or treatment of any individual subjected to any form of arrest, detention, or imprisonment, regarding the prohibition against torture (Article 10). Parties also must keep interrogation rules, instructions, methods, and practices under systematic review regarding individuals who are under custody or physical control in any territory under their jurisdiction, in order to prevent all acts of torture (Article 11). Parties are also obliged to prevent all acts of cruel, inhuman, or degrading treatment or punishment in any territory under their jurisdiction, and to investigate any allegation of such treatment. (Article 16).

**Part II** (Articles 17–24) governs reporting and monitoring of the Convention and the steps taken by the parties to implement it. It establishes the Committee against Torture (Article 17), and empowers it to investigate allegations of systematic torture (Article 20). It also establishes an optional dispute-resolution mechanism between parties (Article 21) and allows parties to recognize the competence of the Committee to hear complaints from individuals about violations of the Convention by a party (Article 22).

**Part III** (Articles 25–33) governs ratification, entry into force, and amendment of the Convention. It also includes an optional arbitration mechanism for disputes between parties (Article 30).

# Main provisions

## Definition of torture

**Article 1.1** of the Convention defines torture as:

> For the purpose of this Convention, the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him, or a third person, information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in, or incidental to, lawful sanctions.

pg 74

The words "inherent in or incidental to lawful sanctions" remain vague and very broad. It is extremely difficult to determine what sanctions are 'inherent in or incidental to lawful sanctions' in a particular legal system and what are not. The drafters of the Convention neither provided any criteria for making such determination nor did it define the terms. The nature of the findings would so differ from one legal system to another that they would give rise to serious disputes among the Parties to the Convention. It was suggested that the reference to such rules would make the issue more complicated, for it would endow the rules with a semblance of legal binding force. This allows state parties to pass domestic laws that permit acts of torture that they believe are within the lawful sanctions clause. However, the most widely adopted interpretation of the lawful sanctions clause is that it refers to sanctions authorized by international law. Pursuant to this interpretation, only sanctions that are authorized by international law will fall within this exclusion. The interpretation of the lawful sanctions clause leaves no scope of application and is widely debated by authors, historians, and scholars alike.[7]

## Ban on torture

**Article 2** prohibits torture, and requires parties to take effective measures to prevent it in any territory under their jurisdiction. This prohibition is absolute and non-derogable. "No exceptional circumstances whatsoever"[8] may be invoked to justify torture, including war, threat of war, internal political instability, public emergency, terrorist acts, violent crime, or any form of armed conflict.[6] In other words, torture cannot be justified as a means to protect public safety or prevent emergencies.[8] Subordinates who commit acts of torture cannot abstain themselves from legal responsibility on the grounds that they were just following orders from their superiors.[6]

The prohibition on torture applies to anywhere under a party's effective jurisdiction inside or outside of its borders, whether on board its ships or aircraft or in its military occupations, military bases, peacekeeping operations, health care industries, schools, day care centers, detention centers, embassies, or any other of its areas, and protects all people under its effective control, regardless of nationality or how that control is exercised.[6]

The other articles of part I lay out specific obligations intended to implement this absolute prohibition by preventing, investigating, and punishing acts of torture.[6]

## Ban on *refoulement*

**Article 3** prohibits parties from returning, extraditing, or *refouling* any person to a state "where there are substantial grounds for believing that he would be in danger of being subjected to torture."[9] The Committee against Torture has held that this danger must be assessed not just for the initial receiving state, but also to states to which the person may be subsequently expelled, returned or extradited.[10]

## Ban on cruel, inhuman, or degrading treatment or punishment

**Article 16** requires parties to prevent "other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article 1" in any territory under their jurisdiction. Because it is often difficult to distinguish between cruel, inhuman, or degrading treatment or punishment and torture, the Committee regards Article 16's prohibition of such act as similarly absolute and non-derogable.[6]

# Signatories and ratifications

pg 75

S.D. -20

WIKIPEDIA

# International Covenant on Civil and Political Rights

The **International Covenant on Civil and Political Rights (ICCPR)** is a multilateral treaty adopted by United Nations General Assembly Resolution 2200A (XXI) on 16 December 1966, and in force from 23 March 1976 in accordance with Article 49 of the covenant. Article 49 allowed that the covenant would enter into force three months after the date of the deposit of the thirty-fifth instrument of ratification or accession. The covenant commits its parties to respect the civil and political rights of individuals, including the right to life, freedom of religion, freedom of speech, freedom of assembly, electoral rights and rights to due process and a fair trial.[3] As of September 2019, the Covenant has 173 parties and six more signatories without ratification.[1]

The ICCPR is part of the International Bill of Human Rights, along with the International Covenant on Economic, Social and Cultural Rights (ICESCR) and the Universal Declaration of Human Rights (UDHR).[4]

The ICCPR is monitored by the United Nations Human Rights Committee (a separate body to the United Nations Human Rights Council), which reviews regular reports of States parties on how the rights are being implemented. States must report initially one year after acceding to the Covenant and then whenever the Committee requests (usually every four years). The Committee normally meets in Geneva and normally holds three sessions per year.

### International Covenant on Civil and Political Rights



Parties and signatories of the ICCPR

☐ State party
☐ Signatory that has not ratified
☐ State party that attempted to withdraw
☐ Non-state party; non-signatory

| | |
|---|---|
| **Type** | United Nations General Assembly resolution |
| **Drafted** | 1954 |
| **Signed** | 16 December 1966[1] |
| **Location** | United Nations Headquarters, New York City |
| **Effective** | 23 March 1976[1] |
| **Signatories** | 74[1] |
| **Parties** | 173[1] |
| **Depositary** | Secretary-General of the United Nations |
| **Languages** | French, English, Russian, Chinese, Spanish[2] |

🍷 Wikisource

- International Covenant on Civil and Political Rights

# Contents

**History**

**Articles of the Covenant**
    Rights to physical integrity
    Liberty and security of person
    Procedural fairness and rights of the accused
    Individual liberties
    Political rights

**Optional protocols**

**Reservations**

pg 76

Covenant on Economic, Social and Cultural Rights was adopted shortly before the International Covenant on Civil and Political Rights. Together, the UDHR and the two Covenants are considered to be the foundational human rights texts in the contemporary international system of human rights.[5]

# Articles of the Covenant

The Covenant follows the structure of the UDHR and ICESCR, with a preamble and fifty-three articles, divided into six parts.[11]

**Part 1** (Article 1) recognizes the right of all peoples to self-determination, including the right to "freely determine their political status",[12] pursue their economic, social and cultural goals, and manage and dispose of their own resources. It recognises a negative right of a people not to be deprived of its means of subsistence,[13] and imposes an obligation on those parties still responsible for non-self governing and trust territories (colonies) to encourage and respect their self-determination.[14]

**Part 2** (Articles 2 – 5) obliges parties to legislate where necessary to give effect to the rights recognised in the Covenant, and to provide an effective legal remedy for any violation of those rights.[15] It also requires the rights be recognised "without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status,"[16] and to ensure that they are enjoyed equally by women.[17] The rights can only be limited "in time of public emergency which threatens the life of the nation,"[18] and even then no derogation is permitted from the rights to life, freedom from torture and slavery, the freedom from retrospective law, the right to personhood, and freedom of thought, conscience and religion.[19]

**Part 3** (Articles 6 – 27) lists the rights themselves. These include rights to:

- physical integrity, in the form of the right to life and freedom from torture and slavery (Articles 6, 7, and 8);
- liberty and security of the person, in the form of freedom from arbitrary arrest and detention and the right to *habeas corpus* (Articles 9 – 11);
- procedural fairness in law, in the form of rights to due process, a fair and impartial trial, the presumption of innocence, and recognition as a person before the law (Articles 14, 15, and 16);
- individual liberty, in the form of the freedoms of movement, thought, conscience and religion, speech, association and assembly, family rights, the right to a nationality, and the right to privacy (Articles 12, 13, 17 – 24);
- prohibition of any propaganda for war as well as any advocacy of national or religious hatred that constitutes incitement to discrimination, hostility or violence by law (Article 20);
- political participation, including the right to the right to vote (Article 25);
- Non-discrimination, minority rights and equality before the law (Articles 26 and 27).

Many of these rights include specific actions which must be undertaken to realise them.

**Part 4** (Articles 28 – 45) governs the establishment and operation of the Human Rights Committee and the reporting and monitoring of the Covenant. It also allows parties to recognise the competence of the Committee to resolve disputes between parties on the implementation of the Covenant (Articles 41 and 42).

**Part 5** (Articles 46 – 47) clarifies that the Covenant shall not be interpreted as interfering with the operation of the United Nations or "the inherent right of all peoples to enjoy and utilize fully and freely their natural wealth and resources".[20]

**Part 6** (Articles 48 – 53) governs ratification, entry into force, and amendment of the Covenant.

## Rights to physical integrity

pg 77

The Universal Declaration of Human Rights (UDHR) is a milestone document in the history of human rights. Drafted by representatives with different legal and cultural backgrounds from all regions of the world, the Declaration was proclaimed by the United Nations General Assembly in Paris on 10 December 1948 (General Assembly resolution 217 A (http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/217(III))) as a common standard of achievements for all peoples and all nations. It sets out, for the first time, fundamental human rights to be universally protected and it has been translated into over 500 languages. (http://www.ohchr.org/EN/UDHR/Pages/SearchByLang.aspx)

Download PDF (http://www.ohchr.org/EN/UDHR/Documents/UDHR_Translations/eng.pdf)

# Preamble

Whereas recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Whereas disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people,

Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,

Whereas it is essential to promote the development of friendly relations between nations,

Whereas the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

Whereas Member States have pledged themselves to achieve, in co-operation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms,

Whereas a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge,

Now, Therefore THE GENERAL ASSEMBLY proclaims THIS UNIVERSAL DECLARATION OF HUMAN RIGHTS as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance, both among the peoples of Member States themselves and among the peoples of territories under their jurisdiction.

## Article 1.

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

pg 78

## Article 2.

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

## Article 3.

Everyone has the right to life, liberty and security of person.

## Article 4.

No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

## Article 5.

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

## Article 6.

Everyone has the right to recognition everywhere as a person before the law.

## Article 7.

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

## Article 8.

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

## Article 9.

No one shall be subjected to arbitrary arrest, detention or exile.

## Article 10.

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

## Article 11.

(1) Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.
(2) No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a

Pg 79



**U. S. Department of Justice**
Federal Bureau of Prisons

INSTITUTION SUPPLEMENT

OPI:        SCU Unit Manager
NUMBER:   THX-5217.02D
DATE:       June 11, 2021

## Operation and Security of the Special Confinement Unit (SCU)

*Approved*:   T. J. Watson
             Complex Warden

             B. Lammer
             Warden

I.     **PURPOSE AND SCOPE**: The Special Confinement Unit (SCU) at FCC Terre Haute has been established and designed with the mission to provide a humane, safe, and secure environment for individuals who have received a sentence of death in the federal court system. The purpose of this supplement is to establish guidelines and procedures concerning the operation and security of the SCU.

In special circumstances, with the approval from the North Central Regional Director, inmates who are not under a court imposed sentence of death may be housed in the SCU. These inmates will be referred to as "NON DEATH SENTENCE INMATES" (NDS) and will be managed similar to provisions outlined in Program Statement 5270.09, CN-1, Inmate Discipline Program, and Program Statement 5270.11, Special Housing Units.

II.    **DIRECTIVES AFFECTED**:

   A.    **Directive Referenced**:
         Program Statement 1480.05, News Media Contacts, dated 9/21/2000
         Program Statement 5217.02, Special Management Units, dated 8/9/2016
         Program Statement 5264.08, Inmate Telephone Regulations, dated 1/24/2018
         Program Statement 5270.09, CN-1, Inmate Discipline Program, dated 11/18/2020
         Program Statement 5270.11, Special Housing Units, dated 11/23/2016
         Program Statement 5500.14, CN-1, Correctional Services Procedures Manual, dated 8/1/2016
         Program Statement 5566.06, CN-1, Use of Force and Application of Restraints, dated 8/29/2014
         Institution Supplement THX-5580.08F, Inmate Personal Property, dated 3/12/2021

pg 80

process unless the inmate specifically requests a Chaplain from USP Terre Haute and the Chaplain agrees. A Bureau of Prisons' Chaplain will be temporarily assigned to the execution facility while an inmate is held there to ensure pastoral care is available to the inmate from the time he leaves the SCU until the execution is completed. Provisions will be made for the inmate's Minister of Record and/or Spiritual Advisor representative to be available if the inmate submits a request in advance. Execution procedures allow for final religious ceremonial rites. Procedures for handling of the body after the execution need to provide for ceremonial concerns of the inmate's faith group whenever possible.

These concerns may require discussions with state and/or county officials. An inmate in the SCU with religious concerns regarding his bodily remains should make this known in writing along with documentation outlining the religious nature of his concerns and requests.

## XI.  <u>RECREATION AND SHOWERS</u>:

Inmates will be afforded a minimum of five hours of out of cell recreation activity per week. If weather and resources permit, the inmate shall receive the opportunity for outdoor exercise periods.

During Phase I and Phase III, only one inmate per recreation enclosure will be permitted. Phase II inmates may be placed in the same recreation enclosure or leisure activity room with no more than two inmates in their Unit Team approved Rec/Leisure Group. Inmates will not be allowed to take personal items to the recreation enclosures.

Only one NDS inmate per recreation enclosure will be permitted.

Showers are available in each cell. Hygiene items will be issued on an as needed basis. Clean serviceable clothing will be exchanged on a one-for-one basis as needed.

## XII.  <u>LEISURE TIME</u>:

Phase II inmates will be allowed to participate in leisure time activities with no more than two inmates in their approved REC/Leisure Group. Leisure time activities are a privilege and subject to availability.

Phase II inmates will be restrained at their cell doors, pat searched, and transfrisked prior to being escorted by staff to the Leisure Activity Room. When being returned to their cells, inmates will be pat searched and transfrisked prior to being escorted back to their assigned cells.

pg 81

**U.S. DEPARTMENT OF JUSTICE**    **REQUEST FOR ADMINISTRATIVE REMEDY**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.

From: __Council Brandon M__    __63961056__    __SCU__    __Terre Haute__
    LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST**

My Administrative Detention classification is keeping me housed in solitary confinement permanently, which is Psychologically harmful and Torture which violates the United Nations Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment, which is a ratified United States Treaty. I want this issue litigated in the United States District Court for the Southern District of Indiana for a Habeas Corpus 2241 resolution.

__2-27-23__    __Brandon M Council__
    DATE    SIGNATURE OF REQUESTER

**Part B- RESPONSE**

3/16/2023
3/23/2023

_____    _____
DATE    WARDEN OR REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE    CASE NUMBER: __1154680-F1__

    CASE NUMBER: _____

**Part C- RECEIPT**    pg 82

Return to: _____
    LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____    _____    S.D.-3
DATE    RECIPIENT'S SIGNATURE (STAFF MEMBER)    BP-229(13)
    APRIL 1982

Remedy No.:  1145007-F1        FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted December 15, 2022, in which you allege the conditions for the Special Confinement Unit (SCU) amount to psychological torture. For relief, you request to be moved to a General Population within the Federal Bureau of Prisons.

A review of your request reveals the Federal Bureau of Prisons' classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. 3621 (b).

Pursuant to Program Statement 5100.08, Inmate Security Designation and Custody Classification, each inmate is placed in a facility commensurate with their security and program needs through an objective and consistent system of classification. Designation staff objectively review an inmate's classification making the environment in which they are housed safer for both inmates and staff while protecting the public from undue risk. Your case was carefully reviewed, and you were appropriately designated to the Special Confinement Unit at USP Terre Haute on October 18, 2019.

In reference to your allegations of the SCU unit conditions amounting to torture, USP Terre Haute, to include the SCU, recently received reaccreditation by the American Correctional Association (ACA).  The ACA sets forth the industry standards for American prisons and jails.  During the ACA audit, it was found conditions in the SCU met or exceeded all standards with no deficiencies noted.

Therefore, your Request for Administrative Remedy is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

_____  2/27/23
Date

_____
S. Kallis, Complex Warden

pg 83

S.D.-4

Remedy No.: 1145008-F1                                    FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted December 15, 2022, in which you allege the conditions for the Special Confinement Unit (SCU) amount to psychological torture. For relief, you request modifications to the SCU and a sum of one hundred million dollars.

A review of your request reveals a bulletin detailing new programming and increased out-of-cell time was sent to inmates December 29, 2022. The Start NOW! Program has already begun and more programming opportunities are forthcoming.

Per Program Statement 1320.06, Federal Tort Claims Act, Pursuant to the Federal Tort Claims Act, a claim for money damages for personal injury or death and/or damage to or loss of property must be filed against the United States by the injured party with the appropriate Federal agency for administrative action. General provisions for processing administrative claims under the Federal Tort Claims Act are contained in 28 CFR part 14. The provisions in this subpart describe the procedures to follow when filing an administrative tort claim with the Bureau of Prisons. However, there is no monetary relief available to you through the Administrative Remedy system.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

_____3/23/23_____                              _____
Date                                           S. Kallis, Complex Warden

pg 84

S.D.- 5

Remedy No.: 1154680-F2                              FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted March 23, 2023, in which you allege your Administrative Detention status is psychologically harmful and torture. For relief, you request this issue litigated in the United States District Court for the Southern District of Indiana for a Habeas Corpus 2241 resolution.

A review of your request reveals your request cannot be resolved through the Administrative Remedy Program. You may address this concern through your attorney or, if representing yourself, *pro se*, with the courts, under statutorily-mandated procedures. The Bureau of Prisons does not provide legal services on behalf of those incarcerated.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

___4·6·23___
Date

_____
S. Kallis, Complex Warden

pg 85
S.D.-6

**U.S. Department of Justice**
**Federal Bureau of Prisons**                          **Regional Administrative Remedy Appeal**
**North Central Regional Office**                                        **Part B - Response**

**Administrative Remedy Number:**    1145008-R1

This is in response to your Regional Administrative Remedy Appeal received February 21, 2023, in which you contend your continued placement in the Special Confinement Unit (SCU) at the United States Penitentiary, Terre Haute, Indiana, is psychologically torturous.   For relief, you request changes be made and monetary compensation.

We have reviewed your appeal and the Warden's response dated March 23, 2023.   Several changes to programming in SCU have recently been implemented.   These include, but are not limited to, an increase in recreation time, job assignments, and programs.   You are encouraged to continue to communicate with Psychology staff regarding any mental health issues you may be experiencing.

Monetary damages may not be awarded via the administrative remedy process.   If you wish to seek monetary compensation based on the negligence of staff, you must file your claim through the administrative procedures applicable to the basis of your claim (i.e. 31 U.S.C. § 3723 or the Federal Tort Claims Act).

Based on the above information, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

5/25/23
_____
Date                                                            Andre Matevousian, Regional Director

pg 86
S.D.-11

U.S. DEPARTMENT OF JUSTICE                          REQUEST FOR ADMINISTRATIVE REMEDY

Federal Bureau of Prisons

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: __Council   Brandon   M__     __63961056__     __S.C.U.__     __Terre Haute__
        LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A– INMATE REQUEST**

My Administrative Detention classification is keeping me permanently housed in Psychologically severe conditions of confinement at the Terre Haute Special Confinement Unit that is the equivalent to Torture. I would like to request a transfer to a General Population within the Federal Bureau of Prisons that is not overly restrictive and does not cause unreasonable Psychological harm.

__12-12-22__                                    _Brandon M Council_
        DATE                                      SIGNATURE OF REQUESTER

**Part B– RESPONSE**

_____                          _____
        DATE                                   WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                      CASE NUMBER: __1145007-F1__

                                                CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

_____              ⊕              _____
        DATE                                   RECIPIENT'S SIGNATURE (STAFF MEMBER)

USP LVN                                                      BP–229(13)
                                                            APRIL 1982

pg 87

# FCC Terre Haute
## BP-8 - Informal Resolution

| NAME | NUMBER | UNIT |
|---|---|---|
| Council | 63961056 | S.C.U |

**Notice to Inmate:** Be advised, ordinarily, prior to filing a Request for Administrative Remedy, BP-229 (13), you should attempt to informally resolve your complaint through your Correctional Counselor. Please refer to P.S. 1330.18, Administrative Remedy Program and the FCC Terre Haute Institutional Supplement thereto (both available via Law Library).

**1. Briefly state inmate's complaint (One complaint/issue per Form):**

My Administrative Detention classification is keeping me housed in solitary confinement permanently, which is psychologically harmful and torture, in violation of the United Nations Convention Against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment, which is a ratified United States Treaty.

**2. Requested Resolution**

I want this issue to be taken to the United States District Court for the Southern District of Indiana for Habeas Corpus 2241 resolution.

| **Inmate Signature:** | X Brandon M Council | 2-21-23 |
|---|---|---|
| **Staff Printed Name/Signature** | ZWeymuch / RWeyh | **Date:** 2-21-23 |
| **Dept. Assigned for Response:** | Unit Team | **Due Date:** 2-28-2023 |

**3. Staff Response:**

This is a repeititve remedy, currently already in process. Please wait for your answer to your Administrative Remedy.

**Section 4:** ☐ Informally Resolved/Complaint Withdrawn ☐ No Informal Resolution/Progress to BP-229

_____     _____     Schmalensee
Inmate's signature                Date          Staff Printed Name/Signature

THX-1330.18D

Page 5

pg 88

Remedy No.: 1154680-F2                          FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted March 23, 2023, in which
you allege your Administrative Detention status is psychologically harmful and torture.
For relief, you request this issue litigated in the United States District Court for the
Southern District of Indiana for a Habeas Corpus 2241 resolution.

A review of your request reveals your request cannot be resolved through the
Administrative Remedy Program. You may address this concern through your attorney
or, if representing yourself, *pro se*, with the courts, under statutorily-mandated
procedures. The Bureau of Prisons does not provide legal services on behalf of those
incarcerated.

Therefore, this response to your Request for Administrative Remedy is for informational
purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North
Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800,
Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of
the date of this response.

4·6·23
Date

S. Kallis, Complex Warden

pg 89

Remedy No.: 1145008-F1                                    FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted December 15, 2022, in which you allege the conditions for the Special Confinement Unit (SCU) amount to psychological torture. For relief, you request modifications to the SCU and a sum of one hundred million dollars.

A review of your request reveals a bulletin detailing new programming and increased out-of-cell time was sent to inmates December 29, 2022. The Start NOW! Program has already begun and more programming opportunities are forthcoming.

Per Program Statement 1320.06, Federal Tort Claims Act, Pursuant to the Federal Tort Claims Act, a claim for money damages for personal injury or death and/or damage to or loss of property must be filed against the United States by the injured party with the appropriate Federal agency for administrative action. General provisions for processing administrative claims under the Federal Tort Claims Act are contained in 28 CFR part 14. The provisions in this subpart describe the procedures to follow when filing an administrative tort claim with the Bureau of Prisons. However, there is no monetary relief available to you through the Administrative Remedy system.

Therefore, this response to your Request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

_____3/23/23_____
Date

_____
S. Kallis, Complex Warden

pg 90

U.S. DEPARTMENT OF JUSTICE                    REQUEST FOR ADMINISTRATIVE REMEDY
Federal Bureau of Prisons

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Council Brandon M            63961056      S.C.U.      Terre Haute
      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.      UNIT      INSTITUTION

**Part A– INMATE REQUEST**

The Terre Haute Special Confinement Unit where I am housed is Psychologically harmful and the equivalent to Torture. I would like to request that modifications to the Terre Haute Special Confinement Unit be made to eliminate the Psychological harm that is the equivalent to Torture, and One hundred million dollars be paid to me in punitive and compensatory damages.

12-12-22
DATE

Brandon M Council
SIGNATURE OF REQUESTER

**Part B– RESPONSE**

DATE                                        WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                  CASE NUMBER: 1145008-F1

                                            CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____
                                                                        Pg 91

_____          ⊛          _____
      DATE                                    RECIPIENT'S SIGNATURE (STAFF MEMBER)
                  PRINTED ON RECYCLED PAPER                                BP–229(13)
USP LVN                                                                    APRIL 1982

Remedy No.: 1145007-F1      FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted December 15, 2022, in which you allege the conditions for the Special Confinement Unit (SCU) amount to psychological torture. For relief, you request to be moved to a General Population within the Federal Bureau of Prisons.

A review of your request reveals the Federal Bureau of Prisons' classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. 3621 (b).

Pursuant to Program Statement 5100.08, <u>Inmate Security Designation and Custody Classification</u>, each inmate is placed in a facility commensurate with their security and program needs through an objective and consistent system of classification. Designation staff objectively review an inmate's classification making the environment in which they are housed safer for both inmates and staff while protecting the public from undue risk. Your case was carefully reviewed, and you were appropriately designated to the Special Confinement Unit at USP Terre Haute on October 18, 2019.

In reference to your allegations of the SCU unit conditions amounting to torture, USP Terre Haute, to include the SCU, recently received reaccreditation by the American Correctional Association (ACA). The ACA sets forth the industry standards for American prisons and jails. During the ACA audit, it was found conditions in the SCU met or exceeded all standards with no deficiencies noted.

Therefore, your Request for Administrative Remedy is denied.

If you are dissatisfied with this response, you may appeal to the Regional Director, North Central Regional Office, Federal Bureau of Prisons, 400 State Avenue, Suite 800, Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

_____2/27/23_____
Date

_____
S. Kallis, Complex Warden

pg 92

U.S. Department of Justice
Federal Bureau of Prisons
North Central Regional Office

Regional Administrative Remedy Appeal
Part B - Response

**Administrative Remedy Number:**   1145007-R1

This is in response to your Regional Administrative Remedy Appeal received March 16, 2023, in which you request a transfer from the Special Confinement Unit (SCU) at the United States Penitentiary, Terre Haute, Indiana, due to psychological hardships.

We have reviewed your appeal and the Warden's response dated February 27, 2023.  As indicated in the Warden's response, you were initially designated to the SCU by the Designation and Sentence Computation Center (DSCC) after careful consideration.  As such, we find you are appropriately classified at this time; therefore, a transfer is not appropriate.  You are encouraged to continue to communicate with Psychology staff regarding any mental health issues you may be experiencing. Accordingly, the institution's decision is supported.

Based on the above information, your Regional Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.  Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_7-11-2023_
Date

_(signature)_
Andre Matevousian, Regional Director

pg 93

U.S. Department of Justice
Federal Bureau of Prisons
North Central Regional Office

Regional Administrative Remedy Appeal
Part B - Response

**Administrative Remedy Number:** 1145008-R1

This is in response to your Regional Administrative Remedy Appeal received February 21, 2023, in which you contend your continued placement in the Special Confinement Unit (SCU) at the United States Penitentiary, Terre Haute, Indiana, is psychologically torturous.   For relief, you request changes be made and monetary compensation.

We have reviewed your appeal and the Warden's response dated March 23, 2023.   Several changes to programming in SCU have recently been implemented.   These include, but are not limited to, an increase in recreation time, job assignments, and programs.   You are encouraged to continue to communicate with Psychology staff regarding any mental health issues you may be experiencing.

Monetary damages may not be awarded via the administrative remedy process.   If you wish to seek monetary compensation based on the negligence of staff, you must file your claim through the administrative procedures applicable to the basis of your claim (i.e. 31 U.S.C. § 3723 or the Federal Tort Claims Act).

Based on the above information, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534.   Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_5/25/23_
Date

_Andre Matevousian, Regional Director_

pg 94

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Council Brandon M          63961056          S.C.U.          FCC Terre Haute

LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A– INMATE REQUEST**

This Request for Administrative Remedy is to appeal the decision of Complex Warden Mr. Steven Kallis denying my request for Compassionate Release. Mr. Kallis should have removed himself from this process because he was the respondent that denied all of my request for administrative remedy regarding the same issue pertaining to subjection to Torture

10-19-23

DATE

_Brandan M Council_

SIGNATURE OF REQUESTER

**Part B– RESPONSE**



RECEIVED
DEC 08 2023
Administrative Remedy Clerk
FCC Terre Haute, IN

_____          _____
DATE                      WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**          CASE NUMBER: 1183597-F

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____

LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____          pg 95

_____                    _____
DATE          ☣          RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP–229(13)
APRIL 1982

COUNCIL, Brandon Michael
Reg. No. 63961-056
SCU

---

**Inmate Request to Staff Member Response**

This is in response to your Inmate Request to Staff regarding a Compassionate Release/Reduction in Sentence (RIS).

A review of your request reveals you failed to provide documentation of any extraordinary or compelling circumstances to warrant a Compassionate Release/Reduction in Sentence. As outlined in Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§3582(c)(1)(A) and 4205(g), an inmate may file a request to the Warden if it is determined he has been diagnosed with a terminal medical condition, debilitated medical condition, he/she is elderly or elderly with a medical condition, the death or incapacitation of the family member caregiver of an inmate's minor child, or the incapacitation of a spouse or registered partner.

I encourage you to carefully review the above listed Program Statement and if you are still of the opinion that you meet the criteria, then submit your request.

I trust this response adequately addresses your concerns.

_____10/2/23_____
Date

_____
S. Kallis, Complex Warden

pg 96

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Merrick Garland
950 Pennsylvania Ave NW
Washington, D.C. 20530

9590 9402 6307 0274 1088 22

2. Article Number (Transfer from service label)

7018 3090 0002 1667 8811

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

JUL 02 2021

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Merrick Garland
950 Pennsylvania Ave NW
Washington, D.C., 20530

9590 9402 6803 1074 8488 87

2. Article Number (Transfer from service label)

7020 3160 0001 3731 4648

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery
FEB 2 1

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Merrick Garland
950 Pennsylvania Ave NW
Washington, D.C., 20530

9590 9402 6307 0274 1086 79

2. Article Number (Transfer from service label)

2307 2390 0000 2888 2754

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent ☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

pg 97

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Merrick Garland
950 Pennsylvania Ave NW
Washington, D.C., 20530

9590 9402 6307 0274 1087 23

2. Article Number (Transfer from service label)

7017 2620 0000 1360 8126

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Address

B. Received by (Printed Name)    C. Date of Deliv

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

FEB 7 2022

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☑ Registered Mail™
☐ Registered Mail Restri Delivery
☐ Signature Confirmatio
☑ Signature Confirmatio Restricted Delivery

Domestic Return Recei

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mrs. Lisa Monaco
950 Pennsylvania Ave
Washington, D.C., 20530

9590 9402 6803 1074 8488 70

2. Article Number (Transfer from service label)

7022 1670 0000 8977 6835

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Address

B. Received by (Printed Name)    C. Date of Delive

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restri Delivery
☐ Signature Confirmatior
☐ Signature Confirmatior Restricted Delivery

Domestic Return Recei

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. John G. Roberts
1 First Street NE
Washington, D.C., 20543

9590 9402 6803 1074 8489 93

2. Article Number (Transfer from service label)

7020 3160 0000 1373 1457 0

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Address

B. Received by (Printed Name)    C. Date of Delive

D. Is delivery addre RECEIVED ? ☐ Yes
If YES, enter delivery address below: ☐ No

SEP - 4 2024

OFFICE OF THE CLERK
SUPREME COURT, U.S.

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restri Delivery
☐ Signature Confirmation
☐ Signature Confirmation Restricted Delivery

Domestic Return Recei

pg 98

Dear Mr. Garland                                    2-1-22

My name is Brandon Michael Council. Thank you for circumspecting this correspondence with candor and care. The elucidation for this letter is to request your authorization and consent to pursue litigation against the U.S. D.O.J. For the past 231 years the U.S. Criminal Justice System has continuously and historically used cruel and unusual punishment despite the implementation of the U.S. 8th Amendment. 1st Timothy 1st chapter 8th verse states, "But we know that the law is good if a man uses it lawfully". With that being said it is not the Constitutions fault that, "We the People" who facilitate the use of the Constitution never correctly or fully provided the intended U.S. Bill of Rights guaranteed protection from cruel and unusual punishment. The evidence that proves Death, Slavery, and Torture are unequivocally violations of the 8th Amendment has been concealed by 10 U.S. Government officials. 4 of these officials are current U.S. Cabinet members. According to the U.S. D.O.J website the primary actions of the D.O.J are investigating instances of white collar crime, defending the U.S. in legal matters and running the Federal B.O.P. At this time, I am now reporting to you a white collar crime which is unbeknownst to the public but is widely recognised throughout U.S. Jurisprudence craft as Blind Justice. This particular esoteric act is also referred to as, "turning a Blind Eye" to apparent negligence and tolerance of judiciary abuses of the Constitution which subsequently deprive convicted U.S. citizens of their inherent right to guaranteed protection from cruel and unusual punishments known as Death, Slavery, and Torture.

pg 99

You may recall approximately 8 months ago I requested your assistance with resolving these compromising and sensitive issues discreetly and expeditiously so as to avoid the evolved ongoing situation and coverup attempt by U.S. government officials to prevent this irrefutable information from becoming public knowledge. What I would like to do to resolve these issues is discuss being granted 1 of the following options, a non disclosure agreement settlement, a compassionate release, a pardon, federal witness protection or permission to sue the U.S. D.O.J for its negligent use of cruel and unusual punishment. If none of these suggestions appeal to your professional objective please contact me with any and all appropriate and available resolutions. My goal is to resolve this situation immediately and cooperate with the U.S. D.O.J. The U.S. Criminal Justice System and Federal B.O.P. use of Torture is ascertainly unconstitutional and illegal. The reason why I have brought this subject to your attention is because the Supreme Court Justices knew the entire time; individuals who are sentenced to death are permanently housed in overly restrictive, psychologically abusive conditions of confinement and have turned a Blind Eye to the fact that this is textbook criteria that can only be identified as torture. The astonishing fact is that despite this acknowledgement in Glossip v.s. Gross the Supreme Court has still not mandated that the Federal Death Row conditions of confinement be remedied or modified. All I'm asking for is my full constitutional protections from cruel and unusual punishment. If this problem can not be resolved by compromise and communication then lets put everything to a judiciary examination, test, and trial by jury of We The People. All that is required is your consent to waive

pg 100

soverign immunity and, a set court date and we can allow a jury to determine whose version of the truth is correct, the Constitution and what it states or everything the U.S. Criminal Justice System has historically done to avoid, ignore, and manipulate what the Constitution states. I've taken the liberty of enclosing several documents that may be able to provide you with further insight into the situation pertaining to Blind Justice. The reason why I have included a copy of my current pending litigation is so you can see exactly what the cardinal elements of Blind Justice manipulation of the Constitution look like. Please do not ignore this correspondence or continue to place this issue at the bottom of your priorities list because, We the People, The U.S. Criminal Justice System need your guidance and wisdom immediately.

Sincerely Faith Hope Charity
Masterbuilder Brandon Michael Council

pg 101

Dear Mr. Garland, Good Day!      7-18-23

My name is Brandon Michael Council. The reason why I am writing to you again is because we still have unresolved legal matters to address and resolve. First, I would like to remind you that I have had several letters delivered to you at Main Justice by Certified and Registered Mail that you have not responded to. Secondly, I want to formally clear the air about Case # 2:21-CV-00302-JPH-DLP. I have never attempted to sue you. You were named as a Defendant in my pending lawsuit due to a misunderstanding. It has taken my filing of a 3rd Amended Complaint to permanently correct this mistake made by myself and the United States District Court. Your name was used in my initial filing due to the United States originally being named as a Defendant and yourself as the Respondent. If you were to check court records those documents will confirm my elucidation for how you came to be named as a Defendant. Now that we have come to grips with that misunderstanding I hope and pray that you will lawfully assist me as United States Attorney General. In the previous correspondences that I have sent to you, I have requested discreet and expeditious resolutions to egregious and flagitious abuses of the United States Constitution that has been identified as "Blind Justice". In those correspondences I have requested and made suggestions to resolve issues related to the United States Government using Cruel and Unusual Punishment that the United States Constitution prohibits, such as Torture, Slavery, and Capital Punishment. I have specifically requested and suggested to be placed in unrestricted Witness Protection, to be granted An Absolute Pardon, or your pg 102

permission and consent to sue the United States of America, or any other appropriate recommendation or resolution that you can provide to satisfy all invested parties. Mr. Garland, the issues that I have alerted you to are extremely sensitive, high profile, controversial and political and I can not in good faith move forward in any legal direction until I am ascertain on which side of the issues you stand upon. The truth or The lie. There are two things that I have discovered that the truth and lies have in common. Neither lies nor Truth care who tell them and neither lies or Truth care who listens to them. The issues that I have raised pertaining to Slavery, Torture, and Unconstitutional deprivation of life by Judiciary abuses of the law require your response and appropriate resolution to avoid contretemp muckrake. Mr. Garland I have acquired irrefutable evidence that the United States Criminal Justice System is participating in morally degenerate improper conduct. The Volume of Sacred Law states in First Timothy 1st chapter 8th verse that, "We know that the law is good, if a man uses it lawfully. The unprecedented, unbeknownst Truth that I have acquired from the United States Constitution proves beyond any reasonable doubt with absolute infallible legal certainty that the United States Criminal Justice System is using its interpretations of the Constitution unlawfully and is in fact an Artifice Hoodwink. Mr. Garland with the infallible working tools of the Masterbuilder I discovered everything pertaining to Blind Justice, Absolute Immunity, and the United States Government turning a Blind Eye to its Judiciary usage of Cruel and Unusual Punishment. Mr. Garland, I may not have a Harvard Law Degree but I have acquired a Master Degree in the system of morality veiled in allegory, illustrated by symbols. I'm only requesting to be given what the United States Constitution says I'm entitled to, but because I was cunningly, deceptively, and intentionally pg 103

deprived of those gauranteed protections, I'm requesting to be released from Federal Custody and financially compensated for being unconstitutionally subjected to Torture while in the custody of the United States Attorney General. I realize that you may require more specific details and evidence of my allegations so I have taken the liberty of providing you with substantiating documents. In light of the possibility that you may refuse to respond to this correspondence I have provided you with a brief synopsis of the evidence that the use of Capital Punishment, Slavery, and Torture are unequivocally prohibited by the United States Constitution. Therefor, subsequently a miscarriage of justice. The evidence that all forms of Capital Punishment is prohibited by the Constitution is within the 4th, 5th, 8th, 9th, and 14th Amendments To assimilate completely please see my (United States 4th Circuit Court of Appeals Pro Se Supplemental Brief.) Just to be clear, the 4th Amendment proclaims the Right of the people-to be secure in their persons-shall not be violated! This Amendment provides irrefutable proof that Capital Punishment violates the United States Constitution. Therefor making any and all sentences to death Supremacy Clause Aritle 6 violations. In addition, a conspiracy to contain this insight, Knowledge, and argument has already been established by my 7 Federally appointed Capital Appeals Attorney and the United States 4th Circuit Court of Appeals. Please see my (Motion For Substitution of Counsel 1&2), to verify that I have alleged sabotage by the identified individuals who refused to make my novel, afortiori, arguments and explications to the Judiciary Court for circumspection and that the aforementioned Appellate Court has refused to allow me substantive Due Process by allowing me to submit my Pro Se Supplemental Brief. Please see my (United States 4th Circuit Court of Appeals Documents.) Mr. Garland the proof and evidence that

pg 104

the 13th Amendment Exemption is unconstitutional is very well hidden in plain sight. The irrefutable evidence that slavery is unconstitutionally cruel and unusual punishment is actually the exemption itself. Meaning, the reason Congress exempted and excused slavery as a form of punishment is because it is painfully apparent, and obvious that slavery of any kind and any purpose, requires cruel, inhumane, degrading, treatment and it would be absolutely absurd, asinine, and visceral not to conclude that slavery fits the verbatim, textbook criteria for cruel and unusual punishment. In addition we can not overlook and ignore the fact that the 13th Amendment exemption was created at the exact same time Congress's alleged intent was to abolish slavery, and that the decision to exempt and excuse slavery that was used as a form of punishment was created and passed by an all caucasian group of individuals who previously condoned or resided in a United States of America society that victimized African Americans in the form of Slavery. Furthermore the United States has ratified several International Treaty laws that prohibit Slavery, Torture, and ensure the fundamental inherent right to life. All of which the United States has refused to enforce, and prohibit incarcerated United States citizens from pursuing litigation in light of violation of International Treaty Laws. Again, Article 6, Clause 2 of the United States Constitution states all treaties made or which shall be made under the authority of the United States shall be the supreme law of the land. Please see my (13th Amendment Exemption Documents). Now the United States Government has passed both unconstitutional Amendments and Federal Laws to supersede the text and intents that Congress imposed in the United States Constitution to continue its historically perpetuated use of Cruel and Unusual Punishment

pg 105

but no text, legislation, or inferences can be drawn to utilize torture of any form, under any conditions, or circumstances. Please see my (Torture Documents The United States Tortures Before It Kills.) While in the custody of the United States Attorney General, the United States Federal Bureau of Prisons has subjected me to both Physical and Psychological anguish, pain, and suffering which is the verbatim definition, and elements of Torture, which you are or should be aware that subjection to this form of explicitly prohibited form of cruel and unusual punishment requires revocation of my sentence to death and release from Federal Custody of the United States Attorney General. Please see my (Unclassified Declaration of Stuart Grassian M.D. and U.S.S.C Medley 134 U.S 160.) Mr. Garland the conspiracy to contain and conceal the Constitutional Truth that I have discovered and acquired goes beyond what I have relayed to you in this correspondence. The reason why I brought this information to your attention is because I want you to know exactly how serious I am about pursuing these issues until I have been satisfied with the appropriate resolution. Everthing that I have disclosed to you is a Blind Justice abuse of the Constitution. I wrote this voluminous letter because if the Constitution says to do something and the United States Judiciary and Government choose to do otherwise it is a crime. The Constitution is a law, and the violation of the law in all law abiding, compete minds constitutes a crime. The very fact that Absolute Judiciay Immunity exist, although only in doctrine, demonstrates motive and opportunity to inflict individuals who are duly convicted and sentenced with cruel and unusual punishments that violate their inherent and irrevocable Constitutional Rights.    pg 106

Before we part upon the square, I want you to know that I'm well aware that the procedure that the United States Supreme Court utilized to arrive at their Judiciary conclussion, sustaining the use of Capital Punishment was made by fraud. I hate to use such a strong and distasteful term but the definition of fraud means deceit and trickery. The Constitution clearly expresses all of its intents and purposes. The trick and deception is the act of voting to determine whether Capital Punishment is permissable or prohibited which makes the United States Constitution a choice-when it is not a choice. Opinions are not equivalent or synonymous with facts. When the Supreme Court adopted the voting methodology to arrive at its Judiciary Ruling, the outcome was not rendered by infallible legal certainty which the Constitution requires and demands be facilitated. The procedure that utilizes voting creates a loophole, so that facts within the Constitution can be defeated by opinion, which is only a belief. Thats fraud because the Constitution is not to be voted upon to determine whether or not someone agrees with its determinations and proclaiments. This revelation of Artifice Hoodwink fraud proves beyond any reasonable doubt that an inaccurate, indefensible ruling can be, and has been facilitated and administered by the Supreme Courts Ruling to sustain the use of Capital Punishment. The Conservative Wing of the Supreme Court used their voting methodology to obfuscate and obliterate the prohibition of Capital Punishment with their opinion-not facts, which is not acceptable when the Constitution demands infallible legal certainty. Your Honor, the Plaintiff rests. Its been nearly 1½ years since I last contacted you and I have proven my patience. I have no ultimatums or deadline to respond to this correspondence, however, I would greatly appreciate it if you would contact me and respond at your earliest convenience.

Sincerely, Faith, Hope, Charity
Brandon M. Council

pg. 107

Dear Mrs. Peters                                        7-11-23

My name is Brandon Michael Council. I first want to thank you for allowing me the opportunity to speak to you on April 11th 2023, at the Terre Haute Special Confinement Unit. It was a pleasure to meet you in person and I personally wish you further success in your carerr and leadership as Director of the Federal Bureau of Prisons. The elucidation for why I'm sending you this correspondence is because I was not able to ascertain if the response that I received, pertaining to my written correspondence, and request I submitted to you on Aprill 11th 2023, from the Terre Haute Special Confinement Unit Complex Warden was made with your authorization, decisions, and direction. I have taken the liberty of enclosing with this correspondence a copy of that response to demonstrate why it is unclear to me if the responses were your determinations and conclussions, or soley those of the Terre Haute Special Confinement Unit Complex Warden Mr. Steven Kallis. Today which is my 38th Birthday makes 90 days in which I have not received a response from you pertaining to my correspondence or substantiating documents. Included in the correspondence that I provided you with, I requested your personal assistance with acquiring Nationally Televised Media Interviews with 20/20, Dateline, and 60 minutes so that I could relay infallible, unprecedented Constitutional information and evidence that will inevitably save 3,000 human lives. Mrs. Peters, the United States has not corrected its institution of Criminal Justice. The 3 most egregious problems are its facilitation of Torture Slavery, and Capital Punishment. The Jurisprudence perpetuction

pg 108
pg 1

of these Judiciary consequences is cruel and unusual punishment that I have unequivocal proof, is an esoteric doctrine, philosophy, and abuse of the Constitution known as "Blind Justice." All I want to do is reveal Constitutional irrefutable proof that Capital Punishment is unconstitutional so that at least 1/3 and the most flagitious abuses of the law will be infallibly corrected and save 3,000 human lives. Mrs. Peters I'm going to be candid with you, my lawyers whom are federally appointed, refuse to assist me with arranging and acquiring the aforementioned interviews because they do not want to permanently correct the problem, which if they were to do so, would consequently put their Capital Appeal Craft into extinction. My Constitutional arguments that I wish to reveal to the media on television can not be disproven by fact or opinion. You are a very, wise, intelligent, and educated individual and it would be behooving for you to assist me with arranging these interviews. The reason why I feel so strongly about that is because it has been relayed to inmates by word of mouth that you are genuinely sincere about Criminal Justice Reform and if that is true and accurate then you literally have no choice but to address the abuses of the law that victimize United States citizens by subjecting prisoners to cruel and unusual punishment. If you can not assist me, or will not assist me, I have no choice but to accept it, but I do need you to clarify if that decision is truly yours. Inevitably, the information which I wish to disclose will be a Bombshell Whistleblower Revelation of the Century and I do not intend to communicate any misinformation about any

pg 109

04 2

of the individuals who turned a Blind Eye and ignored the allegations and evidence that proved the allegations justifiable. Mrs. Peters with great power comes even greater responsibility. I'm aware of the pending lawsuit against you and the Terre Haute Complex Warden Mr. Steven Kallis pertaining to the conditions of confinement there at the Special Confinement Unit where I met you in person, and where I am still permanently confined in Torturous living conditions. People are already pointing their finger at you for a problem that has existed in the United States Criminal Justice System for Centuries according to the United States Supreme Court. If you were to help me with the media interview and publicly relay that solitary confinement more than 15 consecutive days does constitute Torture it could actually mitigate the pending lawsuit by agreeing that it is cruel and unusual punishment to place any human being in Psychologically Harmful Conditions of Confinement permanently, which logically means Torture and abuse. In a prior and seperate lawsuit, that is not against you or the current Special Confinement Unit Warden Mr. Steven Kallis, I have alleged that former Special Confinement Unit Warden Mr. Thomas J. Watson and Special Confinement Unit Psychologist Dr. Gina Sacchetti have both been deliberately indifferent to my medical needs as it pertains to the Psychological harm and injury that I have suffered and been subjected to due to their apparent desensitized and dellusional inactions and responses to my direct allegation of Torture at the Terre Haute Special Confinement Unit. Mrs. Peters I'm not specifically asking for your help to talk about Torture or Lawsuits unless your

pg 110

pg 3

100% comfortable discussing that subject matter on a nationally televised interview, but I am asking and begging you to help me discuss unprecedented Constitutional analysis that will save 3,000 lives. If you were not aware, the United States Supreme Court has allegedly refused to hear any new debate or challenges to the Constitutionality of Capital Punishment. To me, that shows that the United States Criminal Justice System is not a product of Democracy but of a 9 member United States Supreme Court Dictatorship. If I were capable of turning back the hands of time I would. I would never even think about touching a firearm, and I would exterminate and abolish the invention of a firearm. My pennace and restitution to society for my violation of Divine and Secular Law is to accomplish saving 3,000 lives, and ensuring that the United States Government does not commit the same crime, and perpetuate the same problem I committed and contributed to by being responsible for taking another human being's life away from them illegally and unnecessarily. In regard to my request for compassionate release, the explication for why I submitted that request to you initially, prior to submitting it at the Institutional level is due to a direct professional conflict of interest with Mr. Kallis. Mr. Kallis was previously made aware of all of the cardinal issues in my request for compassionate release through the Request for Administrative Remedy Grievane process. Mr. Kallis, who responded to all of my request for Administrative Remedy denied all of my request and it is my observation that Mr. Kallis would not circumspect my request with impartiality due to his previous replies and his professional indifference to my subjection to Torture!

pg 111

pa 4

My ongoing conditions of confinement medically constitute Torture because it is keeping me detained permanently in A-Typical prisons conditions that the B.O.P. and the United States Inspector General have concluded as harmful to any prisoner even in short increments of time, and that Legally, Torture is prohibited under Article 6 clause 2 of the United States Constitutio which affirms that all treaties made under the authority of the Unitec States shall be the Supreme Law of the Land i.e. (United Nations Convention Against Torture and Other Cruel, Inhumane, Degrading Treatment or Punishment. Mrs. Peters I'm not requesting your determination on my request for compassionate release due to my grievances having not been exhausted by the B.O.P. General Counsel response. I just wanted to expound some of the reason why I choose to submit my request to you.

Sincerely Faith, Hope, Charity
Masterbuilder Brandon M. Council

pg 112

pg 5

COUNCIL, Brandon
Reg. No.: 63961-056
USP: SCU

---

**Inmate Request to Staff Response**

This is in response to your request forwarded from the Director's office and received on April 14, 2023. In your request, you ask the Director to approve your request for Compassionate Release and to help you arrange multiple, nationally televised interviews with major news networks.

A review of your request reveals the issues concerning Compassionate Release, enumerated in your correspondence to the Director, have also been, or are currently being, addressed through the Administrative Remedy process. Listed below are those status of those remedies:

- Administrative Remedy 1145005-F2 requesting Compassionate Release was Rejected on December 19, 2022, and there is no record of your request being re-submitted.
- Administrative Remedy 1145007-F1 requesting to be transferred to General Population was Closed February 27, 2023. Administrative Remedy 1145007-R1 was Accepted on March 16, 2023, and has a due date of May 15, 2023.
- Administrative Remedy 1145008-F1 requesting SCU modifications and financial compensation was Closed March 24, 2023. Administrative Remedy 1145008-R1 was Accepted February 24, 2023, and has a due date of April 22, 2023.
- Administrative Remedy 1145010-F1 requesting Psychological Services was Closed December 27, 2022. There is no record of an appeal with the North Central Region.
- Administrative Remedy 1154680-F2 requesting to litigate Single Cell Status in the Special Confinement Unit was Closed with Explanation on April 6, 2023. Administrative Remedy 1154680-R1 is currently processing at the North Central Region with a due date of June 12, 2023.

This portion of your request, therefore, is for informational purposes. Please continue to utilize the Administrative Remedy process to address your concerns. Your Unit Team is available to assist you if you have any further questions.

Your request pertaining to media interviews can be addressed at the local, institutional level through the administrative process. All media, interview requests must be in writing and in conformance with BOP Program Statement 1480.05, <u>News Media Contacts</u>, as well as the local, institutional supplement. In your correspondence with the Director, you list several media networks and programs as possibilities for interviews, but no further specificity about the media organizations is defined. In institutional supplement THX-1480.05K, IV. A. 1., *News Media Contacts*, it states, "An inmate may initiate an interview with the news media by regular correspondence or through inmate correspondence procedures." Your request, therefore, is overly broad and lacks the specificity necessary to approve a media interview. Therefore, your request is denied.

pg. 113

I trust this response adequately addresses your concerns pertaining to these matters.

_4/19/23_
Date

S. Kallis, Complex Warden

pg. 114

AO 242 (12/11) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

## UNITED STATES DISTRICT COURT
for the

Southern District of Indiana

Brandon Michael Council
_____
Petitioner

.v.

Merrick Garland, Steven Kallis
_____
Respondent

*(name of warden or authorized person having custody of petitioner)*

)
)
)
)
)
)
)
)
)
)
)

Case No.   2:23-cv-00491-JPH-MKK
          _____
          *(Supplied by Clerk of Court)*

| FILED |
|---|
| **10/16/2023** |
| U.S. DISTRICT COURT |
| SOUTHERN DISTRICT OF INDIANA |
| Roger A.G. Sharpe, Clerk |

### PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

**Personal Information**

1.    (a) Your full name: **Brandon Michael Council**
      (b) Other names you have used: **N/A**

2.    Place of confinement:
      (a) Name of institution: **United States Penitentiary Terre Haute S.C.U**
      (b) Address: **4700 Bureau Road South**
                   **Terre Haute, IN 47802**
      (c) Your identification number: **63961056**

3.    Are you currently being held on orders by:
      ☑ Federal authorities    ☐ State authorities    ☐ Other - explain: _____

4.    Are you currently:
      ☐ A pretrial detainee (waiting for trial on criminal charges)
      ☑ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime
         If you are currently serving a sentence, provide:
         (a) Name and location of court that sentenced you: **U.S. District Court**
             **District of South Carolina (Florence)**
         (b) Docket number of criminal case: **No. 4:17-CR-866-RBH**
         (c) Date of sentencing: **10-3-19**
      ☐ Being held on an immigration charge
      ☐ Other *(explain):* _____

Page 2 of 10

pg 115

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRANDON MICHAEL COUNCIL, )
)
Petitioner, )
)
v. )    No. 2:23-cv-00491-JPH-MKK
)
MERRICK GARLAND, )
STEVEN KALLIS, )
)
Respondents. )

**ENTRY DISMISSING PETITION FOR A WRIT OF HABEAS CORPUS**

Brandon Michael Council, an inmate at the United States Penitentiary in Terre Haute, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Mr. Council asserts that the conditions of his confinement amount to torture under the Eighth Amendment, the Fourteenth Amendment, the United Nations Convention Against Torture, and other standards and rules. Dkt. 1. Mr. Council asks the Court to order his immediate release under what he describes as the "binding United States Supreme Court precedent" in *In re Medley*, 134 U.S. 160 (1890). *See* dkt. 1 at 9. Mr. Council also has a civil rights action pending in which he challenges his conditions of confinement. *See Council v. Sacchetti*, No. 2:21-cv-00302-JPH-MKK (S.D. Ind.) ("Civil Rights Dkt."). He is represented by counsel in that case. That case has been stayed while Mr. Council exhausts his criminal appeals. Civil Rights Dkt. 123.

For the reasons stated below, Mr. Council's § 2241 petition is **dismissed without prejudice**.

1

pg 116

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRANDON MICHAEL COUNCIL,                )
                                        )
                    Petitioner,         )
                                        )
        v.                              )        No. 2:23-cv-00491-JPH-MKK
                                        )
MERRICK GARLAND,                        )
STEVEN KALLIS,                          )
                                        )
                    Respondents.        )

## FINAL JUDGMENT

The Court enters FINAL JUDGMENT. The petition for writ of habeas corpus under 28 U.S.C. § 2241 is dismissed **without prejudice**.

**SO ORDERED.**

Date: 10/30/2023

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: _____*Pam Pope*_____
        Deputy Clerk, U.S. District Court

Distribution:

BRANDON MICHAEL COUNCIL
63961056
TERRE HAUTE - USP
TERRE HAUTE U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808

pg 117

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRANDON MICHAEL COUNCIL, )
)
Plaintiff, )
)
v. )    No. 2:21-cv-00302-JPH-DLP
)
GINA SACCHETTI, )
THOMAS J. WATSON, )
)
Defendants. )

**ORDER DENYING PLAINTIFF'S MOTION TO RECONSIDER**

Brandon Council is a federal inmate awaiting execution at USP Terre Haute. His original complaint and his first amended complaint were dismissed for failure to state a claim upon which relief may be granted. Dkts. 10, 20.

The Order screening the second amended complaint allowed this lawsuit to proceed against Warden Thomas Watson and Staff Psychologist Gina Sacchetti on the theory that Mr. Council's prolonged placement in solitary confinement and a lack of access to adequate psychiatric or psychological care violates the Eighth Amendment Dkt. 23. Mr. Council's claims against the Justice Department and the Federal Bureau of Prisons for "Eighth Amendment violations which [he] allege[s] are currently identified as Slavery and Torture," dkt. 21, pp. 4-5, were dismissed because prisoners may not bring constitutional claims against a federal department or agency. *Id.* at 3 (citing *F.D.I.C. v. Meyer*, 540 U.S. 471, 485 (1993)).

Mr. Council has filed a motion to reconsider, in which he seeks to bring excessive force and slavery claims against Warden Watson. A motion to reconsider must be premised on newly discovered evidence or a manifest error of law or fact. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013).

1

pg 118

Neither the second amended complaint nor the motion to reconsider alleges facts sufficient to raise a reasonable inference that Warden Watson has caused Mr. Council to suffer excessive force in violation of the Eighth Amendment or slavery in violation of the Thirteenth Amendment. These documents state that Mr. Council is in prison as a result of his federal criminal convictions. He is proceeding in this lawsuit on allegations that certain conditions of his incarceration, specifically prolonged solitary confinement and an alleged lack of access to psychiatric or psychological care, violate the Eighth Amendment. Dkt. 23. Mr. Council may not proceed in this lawsuit on the theory that his incarceration itself is a form of slavery or torture. If he believes that his incarceration itself violates the Federal Constitution, his recourse is to file a petition for a writ of habeas corpus. *See* dkt. 10, pp. 3-4 (citing *Nelson v. Campbell*, 541 U.S. 637, 646 (2004); *Abella v. Rubino*, 63 F.3d 1063, 1066 (11th Cir. 1995) (Claims seeking release from custody are not cognizable in a civil rights lawsuit).

Mr. Council's motion to reconsider, dkt. [27], is **DENIED**.

**SO ORDERED.**

Date: 7/7/2022

James Patrick Hanlon
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

BRANDON MICHAEL COUNCIL
63961056
TERRE HAUTE - USP
TERRE HAUTE U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808

pg 119

1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
                    FLORENCE DIVISION


UNITED STATES OF AMERICA,        }  4:17-CR-00866-RBH
                                 }
        VERSUS                   }  AUGUST 14, 2019
                                 }
BRANDON MICHAEL COUNCIL          }  FLORENCE, SC
- - - - - - - - - - - - - - - - -}


            BEFORE THE HONORABLE R. BRYAN HARWELL
                UNITED STATES DISTRICT JUDGE


                  TRANSCRIPT OF PROCEEDINGS
                     MOTIONS HEARING
```

(STENOTYPE/COMPUTER-AIDED TRANSCRIPTION)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BETH A. KRUPA, RPR, CRR
UNITED STATES COURT REPORTER
401 WEST EVANS STREET
FLORENCE, SC  29501


*Beth A. Krupa, RPR, CRR*

pg 120

2

```
A P P E A R A N C E S:

FOR THE GOVERNMENT:   DEREK ALAN SHOEMAKE, AUSA
                      NATHAN WILLIAMS, AUSA
                      EVERETT EUGENE MCMILLIAN, AUSA
                      U.S. ATTORNEY'S OFFICE
                      PO BOX 1567
                      FLORENCE, SC 29503


FOR THE DEFENDANT:    DUANE K. BRYANT, ESQUIRE
                      LAW OFFICES OF DUANE K. BRYANT
                      1207 BRENTWOOD STREET
                      HIGH POINT, NC 27260

                      WILLIAM F. NETTLES, IV, AFPD
                      MICHAEL A. MEETZE, AFPD
                      FEDERAL PUBLIC DEFENDER'S OFFICE
                      401 WEST EVANS STREET, SUITE 105
                      FLORENCE, SC 29503

                      AKIN ADEPOJU, ESQUIRE
                      OFFICE OF THE PUBLIC DEFFENDER
                      800 KING STREET
                      WILMINGTON, DE 19801
```

(STENOTYPE/COMPUTER-AIDED TRANSCRIPTION)

------------------------------------------------------------

BETH A. KRUPA, RPR, CRR
UNITED STATES COURT REPORTER
401 WEST EVANS STREET
FLORENCE, SC  29501

*Beth A. Krupa, RPR, CRR*

pg 121

82

ATTORNEY ADEPOJU:  Thank you.

(Brief pause.)

THE COURT:  Yes, let me ask you, I think Mr. Shoemake indicated that he didn't think future conditions of confinement or comparative proportionality was going to be an issue.  Do we need to address that?

ATTORNEY ADEPOJU:  No, Your Honor, I think it's entirely right what we indicated to the Court is what we intend to do.  If that changes, we'll let the Court and the government know right away.

THE COURT:  Okay.  All right.  Let's take up the next category.

ATTORNEY SHOEMAKE:  Yes, Your Honor, so the next category actually covers the rest of this motion and two other motions because they're virtually the same argument. This covers Section 1-A from the omnibus penalty motion and it covers the motions regarding Dr. McCarter and Mrs. Grey.

THE COURT:  Okay.  Let's start with -- I guess let's start with Dr. Susan McCarter.

ATTORNEY SHOEMAKE:  Yes, Your Honor, so we have filed a motion in limine to generally, initially to generally exclude what we thought was coming in as mental health evidence and now that we've seen these two disclosures, we have a little more specificity.

Your Honor, as a general rule, the defendant

*Beth A. Krupa, RPR, CRR*                    pg 122

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

10 S.Ct. 384
Supreme Court of the United States.

*In re* MEDLEY.

March 3, 1890.

**Synopsis**
Petition for *habeas corpus*.

BREWER and BRADLEY, JJ., dissenting.

**Attorneys and Law Firms**

**384 *161 *A. T. Britton, Henry Wise Garnett,* and *W. V. R. Berry,* for petitioner.

*H. M. Teller,* for respondents.

**Opinion**

MILLER, J.

This is an application to this court by James J. Medley for a writ of *habeas corpus*, the object of which is to relieve him from the imprisonment in which he is held by J. A. Lamping, warden of the state penitentiary of the state of Colorado. The petitioner is held a prisoner under sentence of death pronounced by the district court of the second district of the state of Colorado for the county of Arapahoe. The petition of the prisoner sets forth that an indictment for the murder of Ellen Medley, was found against him by the grand jury of Arapahoe county on the 5th day of June, 1889; that the indictment charges petitioner with this murder, which took place on the 13th day of May of that year; that he was tried in said district court on the 24th day of September thereafter, and found guilty by the jury of murder in the first degree; that on the 29th day of November he was sentenced to be remanded to the custody of the sheriff of Arapahoe county, and within 24 hours to be taken by said sheriff and delivered to the warden of the state penitentiary, *162 to be kept in solitary confinement until the fourth week of the month of December thereafter, and that then, upon a day and hour to be designated by the warden, he should be taken from said place of confinement to the place of execution, within the confines of the penitentiary, and there hanged be by the neck until he was dead. Copies of the indictment, of the verdict of the jury, and of the sentence of the court are annexed to the petition as exhibits. The petitioner then sets forth that he was sentenced

under the statute of Colorado approved April 19, 1889, and which went into effect July 19, 1889, and repealed all acts and parts of former acts inconsistent therewith, without any saving clause, and that the crime on account of which the sentence was passed was charged to be and was actually committed on the 13th day of May of the same year. The petitioner enumerates some 20 variances between the statute in force at the time the crime was committed and that under which he was sentenced to punishment in the present case, all of which are claimed to be changes to his prejudice and injury, and therefore *ex post facto,* within the meaning of section 10, art. 1, of the copstitution of the United States, which declares that no state shall pass any bill of attainder or *ex post facto* law. The petitioner applies directly to this court for the writ of *habeas corpus,* instead of to the circuit court of the United States; because he alleges that court has in a similar case, involving the same points, decided adversely to the petitioner. Upon examining the petition and the accompanying exbibits, an order was made that the writ should issue and be returnable forthwith. By an arrangement between the parties and the counsel, it was agreed that the prisoner need not, in person, be brought to Washington. The case was therefore heard on the documents and transcripts of record presented to the court, and the only question argued before us was whether the act of April 19, 1889, which by the constitution of the state of Colorado became operative on the 19th day of July thereafter and under which the sentence complained of was imposed *163 by the district court, is an *ex post facto* law, so as to be void under the provision of the constitution of the United States on that subject, and, if so, in what respect it is in violation of that constitutional provision.

This statute will be found in the Session Laws of the state of Colorado of 1889, p. 118, and is as follows: 'An act relative to the time, place, and manner of infliction of the death penalty, and to provide means for the infliction of such penalty; and making it a misdemeanor, punishable by fine or imprisonment, to disclose or publish proceedings in relation thereto. Be it enacted **385 by the general assembly of the state of Colorado: Section 1. The commissioners of the state penitentiary, at the expense of the state of Colorado, shall provide a suitable room or place inclosed from public view within the walls of the penitentiary, and therein erect and construct, and at all times have in preparation, all necessary scaffolding, drops, and appliances requisite for carrying into execution the death penalty; and the punishment of death must, in each and every case of death sentence pronounced in this state, be inflicted by the warden of the said state penitentiary in the room or place and with the appliances provided as aforesaid, by hanging such convict by the neck

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

pg 123

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

until he shall be dead. Sec. 2. Whenever a person convicted of a crime, the punishment whereof is death, and such convicted person be sentenced to suffer the penalty of death, the judge passing such sentence shall appoint and designate in the warrant of conviction a week of time within which such sentence must be executed. Such week, so appointed, shall be not less than two nor more than four weeks from the day of passing such sentence. Said warrant shall be directed to the warden of the state penitentiary of this state, commanding said warden to do execution of the sentence imposed as aforesaid, upon some day within the week of time designated in said warrant, and shall be delivered to the sheriff of the county wherein such conviction is had, who shall within twenty-four hours thereafter *164 after proceed to the said penitentiary and deliver such convicted person, together with the warrant as aforesaid, to the said warden, who shall keep such convict in solitary confinement until infliction of the death penalty; and no person shall be allowed access to said convict, except his attendants, counsel, physician, a spiritual adviser of his own selection, and members of his family, and then only in accordance with prison regulations. Sec. 3. The particular day and hour of the execution of said sentence, within the week specified in said warrant, shall be fixed by said warden, and he shall invite to be present thereat the sheriff of the county wherein the conviction was had, the chaplain and physician of the penitentiary, one practicing surgeon resident in the state, the spiritual adviser of the convict, if any, and six reputable citizens of the state of full age. Said warden may also appoint three deputies or guards to assist him in executing said sentence, and said warden shall permit no person or persons to be present at such execution except those provided for in this section. The time fixed by said warden for said execution shall be by him kept secret, and in no manner divulged, except privately, to the persons by him invited to be present as aforesaid; and such persons so invited shall not divulge such invitation to any person or persons whomsoever, nor in any manner disclose the time of such execution. All persons present at such execution shall keep whatever may transpire thereat secret and inviolate, save and except the facts certified to by them as hereinafter provided. No account of the details of any such execution, beyond the statement of the fact that such convict was on the day in question duly executed according to law at the state penitentiary, shall in any manner be published in this state. Sec. 4. Upon receiving notice from said warden of such execution, it shall be the duty of said sheriff to be present and witness such execution; and shall receive and cause the certified transcript of record of said execution, hereinafter specified, to be filed within ten days after said execution in the office of the clerk of the court in which said conviction was had; *165 and the said clerk shall record said transcript at length in the records of the said case. In case of the disability, from illness or other sufficient cause, of said warden or said sheriff to be present at such execution, it shall be the duty of their respective deputies, acting in their place and stead, to execute said warrant, and to perform all other duties in connection therewith and by this act imposed upon their principals. Sec. 5. Said warden shall keep a book of record, to be known as 'Record of Executions,' in which shall be entered at length the reports hereinafter specified. Immediately after said execution a *post moitem* examination of the body of the convict shall be made by the attending physician and surgeon, and they shall enter in said book of record the nature and extent of such examination, and sign and certify to the same. Said warden shall also immediately make and enter in said book a report setting forth the time of such execution, and that the convict (naming him) was then and there executed in conformity to the sentence specified in the warrant of the court (naming such court) to him directed, and in accordance with the provisions of this act; and shall insert in said report the names of all the persons who were present and witnessed said execution, and shall procure each and every of such persons to sign said report with their full name and place of residence before leaving the place of execution; and said warden shall thereupon attach his certificate to said report, certifying to the truth and correctness thereof, and shall immediately deliver a certified transcript of said record entry to said sheriff. Sec. 6. Any person who shall violate or omit to comply with section 3 of this act shall be guilty of a misdemeanor, and upon conviction thereof be punished by a fine of not less than $50, nor more than $500, or by imprisonment in the county jail for not less than thirty days, nor more than six months. Sec. 7. The warden, or other person acting in his stead, who performs the duties imposed upon him by this act, shall be paid for his services out of the moneys provided for the maintenance of said state penitentiary the sum of fifty (50) *166 dollars; and the said sheriff shall be paid for his services by the county where such conviction was had the sum of twenty-five (25) dollars, together with his mileage fees as provided by law. Sec. 8. All acts and parts of acts inconsistent with the provisions of this act are hereby repealed. Approved April 19, 1889.'

Section 19 of article 5 of the constitution of the state of Colorado, as amended November 4, 1884, is as follows: 'No act of the general assembly shall take effect until **386 ninety days after its passage, unless in case of emergency (which shall be expressed in the preamble or body of the act) the general assembly shall, by vote of two-thirds of all the members elected to each house, otherwise direct. No

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works

pg 124

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

bill except the general appropriation for the expenses of the government only, introduced in either house of the general assembly after the first thirty days of the session, shall become a law.'

We think it follows from this provision that neither the repealing clause nor any other part of this act was in force prior to the 19th of July, 1889, and that the crime, having been committed in May of that year, was to be governed in all particulars of trial and punishment, by the law then in force, except so far as the legislature had power to apply other principles to the trial and punishment of the crime. If these were conducted and administered under the law of 1889, which became a law after the commission of the offense, and its provisions, so far as applied by the court to the case of the prisoner, were such invasions of his rights as to properly be called *ex post facto* laws, they were void. It is unnecessary to examine all the points in which, according to the argument for plaintiff, the new statute was *expost facto*. Therefore we shall notice only a few of those which appear to us most deserving of attention, and in doing this we shall compare the new statute with the one which it superseded and repealed.

*167 The first of these, and perhaps the most important, is that which declares that the warden shall keep such convict in solitary confinement until the infliction of the death penalty. The former law, the act of 1883, contained no such provision. It declared that every person convicted of murder in the first degree should suffer death, and every person convicted of murder of the second degree should suffer imprisonment in the penitentiary for a term of not less than 10 years, which might extend to life; and it declared that the manner of inflicting the punishment of death should be by hanging the person convicted by the neck until death, at such time as the court should direct, not less than 15 nor more than 25 days from the time sentence was pronounced, unless for good cause the court or governor might prolong the time. The prisoner was to be kept in the county jail under the control of the sheriff of the county, who was the officer charged with the execution of the sentence of the court. Solitary confinement was neither authorized by the former statute, nor was its practice in use in regard to prisoners awaiting the punishment of death.

This matter of solitary confinement is not, as seems to be supposed by counsel, and as is suggested in an able opinion on this statute, furnished us by the brief of the counsel for the state, by Judge HAYT, (in the Case of Tyson, 22 Pac. Rep. 810,) a mere unimportant regulation as to the safe-keeping of the prisoner, and is not relieved of its objectionable features by the qualifying language, that no person shall be allowed access to said convict except his attendants, counsel, physician, a spiritual adviser of his own selection, and members of his family, and then only in accordance with prison regulations. Solitary confinement, as a punishment for crime, has a very interesting history of its own, in almost all countries where imprisonment is one of the means of punishment. In a very exhaustive article on this subject in the American Encyclopedia, vol. 13, under the word 'Prison,' this history is given. In that article it is said that the first plan adopted, when public attention was called to the evils of congregating persons in masses without employment, was the solitary prison connected *168 with the Hospital San Michele at Rome, in 1703, but little known prior to the experiment in Walnut-Street Penitentiary, in Philadelphia, in 1787. The peculiarities of this system were the complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction. Other prisons on the same plan, which were less liberal in the size of their cells and the perfection of their appliances, were erected in Massachusetts, New Jersey, Maryland, and some of the other states. But experience demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community. It became evident that some changes must be made in the system, and the separate system was originated by the Philadelphia Society for Ameliorating the Miseries of Public Prisons, founded in 1787. The article then gives a great variety of instances in which the system is somewhat modified and it is within the memory of many persons interested in prison discipline that some 30 or 40 years ago the whole subject attracted the general public attention, and its main feature of solitary confinement was found to be too severe.

It is to this mode of imprisonment that the phrase 'solitary confinement' has been applied in nearly all instances where it is used, and it means this exclusion from human associations; where it is intended to mitigate it by any statutory enactment or by any regulations of persons having authority to do so, it is by express exceptions and modifications of the original principle of 'solitary confinement.' The statute of Colorado is undoubtedly framed on this idea. Instead of confinement in the ordinary county prison of the place where he and his friends reside; where they may, under the control of

pg 125

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

the sheriff, see him and visit him; where the sheriff and his attendants *169 must see him; where his religious adviser and his legal counsel may often visit him without any hindrance of law on the subject,—the convict is transferred to a place where imprisonment always implies disgrace, and which, as this court has judicially decided in Ex **387 parte Wilson, 114 U. S. 417, 5 Sup. Ct. Rep. 935; Mackin v. U. S., 117 U. S. 348, 6 Sup. Ct. Rep. 777; Parkinson v. U. S., 121 U. S. 281, 7 Sup. Ct. Rep. 896, and U. S. v. De Walt, 128 U. S. 393, 9 Sup. Ct. Rep. 111,—is itself an infamous punishment, and is there to be kept in 'solitary confinement,' the primary meaning of which phrase we have already explained. The qualifying phrase in this statute is but a small mitigation of this solitary confinement, for it expressly declares that no one shall be allowed access to the convict except certain persons, and these are not admissible unless their access to the prisoner is in accordance with prison regulations, prescribed by the board of commissioners of the penitentiary under section 2553 of the general statutes of Colorado in force since 1877. This section declares that 'the board of commissioners [of the penitentiary] shall make such rules and regulations for the government, discipline, and police of the penitentiary, and for the punishment of persons confined, not inconsistent with law, as they deem expedient.' What these may be at any particular time is unknown. How far they may permit access of counsel, physicians, the spiritual adviser, and the members of his family, is a matter in their discretion, which they exercise by general rules, which may be altered at any time so as to exclude all these persons, and thus the prisoner be left to the worst form of solitary confinement.

Even the statutory amelioration is a very limited one. By the words 'his attendants' in the statute, is evidently meant the officers of the prison and subordinates, who must necessarily furnish him with his food and his clothing, and make inspection every day that he still exists. They may be forbidden by prison regulations, however, from holding any conversation with him. The attendance of the counsel can only be casual, and a very few interviews, one or two, perhaps, are all that he would have before his death, and that of the physician not at all, unless he was so sick as to require *170 it; and the spiritual adviser of his own selection, and the members of his family, are all dependent for their opportunities of seeing the prisoner upon the regulations of the prison. The solitary confinement, then, which is meant by the statute, remains of the essential character of that mode of prison life as it originally was prescribed and carried out, to mark them as examples of the just punishment of the worst crimes of the human race. The brief of counsel for the prisoner furnishes us with the statutory history of solitary confinement

in the English law. Act 25 Geo. II. c. 37, entitled 'An act for better preventing the horrid crime of murder,' is preceded by the following preamble: 'Whereas, the horrid crime of murder has of late been more frequently perpetrated than formerly; * * * and whereas, it is thereby become necessary that some further terror and peculiar mark of infamy be added to the punishment of death now by law inflicted on such as shall be guilty of the said heinous offense,'—then follow certain enactments, the sixth section of which reads as follows: 'Be it further enacted, * * * that from and after such conviction, and judgment given thereupon, the jailer of keeper to whom such criminal shall be delivered for safe custody shall confine such prisoner to some cell * * * separate and apart from the other prisoners, and that no person or persons whatsoever, except the jailer or keeper, or his servants, shall have access to any such prisoner, without license being first obtained.' This statute is very pertinent to the case before us, as showing —First, what was understood by solitary confinement at that day; and, second, that it was considered as an additional punishment of such a severe kind that it is spoken of in the preamble as 'a further terror and peculiar makr of infamy' to be added to the punishment of death. In Great Britain, as in other countries, public sentiment revolted against this severity, and by the statute of 6 & 7 Wm. IV. c. 30, the additional punishment of solitary confinement was repealed.

The term 'ex post facto' law, as found in the provision of the constitution of the United States, to-wit, that 'no state shall *171 pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts,' has been held to apply to criminal laws alone, and has been often the subject of construction in this court. Without making extracts from these decisions, it may be said that any law which was passed after the commission of the offense for which the party is being tried is an ex post facto law when it inflicts a greater punishment than the law annexed to the crime at the time it was committed, (Calder v. Bull, 3 Dall. 386, 390; Kring v. Missouri, 107 U. S. 221, 2 Sup. Ct. Rep. 443; Fletcher v. Peck, 6 Cranch, 87;) or which alters the situation of the accused to his disadvantage; and that no one can be criminally punished in this country except according to a law prescribed for his government by the sovereign authority before the imputed offense was committed, or by some law passed afterwards, by which the punishment is not increased. It seems to us that the considerations which we have here suggested show that the solitary confinement to which the prisoner was subjected by the statute of Colorado of 1889, and by the judgment of the court in pursuance of that statute, was an additional punishment of the most important and painful character, and is therefore forbidden by this provision of the

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

4

pg 126

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

constitution of the United States. Another provision of the statute, which is supposed to be liable to this objection of its *ex post facto* character, is found in section 3, in which the particular day and hour of the execution of the sentence within the week specified by the warrant shall be fixed by the warden, and he shall invite to be present certain persons named, to-wit, a chaplain, a physician, a surgeon, the spiritual adviser of the convict, and six reputable citizens of the state of full age, and that the time fixed by said warden for such execution shall be by him kept secret, and in no manner divulged except privately to said persons invited by him to be present as aforesaid, and such persons shall not divulge such invitation to any person or persons whomsoever, nor in any manner disclose the time of such execution; and section 6 **388 provides that any person who shall violate or omit to comply with the requirements of section *172 3 of the act shall be punished by fine or imprisonment. We understand the meaning of this section to be that within the one week mentioned in the judgment of the court the warden is charged with the power of fixing the precise day and hour when the prisoner shall be executed; that he is forbidden to communicate that time to the prisoner; that all persons whom he is directed to invite to be present at the execution are forbidden to communicate that time to him; and that, in fact, the prisoner is to be kept in utter ignorance of the day and hour when his mortal life shall be terminated by hanging, until the moment arrives when this act is to be done. Objections are made to this provision as being a departure from the law as it stood before, and as being an additional punishment to the prisoner, and therefore *ex post facto*. It is obvious that it confers upon the warden of the penitentiary a power which had heretofore been solely confided to the court and is therefore a departure from the law as it stood when the crime was committed. Nor can we withhold our conviction of the proposition that when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it, which may exist for the period of four weeks, as to the precise time when his execution shall take place. Notwithstanding the argument that under all former systems of administering capital punishment the officer appointed to execute it had a right to select the time of the day when it should be done, this new power of fixing any day and hour during a period of a week for the execution is a new and important power conferred on that officer, and is a departure from the law as it existed at the time the offense was committed, and with its secrecy must be accompanied by an immense mental anxiety amounting to a great increase

of the offender's punishment. There are other provisions of the statute pointed out in the argument of counsel which are alleged to be subject to the same objection, but we think the two we have mentioned are *173 quite sufficient to show that the constitution of the United States is violated by this statute, as applied to crimes committed before it came into force. These considerations render it our duty to order the release of the prisoner from the custody of the warden of the penitentiary of Colorado, as he is now held by him under the judgment and order of the court.

A question suggests itself, however, to the court which is not a little embarrassing, and which was not presented by counsel in the argument of the case. This consideration arises from the fact that there does not seem to be in the record before us any error in the proceedings of the court on the trial, and the verdict of the jury, by which the party was convicted of murder in the first degree. It is only when the sentence or judgment of the court upon that verdict is entered that the error of the proceedings commences. When, in the language of the judgment of the court, the prisoner was ordered to be 'kept by the warden of the penitentiary in solitary confinement until the day of his execution, and when the knowledge of the day and the hour of his execution was by the statute to be withheld from him, the constitution of the United States was violated, because the additional punishments were inflicted on him by reason of the direction of the statute, which we have just seen was an *ex post facto* law, and in those respects void, as being forbidden by the constitution of the United States. If this were a writ of error to the supreme court of Colorado, as Kring's Case was a writ of error to the supreme court of Missouri, our duty would be plain, namely, to reverse the judgment for the error found in it, and remand the case to the state court for further proceedings. If such were the case before us, our duty would be to reverse the judgment and remand the case to the court below, to deal with the prisoner in the face of the fact that a verdict of guilty, which was valid and legal, remains unenforced. But under the writ of *habeas corpus* we cannot do anything else than discharge the prisoner from the wrongful confinement in the penitentiary under the statute of Colorado invalid as to this case. *174 The language of the act of congress, however, seems to have contemplated some emergency of the kind now before us. Section 761 of the Revised Statutes declares that the court, or justice, or judge, (before whom the prisoner may be brought by writ of *habeas corpus*,) shall proceed in a summary way to determine the facts of the case, by hearing the testimony and argument, and thereupon to dispose of the party as law and justice require. What disposition shall we now make of the prisoner, who is entitled to his discharge from the custody of the warden of

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

pg 127

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

the penitentiary under the order and judgment of the court, because, within the language of section 753, he is in custody in violation of the constitution of the United States, but who is, nevertheless, guilty, as the record before us shows, of the crime of murder in the first degree? We do not think that we are authorized to remand the prisoner to the custody of the sheriff of the proper county to be proceeded against, in the court of Colorado which condemned him, in such a manner as they may think proper; because it is apparent that, while the statute under which he is now held in custody is an *ex post facto* law in regard to his offense, it repeals the former law, under which he might otherwise have been punished, and we are not advised whether that court possesses any power to deal further with the prisoner or not. Such a question is not before us, because it has not been acted upon by the court below, and it is neither our inclination nor our duty to decide what the court may or what it may not do in regard to the case as it stands. Upon the whole, after due deliberation, we have come to the conclusion that the attorney general of the state of Colorado shall be notified by the warden of the penitentiary of the precise time when he will release the prisoner from his **389 custody under the present sentence and warrant, at least 10 days beforehand, and after doing this, and at that time, he shall discharge the prisoner from his custody; and such will be the order of this court.

*175  BREWER, J., (*dissenting.*)

I dissent from the opinion and judgment as above declared. The substantial punishment imposed by each statute is death by hanging. The differences between the two, as to the manner in which this sentence of death shall be carried into execution, are trifling. What are they? By the old law, execution must be within 25 days from the day of sentence; by the new, within 28 days. By the old, confinement *176 prior to execution was in the county jail; by the new, in the penitentiary. By the old, the sheriff was the hangman; by the new, the warden. Under the old, no one had a right of access to the condemned except his counsel, though the sheriff might, in his discretion, permit any one to see him; by the new, his attendants, counsel, physician, spiritual adviser, and members of his family have a right of access, and no one else is permitted to see him. Under the old, his confinement might be absolutely solitary, at the discretion of the sheriff, with but a single interruption; under the new, access is given to him, as a matter of right, to all who ought to be permitted to see him. True, access is subject to prison regulations; so, in the jail, the single authorized access of counsel was subject to jail regulations. It is not to be assumed that either regulations would be unreasonable, or

operate to prevent access at any proper time. Surely, when all who ought to see the condemned have a right of access, subject to the regulations of the prison, it seems a misnomer to call this 'solitary confinement,' in the harsh sense in which this phrase is sometimes used. All that is meant is that a condemned murderer shall not be permitted to hold anything like a public reception, and that a gaping crowd shall be excluded from his presence. Again, by the old law, the sheriff fixes the hour within a prescribed day; by the new, the warden fixes the hour and day within a named week. And these are all the differences which the court can find between the two statutes, worthy of mention. Was there ever a case in which the maxim, '*de minimis non curat lex*,' had more just and wholesome application? Yet, on account of these differences, a convicted murderer is to escape the death he deserves, and be turned loose on society. I am authorized to say that Mr. Justice BRADLEY concurs in this dissent.

*174  On consideration of the application for the discharge of the petitioner, James J. Medley, the writ of *habeas corpus*, directing J. A. Lamping, warden of the state penitentiary of the state of Colorado at Canon City, Fremont county, state of Colorado, to produce the body of the said James J. Medley before this court, and to certify the cause of his detention and imprisonment, having been duly issued and served, and the said J. A. Lamping, warden as aforesaid, having certified that said James J. Medley is detained in his custody under and by virtue of a writ issued out of the district court of Arapahoe county, state of Colorado, and the cause of said imprisonment having been duly inquired into by this court upon the return of the said writ of *habeas corpus* heretofore issued herein, and counsel having been heretofore heard and due consideration having been had, it is now here ordered by this court that the imprisonment of said James J. Medley under said writ issued out of the district court of Arapahoe county, state of Colorado, is without authority of law, and in violation of the constituion of the United States, and that the said James J. Medley is entitled to have his liberty. Whereupon it is hereby ordered that the said James J. Medley be, and he is hereby, discharged from said imprisonment. It is further ordered that the said J. A. Lamping, warden as aforesaid, do notify the attorney general of the state of Colorado of the day and the hour of the day when he will discharge the said James J. Medley from imprisonment, and that such notice be given at least 10 days before the release of the prisoner.
Per Mr. Justice MILLER.

March 3, 1890.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

pg 128

In re Medley, 134 U.S. 160 (1890)
10 S.Ct. 384, 33 L.Ed. 835

**All Citations**

134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Furman v. Georgia, 408 U.S. 238 (1972)**

92 S.Ct. 2726, 33 L.Ed.2d 346

historical derivation of the Eighth Amendment and *316 the construction given it in the past by this Court, and then exploring the history and attributes of capital punishment in this country, we can answer the question presented with objectivity and a proper measure of self-restraint.

Candor is critical to such an inquiry. All relevant material must be marshaled and sorted and forthrightly examined. We must not only be precise as to the standards of judgment that we are utilizing, but exacting in examining the relevant material in light of those standards.

Candor compels me to confess that I am not oblivious to the fact that this is truly a matter of life and death. Not only does it involve the lives of these three petitioners, but those of the **2766 almost 600 other condemned men and women in this country currently awaiting execution. While this fact cannot affect our ultimate decision, it necessitates that the decision be free from any possibility of error.

I

The Eighth Amendment's ban against cruel and unusual punishments derives from English law. In 1583, John Whitgift, Archbishop of Canterbury, turned the High Commission into a permanent ecclesiastical court, and the Commission began to use torture to extract confessions from persons suspected of various offenses.[5] Sir Robert Beale protested that cruel and barbarous torture violated Magna Carta, but his protests were made in vain.[6]

*317 Cruel punishments were not confined to those accused of crimes, but were notoriously applied with even greater relish to those who were convicted. Blackstone described in ghastly detail the myriad of inhumane forms of punishment imposed on persons found guilty of any of a large number of offenses.[7] Death, of course, was the usual result.[8]

The treason trials of 1685-the 'Bloody Assizes'-which followed an abortive rebellion by the Duke of Monmouth, marked the culmination of the parade of horrors, and most historians believe that it was this event that finally spurred the adoption of the English Bill of Rights containing the progenitor of our prohibition against cruel and unusual punishments.[9] The conduct of Lord Chief Justice Jeffreys at those trials has been described as an 'insane lust for cruelty' which was 'stimulated by orders from the King' (James II).[10] The assizes received wide publicity from Puritan pamphleteers and doubtless had some influence on the

adoption of a cruel and unusual punishments clause. But, *318 the legislative history of the English Bill of Rights of 1689 indicates that the assizes may not have been as critical to the adoption of the clause as is widely thought. After William and Mary of Orange crossed the channel to invade England, James II fled. Parliament was summoned into session and a committee was appointed to draft general statements containing 'such things as are absolutely necessary to be considered for the better securing of our religion, laws and liberties.'[11] An initial draft of the Bill of Rights prohibited 'illegal' punishments, but a later draft referred to the infliction by James II of 'illegal and cruel' punishments, and declared 'cruel and unusual' punishments to be **2767 prohibited.[12] The use of the word 'unusual' in the final draft appears to be inadvertent.

This legislative history has led at least one legal historian to conclude 'that the cruel and unusual punishments clause of the Bill of Rights of 1689 was, first, an objection to the imposition of punishments that were unauthorized by statute and outside the jurisdiction of the sentencing court, and second, a reiteration of the English policy against disproportionate penalties,'[13] and not primarily a reaction to the torture of the High Commission, harsh sentences, or the assizes.

*319 Whether the English Bill of Rights prohibition against cruel and unusual punishments is properly read as a response to excessive or illegal punishments, as a reaction to barbaric and objectionable modes of punishment, or as both, there is no doubt whatever that in borrowing the language and in including it in the Eighth Amendment, our Founding Fathers intended to outlaw torture and other cruel punishments.[14]

The precise language used in the Eighth Amendment first appeared in America on June 12, 1776, in Virginia's 'Declaration of Rights,' s 9 of which read: 'That excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'[15] This language was drawn verbatim from the English Bill of Rights of 1689. Other States adopted similar clauses,[16] and there is evidence in the debates of the various state conventions that were *320 called upon to ratify the Constitution of great concern for the omission of any prohibition against torture or other cruel punishments.[17]

The Virginia Convention offers some clues as to what the Founding Fathers had in mind in prohibiting cruel and unusual punishments. At one point George Mason advocated

pg 28
pg 130

Glossip v. Gross, 135 S.Ct. 2726 (2015)
192 L.Ed.2d 761, 83 USLW 4656, 15 Cal. Daily Op. Serv. 6950...

the demands of a Constitution that first and foremost insists upon a rule of law?

### III

*Torture*   "*Cruel*"—*Excessive Delays*

The problems of reliability and unfairness almost inevitably lead to a third independent constitutional problem: excessively long periods of time that individuals typically spend on death row, alive but under sentence of death. That is to say, delay is in part a problem that the Constitution's own demands create. Given the special need for reliability and fairness in death penalty cases, the Eighth Amendment does, and must, apply to the death penalty "with special force." *Roper,* 543 U.S., at 568, 125 S.Ct. 1183. Those who face "that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution."

*Hall v. Florida,* 572 U.S. ——, ——, 134 S.Ct. 1986, 2001, 188 L.Ed.2d 1007 (2014). At the same time, the Constitution insists that "every safeguard" be "observed" when "a defendant's life is at stake." *Gregg,* 428 U.S., at 187, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.); *Furman,* 408 U.S., at 306, 92 S.Ct. 2726 (Stewart, J., concurring) (death "differs from all other forms of criminal punishment, not in degree but in kind");

*Woodson, supra,* at 305, 96 S.Ct. 2978 (plurality opinion) ("Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two").

These procedural necessities take time to implement. And, unless we abandon the procedural requirements that assure fairness and reliability, we are forced to confront the problem of increasingly lengthy delays in capital cases. Ultimately, though these legal causes may help to explain, they do not mitigate the harms caused by delay itself.

### A

Consider first the statistics. In 2014, 35 individuals were executed. Those executions occurred, on average, nearly 18 years after a court initially pronounced its sentence of death. DPIC, Execution List 2014, online at http://www.deathpenaltyinfo.org/execution–list–2014 (showing an average delay of 17 years, 7 months). In some death penalty States, the average delay is longer. In an oral argument last year, for example, the State admitted that the last 10 prisoners executed in Florida had spent an average of nearly 25 years on death row before execution. Tr. of Oral Arg. in *Hall v. Florida,* O.T. 2013, No. 12–10882, p. 46.

The length of the average delay has increased dramatically over the years. In 1960, the average delay between sentencing and execution was two years. See Aarons, Can Inordinate Delay Between a Death Sentence and Execution Constitute Cruel and Unusual Punishment? 29 Seton Hall L. Rev. 147, 181 (1998). Ten years ago (in 2004) the average delay was about 11 years. See Dept. of Justice, Bureau of Justice Statistics (BJS), T. Snell, Capital Punishment, 2013—Statistical Tables 14 (Table 10) (rev. Dec. 2014) (hereinafter BJS 2013 Stats). By last year the average had risen to about 18 years. DPIC, Execution List 2014, *supra.* Nearly half of the 3,000 inmates now on death row have been **\*2765** there for more than 15 years. And, at present execution rates, it would take more than 75 years to carry out those 3,000 death sentences; thus, the average person on death row would spend an additional 37.5 years there before being executed. BJS 2013 Stats, at 14, 18 (Tables 11 and 15).

I cannot find any reasons to believe the trend will soon be reversed.

### B

These lengthy delays create two special constitutional difficulties. See *Johnson v. Bredesen,* 558 U.S. 1067, 1069, 130 S.Ct. 541, 175 L.Ed.2d 552 (2009) (Stevens, J., statement respecting denial of certiorari). First, a lengthy delay in and of itself is especially cruel because it "subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement." *Ibid.;* *Gomez v. Fierro,* 519 U.S. 918, 117 S.Ct. 285, 136 L.Ed.2d 204 (1996) (Stevens, J., dissenting) (excessive delays from sentencing to execution can themselves "constitute cruel and unusual punishment prohibited by the Eighth Amendment"); see also *Lackey v. Texas,* 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (memorandum of Stevens, J., respecting denial of certiorari); *Knight v. Florida,* 528 U.S. 990, 993, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (BREYER, J., dissenting from denial of certiorari). Second, lengthy delay undermines the death

Glossip v. Gross, 135 S.Ct. 2726 (2015)

192 L.Ed.2d 761, 83 USLW 4656, 15 Cal. Daily Op. Serv. 6950...

death penalty is cruel because it is unreliable; but it is *convictions*, not *punishments*, that are unreliable. Moreover, the "pressure on police, prosecutors, and jurors to secure a conviction," which he claims increases the risk of wrongful convictions in capital cases, flows from the nature of the crime, not the punishment that follows its commission. *Post*, at 2757 – 2758. Justice BREYER acknowledges as much: "[T]he crimes at issue in capital cases are typically horrendous murders, and thus accompanied by intense community pressure." *Ibid*. That same pressure would exist, and the same risk of wrongful convictions, if horrendous death-penalty cases were converted into equally horrendous life-without-parole cases. The reality is that any innocent defendant is infinitely better off appealing a death sentence than a sentence of life imprisonment. (Which, again, Justice BREYER acknowledges: "[C]ourts (or State Governors) are 130 times more likely to exonerate a defendant where a death sentence is at issue," *post*, at 2757.) The capital convict will obtain endless legal assistance from the abolition lobby (and legal favoritism from abolitionist judges), while the lifer languishes unnoticed behind bars.

Justice BREYER next says that the death penalty is cruel because it is arbitrary. To prove this point, he points to a study of 205 cases that "measured the 'egregiousness' of the murderer's conduct" **\*2748** with "a system of metrics," and then "compared the egregiousness of the conduct of the 9 defendants sentenced to death with the egregiousness of the conduct of defendants in the remaining 196 cases [who were not sentenced to death]," *post*, at 2760. If only Aristotle, Aquinas, and Hume knew that moral philosophy could be so neatly distilled into a pocket-sized, *vade mecum* "system of metrics." Of course it cannot: Egregiousness is a moral judgment susceptible of few hard-and-fast rules. More importantly, egregiousness of the crime is only one of several factors that render a punishment condign—culpability, rehabilitative potential, and the need for deterrence also are relevant. That is why this Court has required an individualized consideration of all mitigating circumstances, rather than formulaic application of some egregiousness test.

It is because these questions are contextual and admit of no easy answers that we rely on juries to make judgments about the people and crimes before them. The fact that these judgments may vary across cases is an inevitable consequence of the jury trial, that cornerstone of Anglo–American judicial procedure. But when a punishment is authorized by law —if you kill you are subject to death—the fact that some

defendants receive mercy from their jury no more renders the underlying punishment "cruel" than does the fact that some guilty individuals are never apprehended, are never tried, are acquitted, or are pardoned.

Justice BREYER's third reason that the death penalty is cruel is that it entails delay, thereby (1) subjecting inmates to long periods on death row and (2) undermining the penological justifications of the death penalty. The first point is nonsense. Life without parole is an even lengthier period than the wait on death row; and if the objection is that death row is a more confining environment, the solution should be modifying the environment rather than abolishing the death penalty. As for the argument that delay undermines the penological rationales for the death penalty: In insisting that "the major alternative to capital punishment—namely, life in prison without possibility of parole—also incapacitates," *post*, at 2767, Justice BREYER apparently forgets that one of the plaintiffs *in this very case* was already in prison when he committed the murder that landed him on death row. Justice BREYER further asserts that "whatever interest in retribution might be served by the death penalty as currently administered, that interest can be served almost as well by a sentence of life in prison without parole," *post*, at 2769. My goodness. If he thinks the death penalty not much more harsh (and hence not much more retributive), why is he so keen to get rid of it? With all due respect, whether the death penalty and life imprisonment constitute more-or-less equivalent retribution is a question far above the judiciary's pay grade. Perhaps Justice BREYER is more forgiving—or more enlightened—than those who, like Kant, believe that death is the only just punishment for taking a life. I would not presume to tell parents whose life has been forever altered by the brutal murder of a child that life imprisonment is punishment enough.

And finally, Justice BREYER speculates that it does not "seem likely" that the death penalty has a "significant" deterrent effect. *Post*, at 2768. It seems very likely to me, and there are statistical studies that say so. See, *e.g.*, Zimmerman, State Executions, Deterrence, and the Incidence of Murder, 7 J. Applied Econ. 163, 166 (2004) ("[I]t is estimated that each state execution deters approximately fourteen murders per year on average"); Dezhbakhsh, Rubin, & Shepherd, **\*2749** Does Capital Punishment Have a Deterrent Effect? New Evidence from Postmoratorium Panel Data, 5 Am. L. & Econ. Rev. 344 (2003) ("[E]ach execution results, on average, in eighteen fewer murders" per year); Sunstein & Vermeule, Is Capital Punishment Morally Required? Acts,

Glossip v. Gross, 135 S.Ct. 2726 (2015)
192 L.Ed.2d 761, 83 USLW 4656, 15 Cal. Daily Op. Serv. 6950...

penalty's penological rationale. *Johnson, supra,* at 1069, 130 S.Ct. 541; *Thompson v. McNeil,* 556 U.S. 1114, 1115, 129 S.Ct. 1299, —— L.Ed.2d —— (2009) (statement of Stevens, J., respecting denial of certiorari).

1

Turning to the first constitutional difficulty, nearly all death penalty States keep death row inmates in isolation for 22 or more hours per day. American Civil Liberties Union (ACLU), A Death Before Dying: Solitary Confinement on Death Row 5 (July 2013) (ACLU Report). This occurs even though the ABA has suggested that death row inmates be housed in conditions similar to the general population, and the United Nations Special Rapporteur on Torture has called for a global ban on solitary confinement longer than 15 days. See *id.,* at 2, 4; ABA Standards for Criminal Justice: Treatment of Prisoners 6 (3d ed. 2011). And it is well documented that such prolonged solitary confinement produces numerous deleterious harms. See, *e.g.,* Haney, Mental Health Issues in Long–Term Solitary and "Supermax" Confinement, 49 Crime & Delinquency 124, 130 (2003) (cataloguing studies finding that solitary confinement can cause prisoners to experience "anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations," among many other symptoms); Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash U. J. L. & Policy 325, 331 (2006) ("[E]ven a few days of solitary confinement will predictably shift the [brain's] electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium"); accord, *In re Medley,* 134 U.S. 160, 167–168, 10 S.Ct. 384, 33 L.Ed. 835 (1890); see also *Davis v. Ayala,* —— U.S. ——, 135 S.Ct. 2187, —— L.Ed.2d —— (2015) (KENNEDY, J., concurring).

The dehumanizing effect of solitary confinement is aggravated by uncertainty as to whether a death sentence will in fact be carried out. In 1890, this Court recognized that, "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *Medley, supra,* at 172, 10 S.Ct. 384. The Court was there *describing a delay of a* *2766 *mere four weeks.* In the past century and a quarter, little has changed in this respect—except for duration. Today we must describe delays measured, not in weeks, but in decades. *Supra,* at 2764 – 2765.

Moreover, we must consider death warrants that have been issued and revoked, not once, but repeatedly. See, *e.g.,* Pet. for Cert. in *Suárez Medina v. Texas,* O.T. 2001, No. 02–5752, pp. 35–36 (filed Aug. 13, 2002) ("On fourteen separate occasions since Mr. Suárez Medina's death sentence was imposed, he has been informed of the time, date, and manner of his death. At least eleven times, he has been asked to describe the disposal of his bodily remains"); Lithwick, Cruel but not Unusual, Slate, Apr. 1, 2011, online at http://www.slate.com/articles/news_and_politics/jurisprudence/2011/04/cruel_ but_not_unusual.html (John Thompson had seven death warrants signed before he was exonerated); see also, *e.g.,* WFMZ–TV 69 News, Michael John Parrish's Execution Warrant Signed by Governor Corbett (Aug. 18, 2014), online at http:// www.wfmz.com/news/Regional-Poconos-Coal/Local/michael-john-parrishs-execution-warrant-signed-by-governor-corbett/27595356 (former Pennsylvania Governor signed 36 death warrants in his first 3.5 years in office even though Pennsylvania has not carried out an execution since 1999).

Several inmates have come within hours or days of execution before later being exonerated. Willie Manning was *four hours* from his scheduled execution before the Mississippi Supreme Court stayed the execution. See Robertson, With Hours to Go, Execution is Postponed, N.Y. Times, Apr. 8, 2015, p. A17. Two years later, Manning was exonerated after the evidence against him, including flawed testimony from an FBI hair examiner, was severely undermined. Nave, Why Does the State Still Want to Kill Willie Jerome Manning? Jackson Free Press, Apr. 29, 2015. Nor is Manning an outlier case. See, *e.g.,* Martin, Randall Adams, 61, Dies; Freed With Help of Film, N.Y. Times, June 26, 2011, p. 24 (Randall Adams: stayed by this Court three days before execution; later exonerated); N. Davies, White Lies 231, 292, 298, 399 (1991) (Clarence Lee Brandley: execution stayed twice, once 6 days and once 10 days before; later exonerated); M. Edds, An Expendable Man 93 (2003)M. Edds, An Expendable Man 93 (2003) (Earl Washington, Jr.: stayed 9 days before execution; later exonerated).

Furthermore, given the negative effects of confinement and uncertainty, it is not surprising that many inmates volunteer to be executed, abandoning further appeals. See, *e.g.,* ACLU Report 8; Rountree, Volunteers for Execution: Directions for Further Research into Grief, Culpability, and Legal Structures, 82 UMKC L. Rev. 295 (2014) (11% of those

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

UNITED STATES OF AMERICA          )

              VS                  )    CASE NO:   5:01-cr-12

DONALD FELL                       )

_____   )    MOTIONS HEARING


BEFORE:     HONORABLE GEOFFREY W. CRAWFORD
            DISTRICT JUDGE


APPEARANCES:   SONIA V. JIMENEZ, ESQUIRE
               RICHARD E. BURNS, ESQUIRE
                    U.S. Department of Justice
                    Capital Case Section
                    1331 F Street, N.W., 6th Floor
                    Washington, DC   20530
                    Representing The Government


               WILLIAM B. DARROW, ESQUIRE
                    Assistant U.S. Attorney
                    P.O. Box 570
                    Burlington, Vermont   05402
                    Representing The Government


               (Appearances Continued:)


DATE:          July 11, 2016

          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    Official Court Reporter
                    P.O. Box 1932
                    Brattleboro, Vermont   05302

pg 134

S.D. -42

APPEARANCES CONTINUED:


MICHAEL N. BURT, ESQUIRE
    Law Offices of Michael N. Burt
    1000 Brannan Street, Suite 400
    San Francisco, California    94103
    Representing the Defendant


KERRY B. DeWOLFE, ESQUIRE
    38 Calberg Drive
    Corinth, Vermont    05039
    Representing the Defendant


LAURA ROGERS, ESQUIRE
    Law Offices of Laura Rogers
    115 1/2 Bartlett Street
    San Francisco, California    94110
    Representing the Defendant

pg 135

S.D.-42

13

Q.   Sir, could you state your name, for the record, and tell the Court who you are?

A.   Yes.  My name is Craig Haney.  I'm a Professor of Psychology at the University of California at Santa Cruz.

Q.   And, doctor, in accordance with the Court's instruction about keeping the qualifications fairly brief here, give the Court just a little thumbnail sketch on what you do for a living and what your expertise is in the area of the death penalty?

A.   My general area of expertise in psychology is what's generally called psychology and law.  I became interested as a graduate student in this application of psychological principles and theories and data to various legal questions.

So got a Ph.D. in psychology at Stanford.  Went to law school at Stanford.  And have been doing research on primarily two very general topics.  One, the topic on which I began work in psychology and law while still a fairly young graduate student is the psychology of imprisonment.

And somewhere along the line, after getting into graduate school and starting to connect to the issues in the law school, I became interested in another very general topic, capital punishment, the system of death sentencing in the United States.

So over really a 40 year period I've done research almost equally much in both general areas.  The research has

pg 136

S.D. - 42

12

later than 3 o'clock today and then we would start right away with Dr. Reidy.

THE COURT: Sure. Okay. I think we're ready to begin.

MR. BURT: Thank you. We would call Dr. Craig Haney.

C R A I G   H A N E Y,   The Witness, after being duly sworn, was examined and testified as follows:

THE COURT: Good morning. Thank you for making the trip.

THE WITNESS: Good morning, Your Honor.

THE COURT: It wasn't a great weekend for travel. Did you come in okay?

THE WITNESS: I came in fine. Thank you.

THE COURT: Good. Good. Glad to have you here.

MR. BURT: And Your Honor should have before you certain volumes. There are exhibit volumes for each individual witness. And those have been pre-marked. The exhibit volumes relating to Dr. Haney are in three volumes. The first volume is marked A1 through 18. The second is marked A19 through 28. And the third is marked A29 through 31.

THE COURT: Thank you. I have all three.

MR. BURT: Thank you.

DIRECT EXAMINATION BY MR. BURT:

pg 137

S.D-42

14

taken different forms. I worked on different topics. But largely under the rubric of either the psychology of imprisonment or some aspect of the system of death sentencing in the United States; either the manner in which the system of death sentencing unfolds or proceeds in the United States and it's also involved becoming very interested in doing research on the backgrounds and social and institutional histories of people who are charged with or convicted of capital crimes.

Q. And can you tell the Court, just generally, the two topics you're going to discuss today in your testimony?

A. Yes. You asked me to prepare testimony for the Court on the issue of solitary confinement, the effects of solitary confinement. And, in particular, the conditions of confinement that exist in the special confinement unit, the federal death row facility at the United States Penitentiary at Terra Haute.

And then you also asked me to prepare testimony on a separate issue. The state of knowledge on the issue of death qualification. The procedure that is used in capital cases to identify persons who are eligible to serve on a jury, in part, on the basis of their attitudes towards the death penalty.

Q. Now, are those the only two topics that your research and writing has focused on in relation to the death penalty?

pg 138

S.D. - 42

Case 2:23-cv-00491-JPH-MKK   Document 1-1   Filed 10/16/23   Page 118 of 220 PageID #: 138

15

A.    No.    No.   I've done research on a variety of different aspects having to do with capital punishment.  I wrote a book about the entire system of death sentencing in the United States.

Q.    And besides writing a book about the death system in the United States, have you also published a number of articles that are listed in your C.V. about various aspects of capital punishment, as well as various aspects about the effects, psychological effects of long-term incarceration?

A.    Yes, I have.

Q.    Okay.  You are a social psychologist; correct?

A.    I am.

Q.    You are not a clinical psychologist; right?

A.    Correct.

Q.    And how is that field different than say what a clinical psychologist does?

A.    Clinical psychologists are trained in the diagnosis and treatment of various forms of mental disorders, mental illness, mental health problems and so on.

        Social psychologists are trained in how people, in general, react to various conditions, experiences, circumstances.  So social psychologists don't focus exclusively on people who have different forms of mental disorder or emotional distress.

Q.    In terms of your experience in assessing the

pg 139

S.D. - 42

16

psychological effects of incarceration, give the Court a sense of your experience in that particular field. Who have you worked for doing that kind of work and how long has that work been going on in your experience?

A.     I, it's a topic that I became interested in as a young graduate student. Phillip Zimbardo and Curtis Banks and I did an experiment when I was a second year graduate student at Stanford that became a very famous experiment. It's called the Stanford Prison Experiment in which we put college student volunteers in a prison-like environment, randomly assigning half of them to be prisoners and the other half to be guards.

We expected that there would be some differences between both groups. That's why we did the study. But the results were very dramatic. The young students were changed and transformed by the experiment almost immediately.

As a graduate student I was there for most of it. And I watched these transformations take place. And it underscored for me the power of institutional environments, particularly prison environments. And I began, even as a graduate student, to study how people were changed and affected in real prisons, not simulated prisons.

Correctional officers, to a certain extent, but I focused my attention primarily on prisoners, mostly in maximum security prisons. And then over the years, the

pg 140

S.D.-42

17

focus of today's testimony, I began to concentrate on the issue of solitary confinement, an increasingly widespread practice in the United States in the late 1970's and throughout the '80's, and really up to the present time.

And I devised a technique for interviewing and understanding the ways in which prisoners were affected by their conditions of confinement.

As His Honor said earlier, very -- everybody learns from other people who have gone before them. So there were already well identified standard ways of assessing people's emotional distress. And I simply applied those techniques in institutional settings.

I've probably been in and accessed the effects of conditions of confinement in dozens of state prison systems and the federal prison system as well. Scores of prisons around the country. Many, many solitary confinement units. Over a four year or so year period I've probably interviewed thousands of prisoners, including over a thousand who were confined in solitary confinement type units.

Q. Have you done any work for governmental agencies related to assessing the effects of prison conditions?

A. Yes. Quite a bit. I've been a consultant to various Legislative bodies in California and elsewhere. I was a member of the National Academy of Sciences Committee to which I was appointed in 2012. It was a committee that was

pg 141

S.D. - 42

18

charged with the responsibility of assessing the causes and the consequences of high rates of incarceration in the United States.

And my job, on the committee, was to bring to bear the most up-to-date scientific knowledge about the effects of imprisonment, what prison conditions did to or how they changed the people who were exposed to them.

We published the results of that, the committee's deliberations, which went on for two years in a book that was published in 2014 on which I and the rest of the committee members were a co-author.

I testified in front of the United States Senate in 2012. Senator Durbin had a hearing, really a historic hearing. There had never been a Senate hearing on the issue of solitary confinement. There were four or five witnesses, expert witnesses who were called to testify. And my job at the hearing was to talk about the psychological effects of solitary confinement.

In conjunction with the National Academy of Sciences Report I've been a consultant to the White House on several occasions to various Congressional Committees. Basically briefing those bodies on the, the analysis and the conclusions which the National Academy of Sciences Committee reached. Consulted with Bureau of Justice Statistics, National Institute of Justice, the Justice Department,

pg 142

S.D.-42

19

Homeland Security, all around issues of various aspects of the psychology of prison confinement.

Q.   And have you also, on the second topic you're going to talk about here, the effects of death qualification, are you also published fairly extensively in that area?

A.   Yes.  It's a topic which I became interested in the 1970's.  And I, at the time many of these, the issues I'm going to talk about were being litigated widely in the United States.  And I did, not only some, a number of studies myself, but also testified about these issues in various state and federal courts.

Q.   You have a copy of the three binders of exhibits that I referred to earlier?

A.   I do.  They are right here.

Q.   Okay.  And if you could take a look at the first volume, which is volume one of three, A1 through 18?

A.   Yes.

Q.   Does tab one contain a current C.V. listing your various qualifications and publications in the areas that you're going to testify about, as well as other areas?

A.   It does.

Q.   And does tab two contain your expert witness report in this case dated June 1st, 2016?

A.   Yes.

Q.   And do the remainder of the items in volume one and

pg 143

S.D.-42

20

also volume two and volume three contain copies of the literature that you either wrote or are going to discuss during the course of your testimony?

A.    Yes.

MR. BURT:  Judge, I would move into evidence, at this point, Exhibits A1 through 31.

MS. JIMENEZ:  Your Honor, the government does not object, given the Court's comments earlier.  I do just want to note for the record that we received this exhibit list Saturday night.  And that some of the studies listed on this exhibit list are not referenced in Dr. Haney's report.  And so we just learned about them Saturday night.

THE COURT:  All right.  I'll admit 1 through 31.

MR. BURT:  Thank you, Your Honor.  And, Your Honor, at this point I would offer Dr. Haney as an expert in social psychology and the effects, psychological effects of long-term incarceration and in the death qualification process.

MS. JIMENEZ:  No objection.

THE COURT:  Noted.  And I welcome his testimony.

Q.    Now, doctor, in terms of the substance of your testimony, have you prepared a power point which hopefully will get us through the material in fairly efficient fashion here?

A.    Yes, I have.

S.D.-42

21

Q.    And is a copy of that power point in volume number three of that set of exhibits under tab 31?

A.    Yes.

Q.    And could we bring that up at this point?  Doctor, does this first slide, which corresponds with tab 31, set forth the two topics you're going to talk about?

A.    Yes, exactly.

Q.    And in terms of the first topic, let's start there, with the Conditions of Isolated SCU Confinement, tell us what SCU refers to?

A.    It's an acronym for this special confinement unit, which is essentially the federal death row facility.  It's an area within the prison at the United States Penitentiary at Terre Haute.

Q.    And in terms of framing that particular issue, if I could have the next slide, do you have a portion of Justice Breyer's opinion in Glossip excerpted here?

A.    Yes.  It was my understanding that the, at least part of the Court's focus in this proceeding was at least related to some of the issues which Justice Breyer had surfaced in his in Glossip.  And as you all know, one of the issues that he addressed or raised as a constitutional difficulty with the death penalty is the fact that death rows are kept in isolation, death row inmates are kept in isolation in most parts of the country, and certainly, as you'll see in a

pg 145

S.D.-42

22

moment, in the federal system.

And so this is one portion or the first portion in the Glossip opinion in which he raises that. There's a following paragraph I think I've also quoted that --

Q.   Okay. And in this excerpt we have here, Justice Breyer says, it is well documented that such prolonged solitary confinement produces numerous deleterious harms. And then he cites, see, for example, Haney, Mental Health Issues in Long-term Solitary and Supermax Confinement. Are you familiar with that cite?

A.   Yes.

Q.   Did you write that article?

A.   I did.

Q.   Is that one of the articles you're going to talk about today?

A.   It is.

Q.   And could I have the next slide, please? Is this also from the Glossip dissent?

A.   It is. Yes. It is, I mean, it elaborates a little bit on the issue of the dehumanizing effect of solitary confinement. But it's an interesting reference because it's one of the few times that the United States Supreme Court has talked directly about the dehumanizing effect of solitary confinement. It's a 1890 case. And In re: Medley actually is a death penalty case.

pg 146

S.D.-42

23

So many people like myself, who are scholars on the issue of solitary confinement, cite this case because it's the Court talking about the harms of solitary confinement. But, in fact, it's solitary confinement that was imposed as the aftermath of a death sentence, not unlike the issue we're talking about now and that Justice Breyer has raised in Glossip.

Q.    So looking on the next slide, if we could, you're going to talk, first of all, about the Conditions of Isolated, SCU Confinement, correct?

A.    Yes.

Q.    And the next slide, could you define for us what you mean by solitary confinement?

A.    Yes.  So there are a variety of ways to define it. Most people who study it have settled upon a particular definition.  And that definition I've quoted here.  And it's actually from the United States Department of Justice. They've used the definition that most people who study solitary confinement use.

It basically means being confined to one's cell for approximately 22 hours a day or more, alone or with other prisoners, because solitary confinement can apply when prisoners are actually double celled as long as they are confined to their cell in the overwhelming majority of hours in a day.  And it limits their contact with others.

pg 147

S.D.-42

24

And they go on to say that an isolation unit means a unit where all or most of those housed in the unit are subjected to isolation as defined in the preceding paragraph.

And this is a kind of operating definition that most of us who study solitary confinement would endorse. I've defined it in essentially the same way in scholarly writing.

Q.    And I think you allude in your report to the fact that, or I'll ask you, is there any solitary confinement unit in the country that imposes total solitary confinement in the sense that there is absolutely no contact with any human beings at any point in time?

A.    No.    There isn't and there can't be if you reflect on a moment on that notion.    You can't, you can't keep a human being alive without having some contact with other persons. They have to be fed.    They have to get medical attention. They have to be checked in on and so on.

So solitary confinement has never meant total and complete isolation from another human being.    It's physically impossible to do that.    It was impossible in the 19th century when solitary confinement was in widespread use in the Eastern State Penitentiary in Philadelphia.    It's different now in the sense that we have more modern ways of controlling and monitoring solitary confinement, but it's

pg 148

S.D. - 42

25

essentially the same kind of experience that it's always been. And, as I say, the Justice Department defines it just fine in this quote.

Q.    So tell us what the effects are. Just summarize that for us in terms of the effects of solitary confinement as you've defined it?

A.    So there are, there are several kinds of, distinct kinds of effects. And the first set of effects are what I would call here, immediate symptoms or indices of stress and trauma. And immediate doesn't mean that they happen in the beginning and then go away.

One of the things that I've learned, as a result of studying this widely, is that people are oftentimes traumatized by the experience of being placed in solitary confinement at the outset of their placement. And that trauma continues. It does not necessarily, for most people, subside. It happens early on. They have to figure out ways to cope with and survive it. But, as you'll see when we talk a little bit later about long-term confinement, many people who have been in solitary confinement for a long period of time are still suffering as a result of the immediate shock that they felt when they first went into solitary confinement.

There are many symptoms and indices of stress and trauma. And they have been studied by lots of different

pg 149

S.D.-42

2.6

people.  And I think the next slide actually to, not to dwell on all of them, but just to underscore for the Court how extensively these things have been studied, how many people have looked at these issues, how many different symptoms and indices of stress and trauma have been identified in studies of solitary confinement.

So this long string cite, which I will mercifully not go into in detail, basically just summarizes those symptoms, the symptoms that have been documented in empirical studies, the various studies that have documented them.  This is from an article of mine, the article that you cited earlier that Justice Breyer also cited in 2003.  There are more studies that have been done since 2003 that aren't listed here.  But this just gives you a feel for how many of these symptoms there are and how many people have studied them.

Q.   And that set of cites comes directly from your paper that is cited in the Glossip dissent?

A.   Yes.

Q.   Which that full article is tab 16?

A.   It is.

Q.   Of the volume there?

A.   I think this is Page 130 or 131 of that article, but it's just a section of the article where there are citations listed.

pg 150

S.D. - 42

27

Q.    In addition to your own writing on that topic, is there support outside yourself for these effects?

A.    Yes.  In the next slide cites a couple of comprehensive literature.  Two of them are mine, but they don't cite only my research.  And, in fact, they purposely focus on the research that has been done widely by other researchers.  Researchers, it's research really that spans decades, that people have been interested in solitary confinement for a long time.

I mentioned a moment ago the in re: Medley opinion that Justice Breyer cited is from the 19th century.  Solitary confinement has been around for a long time.  And people have studied it for a long time.  So there's a vast literature on solitary confinement and related psychological situations or contexts.

That second article that's listed here on this slide is the article that we've been talking about that that string cite came from, the 2013 article. Stewart Grassian, a psychiatry professor at Harvard, has done research on it and written about and has a very good literature view that he's published in the Washington University Journal of Law and Policy.  That's the third listed.

And then Peter Shaw Smith, who is a Scandinavian researcher, summarized the research that's been done not only in the United States but also Europe and in Scandinavia

pg 151

S.D.-42

28

where they also have had solitary confinement and studied solitary confinement carefully.  So his literature review, both those last two are 2006 literature reviews.  Again, there's been research even done since 2006 on this topic.

Q.   And are the empirical findings, that are set forth in these studies, in terms of the effects of solitary confinement, are they theoretically coherent?

A.   Yes.  It's one of the things that has emerged over the last decade and a half.  The notion that there are sound theoretical reasons that explain the harmful or deleterious effects of solitary confinement.

A kind of deeper theoretical understanding of what may be obvious, but it's also always nice to have theoretical support for a proposition that seems otherwise obvious or common sense.  And I've listed the two, the two interrelated notions here.

In the last 10 or 15 years there has been a tremendous amount of research, broad research in social psychology underscoring the importance of social contact and social connectedness to human health and well-being.  You may, you may be familiar with the phrase, we're social animals.

Well, in the last 10 or 15 years social psychologists have actually documented how extensively and intensively we are social animals.  How fundamentally our

pg 152

S.D. - 42

29

contact is with other people, not just to derive joy and happiness from contact with other people, but really our sense of self depends on our interactions with other people. Some social psychologists have argued, as a result of this research, that there's a fundamental human need to be able to connect to others.

One of my colleagues has written a book called Wired to Connect, by which he means to suggest that human beings are, in fact, innately structured, neurologically wired to connect to other people.

And one of the things that underscores the importance of this is what happens when you look at circumstances or situations with where people are denied the opportunity to do that or, for whatever reason, aren't able to connect to other people.

So there's been a lot of research on social isolation and social exclusion and loneliness in settings outside of prison.

So you're looking now at particularly aging populations where people have lost their connections to other people. They don't, it's not, they are not as comfortable interacting with other people. Or people who are placed in settings maybe even or homes or other institutions, but penal institutions, but places where it's difficult for them to have normal social interaction with

pg 153

S.D. - 42

30

others.

And what researchers find is there is a tremendous negative cost, both psychologically and physically. So that people who are isolated and lonely actually get sick more often. And they also have higher mortality rates that researchers have been able to connect to their social isolation.

Now, these are studies that are done outside of the prison setting. But it provides a kind of theoretical framework for what solitary confinement researchers have uncovered over the decades, which is that because solitary confinement imposes social exclusion and loneliness in, as comprehensive and pejorative a way as possible, it's not surprising that it has the kind of negative effects that we've been able to identify given what we know about isolation and loneliness in the world at large under conditions much less onerous, much less comprehensively isolating than exists in solitary confinement.

Q.   So that's the way it operates outside of prison. Have you tested that theory in the context of the prison environment, and specifically the environment of prisoners who have been isolated?

A.   Yes. I've done really research over -- I started doing the work in late 1970's. And I've continued do it up, you know, up until the present time.

pg 154

S.D.-42

Case 2:23-cv-00491-JPH-MKK   Document 1-1   Filed 10/16/23   Page 134 of 220 PageID #: 154

31

I've done it in a variety of different ways, but one of the main ways I've done it is to conduct long, systematic interviews, structured interviews with prisoners who are in isolation units in different parts of the country.

Oftentimes, I'm able to select these, the prisoners that I interview randomly so that I can be assured that it's a random or representative sample of the prisoners who are in these units. And then I'm able to interview them for an hour or so about -- with a specific list of questions designed to understand the nature of the experience, what they are going through, what's happening to them, how they've changed as a result of being in isolated confinement.

Not everybody reacts in exactly the same way, but as I've said here, virtually all of the people suffer from some form of distress and psychic pain. Very, very rarely does someone tell you that they are not bothered by this experience, that it does not hurt them, that they are not feeling distressed or pain of some sort.

There are -- the high prevalence of symptoms of severe stress and isolation related trauma, I'll show you some numbers on that in a moment. So that high prevalence addresses the issue of how many people feel this way.

So it's not just, as you'll see in a minute, it's

pg 155

S.D. - 42

32.

not just a few people, it's the overwhelming majority of people who are suffering from a whole range of these stress related and trauma related symptoms.

And then, because solitary confinement has been used in the United States with increasing frequency, really up until relatively recently, at which time, beginning a few years ago, I think there's been a, a reflection on whether or not we've overused this. But it was unreflectively used for a couple of decades in the United States.

And what I began to encounter were people who were in solitary confinement for relatively long periods of time. So we're not talking about people who now are, maybe have spent a month or even a few months or a year in solitary confinement. But I've encountered populations, or at least individuals within populations in solitary confinement, who have been in there for years, several years. Sometimes a decade. Sometimes two decades.

And what I have seen in those people is something a little bit different than simply the prevalence of symptoms of stress and trauma. But, rather, it is the consequence of people trying to adapt to or adjust to living in a world without people.

It's the long-term consequence of what happens when we have to -- that wiring to connect that we have, begins to atrophy. So you have to structure your life, your

pg 156

S.D. - 42

33

world without human beings in it.

And, again, apropos what you asked me earlier, do I mean literally no one. I mean no meaningful social contact with people. And that's an abnormal situation to place people in.

You can argue about whether or not it's justified in some circumstances or not, but it's abnormal. No one would dispute it's abnormal for people to live without the presence, the normal meaningful contact with others.

So how do we adjust to or adapt to living for a long period of time in an abnormal situation? We began to make abnormal adaptations to that abnormal situation so that the abnormal becomes normal.

People get used to not being around other people. And after getting used to it it doesn't, it doesn't mean they are not in pain about it, but they just assume that there won't be other people in their life.

And then, after that happens, people begin paradoxically, to become aversive. They don't want to be around people. They, even though they are isolated from people they isolate themselves even further. And that's what I've described a form of social pathology, that is, it is a pathological human adaptation to an abnormal pathological situation.

Q.   You said you had discussed the numbers in terms of the

pg 157

S.D. -42

34

prevalence. And I think your slide that we have here does that.

A. Yes. So this is a, this is a summary of some of the, some of the data that's reported in the 2003 article that we've talked about a couple times already. These are data that I collected in a study that I did some years ago in an isolation unit in California. I've done this kind of study elsewhere in the United States. And these numbers are roughly comparable in each one of those institutions.

In fact, I had an opportunity to go back to that particular facility and basically redo this study and came up with many of the same exact results even though it was 20 or so years later.

And what you can see is that **the symptoms of stress related trauma are experienced by very high numbers of people**. Now, this was a sample of people who were randomly selected. These were not prisoners who were complaining or they were not prisoners whose lawyers brought to me because they had issues. This is a representative sample of prisoners who were in that unit at that time.

And you can see over 50 percent of them were experiencing one or another of these forms of trauma. And some of the stress related symptoms were being experienced by nearly everybody, including **anxiety, troubled sleep and feelings of an impending breakdown**.

pg 158

S.D.-42

35

Q.    And the next slide, please?

A.    And then there were, again, in the same study, same group of people, a hundred randomly selected, so they were representative of the general population of people in that isolation unit.  And these are what I've characterized and they are characterized in the literature as the psychopathological effects of isolation.

These are a bit more extreme, but these are the kinds of thing that happen to people, not just under stress, but when they are under the kind of stress that people are in when they are in isolation units.

And so you can see, again, very high prevalence rates.  Most, in some instances nearly all of the prisoners are experiencing these things, sometimes experiencing them in very deep and profound ways.  You know, including things like chronic depression, three out of four people talking about just feeling hopeless and helpless.  More than three out of four of them withdrawing that paradoxical effect of being isolated, wanting to be around people, but then not being comfortable around people and so pushing people even further away withdrawing further into yourself.

The only, the only symptom of psychopathology reported by less than half of the people in this study were hallucinations and suicidality or thoughts of self harm. But even those things were experienced in this study by a

pg 159

S.D.-42

36

relatively high number of people. A quarter of the prisoners I interviewed said that they had thought about, thought seriously about taking their own lives.

THE COURT: How do you correct for the psychological impact of incarceration on all prisons? Right, because the general population probably has some of these troubles too.

THE WITNESS: They do. And so we have -- I didn't show you -- we have data that show for the general population much, much, as you would expect, much, much lower. And then for prisoners in general, again, higher than the general population, but much lower than the prevalence rates for people who are in solitary confinement.

So other people, I've done some of that research myself, but there are other people who have studied what happens to people in mainline prison populations. And those prevalences are nowhere near as high.

Q. Now, doctor, you talked about your experience with people who have been in these isolation conditions for long periods of time. And I want to focus just for a couple minutes on definitions of longer term isolation.

So if we could have the next slide and then the next slide as well?

A. So longer-term isolation, when I use this term, you said what do you mean by longer-term isolation. So I

pg 160

S.D.- 42

37

thought I would try to define it in, with reference to how other people, other organizations have defined it.

Obviously longer-term or long-term is a relative comparative term. So what do people who have opined about solitary confinement think is long-term.

So I've given you several examples here of people who have issued opinions and standards or mandates about the use of long-term solitary confinement.

The first one comes from the American Psychiatric Association and separately the Society of Correctional Physicians. So the American Psychiatric Association, I'm sure you know, is the professional organization for the nation's psychiatrists. The Society of Correctional Physicians is a group of physicians who work in prison settings. So these are people who are not only physicians, but whose primary occupation is to work in correctional settings, oftentimes working for correctional institutions. They define solitary confinement that lasts for longer than four weeks as prolonged solitary confinement.

The second citation I've given you here is just from something that was issued last year by the United Nations. The United Nations, as you may know, devises and then promulgates what they call standard minimum rules for the treatment of prisoners. These have come to be known as the Mandela Rules, after Nelson Mandela.

pg 161

S.D.-42

38

But just last year they issued the latest version of these. And they prohibit the use of solitary confinement that is indefinite. So any solitary confinement that has no ending point to it is prohibited under the Mandela Rules. And it will also, what they call prolonged solitary confinement lasting more than 15 days, they, the Mandela Rules also prohibit.

The American Bar Association has standards on the treatment of prisoners. They mandate, not an absolute ending point, but they do identify as 90 days the interval at which, each 90 days there needs to be a full classification review. But not only that, an individualized treatment plan each 90 days devised in segregation with, as they say quote, a presumption in favor of removing the prisoner from segregated housing. So a treatment plan each 90 days, with the expectation that that prisoner will be moved from solitary confinement.

And, finally, just a few months ago, the National Commission on Correctional Healthcare issued a position statement concluding that what they called, prolonged solitary confinement, i.e., greater than 15 consecutive days, constituted cruel, inhumane and degrading treatment and is harmful to an individual's health.

So these obviously are examples of what certain bodies or organizations that have considered this issue have

pg 162

S.D. - 42

.39

considered either long-term or prolonged.

In the United States we deal typically with longer periods than that. But just so you can get a framework for what some of the evolving standards look like in terms of the length of time people regard as problematic, harmful or in the case of the NCCHC cruel, inhuman and degrading.

Q.   Who is on this National Commission on Correctional Healthcare and what role do they play in the correctional system?

A.   It's actually a prestigious body of correctional healthcare administrators and physicians, and including mental health professionals, who actually certify correctional healthcare in systems all around the country.

So you may know that the American Correctional Association does this as well. And, but the NCCHC also is a body that evaluates the quality of correctional healthcare and mental healthcare around the country.

And correctional institutions apply for certification either from the American Correctional Association or from this organization or both.

Q.   Before we turn to your analysis of the federal death row, could you just elaborate a little on this idea of social pathologies of long-term isolation, which I think on the next slide you have summarized?

A.   Sure. Again, this is based on the notion that somebody

pg 163

S.D. - 42

40

is in an environment for a long period of time.  An environment in which they begin to operate on a day-to-day basis in the absence of meaningful human social contact.

They try to adjust and survive to this environment as best they can.  And the adaptation that they make is to try to accommodate to the fact that there is no interaction in their life, there are no meaningful social contacts.  But that adaptation oftentimes leads people to atrophy in their ability to interact with other people.  So much so that they actually become anxious around other people, find themselves, because they are hardly around anybody else, in those rare instances in which they are given an opportunity to interact with someone, find that this is anxiety arousing and they begin to develop what I call here a social phobia or an asociality.

I recognized this when I would do interviews with people who have been in solitary confinement for a relatively long period of time.  And when I was given, I was -- I don't always have the opportunity to have contact visits with them, but sometimes I would.  So that, you know, that would be a situation in which I would be able to actually sit in the same room with them rather than talking to them over the, over a telephone and through glass in a non-contact visit, but actually to interact with them the way you ordinarily would interact with somebody who you were

pg 164

S.D.-42

41

visiting or somebody who you were having a normal social interaction with.

And I realized this was, for many of them, the first time that they had had this kind of an interaction with anybody for months or years. And they were extraordinarily uncomfortable. Not having anything to do necessarily with me, but just because -- and some of them actually verbalized it, that it made them very uncomfortable, that they had to get used to it.

Now, sometimes they began to perspire. Some of them hyperventilated. I, you know, had the sort of natural human tendency when you meet somebody to extend your hand to shake their hand. And I had long-term isolated prisoners recoil from an extended hand because it was, it was so foreign an experience to them.

So it led me to begin to sort of dig deeper with this issue and understand that this is one of the things that happens to people who have been in this environment for a long, a long period of time.

The other thing I've listed here is what I've called, pardon this sort of academic jargon, but derealization or ontological insecurity. People really questioning whether or not they exist.

And this sounded farfetched to me when I first heard it, but the more I talked to prisoners, again

pg 165

S.D. - 42

42

long-term, isolated prisoners, the more I realized that it was actually a very frequent phenomenon that occurs in these institutions.

So much of what we do and who we are depends on our interactions with other people. It's such a part of who we are. It's almost like the air we breathe. We take it for granted. And it's only when people, for long periods of time, are taken out of those opportunities to interact with other people, they, they really lose a sense of themselves.

And I've had many prisoners say to me, I don't know if I exist any more. I don't have any -- I don't have any way of affecting the world around me. The only interactions I have with people are these sort of proforma superficial interactions that I have with correctional staff. And I, either there are times when I'm not sure whether I'm still here. Or they talk about an unreality to their existence, not necessarily that they literally don't think they are there, but that there's something unreal about their, about their existence.

And it leads to, not surprisingly, this third phenomenon that I've described here as melancholia. A deep joylessness, a kind of a grief that's deeper than depression, where people just feel like they've lost who they are, who they were. And they've lost the capacity to regain.

pg 166

S.D. - 42

43

Again, this typically happens only after long-term solitary confinement, but it is a deep and a widespread phenomenon.

And then the final stage I've described here is social death. People being in an environment where as all of these things have added up over time for them they are no longer comfortable with people, they no longer feel connected to other people. Oftentimes relationships have withered because they've been in solitary confinement for a long period of time and they haven't, you know, for various reasons, haven't been able to maintain contacts with the outside world.

Many of these units are located in remote locations. So it's difficult for families to visit. Oftentimes you have only non-contact visits so even when the visits take place they are over a telephone, you're talking to somebody through glass. You can't touch them.

One of the components of this experience is that in the overwhelming majority of these places there are non-contact visits. So people have not touched another human being with affection for years or decades, however long they've been in solitary confinement.

The only physical contact they'll have with another human being is the incidental contact they have with a correctional officer whose putting them in restraints.

pg 167

S.D. -42

44

Otherwise, there's no opportunity to shake hands, hug, to do the things we ordinarily would do, not just signs or demonstrations of affection, but it's a way of reinforcing our humanness.

Well, you live for a long period of time where you can't do even those basic things and your self begins to recede. And you experience, what I've called here, a form of social death. You really don't have any meaningful contacts with people, both in the immediate environment where you're denied to have those kind of contacts, but even in the larger world around you.

And then in the case of people who are in these environments for very long periods of time, they age in these environments. And, indeed, many family members also age, but without them and people pass away and they literally have nobody in the outside world with whom they can be connected. And they are for all intents and purposes socially dead.

Q.   Now, did I ask you to assess whether the conditions under which federal death row inmates are housed constitute the kind of the solitary confinement that you've been speaking of?

A.   Yes.

Q.   And before I asked you to do that in this case, had you in fact toured any isolation units within the federal system

SCU

pg 168

S.D. -42

45

or interviewed any federal prisoners about the kinds of issues you've been discussing here?

A.    Yes.   I've toured the federal administrative maximum security, which is commonly referred to as ADX, in Florence, Colorado several times.   Interviewed many prisoners there.

Q.    And the ADX Unit is for non-death row prisoners who, for whatever reason, are confined in solitary confinement?

A.    Yes.   There are, in fact, several death row prisoners who have been sent to ADX who are currently confined in ADX, but it's primarily, overwhelmingly not a death row unit, but a long-term maximum, super maximum security prison.   Perhaps the, you know, the most modern and among the most isolating in the United States.

Q.    And how about your experience with death, federal death row before your involvement in this case?

A.    I, yes, I have, I had been to the special confinement unit, but did not tour it.   I conducted interviews with four or five prisoners in 2012 at the request of some federal attorneys who were concerned that clients on the federal death row were becoming so despondent over their conditions of confinement that they may be volunteering to be executed, to waive their appeals because the conditions were so severe.

And so they asked me to begin the process of trying to evaluate that issue, in a general way, to

pg 169

S.D.-42

46

understand what conditions were like and how -- if they were having an effect on people and, if so, how.

Q.   And did that process involve actually interviewing federal death row inmates in 2012, I think you said?

A.   Yes.  November of 2012 I was there.  And in a room that, a picture of which is coming up, but there's an attorney visiting room in the federal death row at Terre Haute.  And that's where I conducted those interviews.

Q.   Did you draw any conclusions as a result of those interviews in terms of conditions at that point?

A.   The conditions that were described to me by the prisoners I interviewed were severe, but I hadn't seen them myself.  But they certainly gave me reason for concern that that, that what the routines that the prisoners described in 2012, and their reactions to those conditions, were -- underscored concerns about the negative long-term effects of living in that environment, yes.

Q.   Now, and just recently, were you permitted to actually tour the facility?

A.   I was.

Q.   When did that happen?

A.   It happened just last week, on last Thursday, July 7, 2016.

Q.   Now, as a result of that visit, and also as a result of looking at some photographs that were in discovery, do you

pg 170

S.D.-42

47

have some photographs that you could use to sort of walk the Court through what the conditions are like there?

A.    I do.  I thought it would be better to try to explain this with photographs.  And I'll sort of narrate them as we go through.

And I'll do this quickly and please stop me if I skip over something, but I'll try to recreate what it was like as you walk into the, into the institution and then eventually get into the -- the special confinement unit is generally referred to both by the staff and by the prisoners as the SCU.  SCU.  So if I lapse into that you'll know that's what I'm talking about.

This is just the entrance, the outside entrance to the main prison.  The Terre Haute complex is a large prison.  It's got a general population unit.  It's also got an infirmary and a special housing unit that you'll see in a minute.  And then in that unit that houses the special housing unit also houses the special confinement unit or the SCU.

Q.    And just so we're clear, in terms of the special housing unit, is that an isolation unit for non-death row inmates?

A.    It is.  It's special housing unit or security housing unit, or SHU, is a term which is used widely in the United States to describe isolation, solitary confinement, supermax

pg 171

S.D. - 42

48

type prison units.

Q. So are these units basically prisons within prisons?

A. That's exactly what they are, yes.

Q. All right. Next slide, please. What do we see here?

A. So this is just the entrance area. Everybody going into the prison. Visitors and staff enters in this way. This is where the security is done and so on.

And then you move through this area to the next area. And this is the entrance to the actual prison itself. So the visiting entrance is a slight distance away from the entrance of the prison, but, you know, you can see here the large walls that surround the entire prison as you go in.

And then when you get through that first gate or door you enter then a series of gates and walk down a hallway, a long hallway towards the area where the special housing unit or the SHU is located. So you can see it's a fairly long hallway. And the special housing unit and the special confinement unit, the federal death row, is down this hallway. You have to go through a door.

The special confinement unit is on the second floor. So there's an elevator. You go through the next door. Take the elevator up.

THE COURT: I've been on a couple prison tours, not to this one, they didn't encourage photography.

THE WITNESS: No, they didn't. And it was -- so

pg 172

S.D.-42

49

some of these photographs, as Mr. Burt described, these were not taken by me. I'm not sure whether I would have done a better or worse job, but I can't take credit or blame for the photography.

So some of these photographs came from a file that involved an incident in which I believe Mr. Fell was involved in and you had photographs that had been taken of the facility.

And then other photographs were taken -- I requested, the legal affairs coordinator accompanied me, at the prison accompanied me on the tour. And I requested of him certain photographs to be taken of places that I wanted to be able to illustrate to the Court.

We got those, those photographs last night at about 9:30. So I've integrated some of those photographs in here. You'll see, they are distinctively marked. And it will be clear when those photographs come up. But most of the photographs, and all of them up to this point, are ones that were in the file that you gave me Mr. Burt.

Q. All right. Next slide?

A. So this -- so that this is the entrance to the unit, which you go inside the unit. Let me, let's back up and let me just talk for a second. Can we go back to the slide before that?

MS. DeWOLFE: I'm very sorry, I don't think I can

pg 173

S.D. - 42

50

without jeopardizing everything.

THE WITNESS:  You can't.  Okay.  All right.  So that's okay.  There's, that, a slide like that comes up I think again.  So you enter into the unit, and let me put on my glasses and see, the corner where these three housing units come together is the, there's an area that, sort of in the very middle of the page it says, officer's station.  Exactly.  That's, that's called -- referred to by the staff and the inmates as the bubble.  That's the control room where the officers both have the security and restraint equipment and also control movement in and out of the unit, including being able to open the doors.

So this is a relatively modern facility in which the inmate movement is controlled in large part centrally with mechanically controlled locking devices.

Right where that arrow is, is the entrance to the unit.  So that was the earlier photograph that we went by quickly was taken right where that arrow is sort of looking out on the floor of the unit, which is generally referred to as the rotunda.

If you look, if you look at the arrow and then to the left you'll see below a series of rooms.  There's a room that's labeled law library.  I'll show you a photograph of that in a moment.  That's an area where prisoners are able to access the law library.  They have to make an appointment

pg 174

S.D. - 42

51

to do it.  They get scheduled to do it.

They are taken out of their cells and they are placed in that room.  Only one at a time.  And they have access to a computer terminal on which they can do legal research.

The next room over is listed as an inmate workroom.  This room is depicted on this graphic as an empty room, but it isn't empty.  It's actually filled with eight cages.  I don't know how else really to describe them.  They are telephone booth size, type size cages, not unlike the cages that we'll see in a minute that are used for exercise, but they are smaller.

And in this inmate workroom these, the cages are there because, it was described to me, the unit manager Mr. Sample, Mike Sample, explained to me that this was an area which was used primarily for religious services.

So when prisoners are given an opportunity to come out for appropriate religious services once a week they are placed in these cages because they are not allowed to have contact with one another.  So they are placed in the cages and then the minister, or which ever denomination it is, comes in and administers the religious service.

There's also another, another workstation.  I believe there's two workstations in separate cages.  So two of the cages have a computer terminal in it.  And, again,

pg 175

5.D.-42

54

minute.

Just, I think may be the only schematic that I have so I'll just quickly go through it and then I'll show you the actual facility.

B Range, in the middle, is for prisoners who are on phase two. This is the phase where prisoners have the possibility to have very limited interaction, face to face contact with other, with other prisoners. And I'll describe what that consists of in a moment. But those prisoners who are on phase two are housed in that middle, in that middle unit.

And then to the right, or as you go clockwise to the end, that's C Range. And the prisoners who are in that range are on phase one. And this is complete non-contact. There's never -- they never have the possibility of being in the presence of another prisoner. And that, that includes when they are exercising or any of the other activities that take place. They are always separated from another one, either in the cell that they are in or in a cage or in some other way.

Q.    Where does somebody start out when they first come to death row? Are they assigned to a particular phase, and, if so, how long do they stay in that phase before they move to another?

A.    So there are actually more people in phase one in the

pg 176

S.D.-42

55

institution.    There are about, 52 I think was the count the day that I was there.

Q.    Fifty-two total in the entire unit?

A.    Total in this unit, yes.   There are 120 cells.    And there are 52 prisoners, according to Mr. Sample.    I didn't see any documentation of that, but that's what he represented to me.

There are more than that, there are more than 52 death sentenced federal prisoners in the United States. There are, there are a couple of them, who I mentioned a moment ago, at ADX.    There is one prisoner, who is a female. And she wouldn't be housed there.    And there is another prisoner who was at the hospital the day that I was there. So the count, I think, was about 52.    And 29 of whom were on phase one.    So you can see the majority of prisoners are on phase one.

You stay on phase one a minimum of one year when you go into the facility, but most people have been there much longer.    Any prisoner who is, has been convicted of attempted murder or murder in a correctional institution stays permanently on phase one.    Other, other prisoners are considered for movement to phase two after a year, but for various reasons many of them don't get moved, so have, basically have stayed on phase one.

Phase two is different in, I suppose a significant

pg 177

S.D.-42

56

respect, but not dramatically so. Phase two prisoners are allowed to apply to have a partner who serves as an exercise partner or a recreation partner. And also prisoners who are on phase two get two hours a week of what's described as leisure time. There's a room on B Range where it's at the very beginning of the entrance to B Range. It's to the left. It's a room with a table in it, there's a television, and there's some board games and prisoner -- and a microwave. Prisoners who have a partner, who have been approved to have a partner. The partner, incidentally, is assigned by the institution. So you don't get to just pick your own partner. The institution has to approve the person who will be your recreation partner. You can go into that area for two hours a week. And you can also go out to outdoor exercise with that person.

Prisoners, whether you're on phase one or phase two or phase three, are permitted out of their cells to go to outdoor or indoor exercise one hour a day, five days a week.

So the total amount of time that a prisoner is in phase one would be regularly out of his cell would be five hours a week. The rest of the time they would be isolated in their cell by themselves.

And those who are on phase two, and assuming they have been approved for the leisure time, not everybody on

pg 178

S.D.-42

57

phase two has been approved for this, you would have five hours of out of cell time for exercise or recreation and then an extra two hours of leisure time in that leisure room, for a total of seven hours a week. Otherwise, they too are confined in their cell and confined in their cell by themselves. So the fact that you have an exercise or a leisure time partner doesn't mean that you have any other contact with that person other than the time that you are in recreation or the two hours a week you would be in the leisure room.

Q.   In terms of the number of hours, maximum number of hours they can be out of their cells, how does that compare to other solitary confinement situations you're familiar with?

A.   It's on the -- it's on the restrictive side. Not, not, not the opportunity to have an exercise partner or a leisure partner, but if you look overall just at the amount of time they are out of their cell, this is severe. Most prison systems with which I'm familiar provide a bit more out of cell time, even severe units.

Realize when we were talking earlier about the definition of solitary confinement, 22 or more hours confined to yourself. The best of circumstances in this unit you are in your cell 23 hours a day. If you take into account the five hours of outdoor recreation, and the two

pg 179

S.D.-42

58

hours of leisure time, that's seven hours a week. That's one hour, average one hour a day that you are out of your cell. So, you know, it, as these things, in my experience, this is a restrictive environment in terms of the amount of out of cell time.

Q.   Did you have an occasion, in the course of your preparation of this case, to talk with a former warden of death row, Mark Bezy?

A.   I did.

Q.   And were you able to determine, through your conversations with him, or otherwise, whether the federal system has yet had experience with inmates who have been moved into phase three, in other words, that informed that there is going to be an execution and then moved off that phase and told your execution has been postponed?

A.   Yes.

Q.   Has that happened in the federal system yet?

A.   It has happened. It has happened in the federal system. He had personal experience with this. He knew a number of cases, I believe some of which he was actually the warden at the facility when it happened, where he had to counsel the men who had pending execution dates.

       There's a certain protocol, he described it to me, as involving the details about who, who, to whom they wanted their property sent, how they wanted their body to be

pg 180

S.D. - 42

59

disposed of. They had to identify people who they wanted to be witnesses to their execution. And then they were moved to this special unit, this A Range, where they were, where they were isolated even further.

You know, I should point out, I'll give, I was going to get to this when we looked at the A Range photograph, but A Range is, I mentioned that there are 52 people in the unit and there are 120 cells. So there are a lot of empty cells in this unit.

A Range is almost completely empty. So there are a total of two people on the second floor. And I think there are 16 cells. And those people are at opposite ends of the hallway.

So they're, they are not only isolated in their own cell, but they are isolated in the sense that there's no one around them. I mean, the man who is at the end of the second floor of A Wing is literally 14 cells away from any other human being on a day-to-day basis. He is a death sentenced prison who is on special administrative measures.

Q.    You mentioned in your report that, and you allude to a letter, I think, by some of the prisoner representatives, that recently there's been issues about people being too easily moved from phase two back to phase one because of rules violations?

A.    Yeah.

pg 181

S.D.-42

60

Q.    Would you explain that a little bit?

A.    Well, there's a lot of discretion, and as there is in many correctional settings, about whether or not somebody is going to be punished for a rule violation.  And there was general unrest among the death sentenced prisons about what they regarded as an arbitrariness to decisions that were being made about relatively minor rule violations resulting in them being moved from phase two back to phase one.

And, you know, it's, it is -- I mentioned that there are -- that the difference between the two phases are not dramatic but, but they are substantial when those are the only privileges that you have.

The unit manager, Mr. Sample, made it clear to me that the privileges that prisoners have on phase two are just that, they are privileges.  And that he made it very clear that they could be withheld or denied based on the, on the decision of the administration, primarily him, but other people as well.

THE COURT:  Mr. Burt, why don't we take a break.

MR. BURT:  Certainly.

THE COURT:  It's 10:30.  I would leave you with a question, if I could, because you are also an attorney, right, that's what we started out?

THE WITNESS:  More or less, Your Honor.

THE COURT:  More or less.  So here's my question

pg 182

S.D.-42

61

really, the additions and concerns about isolation which you've studied, certainly aren't unique to death penalty cases.  They don't strike me as sort of necessary or essential to the operation of a death penalty system.  And they are separate in many ways from the process of adjudicating a death penalty case.  So my question, and I'll leave you to think about it over the break, why aren't these issues subject to review and correction through something like a civil case challenging conditions of confinement rather than this case which looks more at the constitutionality of the penalty and the process itself.

THE WITNESS:  I'd be happy to answer that.

THE COURT:  Okay.  Catch you in 15 minute.

MR. BURT:  Thank you.

(The Court recessed at 10:30 a.m. and resumed 10:45 a.m.)

THE CLERK:  Your Honor, we are back on the record in criminal number 01-12, United States of America versus Donald Fell.  And we have Craig Haney as a witness.

THE COURT:  So what do you think, why are we here with these issues as opposed to in something like a Bivens case?

THE WITNESS:  Well, first of all, there have been, there has been civil litigation having constitutional challenges to this.  And I participated in some of them.

pg 183

S.D.-42

62

And they have been overwhelmingly successful in the sense the Courts have agreed with the literature that I presented about the negative effects on someone.

The issue then becomes, what is the remedy, what do you do to address these concerns. And I think where most Courts have come out is to, is to reduce the amount of time that people can spend. We just finished a case in California in which, although the Court didn't reach this decision, the parties did, ending long-term solitary confinement.

So the idea is not that you can, that you can or will end the practice per se, but that you will address the issue of duration, sort of the worse effects that I was talking about earlier.

The other resolution the Courts have reached is that there are certain kinds of people who should never be in these places, particularly the mentally ill. So mentally ill prisoners have a higher likelihood of getting in a segregation unit, their mental illness tends to precipitate disciplinary infractions, they get written up for it, they get put in isolation. They shouldn't be there. Oftentimes their mental illness worsens in the face of these conditions and so Courts have recognized that and said those folks need to come out.

The problem is, Your Honor, that it is difficult

pg 184

S.D.-42

63

to reform these places. Correctional reform is difficult in its own terms. This is a -- so with respect to death row, it's a much, in a certain sense a more complicated issue because you really can't shorten the time.

So if you make a correctional commitment to putting death sentenced prisoners in conditions of isolation the remedy that many, not just Courts, but correctional systems have moved to of shortening the amount of time, sort of avoiding the worse case scenarios of long duration, all those changes I talked about, with a population of death sentenced prisoners they are, you know, the normative times now are measured in many years or even decades. So you really can't, you really can't circumvent the problem by shortening the length of time in an effective way.

And, you know, it's my understanding that what, that Justice Breyer's point is, that this is an additional punishment over -- it has become a -- long-term solitary confinement has become an inevitable component of a death sentence in the United States simply by practice, simply by virtue of the fact that this now is part and parcel of the sentence by virtue of the lengths of time and by virtue of the correctional decision to keep and overwhelming number of death sentenced prisoners in isolation conditions.

THE COURT: All right. Thank you. I appreciate you thinking about it.

pg 185

S.D. - 42

64

MR. BURT:  Thank you, Your Honor.

DIRECT EXAMINATION CONTINUED BY MR. BURT:

Q.   So, doctor, I think we're ready to sort of move through the rest of these photos fairly quickly in terms of educating the Court here on what this place is about.  So if you could maybe narrate?

A.   Yes, I will.  And I will do it expeditiously.  This is one of the photographs that was provided to us.  This is one of the photographs that I asked to be taken and that we got last night.

This is a photograph of the law library. Prisoners are allowed in here one at a time.  Your clerk was nice enough to show me the technology whereby I can circle things.  So I'm going to try this.  So this is the computer terminal to which a prisoner has access when they are doing legal research.

This is a small room that's off of the main rotunda area that I was describing earlier.  When you first come into the unit it would be to the left as you are walking into the rotunda..

Q.   Next photo?

A.   Good.  Thank you.  This is a, just a perspective photograph.  This is on the bottom of the B Tier, the middle housing unit.  And it shows you up here where the location of the bubble or the control room where the officers are.

pg 186

S.D.-42

65

This is obviously the entrance to the housing unit.

The next photograph shows you, as you're going into the unit, walking from the rotunda. Again, this is the B or the middle housing unit.

You walk through a gate to get in. You can see the cells are arranged, this, the housing units B and C have cells on both sides of the hallway or the tier. You can see that the -- they all have, and I'll show you a close-up of a door in a second, but they all have these solid metal doors.

The next photograph is the opposite perspective. So that's looking down from the end of the hallway. The cells at the very end looking down to where the entrance is.

I'm just going to guess here there's about 15, 16 cells on each side. And then, again, remember these are two story housing units or walks. So each one, A, B and C, both have two stories to them.

Let's to go the next one. This is the, this is the housing unit that I described as having only one, one row of cells. Both the bottom and the top floor are configured in this way. This is the unit where I was describing earlier, prisoners who have pending execution dates are placed. This is the A Block or A Unit.

This is what one of the cell doors looks like. There's solid steel, small thin window. Notable because obviously prisoners can't see into each other's cells. You

S.D.-42 pg 187

66

know, if you're looking out of your cell you would only really be able to see another prisoner if that other prisoner happened to be looking out of his cell at the same time.

So these are obviously designed to allow the staff to look in, monitor or check on prisoners. But they don't provide prisoners with very much visual access to anything outside of their cell.

Q.    Is this a standard in isolation units, these solid doors or does it vary?

A.    It varies actually. I mean, this is -- again, this is on the more sort of severe and secure range of solitary confinement units. There are some solitary confinement units in the United States that have open cells. You know, they sort of have classic bars, open barred cells so that you have visual access to the hallway, visual access to prisoners who are housed in other, in other cells if you have cells across from you.

In other units there's a kind of a metal mesh on the cell. Pelican Bay, for example, where some of the data that I cited and showed the Court earlier was collected, has a, kind of a tight metal mesh or grate on the door, but it does allow much greater visual access. Here the, your visual access to the outside is, as I said, quite restricted.

pg 188

S.D. -42

Case 2:23-cv-00491-JPH-MKK  Document 1-1  Filed 10/16/23  Page 170 of 220 PageID #: 190

67

Q.   All right.  Next photo?

A.   So this is a look inside one of the cells.  This is an empty cell.  I'll show you a cell in a minute, a couple of cells that are occupied.  But unique configuration in a sense because, well, two reasons.  Here is this sallyport grate that I talked about earlier.

Now these are only the cells that are in the one unit that, the A Run, the first unit that I described, where prisoners who are on, what's described as phase three, are housed and a couple of guys who I described earlier who were there for other reasons.

So what this means is when you open that metal door, it's the same outside metal door, but when the correction officer in the bubble opens that door, instead of walking into the cell there is this additional grate or sallyport configuration.  And that then has to be opened -- a second, a second gate then has to be opened for -- in order for the prisoner to come out.

Q.   All right.  The next photo?

A.   So this is a photograph of only a few of the doors. Each one of the housing units have these, they go by various, various terms.  They are basically what they, they call them at the SCU, food tray extenders.

So this is a procedure which is used if correctional officers who have to, of course, feed

S.D.-42  pg 189

68

prisoners. They come around several times a day with food. Prisoners eat in their cells. And if a correctional officer is having a difficult time with a prisoner who may be jostling the food tray or refusing to give it back, or whatever, they get, those prisoners get placed in this cell. And this is a mechanical way which allows the correctional officer to control the delivery of the food tray.

So the officer would put the food tray in this device. And he would pull the lever allowing the prisoner to have access to the food tray. So there's no -- rather than the normal exchange through the tray slot. Which I'll show you in a second, the exchange of the food tray happens through this food tray extender.

There are only a few of these on the doors of the cells in the various units, but they are there. And that's a configuration that they do use.

Q.   Next photo?

A.   Again, this is inside a more typical cell, either in housing Unit B or C. Unusual configuration I started to say a moment ago. These don't have that interior sallyport, but they do have something which very few other solitary confinement units in the country have, which are interior cell showers.

So this is a configuration, I first saw it at ADX in Florence. This is one of the only other few units in the

pg 190

S.D.-42

69

country that have it. It's important because what it means is that prisoners stay in their cell to shower. So in other solitary confinement units you typically get out of your cell several times a week in order to be escorted to a shower somewhere in the unit. And so prisoners have an opportunity for incidental social contact with others as they are walking to the shower and at least it's an opportunity to get out of your cell.

In these units prisoners don't have to do that. And so they -- and, in fact, aren't allowed to do that. So they stay in their cell and shower. You can see there's a little metal cabinet where prisoners keep their property. There's a bunk. Basically the cells are all the same. Very few variations. I looked in every cell when I was there. And there was virtually no difference in the configuration of the cells.

There's a little desk over here and a plastic chair the prisoners can sit at. There is a window on the back. The windows are all the same. They are covered with opaque covering. So that, although light can come into the cell through the window, and you can see it here, you cannot see out of the window. You can't see anything through the white. It looks like kind of a plastic, either a pane or a chemical which the window has been covered with so that it's

pg 191

S.D. - 42

70

impossible to see anything outside of the window.

Unless they are on punishment status prisoners have small televisions in their cells. And, of course, there will be a sink and a toilet over here. Prisoners sleep and eat and defecate and shower and do whatever they do on a daily basis in, in these cells with the exception of, as I said, the hour a day that they go out to exercise. Or if they are on phase two and they are approved for a leisure period they get two additional hours in that leisure room.

Q.    Next photo, please?

A.    This is inside of a cell that Mr. Fell actually, it turns out, occupied, at least in 2012.

Q.    Next one?

A.    Next slide, so you can get a feel for what a cell looks like when, again, this is Mr. Fell's cell, not necessarily his current cell, but a cell that he was in in 2012.

This is a relatively neatly kept cell, I must say. It varies. You're going to see a cell in a minute that's not kept quite this way.

I make a point when I go to these units to look inside cells and see what people are doing, what their cells look like, and so on.

The day that I was there I noted that many of the men, it was about 10:30, 11 o'clock in the morning, many of

pg 192

S.D.-42

71

the men were asleep with the covers pulled up over their heads. And you see this phenomenon in these kinds of units often. It's a sign or a symptom that prisoners have relatively few activities in which to engage. There's nothing for them to do. There's no reason to get up. There's no reason to do much of anything. And so, you know, it's, it, if you see it in a widespread basis it's a sign for concern because it suggests that people have become increasingly disconnected from the world in which they are living.

I didn't do a systematic study of the prisoners in this institution, so I don't want to imply that I know that that's what's happening to them. But I did note there were a lot of people at that hour of the morning who were just inert, not doing anything all.

When you counsel people about how to survive this kind of environment you counsel them against that. You counsel them to get up at the same time every morning early, engage in activities, even if it's the same thing every day, to impose on yourself a structure because if you don't do that you are unlikely to be able to survive it.

Q.    Next photo, please? This is just another shot of that same cell?

A.    This is the same, this is the same cell. It's not uncommon for prisoners to sometimes cover. So it looks like

pg 193

S.D.-42

72

this is a person who maybe is drying something.  Prisoners will sometimes put a towel or covering over the commode to, you know, for obvious sanitary reasons.  Um, and this is the environment in which prisoners in this unit will be living, as you'll see, on a very long-term basis.

Q.    Next photo, please?

A.    This is another cell.  Obviously much less well kept. I don't know exactly why the cell looks like this, but, you know, it would be a cause for concern if somebody was living like this for a long period of time.

It's not uncommon to see cells that look like this.  And I saw a few when I was in the unit, not necessarily quite as disheveled as this, but where people had obviously just kind of lost contact with the rhythm of life, with the rhythm of their day.

And you can imagine how difficult it would be for somebody to survive in an environment where you don't get out of your cell, where you do basically all of the things that you're going to do in a day in this same 60 or so square foot environment.  You accumulate property, you accumulate food.  It becomes difficult for you to take care of all that.  And eventually, for many people, not necessarily everybody, it becomes difficult for you to take care of yourself.  And that's sometimes manifested in the way in which you live in these environments.

pg 194

S.D.- 42

73

Q.   If you could move ahead, I want to skip ahead to a couple of slides here, until we get to the page.  Is there something you wanted to say?

A.   Well, I just wanted to -- I'll just give you a configuration.  Maybe -- we can't back up.  Great, great, we can now.

Q.   We figured that out.

A.   All right.  So this is where you enter.  And this is a slide that we started with and I quickly skipped by it, but this is the entrance.  So the elevator is over here.  And you come off of the elevator and into the unit this way.  This obviously is the bubble.

Back here is where we're about to go.  It's the visiting area.  It's, this is the internal area.  This is where the prisoners are taken for their visits by correctional officers.

I should point out that there are on the doors of the prisoners indications of how many correctional officers are needed for an escort.  So there is a -- no prisoner gets out of their cell without being placed in restraints before they even get out of their cell.  That's the procedure.

Some of the prisoners have a one person escort, but many of the prisoners have additional escorts assigned to them.  And that's designated on a card on the door outside their cell.  And I saw as many as three correctional

pg 195

S.D. - 42

74

officers indicated as needed for an escort. But the point is, nobody leaves their cell without being under at least one, and sometimes as many as three correctional officers, and sometimes as many as three and a lieutenant escorting them.

In any event, under whatever circumstances they are moved through the unit, and if they have a visit, a social visit or a legal visit, they are going to go back through that door. And the visitors will be coming through another hallway that's over here. They never, of course, enter the area itself.

Q.    Next photo, please?

A.    This is the visiting area. This is the back end of the visiting area. So these are the doors through which the prisoner will go. This is a seat where if a prisoner is having a legal visit, which will be a contact visit, these are the only kind of contact visits prisoners are allowed to have, there's always a correctional officer stationed on a chair sitting behind the room in which the contact visit is taking place.

Q.    Next?

A.    This is the attorney visiting room. There were three of them. There are a total of six visiting rooms in the facility. Three are attorney visits. Visiting rooms, they are identical, they all look like this.

pg 196

S.D. - 42

75

The attorney or the prisoner sits on one side or the other. I can't tell which side the picture was taken. But they are identical basically on both sides.

And the, the contact visits are done in these three rooms. The day that I was there there was a contact visit with an inmate and an attorney taking place there.

Q. Next?

A. This is the social visiting area. There are, again, there are three of these rooms. So a prisoner sits on one side of the window and the, he and the visitor communicate over a telephone.

If a prisoner is getting a religious visit or visit from an outside organization that will take place in that room, in this non-contact visiting basis as well. So the only time a prisoner in this unit would have a contact visit would be on a legal, on a legal basis.

Q. And then the last photo I think is the, is this the exercise area?

A. Yes. So this, these, this is a photograph that the former warden of the facility, Mark Bezy, provided me with. I'd asked for photographs to be taken of this and also the cages that are in that inmate workroom, but for some reason or another I didn't receive them. But Mr. Bezy had a photograph of the outdoor exercise cage.

So you can see, a couple of things are notable.

pg 197

S.D. -42

76

One is that they are, they are clearly cages. They are larger than the cells obviously. And phase two prisoners who are approved to have an exercise partner can have, there can be two people in these cages.

The only equipment which is allowed out there is a basketball. There's a basketball hoop in each one of them. You can vaguely make it out up there.

The day I was there there were four men who were out. They were each individually exercising. They didn't have exercise partners. They were really just walking around the perimeter of the unit getting their exercise that way. They weren't, no one was playing basketball.

There are eight of these. It looks much longer -- it looks like a very long hallway, but it actually isn't. If you count them it actually adds up to eight. So this last one here is the eighth one.

And Mr. Sample told me that they rarely have -- almost never have that many people out there. And they oftentimes will separate them so they are not in adjoining, in adjoining cages. So there may be four people out there but they might be separated by a cage.

You can't, you can see, you can see it overhead here, but you can't see anything else. So there's no, there's no view here that you can actually, where you can actually see the outside world or nature or see a horizon or

pg 198

S.D.-42

77

anything like that.   You are on the roof of this facility.

The security housing unit inmates, the security housing unit is exactly the same configuration.  At least I was told that.  I didn't see it.  And it's underneath this.

So the security housing unit inmates exercise in cages like this, but instead of this sort of sky-like area, they have a ceiling or a roof over their head.  Otherwise the units are identical.

Q.    So going back to the definition of solitary confinement that you --

THE COURT:  Are we done with the photos?

MR. BURT:  I'm sorry?

THE COURT:  Are we done with the photos?  I just have one question.

MR. BURT:  Yes, Your Honor.

THE COURT:  Are you under any obligation, confidentiality obligation to the Bureau of Prisons with respect to these photos that I should also respect?

THE WITNESS:  I should defer that question to Mr. Burt.  I think there is an order which has been signed.  And I think it does probably --

MR. BURT:  I think the Court signed an order regarding the photos that were taken at, during the tour, the ones that are marked confidential in the program.  And the agreement was that those photos would be used only in

pg 199

S.D.-42

78

this case and then destroyed after they are used.  I believe I'm stating that correctly.

THE COURT:  Okay.

MR. BURT:  The photos that are not marked confidential were provided in discovery.  I did not think we have a confidentiality agreement as to those photos.  I certainly have no objection to it though if that's what the government wishes to do.

THE COURT:  All right.  Do you have a view about that?  I just want to be sensitive to the BOP security issues.

MR. BURNS:  That's very much appreciated, Your Honor.  We did discuss with BOP counsel regarding the photographs that were taken at Terre Haute last week.  And those were subject to a protective order.  We're not aware that there would be additional photographs described or used in this hearing.  We would similarly request that they be considered under the same protective order that exists.

THE COURT:  All right.  And then I haven't got it in the forefront of my mind, that provides for a sealing?  I just don't want them disseminated if the understanding is they wouldn't be.

MR. BURNS:  That's correct, Your Honor.  They can be used in this hearing and admitted as exhibits, but not disseminated beyond that.

pg 200

S.D.-42

79

THE COURT:  So I'll seal them in the Court's record.

MR. BURNS:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. BURT:  Thank you.

Q.    So, going back to your definition of solitary confinement, did you form an opinion as to whether the conditions you've just described constituted solitary confinement within the meaning of your definition here?

A.    Yes.  So I've asked to put the definition up again so we can be reminded of it.

And, again, this is a definition, I've quoted the Justice Department, but it's a commonly accepted definition of what constitutes isolation or solitary confinement.

Clearly, even under the best of circumstances, the prisoners who were in even phase two and who have been authorized to have a workout partner and have access to the leisure room, would qualify as being prisoners held in isolation or under solitary confinement.

The best case scenario in the SCU is 23 hours a day alone or with other prisoners that limits their contact with others. Most of the prisoners in that unit are experiencing solitary confinement for even more than 23 hours a day. If you have only an hour a day, five days a week, out of your cell, that averages out to more than 23

pg 201

S.O.-42

80

hours a day in your cell.

Q.    And are there certain ways in which the conditions here actually constitute a harsher version of solitary than what you've been describing?

A.    I think so.  And I've listed them on the next slide.

Q.    Would you elaborate on that?

A.    Yes.  It, the core of solitary confinement and the core pain and suffering that people experience is from social depravation.  But there are aspects of it that, I think, makes some units a little bit different than others.

And on most dimensions that I can think of this unit, and certainly for prisoners on phase two, but even those on phase three, really falls into the harsher version of or instance of solitary confinement.  It's not a particularly benign unit in terms of the way it's architecturally structured in terms of the procedures which people are subjected to.

So I've listed here, I've talked as we were going through it, that these are solid doors with small windows on the outside.  So you have very limited opportunity to even look out at what's going on inside, inside the housing unit.

A number of prison solitary confinement units, and I alluded to this earlier, actually have open bars.  And you have the experience oftentimes when you go into one of those units prisoners who hear the gate opening in the unit will

pg 202

S.D. - 42

81

put a mirror out of their cell to see whose coming in, coming into the unit.  So you have this, you have this experience where when you walk in there are people trying to figure out whose coming onto the unit.  And they have their, a mirror in their hand looking out their cell to see whose coming down the walkway.

That's a, you know, a way of, you know, very minimal way of participating in what's taking place in the environment.

Prisoners in these units, needless to say, don't have that opportunity.  And they -- what happens is you basically withdraw further into yourself when you have no, you have no connection whatsoever to what's going on in the hallway even.  Even at the level of looking at what's going on in the hallway, when somebody walks by, I mean, when I walked by, for example, there was not even any -- nobody even acknowledged the fact that anybody was in the hallway, let alone come up to the glass of their window and look out to see who was there.  I mean, these are prisoners who' have learned simply to withdraw further into their cell.

The, you know, I've said here on the second item that these are prisoners who rarely leave their cells.  I talked a moment ago about the feature of showering in your cells, which, again, in a modest way, but nonetheless, limits even incidental social contact that you might have or

pg 203

S.D.-42

82

opportunities to get out of your cell on a regular basis.

These are underpopulated units. You know, in, from a prison management perspective that's a good thing. Prisons that are overcrowded are hard to manage. But from a perspective of isolation it's a bad thing because it means that you can be separated by several cells even from anybody who is similarly isolated. So the opportunity to talk to somebody through a wall, as limited and difficult as that may be, is impossible in an environment where there are two or three cells that, in between you. And that's the norm in this unit. It's about half full or somewhat less than that.

And, you know, the one unit that I talked to you about already, at A Run, the first housing unit, has almost no one in it. And those prisoners are about as isolated from human beings as anybody could be.

The fourth thing I've listed here is there's no view of the outside world, horizon, or nature of any kind. This may sound like a little thing, but prisoners will tell you that being deprived the opportunity to actually see or experience nature in any way, even to see it or touch it, is not necessarily quite as painful as the inability to touch other human beings or to connect to them. But prisoners do experience this as a, as a painful form of deprivation.

This unit doesn't even allow prisoners to see outside. And that's unusual. Usually there's a little,

pg 204

S.D.- 42

83

there's a little sliver of window in the back of a cell that people can look out of if they want to. And, you know, it doesn't necessarily look out into a pleasant vista, but they can at least see the outside world. Or not necessarily the outside world, but a world outside of their cell.

The prisoners in this unit really don't get an opportunity to see anything on a regular basis except what exists inside that unit. And even when they go to the yard they can't see anything other than walls and a sky overhead, certainly, but no other, but no other view of anything else beyond that, beyond that unit.

And then I put down here the no contact visiting, which is not unusual. This is the norm in many solitary confinement units. But there is an additional issue here, which is that as the federal facility, this is a facility that houses people from around the country.

So prison, many prisons are located in remote areas of different, of whatever state they are located in. And the distances that visitors have to travel are sometimes daunting within a state. But if you take into consideration the fact that this, this is, the federal prison, this is a prison that serves the entire United States.

I looked on the Death Penalty Information Center, which identifies the, the place from which the prisoners on death row in the federal system were sentenced.

S.D.-42  pg 205

84

The death row is located in Indiana. There's only one prisoner from Indiana on death row. All of the other prisoners are from other states.

So you take into account the fact that these are non-contact visits and, and the, the limitation, the limited nature of the visiting itself, the kind of experience that a visitor would have visiting somebody on a non-contact basis. And then the geographical distances that many, if not most of the families, would have to travel in order to, in order to reach this place, it, it, it's a severe environment in the sense that the, that the visiting is going to be very challenging in an environment like this.

The day I was there, for example, there was nobody visiting. I can't, I mean I don't have any sense of how often visits occur, but I, I would expect to see that these, that the combination of the non-contact visits and the long distances involved would make it unlikely that people would be getting very many visits.

Q.    On top of those factors that you just discussed, are there unique aspects of the fact that this is a federal death row that add to the traumatic effects that you are talking about?

A.    Yeah, there are several additional issues.  I also tried to, tried to calculate from the Death Penalty Information Center the period of time, the length of time

Pg 206

S.D. - 42

85

that people are spending, have spent in this unit.  So there, at the time that they calculated this figure, and I think it was in 2015 was the latest data they had, there were 62 death sentenced prisoners in the United States.

Now, the reason -- the reason for the difference between 62 and 52 the day I was there, some of it has to do with people like Mr. Fell who are elsewhere.  So even though they are still on a sentence of death they are not housed at that unit.  But just from their, from the calculation of the date that they entered I was able to determine that 39 of the 62 death sentenced prisoners have been housed in the SCU for 10 years or longer.  Ten of them have been there for 18 years or longer, they are approaching their 20th or second decade at this facility.

Two things about that.  One is that those are long, those are long terms.  We're not talking -- remember I started earlier by saying prolonged has been defined by some groups as four weeks or longer.  We're talking about people who, most, the great majority of whom have been there 10 years and some, you know, significant number of them have been there 18.  But even perhaps more importantly, or equally important, it's intended to be a permanent isolated confinement.  So these are not people who have any expectation of coming to the end of their time in solitary confinement because they are going to, because they've moved

S.D.-42  pg 207

86.

through a step process or they've behaved well, or they've -- this is intended to be a -- the permanent conditions of their confinement until and unless the time of their execution.

And that's, that's the kind of indefinite duration of solitary confinement that, along with the actual amount of time someone is spending there, is recognized by, by most of us who study these issues as an added stressor, an added part of the trauma that people experience. That you, you have really no expectation that if you just do -- if you move through the right steps or you behave yourself or you engage, you do this program that you can control your own fate.

These are people who, who realize that absent the intervention of the courts on some other dimension of their life over which they have no control they are going to be there permanently.

And then, you know, I've put what is perhaps obvious, but I think important to emphasize, these are not people who are just or only in solitary confinement, as onerous and psychologically damaging as that can be, but they are all living under the additional stress of a pending, if not impending, death sentence and the associated stress and terror and uncertainty that comes with that.

Q.    Justice Breyer, in his Glossip dissent, in that portion

pg 208

S.D. -42

Case 2:23-cv-00491-JPH-MKK   Document 1-1   Filed 10/16/23   Page 190 of 220 PageID #: 210

87

you had quoted there, refers to the element of uncertainty. And we talked a little bit earlier about inmates who are given a sentence of death, an execution date and then moved off that phase three.

What role does uncertainty play in the process you are describing here? And is there a literature that speaks to that issue?

A.   Yes.   There is broad literature that speaks to the issue of uncertainty and how uncertainty adds to the stress and pain of aversive experiences or aversive events in people's lives.

Basically it intensifies the painfulness of the experience because it makes it difficult for people to adjust to whatever reality they are going to be forced to adjust to. They don't know their status. They don't know their state. They don't know what's going to happen to them or when it's going to happen to them.

And, you know, there's a literature well beyond the death penalty and the issues, the specific issues we're talking about. But showing when people are in situations where punishment is going to be applied, for example, not knowing when the punishment is going to occur is much more psychologically aversive or painful than if you actually have predictability.

In fact, some of the studies have involved

pg 209

S.D. - 42

88

something, where you have this experience repeatedly, it's called, a phenomenon that's called learned helplessness, where people are, they -- the bad things that happened to them are so unpredictable that they give up really trying to adjust to them or control them.

So broad literature shows that uncertainty, uncertainty about a negative event or painful event, a punishment or punishment event adds to the painfulness of it.

Q.    Did some of that literature come out of tortured situations?

A.    It does.  It absolutely does.  I mean, you, one of the things that -- torture protocols involved is imposing a unpredictable routine.  So somebody never knows when it's going to happen and they never know exactly what's going to happen.  And the idea is that that makes it all the more difficult -- all the more painful and also all the more difficult to resist.

Q.    So has that been studied in relation to the victims of that kind of trauma and what happens to them?

A.    Yes.  And the notion is this is part of the learned helplessness phenomenon that I talked about a moment ago. That what -- basically, it certainly doesn't happen to everybody, but it is designed to produce learned helplessness and undermine a person's ability to resist or

pg 210

S.D.-42

89

withstand what they are being subjected to.

Q.   All right.

MR. BURT:  Unless the Court had questions, I wanted to turn to the second area of your testimony which is the death qualification process.

THE COURT:  For the jurors?  The death qualification with respect to the jurors?

MR. BURT:  Correct.

THE COURT:  I was thinking maybe we should hear from the government at this point on this issue so we get people close in time.

MR. BURT:  Sure.

THE COURT:  You guys prepared for that?  Is that a good idea?

MS. JIMENEZ:  That's fine.  Can I just take a moment to organize?

THE COURT:  Take your time.  I know I sprung it on you.

CROSS EXAMINATION BY MS. JIMENEZ:

Q.   Good morning, Dr. Haney.

A.   Good morning.

Q.   So you talked a little bit about your background and your education.  I just want to clarify a couple of things. You do hold a JD but you are not a practicing attorney, correct?

Pg 211

S.D.- 42



**U.S. Department of Justice**

Criminal Division

---

*Office of Administration*                                    *Washington, D.C. 20530*

July 23, 2024

Mr. Brandon Council #63961056,
U.S.P Tere Haute
P.O. Box 33
Terre Haute, IN 47808

Dear Mr. Council:

Thank you for writing the Department of Justice, Criminal Division providing evidence of the U.S. illegally utilizing slavery, torture, and capital punishment. We have been asked to respond on their behalf.

The Department of Justice, after reviewing your correspondence, has determined that the issues as presented do not provide sufficient details or evidence to warrant action by this office. From the information that you have provided, it appears that your concerns have already been submitted to the proper authorities. Consequently, we are unable to assist you at this time.

Again, thank you for writing the Department of Justice, Criminal Division. We regret that we cannot be of further assistance.

Sincerely,

Correspondence Management Staff
Office of Administration

Reference Number: NM302132791
*For further correspondence please email criminal.division@usdoj.gov. Should you wish to speak to a representative please call (202) 353-4641 and provide the reference number.*

pg 212